**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re application of BTA BANK
for an Order to Take Discovery Pursuant to 28
U.S.C. §1782

Misc. No. _____

## MEMORANDUM OF LAW IN SUPPORT OF THE *EX PARTE* APPLICATION OF BTA BANK FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for BTA Bank*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND .................................................................................................. 1

   A.   Mukhtar Ablyazov Embezzled Billions From BTA Bank through Fraud and Self-Dealing 2

   B.   BTA Brings Claims Against Ablyazov in the U.K., and KPMG is Appointed by the Court as Global Receiver ................................................................................ 4

   C.   Zhaikmunai LLP Was One Such Fraudulently Obtained Asset of Ablyazov's................. 7

   D.   Zhaikmunai Raised Hundreds of Millions Through Issuance of Global Depository Receipts Held by BNY Mellon ...................................................................... 8

   E.   BTA Is a Recognized Victim of Crime in the Republic of Kazakhstan's Ongoing Investigations of Ablyazov and his Coconspirators.......................................... 10

ARGUMENT ................................................................................................... 11

   A.   The Statutory Prerequisites are Satisfied Here ............................................. 11

      1.   The Subject of Requested Discovery, The Bank of New York Mellon, Resides in this District.......................................................................................... 11

      2.   The Requested Discovery is Sought for Use in a Proceeding before a Foreign Tribunal 13

      3.   BTA is an Interested Person ..................................................................... 18

   B.   The *Intel* Factors Weigh In Favor of Granting Discovery Here ....................................... 20

      1.   BNY Mellon is Not a Participant in any Contemplated Foreign Proceeding ............... 21

      2.   The Proposed Subpoena Would Not Offend A Foreign Tribunal ................................ 21

      3.   The Proposed Subpoena Does Not Circumvent Foreign Proof Gathering Restrictions or Policies of a Foreign Country or the United States...................................................... 22

      4.   The Proposed Subpoena Is Not Unduly Intrusive or Burdensome ............................. 23

CONCLUSION ................................................................................................ 23

## TABLE OF AUTHORITIES

**Cases**

*Brandi–Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76 (2d Cir.2012) .............. 14, 16, 23

*Certain Funds, Accounts and/or Inv. Vehicles v. KPMG LLP*, 798 F.3d 113 (2d Cir. 2015)  16, 21

*Deposit Ins. Agency v. Leontiv*, No. 17-MC-00414 (GBD) (SN), 2018 WL 3536083 (S.D.N.Y. July 23, 2018)................................................................................................................... 26

*Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095 (2d Cir. 1995).................................... 25

*Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24 (2d Cir. 1998)........................................ 16, 17

*Gorsoan Ltd. v. Bullock*, 652 F. App'x 7 (2d Cir. 2016)............................................... 25

*In re Application of Children's Investment Fund Foundation (UK)*, No. 18-MC-104 (VSB), 2019 WL 400626 (S.D.N.Y. Jan. 30, 2019) ............................................................ 19

*In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, No. CIV.M19-88 BSJ, 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006)........................................................................... 14

*In re Application of Hill*, No. M19-117 (RJH), 2005 WL 1330769 (S.D.N.Y. June 3, 2005) 17, 18

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 921 F. Supp. 2d 56 (S.D.N.Y. 2013) ................................................................................................................................ 15

*In re Ex Parte Application of Glob. Energy Horizons Corp.*, No. 5:15-MC-80078-PSG, 2015 WL 1325758 (N.D. Cal. Mar. 24, 2015)............................................................... 24

*In re Kiobel*, No. 16 CIV. 7992 (AKH), 2017 WL 354183 (S.D.N.Y. Jan. 24, 2017)................ 15

*In re Kolomoisky*, No. M19-116, 2006 WL 2404332 (S.D.N.Y. Aug. 18, 2006)........................ 14

*In re Mare Shipping Inc.*, No. 13 Misc. 238, 2013 WL 5761104 (S.D.N.Y. Oct. 23, 2013) ....... 15

*In re Minatec Fin. S.A.R.L.*, 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008).............................. 24

*In re Postalis*, No. 18-mc-497 (JGK), 2018 WL 6725406 (S.D.N.Y. Dec. 20, 2018) ................ 15

*In re Republic of Kazakhstan*, 110 F. Supp. 3d 512 (S.D.N.Y. 2015)............................. 14, 15, 25

*In re Simetra Global Assets Ltd.*, No. 16-2389 (JLL) (JAD), 2016 WL 3018692 (D.N.J. May 25, 2016) ............................................................................................................. 17

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ......... 16, 20, 21, 22, 23, 24, 25

*Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38 (2d Cir. 1996).................................. 17, 18

*ln re Godfrey*, 526 F. Supp. 2d 417 (S.D.N.Y. 2007) .................................................... 14

*Mees v. Buiter*, 793 F.3d 291 (2d Cir. 2015) ................................................... 14, 16, 23, 25

*Metallgesellschafi v. Hodapp*, 121 F.3d 77 (2d Cir. 1997)............................................... 23, 25

*Schmitz v. Bernstein Liebhard & Lifshitz LLP*, 376 F.3d 79 (2d Cir.2004)................................. 14

**Statutes**

28 U.S.C. § 1782........................................................................................................ 17, 21

Applicant BTA Bank ("BTA") respectfully submits this memorandum of law in support of its *ex parte* application for an order pursuant to 28 U.S.C. §1782 ("Section 1782") to take discovery in the Southern District of New York for use in a foreign proceeding ("the Application"). Section 1782 allows an applicant to take discovery in the United States for use in a foreign proceeding if certain standards are met, which BTA has met here.

## PRELIMINARY STATEMENT

As the courts of the United Kingdom have already found, BTA Bank – formerly the largest financial institution in the Republic of Kazakhstan – was defrauded of billions of dollars by its former Chairman.  Under Kazakhstan law, BTA is a recognized victim of crime and as such an active participant in various on-going criminal investigations and prosecutions there. Through this petition, BTA seeks a limited range of evidence from a New York-based financial institution in support of BTA's participation in an ongoing court-ordered receivership in the United Kingdom, as well as in furtherance of BTA's right to submit evidence and participate in the criminal proceedings in Kazakhstan. This Court has already granted three previous requests for judicial assistance under 28 U.S.C. § 1782 in aid of the above-mentioned U.K. proceedings, and the present request is similarly relevant, discrete, and appropriate.

## BACKGROUND

Mukhtar Ablyazov was the Chairman of BTA Bank from May 2005 until February 2009. During that time, he looted billions of dollars from BTA, in part through a complex scheme directing billions of dollars in sham loans from BTA to valueless entities Ablyazov himself owned, which would then be obscured by transfers among different shell corporations, and never repaid. After years of litigation in the High Court of England and Wales, including the imposition of worldwide freezing orders and a global receivership overseen by court-appointed receivers,

BTA was granted billions of dollars in judgments against Ablyazov.

A. **Mukhtar Ablyazov Embezzled Billions From BTA Bank through Fraud and Self-Dealing**

In or about 1998, Ablyazov formed BTA Bank with his business partner, Yerzhan Tatishev. Shortly thereafter, Ablyazov passed day-to-day control of BTA to Tatishev, while retaining a plurality interest in the bank, in order to become Kazakhstan's Minister of Energy, Industry, and Trade. In 1999, however, Kazakh authorities opened an investigation into Ablyazov's conduct while Minister, based on allegations of abuse of his position. Ablyazov was ultimately convicted and sentenced to six years' incarceration for political corruption, although his sentence was commuted and he was released after less than nine months in prison. After his release in 2003, Ablyazov left Kazakhstan and took up residence in Russia.

In 2005, Ablyazov returned to Kazakhstan and took control of BTA Bank after the untimely death of Tatishev,[1] who had remained BTA's chairman during Ablyazov's time as Minister as well as during the subsequent investigation and Ablyazov's imprisonment and exile. After Tatishev's death, Ablyazov rapidly acquired virtually complete control of BTA and was able to establish complete dominion over the Bank.

As the Courts of the United Kingdom have found, after replacing Tatishev as Chairman, Ablyazov exercised almost unfettered control over the bank's operations, while hiding that control from Kazakhstan's banking regulators. Ablyazov then used this dominion over the bank to treat BTA's assets as his own. As Justice Teare of the High Court of England and Wales (Commercial Court) ultimately found:

---

[1] In late 2018, Ablyazov was convicted of ordering Tatishev's murder. KazTAG, Ablyazov sentenced life term for murder (Nov. 27, 2018), https://kaztag.info/en/news/ablyazov-sentdenced-life-term-for-murder.

[P]rior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted to owning over 75% of the shares in the Bank. Those shares were not held by Mr. Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In January 2009, shortly before the nationalisation of the Bank, the AFN requested Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank. He replied on 19 January 2009 that he did not own directly or indirectly more than 10% of the shares in the Bank. That statement was untrue.

*      *      *

Banks in Kazakhstan tend to be operated in a different manner from that in which they are typically operated in the West. It is common for banks to be owned by a single shareholder who is both chairman of the board of directors and also closely involved in the management of the bank. He therefore has considerable influence over the operation of the bank. Mr. Ablyazov's relationship with the Bank conformed with this general description of Kazakh banking practice. Thus Mr. Talvitie, the independent member of the Board of Directors of the Bank from East Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov had already made the decisions. He described the other members of the board as "straw men". Others in the Bank, below board level, had the same impression. Thus Ms. Tleukulova (a member of the Credit Committee) gave evidence in Russia in 2012 that "all top managers of the bank, including Board Members, have to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr. Ablyazov was "the main" person in the Bank who controlled the granting of the largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated by his issue of an order ("the Ablyazov Order") whereby he, as Chairman, amended certain procedural rules governing the grant of loans.

*      *      *

[O]fficers and staff in the Bank did not draw a clear distinction between the Bank having an interest in a project and Mr. Ablyazov, as shareholder in the Bank, having a personal interest in a project. Thus [Deputy Chairman] Zharimbetov, when being crossexamined, failed to draw a clear distinction, in the context of the offshore companies with which he dealt, between Mr. Ablyazov and the Bank. Thus the unfortunate reality appears to have been that little, if any, distinction was drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's property. The Vitino port project was an example of that reality. Mr. Khazhaev told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.[2]

As a result of Ablyazov's siphoning billions out of the Bank, in 2009, BTA defaulted on

billions of dollars of debt. Following this default, Kazakhstan's sovereign wealth fund, Samruk-

---

[2] *JSC BTA Bank v. Ablyazov et al.* [2013] EWHC (Comm) 510 [15], [19], [29].

Kazyna, was forced to take control of BTA and bail the bank out. As these events unfolded,

Ablyazov fled to London.

BTA's collapse was international news. As the New York Times reported in November of

2009:

> From 2003 to 2008, the likes of Credit Suisse, Morgan Stanley, Royal Bank of Scotland, ING and others funneled more than $10 billion in loans into Kazakhstan's largest bank, Bank Turalem, as the large Central Asian country enjoyed a growth boom spurred by its rich deposits of oil and natural gas.
>
> So many of these loans are now bust that many foreign banks are facing write-offs of as much as 80 percent of their value, prompting investigations into why the loans went so bad so fast, according to officials at Bank Turalem, which was taken over by the government earlier this year. Hoping to become the dominant bank in the region, BTA, as the bank is known, cast its eye well beyond Kazakhstan and lent billions of dollars to finance vast real estate projects in Russia and Ukraine, as well as offshore companies with vague business plans and no trading histories to speak of, according to executives at BTA who did not want to be identified because of the sensitivity of the matter. The money went to companies with names like Best Catch Trading and Sandown Holding, based in places as diverse as the Seychelles, the British Virgin Islands and England, that offered up little in the way of collateral, according to these executives.
>
> Among other things, prosecutors in Kazakhstan and a team of international lawyers and accountants hired by Bank Turalem are investigating whether the foreign banks may have unwittingly financed a scheme by BTA's former chairman, Mukhtar Ablyazov, to direct between $8 billion and $12 billion worth of BTA loans — about half of the bank's loan book — to companies that he secretly controlled, according to lawyers representing BTA as well as prosecutors in Kazakhstan.[3]

**B.  BTA Brings Claims Against Ablyazov in the U.K., and KPMG is Appointed by the Court as Global Receiver**

After Ablyazov's flight from Kazakhstan, BTA commenced a series of lawsuits against

him in London, alleging that he had misappropriated billions of dollars pursuant to these

---

[3] Landon Thomas Jr., *Kazakh Bank Lost Binnions in Western Investments* (Nov. 27, 2009), https://www.nytimes.com/2009/11/28/business/global/28kazakh.html.

fraudulent schemes.  In all, BTA commenced at least eleven proceedings against Ablyazov and his co-conspirators for defrauding BTA in excess of $6 billion.

On November 12, 2009, shortly after filing the first action against Ablyazov in London., the U.K. courts took the previously unprecedented legal step of granting BTA a worldwide freezing order over Ablyazov's assets, which was periodically amended and supplemented by additional orders as the scope of Ablyazov's network of nominees and offshore companies was slowly uncovered (collectively, the "Worldwide Freezing Orders").

From November of 2009 onwards, the Worldwide Freezing Orders specifically prevented Ablyazov from diminishing or alienating any of his assets without prior notification and consent of BTA's counsel and the U.K. courts, including any assets held by others on Ablyazov's behalf or for his benefit, with the exception of a specified monthly living allotment. Ablyazov was also obligated to truthfully disclose his assets, so that the Worldwide Freezing Orders could be effectively enforced.

In reality, Ablyazov repeatedly and willfully defied these disclosure obligations and the Worldwide Freezing Orders, leading the U.K. courts to grant BTA a series of search and disclosure orders. Through these orders, BTA uncovered evidence of a vast network of undisclosed companies and assets used by Ablyazov to hold and invest his stolen wealth. In response, the U.K. courts then ordered Ablyazov's assets to be put in the receivership of the accounting firm KPMG (the "Receivership Orders"), based on findings that Ablyazov had breached the Worldwide Freezing Orders against him. [Declaration of I.B. Ayukhanov ("Ayukhanov Dec.") Ex. C.]

The Receivership Orders directed court-appointed partners at KMPG Jeremy Outen, John Milson, and David Standish (the "Receivers") to take control of and recover Ablyazov's network

of hundreds of offshore entities used to launder billions of dollars. [Declaration of Andrew L. Chesley ("Chesley Dec.") Ex. 6 ¶¶ 6-12.] The receivers were empowered to seek out Ablyazov's assets of their own accord, or based on information supplied through BTA's global investigation of Ablyazov's money-laundering network. [*Id.*]

Ablyazov nonetheless continued to flout both the Worldwide Freezing Orders and Receivership Orders, refusing to truthfully disclose his assets, and moving assets to hide them from the Receivers. Ultimately, Ablyazov was held in criminal contempt by the U.K. courts and sentenced to 22 months' incarceration.  Shortly before his sentencing in February of 2012, however, Ablyazov fled the U.K., despite having promised the court his attendance at his contempt hearing. Ablyazov left behind a 100-acre estate in the English countryside and a London mansion, valued at least 20 million pounds sterling (approximately $31 million) each, and no fewer than 750 shell companies. Ablyazov remained in hiding for over a year, before ultimately being apprehended in France in 2013 on Russian and Ukrainian arrest warrants.

In light of Ablyazov's criminal contempt and flight, his defenses in the U.K. proceedings were struck and BTA was awarded more than $4 billion in judgments by the U.K. Courts, with interest continuing to accrue.  On November 6, 2012, the U.K. Court of Appeal unanimously upheld the judgments and contempt orders against Ablyazov.  Concurring in the judgment, Lord Justice Maurice Kay stated that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov."  *JSC BTA Bank v. Ablyazov et al.* [2012] EWCA (Civ) 1411 510 [202].

At this time, both BTA and the Receivers are continuing to identify and locate Ablyazov's shell companies and nominees so that they may be placed into receivership. As one example, in 2016, BTA identified certain property in the state of Virginia funded with Ablyazov's assets.

BTA then informed the Receivers, and in conjunction with the Receivers, is now seeking to enforce against those assets. Just last month, BTA and the Receivers prevailed at trial against Ablyazov's sister, who nominally owned the assets. Post-trial motions are pending. [4]

## C. Zhaikmunai LLP Was One Such Fraudulently Obtained Asset of Ablyazov's

One such asset BTA is continuing to investigate is Ablyazov's interest in a massively profitable oil development named Zhaikmunai LLP.

When Ablyazov assumed control of BTA after Tatishev's death, he accordingly assumed control of a range of investments made with BTA's funds and owing to BTA. This included an investment of more than $100 million in BTA's funds in Zhaikmunai LLP, a limited partnership that owned the rights to an enormous oil and gas field in eastern Kazakhstan.

BTA's internal accounting records show that the Zhaikmunai Investment was funded by BTA. Between July 7, 2004 and August 20, 2004, through a series of shell companies including "Tradestock Inc.," $103,000,000 was transferred to Zhaikmunai's parent company from BTA through four separate shell companies. When Ablyazov seized control of BTA, he also assumed control of Tradestock and the Zhaikmunai Investment. This is reflected in internal BTA correspondence among Ablyazov's top lieutenants shortly after Ablyazov took control of BTA, who repeatedly referred to Tradestock as now "under our control." Zhaikmunai's former CEO has also publicly admitted in response to reporting by the Organized Crime and Corruption Reporting Project (the "OCCRP"), that while the Zhaikmunai Investment was made during Tatishev's chairmanship of BTA, after Tatishev's death, Ablyazov assumed control of the Zhaikmunai Investment along with the rest of BTA. *See* Aubrey Belford et al., Steppe to Soho: How Millions Links to Kazakhstan Mega Fraud Case Ended up in Trump Property, ORGANIZED CRIME AND

---

[4] The caption for this action is *BTA Bank v. Kussainova*, Case No. CL-2016-8335 (Va. Cir. Ct. Fairfax Cty.). BTA Bank and the receivers obtained a favorable jury verdict on March 20, 2019.

CORRUPTION REPORTING PROJECT (June 25, 2018), https://www.occrp.org/en/investigations/8248-steppe-to-soho-how-millions-linked-to-kazakhstan-mega-fraud-case-ended-up-in-trump-property.

While the Zhaikmunai Investment was funded by BTA, as he did with billions of dollars in other investments made with BTA's funds, Ablyazov treated the Zhaikmunai Investment as his own. Ablyazov did not disclose his control of the Zhaikmunai Investment, even when ordered to disclose his assets under the Worldwide Freezing Orders and Receivership Orders.

While Ablyazov ultimately controlled the Zhaikmunai Investment, Zhaikmunai operated publicly and on a day to day basis at the direction of its then-CEO, Frank Monstrey. At no point did Ablyazov disclose his control of or interest in Zhaikmunai, and to this day, continues to deny any connection to the asset.[5]

**D.**   **Zhaikmunai Raised Hundreds of Millions Through Issuance of Global Depository Receipts Held by BNY Mellon**

Between 2007 and 2008, Zhaikmunai sought to raise capital through an initial public offering of global depository receipts ("GDRs") of membership units in the company.

Foreign companies like Zhaikmunai frequently want to access the global capital markets but are not able to sell U.S. dollar-denominated equity shares without the aid of a U.S.-based bank. One such provider of this service is BNY Mellon, which provides a range of services to issuers of shares through depository receipts. GDRs are one such vehicle by which investors may invest in a foreign company through a bank that manages all currency and other local issues with the issuing company. In other words, BNY Mellon acts as a depository for a foreign company's equity, holding all shares, and allows the public to purchase and sell a foreign company's shares without actually taking possession of the instruments – instead receiving receipts.

---

[5] In 2015, BTA identified and brought sealed proceedings against Monstrey in the U.K., which led to Monstrey stepping down as CEO of Zhaikmunai's successor company, Nostrum Oil & Gas, PLC.

BNY Mellon describes its depository bank services on its website, where it advertises that "more corporate issuers choose BNY Mellon as their depository bank than any of our competitors." [Chesley Dec. Ex. 1]  Specifically, BNY Mellon notes that it has a 55% market share for EMEA (Europe, Middle East, and Africa) depository receipts, and a 53% market share for energy depository receipts. Nostrum is a Dutch energy company. To companies like Nostrum, BNY Mellon states that it "oversee[s] custody arrangements in local markets"; "act[s] as the issuance and cancellation agent to the registrar and transfer agent for registered [depository receipt] holders"; and "support[s] a wide range of corporate actions services, including capital raises, cross-border merger or acquisition, dividend payments and extending voting rights." [*Id.* Ex. 2.]

Zhaikmunai first publicly announced its intention to list GDRs through BNY Mellon in 2007. [*Id.* Ex. 7.] This listing was unsuccessful, however, and Zhaikmunai reportedly was required to execute a corporate restructuring to resolve unspecified issues prior to attempting a second listing. Zhaikmunai successfully publicly issued GDRs, with BNY Mellon as the depository bank, in 2008. [*Id.* Ex. 8.] At that time, Zhaikmunai offered 10 million GDRs, at $10 per unit, representing 9.1 per cent of the equity of Zhaikmunai. This issuance reportedly valued Zhaikmunai at $1.1 billion, and raised an estimated $100 million. [*Id.*] The next year, in 2009, Zhaikmunai reportedly issued 50 million GDRs in one issuance, raising $200 million, and then 75 million more GDRs, raising an additional $300 million. [*Id.* Ex. 10.] In all, Zhaikmunai raised a reported $600 million in under two year through issuances of GDRs, and BNY Mellon acted a depository for each of these GDR issuances and listings, holding all of the related receipts on behalf of the purchasers. [*Id.* Exs. 10, 11.]

In or about 2015, Zhaikmunai changed its name to Nostrum Oil & Gas PLC ("Nostrum"), and currently trades under that name. BNY Mellon lists Nostrum on its depository receipts directory under the symbol NSTRY with a CUSIP (Committee on Uniform Security Identification Procedures) number of 66980J103 and an International Securities Identification Number of US66980J1034. [*Id.* Ex. 12.] For March 2019, BNY Mellon reports that 8,100 Nostrum depository receipts were traded and that the average daily trading volume for Nostrum was 4,050 depository receipts.  [*Id.*]

E.   **BTA Is a Recognized Victim of Crime in the Republic of Kazakhstan's Ongoing Investigations of Ablyazov and his Coconspirators**

In addition to BTA's pursuit of Ablyazov and his co-conspirators through civil litigation, BTA is also a recognized victim of crime in criminal proceedings in the Republic of Kazakhstan. Kazakhstan law enforcement continues to investigate Ablyazov and his co-conspirators for the purposes of bringing appropriate criminal proceedings. At BTA's request, Kazakh law enforcement authorities are now actively investigating Ablyazov's interest in Tradestock and the Zhaikmunai Investment, and possible false representations by Ablyazov and his co-conspirators regarding the same matters.

In the Kazakh criminal justice system, a recognized crime victim (or "complainant") has broad rights to participate in criminal investigations and prosecutions, including the right to assist with the investigation, receive copies of investigation and court materials, support the case at trial and on appeal, and submit formal complaints in response to inaction by prosecutors. [Ayukhanov Dec. ¶¶ 3-4, Ex. A at 2-3.]

BTA is now seeking evidence from BNY Mellon, in the form of the attached subpoena (the "Requested Discovery") [Chesley Dec. Ex. 13], for two purposes: *first*, to continue to investigate Ablyazov's network of nominees and shell companies for the purposes of bringing

10

appropriate receivership proceedings in connection with the U.K proceedings and the

Receivership Orders, and *second*, to collect evidence to be submitted to Kazakh criminal

investigative authorities in BTA's role as a recognized victim of crime.

## ARGUMENT

### A.  The Statutory Prerequisites are Satisfied Here

Section 1782 authorizes federal courts to compel discovery in aid of a foreign proceeding

where:

1) the person from whom discovery is sought resides (or is found) in the
   district of the district court to which the application is made,
2) the discovery is for use in a foreign proceeding before a foreign tribunal,
   and
3) the application is made by a foreign or international tribunal or any
   interested person.

*Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015) (*quoting Brandi–Dohrn v. IKB Deutsche*

*Industriebank AG*, 673 F.3d 76, 80 (2d Cir.2012)). "Once the statutory requirements are met, a

district court is free to grant discovery in its discretion." *Schmitz v. Bernstein Liebhard & Lifshitz*

*LLP*, 376 F.3d 79, 83-84 (2d Cir.2004).

1. The Subject of Requested Discovery, The Bank of New York Mellon, Resides in this
   District

A federal court's power to compel discovery extends to any "person" — both individuals

and legal entities — who (i) resides in, or (ii) is found in the district over which the court

presides. 28 U.S.C. § 1782(a).   Where a corporation "maintains its headquarters in New York" it

"is 'found' within this district." *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*,

No. CIV.M19-88 BSJ, 2006 WL 3844464, at *4 (S.D.N.Y. Dec. 29, 2006); *see also In re*

*Kolomoisky*, No. M19-116, 2006 WL 2404332, at *1-2 (S.D.N.Y. Aug. 18, 2006) (respondent

corporation located and incorporated in New York). Alternatively, a business is "found in" a

11

district if it would be subject to personal jurisdiction in that district by virtue of its systematic

and continuous activities there, even if its place of incorporation or headquarters is outside the

district. *See In re Republic of Kazakhstan*, 110 F. Supp. 3d 512, 515 (S.D.N.Y. 2015) (*citing ln*

*re Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007)).

Here, The Bank of New York Mellon Corporation ("BNY Mellon") is a Delaware

corporation headquartered in this District, at 240 Greenwich Street, New York, New York,

10007. [Chesley Dec. Ex. 3.] This is also the address identified on its public SEC filings, [*see,*

*e.g., Id.* Ex. 4], and BNY Mellon's public website similarly locates the company in New York,

[*Id.* Ex. 5]. Previous judicial decisions have found that BNY Mellon has its principal place of

business in New York. *See, e.g., In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 921

F. Supp. 2d 56, 63 (S.D.N.Y. 2013).

To the extent that BNY Mellon was acting on behalf of or managing documents for an

affiliated entity located outside this District, the standard is still met. Courts in this district have

found that, for a § 1782 claim, it is enough that the respondent resides in this district, even if the

"real party in interest" resides elsewhere. *See In re Mare Shipping Inc*., No. 13 Misc. 238, 2013

WL 5761104, at *3 (S.D.N.Y. Oct. 23, 2013) ("[I]t is sufficient that a respondent law firm

resides in this district, even if the real party in interest, the client, resides elsewhere."); *see also*

*In re Kiobel*, No. 16 CIV. 7992 (AKH), 2017 WL 354183, at *2 (S.D.N.Y. Jan. 24, 2017)

(granting §1782 request and rejecting respondent's claim that is was "not the real 'person from

whom discovery is sought' because it [was] merely a custodian of documents"); *In re Republic*

*of Kazakhstan,* 110 F. Supp. 3d at 515 (granting §1782 discovery over respondent headquartered

in U.K., where New York and U.K. offices "operate as a single law firm"). BNY Mellon resides

in New York, and can be ordered to produce responsive evidence, even if it claims to only to be

maintaining that evidence on behalf of related entities residing outside the District. This extends

to documents that may be held by foreign subsidiaries of BNY Mellon; because BNY Mellon

resides in New York, it must produce all documents within its custody or control (including

those directly controlled by foreign subsidiaries). *See In re Postalis*, No. 18-mc-497 (JGK), 2018

WL 6725406, at *3 (S.D.N.Y. Dec. 20, 2018) (concluding that Section 1782 application related

to proceeding against Brazilian BNY Mellon subsidiaries and was properly submitted to BNY

Mellon in the Southern District of New York, while denying application on other grounds).

2. The Requested Discovery is Sought for Use in a Proceeding before a Foreign Tribunal

Discovery may be ordered "for use in a proceeding in a foreign or international tribunal,

including criminal investigations conducted before formal accusation." 28 U.S.C. § 1782(a). The

term "tribunal" includes investigative, administrative, arbitral, and quasi-judicial bodies or any

"first-instance decisionmaker."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258

(2004). Even where the foreign proceeding has not been filed, this "for use" requirement is still

satisfied if the foreign proceeding is within "reasonable contemplation." *Id.* at 259 (foreign

proceeding need not be "pending" or "imminent."). To meet this "reasonable contemplation"

standard, a petitioner "must provide some objective indicium that the action is being

contemplated . . . . At a minimum, a § 1782 applicant must present to the district court some

concrete basis from which it can determine that the contemplated proceeding is more than just a

twinkle in counsel's eye." *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG LLP*, 798 F.3d

113, 123-24 (2d Cir. 2015). The statutory phrase "for use in" is broadly defined to include

anything "that will be employed with some advantage or serve some use in the proceeding."

*Mees*, 793 F.3d at 298. To be discoverable under the statute, the evidence does not need to be

admissible or even discoverable in the foreign tribunal. *Intel*, 542 U.S. at 260; *Mees*, 793 F.3d at

302; *Brandi–Dohrn*, 673 F.3d at 81-82.

The ongoing or reasonably contemplated proceeding must be "adjudicative in nature." *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998). Courts in this District have established the parameters of proceedings that are adjudicative (and non-adjudicative) in previous decisions. In *In re Application of Hill*, No. M19-117 (RJH), 2005 WL 1330769 (S.D.N.Y. June 3, 2005), this Court explained the difference between *Euromepa*, in which the Second Circuit found that a foreign proceeding was not adjudicative, and an earlier case, *Lancaster Factoring*, that came out the other way. *In re Hill*, 2005 WL 1330769, at *3. *Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38 (2d Cir. 1996) involved an Italian bankruptcy proceeding, and the Second Circuit found that "[a] bankruptcy proceeding . . . is one in which the value of the debtor's estate is adjudicated" and therefore it falls "within the intended scope of § 1782." *Id.* at 42; *see In re Hill*, 2005 WL 1330769, at *3. But later, in *Euromepa*, "a French bankruptcy proceeding was deemed to be merely an enforcement proceeding enabling a corporation to enforce an extant judgment . . . ." *In re Hill*, 2005 WL 1330769, at *3 (citing *Euromepa*, 154 F.3d at 28). As a result, "the pending French bankruptcy proceedings did not involve the adjudication of any claims or rights vis-à-vis the insurer and insured." *Id.* (citing *Euromepa*, 154 F.3d at 28).

BTA satisfies the requirement that the Requested Discovery here is sought "for use" before a foreign tribunal for two independent reasons:

First, BTA seeks to collect and use the Requested Discovery in aid of the Receivership Orders in the U.K. Proceedings. At this time, the Receivers are continuing to identify and administer Ablyazov's assets, entities and nominees, in accordance with the Receivership Orders, and BTA is continuing to investigate and provide evidence to the Receivers in support of

14

those court-appointed duties. There is no question that the U.K. Proceedings constitute a "proceeding in a foreign or international tribunal." *See In re Simetra Global Assets Ltd.*, No. 16-2389 (JLL) (JAD), 2016 WL 3018692, at *3 (D.N.J. May 25, 2016) (concluding that civil proceeding before the U.K. High Court of Justice "satisfies § 1782's 'foreign tribunal' requirement" (quoting 28 U.S.C. § 1782)). And there is similarly no question that the U.K. Proceedings are "adjudicatory."

The Receivers in the U.K. Proceedings are like the court-appointed liquidators in *In re Hill*, the case that explained the distinction between *Lancaster Factoring* and *Euromepa*. *In re Hill*, 2005 WL 1330769, at *3. The Court in that case noted that the liquidators were "court-appointed officer[s]" and exercised "both administrative and adjudicative powers." *Id.* Specifically, the liquidators were "empowered to take into their custody all property and choses of action; to identify, pursue and realize assets of the [target] company; to receive, evaluate and adjudicate creditor claims; and to distribute assets to creditors." *Id.* The Receivers are similarly empowered by the U.K. High Court to take into their possession all property belonging to or traceable to Ablyazov until Receivers themselves "certify that they have control over assets with a value exceeding" the value of the property covered by the Global Freezing Orders. [Ayukhanov Dec. Ex. C ¶ 5.] The Receivers have discretion to decide which properties to pursue among the hundreds specifically identified in the Receivership Order and its addendums. That discretion allows the Receivers to "take all such steps as may seem expedient to recover and preserve" Ablyazov's assets. [*Id.*] More specifically, the Receivers have the explicit power to "bring or defend any action or other legal proceeding in the Courts of this or any other country in order to achieve the purposes of the receivership." [*Id.* at 51.]

Court-appointed agents acting in aid of a foreign tribunal, like the Receivers, are widely

recognized as permissible applicants for discovery under Section 1782.  *See In re Hill*, 2005 WL 1330769, at *5 (finding that "for use" requirement met when discovery sought in aid of "court-appointed trustees pursuing assets on behalf of the debtor estates."); *Lancaster Factoring*, 90 F.3d at 42 (discovery in aid of duties of "court-appointed provisional guardians" satisfied §1782's "for use" requirement).

Earlier this year, in *In re Application of Children's Investment Fund Foundation (UK)*, No. 18-MC-104 (VSB), 2019 WL 400626, at *7 (S.D.N.Y. Jan. 30, 2019), Judge Broderick granted a Section 1782 application for discovery in aid of Mauritius court-appointed liquidators, noting that the liquidators exercised adjudicatory powers because they were empowered to make "decision[s] . . . subject to judicial review." *Id.* (internal quotation marks omitted). Here, the court-appointed receivers in the U.K. Proceedings serve a nearly identical role to that in *Children's Investment Fund*. The Receivers, both independently and based on information discovered and turned over to them by BTA, continue to identify and administer and, as appropriate, bring necessary proceedings against Ablyazov's assets and the shell companies and nominees holding them for his benefit. Their appointment and decisions are subject to review by the U.K. High Court, to which the Receivers must issue periodic reports. [Ayukhanov Dec. Ex. C ¶¶ 4, 15].

In fact, this Court has already granted discovery in aid of these very same receivership proceedings three times in prior Section 1782 applications in this district, seeking correspondent banking information and corporate materials from various banks and companies. *See* Order at 1, *In re Application of Outen*, No. 13-mc-00002-P1 (ECF No. 5) (S.D.N.Y. Jan. 4, 2013); Order at 1, *In re Application of Outen*, No. 13-mc-00001-P1 (ECF No. 6) (S.D.N.Y. Jan. 4, 2013); Order at 1, *In re Application of Outen*, No. 11-mc-00291-P1 (ECF No. 6) (S.D.N.Y. Aug. 19, 2011);

16

Order at 1, *In re Application of Outen*, No. 11-mc-00066-P1 (ECF No. 5) (S.D.N.Y. Mar. 28, 2011).

Second, BTA seeks to use the requested discovery in the pending criminal investigation and proceedings against Ablyazov and his co-conspirators being conducted by the Kazakhstan Anti-Corruption Bureau and General Prosecutor's Office. [Ayukhanov Dec. ¶¶ 3-16.] The Anti-Corruption Bureau is an official investigative body of the Republic of Kazakhstan. [*Id.* ¶ 5.] The Anti-Corruption Bureau has discretion to issue an indictment which is ultimately submitted to the Kazakhstan prosecutor general and the Kazakhstan courts. [*Id.* ¶ 6.] The Anti-Corruption Bureau and the General Prosecutor's Office are therefore "first-instance decisionmakers" and a foreign tribunal under the statute. *See Intel*, 542 U.S. at 257-58 (finding a commission overseeing "investigative stage" a "tribunal" under statute). And the proceedings brought by the Anti-Corruption Bureau are far more than a "twinkle in counsel's eye," as the Anti-Corruption Bureau has brought formal charges against Ablyazov and his co-conspirators with respect to certain conduct, and continues to investigate additional allegedly-criminal conduct by Ablyazov and his coconspirators. [*Id.* ¶ 7.]

Furthermore, the discovery BTA seeks is highly relevant to both the Receivers in the U.K. Proceeding and to the Anti-Corruption Bureau's investigation and BTA's role therein as an injured party. As detailed above, Ablyazov acquired a controlling interest in the Zhaikmunai Investment after taking control of BTA in 2005. Ablyazov then hid this interest from both the Kazakh authorities and then from the Receivers and the U.K. courts. Considering the years-long effort that BTA and the Receivers have engaged in to unravel Ablyazov's web of nominees – the very reason the U.K. Courts imposed the Worldwide Freezing Orders and Receivership Orders in the first place – BTA reasonably believes that Ablyazov's interest in the Zhaikmunai Investment

17

would have been hidden from BNY Mellon (which appears blameless in this matter), and that representations, communications, and due diligence materials submitted to BNY Mellon in connection with the GDRs will reveal more of Ablyazov's nominees and shell companies used to hide his assets from the Receivers, BTA, and the Kazakh authorities. Furthermore, BTA reasonably believes that some of the at least $600 million reportedly raised through the issuance of the GDRs may have been diverted or siphoned off through nominees or shell companies belonging to Ablyazov, and that evidence from BNY Mellon will reveal any such conduct.

    3.  <u>BTA is an Interested Person</u>

        Finally, a section 1782 applicant must be an "interested person." 28 U.S.C.§ 1782(a). The applicant is an interested person if he or she has "participation rights" in proceedings. *Intel*, 542 U.S. at 256; *see also Certain Fun*ds, 798 F.3d at 119 (observing that *Intel* did not establish a minimum threshold for identifying an interested person, but criteria may include "an established right to provide evidence and have the party consider it," "a recognized relationship, such as that of an agent and principal" or "certain procedural rights" afforded to a creditor). The drafters of section 1782 intended the term "interested person" to include any person, including non-litigants, who "merely possess a reasonable interest in obtaining" the judicial assistance contemplated by the statute. *Intel*, 542 U.S. at 257 (internal quotation marks omitted).

        BTA doubtlessly qualifies as an "interested person" in the U.K. proceedings, where BTA is a plaintiff. *See Intel*, 542 U.S. at 256, ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782.").

        BTA also qualifies as an "interested person" under section 1782 based on the Anti-Corruption Bureau's criminal investigation proceedings, because the Anti-Corruption Bureau has officially recognized BTA as a damaged party, providing BTA with broad participation rights.

[Ayukhanov Dec. ¶¶ 3-4, Ex. A at 2-3.] Article 71 of the Kazakhstan Code of Criminal Procedure grants recognized crime victims, like BTA, a host of specific participation rights. These rights include the rights to "(1) know about the suspicions and accusations . . . ; (2) give testimony . . . ; (3) submit evidence; (4) make applications and challenges; . . . (6) have a representative; (7) receive the property, seized from him (her) by the criminal prosecution body as a mean of proving or represented by him (her), as well as his (her) property, confiscated from the person who committed the prohibited by the criminal law act, obtain the original documents, belonging to him (her); (9) get acquainted with the protocols of investigative actions, performed with his (her) participation, and give comments on them; (10) participate . . . in the investigative actions, carried out at his (her) request . . . ; (11) get acquainted at the end of the pre-trial investigation with . . . all case materials . . . ; (13) receive the copies of decisions on recognizing of him/her as a victim . . . on the termination of pre-trial investigation, as well as the copies of the verdict and the court's decision of the first, appeal and cassation instances; (14) participate in the court proceeding of the case in the first, appellate and cassation instances; (15) act in pleadings; (16) support the accusation, including in the case of refusal of the public prosecutor to press charges; (17) get acquainted with the protocol of the court session . . . ; (18) make complaints against the actions (inaction) of the body, conducting the criminal proceedings; (19) appeal the sentence and the court decision; (20) be informed about the complaints brought in the case, the petitions of the prosecutor and protests, to file objections to them and participate in their consideration; (21) protect his (her) rights and legal interests in other ways, not contrary to the law; [and] (22) know about the intention of the parties to conclude a procedural agreement, its conditions and consequences, offer his (her) conditions for compensation of damages, caused by the crime, or object to its conclusion." [*Id.* Ex. A at 2-3.]

19

The Supreme Court in *Intel* concluded that a complainant before the European Commission was an "interested person" for purposes of 28 U.S.C. § 1782. 542 U.S. at 256-57. There, the only involvement of the complainant was in initiating the proceedings, in "submit[ting] information for . . . consideration," and in having the right to "proceed to court if the Commission discontinues the investigation or dismisses the complaint." *Id.* at 256. BTA's participation rights in the Anti-Corruption Bureau investigation are clearly broader than the rights of the complainant in *Intel*. As an entity that possesses a reasonable interest in obtaining judicial assistance here, BTA is an "interested person" for purposes of 28 U.S.C. § 1782, satisfying the third statutory requirement.

**B.  The *Intel* Factors Weigh In Favor of Granting Discovery Here**

Where, as here, the statutory requirements are satisfied, Section 1782 vests the Court with the discretion to grant the requested discovery. However, this discretion must be exercised "in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Mees*, 793 F.3d at 297-298 (internal quotation marks omitted). "In pursuit of these twin goals, the statute has, over the years, been given increasingly broad applicability." *Brandi-Dohrn*, 673 F.3d at 80. The Second Circuit has held that it is an abuse of discretion to deny a Section 1782 application if the denial is contrary to the statute's twin aims. *See, e.g., Metallgesellschaft v. Hodapp*, 121 F.3d 77, 79-80 (2d Cir. 1997) (overturning order denying application where "district court did not advert to these objectives, explicitly or implicitly, and in fact the reasons the court did give were at odds with these goals");

In *Intel*, the Supreme Court set forth four factors to guide a district court's discretion:

(1) whether "the person from whom discovery is sought is a participant in the foreign proceeding;"

(2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;"

(3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States;" and

(4) whether the request is "unduly intrusive or burdensome."

*Intel*, 542 U.S. at 264-65. Here, these factors weigh in favor of granting the Application.

1. <u>BNY Mellon is Not a Participant in any Contemplated Foreign Proceeding</u>

As the Supreme Court explained in *Intel*, the need for assistance under Section 1782 is not as apparent when the foreign tribunal has jurisdiction over the persons from whom discovery is sought and "can itself order them to produce evidence." *Intel*, 542 U.S. at 264. BNY Mellon is not a party to the Anti-Corruption Bureau's investigation and proceedings in Kazakhstan and is not subject to the jurisdiction of courts in Kazakhstan. It is therefore not possible for BTA to obtain evidence from BNY Mellon through process in Kazakhstan. *See In re Ex Parte Application of Glob. Energy Horizons Corp*., No. 5:15-MC-80078-PSG, 2015 WL 1325758, at *2 (N.D. Cal. Mar. 24, 2015) ("Google is not a party in the foreign proceeding. Further, Google is not a company resident in the United Kingdom, and the requested information therefore does not appear to be within the immediate reach of the English High Court of Justice.").

Neither is BNY Mellon a litigant before the Receivers in the U.K. Proceedings, and in fact, BNY Mellon has previously not opposed a Section 1782 application made by the Receivers seeking correspondent banking information, nor did it move to quash the ensuing subpoena. *See In re Application of Outen*, 13-mc-00001-P1.

2. <u>The Proposed Subpoena Would Not Offend A Foreign Tribunal</u>

21

The principal concern when considering this factor is whether there is authoritative evidence that "the foreign tribunals would be 'offended' by our judicial aid." *In re Minatec Fin. S.A.R.L.*, 2008 WL 3884374, at *7 (N.D.N.Y. Aug. 18, 2008). In evaluating this factor, courts only consider "authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995).

Here, there is no authority suggesting that the Anti-Corruption Bureau or any judicial body in Kazakhstan would be offended by evidence gathered pursuant to section 1782, and indeed, this Court has previously granted § 1782 requests from the Republic of Kazakhstan. *See In re Republic of Kazakhstan*, 110 F. Supp. 3d at 514. Similarly, this court has granted section 1782 requests in aid of the Receivers in the U.K. Proceedings. *See* Order at 1, *In re Application of Outen*, No. 13-mc-00002-P1 (ECF No. 5) (S.D.N.Y. Jan. 4, 2013); Order at 1, *In re Application of Outen*, No. 13-mc-00001-P1 (ECF No. 6) (S.D.N.Y. Jan. 4, 2013); Order at 1, *In re Application of Outen*, No. 11-mc-00291-P1 (ECF No. 6) (S.D.N.Y. Aug. 19, 2011); Order at 1, *In re Application of Outen*, No. 11-mc-00066-P1 (ECF No. 5) (S.D.N.Y. Mar. 28, 2011).

3. <u>The Proposed Subpoena Does Not Circumvent Foreign Proof Gathering Restrictions or Policies of a Foreign Country or the United States</u>

Under the third *Intel* factor, courts "consider whether the [Section] 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. There is no "requirement that evidence sought in the United States pursuant to § 1782(a) be discoverable under the laws of the foreign country that is the locus of the underlying proceeding." *Gorsoan Ltd. v. Bullock*, 652 F. App'x 7, 9 (2d Cir. 2016). Similarly, a petitioner need not demonstrate that it attempted to obtain the discovery in the foreign tribunal before filing a Section 1782 petition. *See Mees*, 793 F.3d at

303 (there is "no support in the plain language of the statute" for a "quasi-exhaustion requirement.") (*quoting Metallgesellschaft*, 121 F.3d at 79).

Here, BTA is not attempting to sidestep any foreign discovery procedure; it is seeking documents from a New York-based entity that will aid it before the court-appointed Receivers in the U.K and in participating in the Anti-Corruption Bureau's criminal investigation process in Kazakhstan. BTA cannot obtain these documents through any other reasonable means, and this Court has already granted the very same relief in aid of the Receivers and the Receivership Orders. *See* Order at 1, *In re Application of Outen*, No. 13-mc-00002-P1 (ECF No. 5) (S.D.N.Y. Jan. 4, 2013); Order at 1, *In re Application of Outen*, No. 13-mc-00001-P1 (ECF No. 6) (S.D.N.Y. Jan. 4, 2013); Order at 1, *In re Application of Outen*, No. 11-mc-00291-P1 (ECF No. 6) (S.D.N.Y. Aug. 19, 2011); Order at 1, *In re Application of Outen*, No. 11-mc-00066-P1 (ECF No. 5) (S.D.N.Y. Mar. 28, 2011).

4. The Proposed Subpoena Is Not Unduly Intrusive or Burdensome

The proposed subpoena to BNY Mellon is narrowly tailored and does not seek any privileged information. The Requested Discovery requests only information about Zhaikmunai and the GDRs. In addition, BTA is willing to work in good faith with BNY Mellon to narrow the subpoena further, if necessary. *See, e.g., Deposit Ins. Agency v. Leontiv*, No. 17-MC-00414 (GBD) (SN), 2018 WL 3536083, at *12 (S.D.N.Y. July 23, 2018) (ordering Section 1782 applicant to meet and confer with discovery target to "modify the scope of the subpoena to reduce the burden . . . and to narrow its focus").

## CONCLUSION

For the above reasons, BTA respectfully requests that the Court grant the Application and enter an order authorizing BTA to serve the proposed subpoena.

Dated:    April 26, 2019

New York, New York                    Respectfully submitted,

                                      /s/ *Matthew L. Schwartz*
                                      Matthew L. Schwartz
                                      Andrew L. Chesley

                                      BOIES SCHILLER FLEXNER LLP
                                      55 Hudson Yards
                                      New York, New York 10001
                                      Telephone: (212) 303-3646
                                      Facsimile: (212) 446-2350
                                      E-mail: mlschwartz@bsfllp.com