# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                   :

IN RE APPLICATION OF JEREMY OUTEN,   :
JOHN MILSOM AND DAVID STANDISH,    :          Civil Action No.
AS COURT-APPOINTED RECEIVERS, FOR  :
JUDICIAL ASSISTANCE PURSUANT TO    :
28 U.S.C. § 1782                         :
                                   :

-------------------------------------------------------------x

## <u>DECLARATION OF JEREMY JAMES OUTEN</u>

      JEREMY JAMES OUTEN declares, pursuant to 28 U.S.C. § 1746, as follows:

      1.      I currently serve, along with John Milsom and David Standish

(collectively, the "Receivers"), as a Receiver appointed pursuant to an Order made by the High

Court of England and Wales (the "High Court") on August 6, 2010 (as amended on November

10, 2010, January 26, 2011, April 8, 2011, May 27, 2011, June 9, 2011, March 8, 2012, April 24,

2012, May 22, 2012, August 9, 2012, and August 23, 2012) (the "Receivership Order," attached

to this Declaration as Exhibit A) in the matter titled *JSC BTA Bank* v. *Ablyazov, et. al.* (High

Court of Justice, Queen's Bench Division, Commercial Court, Claim no: 2009 Folio 1099) (the

"Bank Action").  I submit this Declaration on behalf of the Receivers in support of our Application,

pursuant to 28 U.S.C. § 1782, for an order allowing the service of subpoenas on the following 18

Correspondent Banks (the "Correspondent Banks"), all of which can be found in the Southern

District of New York (*see* Exhibit B):

- Bank of America, N.A.
- Barclays Bank PLC
- BNP Paribas
- Citibank, N.A.
- Commerzbank AG
- Crédit Agricole CIB

- Deutsche Bank Trust Company Americas
- Habib American Bank
- HSBC Bank USA, N.A.
- Israel Discount Bank of New York
- J.P. Morgan Chase Bank, N.A.
- Societe Generale
- Standard Chartered Bank
- The Bank of New York Mellon
- The Northern Trust Company
- UBS AG
- Union Bank, N.A.
- Wells Fargo Bank, N.A.

2.      This is the third such declaration I have submitted in relation to the Receivership Order (and in support of an application pursuant to 28 U.S.C. § 1782). My previous declarations, dated March 11, 2011 (the "March Declaration") and August 16, 2011 (the "August Declaration") (both attached as Exhibit C of this Declaration), were in support of an application for an order allowing the service of subpoenas on Standard Chartered Bank International (Americas) Limited ("SCB") and J.P. Morgan Chase Bank. N.A. ("JPMC"), and on Citibank, N.A. ("Citibank"), respectively.

3.      A review of documents produced pursuant to the subpoenas and other documents provided to the Receivers in other jurisdictions has identified a need for subpoenas to be served on the Correspondent Banks.

**My Background**

4.      I am a forensic accountant with over 20 years of forensic accounting experience. I have been a partner of KPMG in London for over ten years. I attended Cambridge University, became a chartered accountant, and am a fellow of the Institute of Chartered Accountants in England and Wales. My fellow Receivers are also members of KPMG in London.

2

5.      I am currently head of KPMG's fraud and investigations group in the United Kingdom (the "U.K."). I specialize in forensic accounting work, including the tracing of assets, and have performed such services on behalf of numerous private entities and various government bodies, including law enforcement agencies. In my 20 years of experience, I have been involved in numerous international fraud and asset tracing investigations. These matters include a case involving the collapse of the Kuwait Investment Office's investments in Spain, where I was responsible for the cash and asset tracing aspects of that case. I also worked on a matter concerning the collapse of SBS-Agro in Moscow, where I investigated, through various methods including cash and asset tracing, losses of approximately $2 billion.

### Introduction:  The Receivership Order

6.      In February 2009, the Republic of Kazakhstan took control of JSC BTA Bank (the "Bank"), a Kazakhstani bank, due to significant concerns regarding the Bank's ability to continue as a going concern. The Bank's financial statements for the year ending December 31, 2008 recorded a negative equity of approximately $6.1 billion. After an investigation, the Bank brought the Bank Action in the U.K. against Mukhtar Ablyazov, the former Chairman of the Bank, accusing him of misappropriating over $4 billion from the Bank.

7.      The High Court initially entered an order in the Bank Action freezing Mr. Ablyazov's assets (the "Freezing Order"), pending a trial of the Bank's claims against Mr. Ablyazov. The High Court later found that the Freezing Order provided inadequate protection, and entered the Receivership Order, appointing myself and Messrs. Milsom and Standish as Receivers, also pending the trial of the Bank's claims. In connection with the Receivership Order, the High Court found that there was a "serious risk that Mr. Ablyazov will

3

dissipate his assets" and that his "disclosure of assets has been evasive." The High Court's opinion is attached as Exhibit D. (*See* Ex. D at ¶ 36; *id.* at ¶¶ 126-27.)

8.      The Receivership Order grants the Receivers the "power to take all such steps as may seem expedient to recover and preserve" the assets understood to be controlled by Mr. Ablyazov. (Ex. A at ¶ 5.)

9.      The Receivership Order further grants the Receivers the "[p]ower to bring or defend any action or other legal proceedings in the Courts of this or any other country in order to achieve the purposes of the receivership." (Ex. A at Schedule 4, ¶ 10.)

10.      The Receivership Order directs the Receivers to "secure and protect" a variety of assets (referred to in the Order as the "Disclosed Assets." "Undisclosed Assets," "Further Undisclosed Assets," "Additional Undisclosed Assets," and "Extra Undisclosed Assets"). (Ex. A at ¶¶ 1-2 and Schedules 3, 3A, 3B, 3C and 3D.) Among other things, the Receivers have also been appointed to "receive" and to "recover and preserve" funds relating to eleven individual cash transfers, totalling $55,332,642, made between June 25 and October 24, 2008 (the "Eleven Transactions"). (Ex. A at ¶ 2.)

11.      The Receivership Order entitles the Receivers to request from third parties all information and documentation relating to (among other things) the companies listed in the Receivership Order (the "Receivership Companies") as they may reasonably require for the purposes of performing their duties under the Receivership Order. (Ex. A at ¶ 12B, 12C(a) and 20(2).) The Receivership Companies are listed in Annex A.

12.      After he fled to the U.K. in 2009, Mr. Ablyazov was instructed by the Receivership Order to assist the Receivers in their duties by cooperating and providing

4

information requested of him. Mr. Ablyazov failed to assist the Receivers and has since been sentenced to 22 months' imprisonment for contempt of court. Mr. Ablyazov's whereabouts are currently unknown.

### Previous application and our findings

13.     The March and August Declarations filed previously were in support of an application for an order allowing the service of subpoenas on JPMC, SCB and Citibank. These applications were granted and the subpoenas were served accordingly.[1]  Pursuant to the subpoenas, documents were provided by JPMC on May 16, 2011 and SCB on May 22 and 24, 2011. (The responses from SCB, JPMC, and Citibank are attached as Exhibit E.)

14.     A detailed explanation as to the reasoning for selecting JPMC, SCB and Citibank as relevant institutions is included in the attached Previous Declarations. In brief, these three banking institutions were identified as potential U.S. correspondent banks executing transactions which involved Trasta Komercbanka ("Trasta"), a Latvian bank with which hundreds of Receivership Companies held accounts. The basis of this identification was through the provision, by the Bank, of relevant banking documentation that detailed two U.S. banks which appeared to be used as correspondent banks: SCB and JPMC. We identified the use, by Trasta, of Citibank as a U.S. correspondent through research undertaken using third party sources including databases such as the Bankers Almanac (one of the premier providers of reference data on the banking industry).

---

[1] The applications were granted on March 28, 2001 and August 19, 2011, respectively.

5

15.     As a result of the March Subpoenas, JPMC provided, inter alia, documentation relating to the Eleven Transactions.  This information was useful in tracing the proceeds of those transactions. The documentation from JPMC also provided us with additional bank account details, which were unknown to us previously, for entities involved in the Receivership and their associated cash flows.

16.     The provision of the JPMC documentation has great significance to the Receivers' protection and valuation of Mr Ablyazov's assets, as the Receivership Order empowers us to do.  Among other things, we have been able to identify further potential sources of information, including additional U.S. banking institutions.  We have also been able to develop our wider investigation strategy – for example adding support to various issues including recognition of the Receivership Order in jurisdictions outside the U.K.

17.     Responses were provided by Citibank on September 1 and 8, 2011, although it was unable to locate any responsive documents.  We believe that this may have been because the funds were transferred to another Trasta account.   If U.S. Dollars are transferred between accounts at the same bank, a correspondent bank is not required.  It is also possible that the funds were transferred using another U.S. correspondent bank.  We have identified three new correspondent banks for Trasta since the Previous Declarations.

18.     In order to more comprehensively trace these transactions and identify, secure, and protect the assets of the Receivership, we have taken a more extensive approach in this application.  We believe that this will greatly assist our efforts to trace the Eleven Transactions and other assets of the Receivership, and will yield results that will allow us to fulfill our duty as Receivers.

2776445.5

## Information Sought by the Receivers in This Application

19.    As outlined above, the Receivers have a duty to identify, preserve, and value the assets currently held in the Receivership.

20.    There are two categories of information in which the Correspondent Banks can provide useful and relevant information to further the Receivership: bank accounts in the name of Receivership Companies at various banks around the world (the "Beneficiary Banks") and specific transactions identified by the Receivers (the "Specific Transactions").

### Bank accounts

21.    The assets of the Receivership include current bank balances held in the name of the Receivership Companies.  Through our investigation, the Receivers have identified a large number of bank accounts held in the name of Receivership Companies at the Beneficiary Banks.  These bank accounts have been identified through disclosure of bank statements for the Disclosed and Undisclosed Assets by other banks.  In many cases, the Beneficiary Banks have held accounts for Receivership Companies that have been named as counterparties (sending or receiving funds) for transactions involving companies named in the Receivership Order.

22.    The following list constitutes the Beneficiary Banks involved in this application:

- AMT Bank LLC
- Trasta Komercbanka
- Eurohypo AG
- LGT (Schweiz) AG
- Uralsib Bank OAO
- Rietumu Banka
- Barclays Bank
- Commerzbank (Eurasija) SAO
- Rosbank OJSC

23.     The Receivers request information concerning transactions involving the Beneficiary Banks in order to understand the assets of the Receivership.  For example, these transactions provide information about the debts owed to Receivership Companies, assets purchased by them and the value of the Receivership assets.  Therefore, the Receivers consider these accounts to be of high importance to fulfilling our duty to identify, value, secure and protect the assets of the Receivership.

Specific Transactions

24.     In addition, the Receivers have identified numerous "high-value" transactions from Receivership Companies to companies outside the Receivership Order.  These "high-value" transactions are transactions of more than $1 million from companies named in the Receivership Order to companies and/or individuals not named in the Receivership Order.

25.     From the information currently available to the Receivers, we have reason to believe that these funds – transferred onwards from a company outside the Receivership Order – are likely to be assets of the Receivership.  We therefore hope to obtain information on either (a) the traceable proceeds of these assets, if the transaction represents a fraudulent dissipation, or (b) the receivables due under these funding arrangements (e.g., if the transfers represent loans or other similar transactions).

**The Importance of the Correspondent Banks**

26.     We believe that most of the accounts held by Receivership Companies were held in U.S. Dollars.  We have received statements for more than 900 accounts held by Receivership Companies.  Of more than 30,000 transactions that were sent to or from these

8

accounts, 71 percent were made in U.S. Dollars.  All of the Specific Transactions were made in U.S. Dollars.

27.     Transactions carried out in U.S. Dollars require the services of a U.S. correspondent bank.  The following is a simplified explanation of a U.S. Dollar transaction: in a U.S. Dollar transaction, the remitting bank sends a SWIFT message (a payment instruction sent between banks) to its U.S. correspondent bank.  This U.S. correspondent bank then sends the SWIFT to a second U.S. correspondent bank, that of the beneficiary bank. The second U.S. correspondent bank then passes the message (and the funds) to the beneficiary bank.  In many cases, these SWIFT messages contain the names of the remitter and beneficiary customers.

28.     On this basis, when Receivership Companies executed transactions in U.S. Dollars, the remitting bank would send a payment instruction to its U.S. correspondent bank, which would then pass a SWIFT message to the beneficiary's U.S. correspondent bank.

29.     The Receivers therefore believe that the provision of the SWIFT messages held by the U.S. Correspondent Banks could identify further assets of the Receivership as the flow of transactions from Receivership Companies would be contained within the SWIFT messages.

30.     In order to identify which U.S. banks acted for the Beneficiary Banks as correspondent banks, we have consulted Bankers Almanac, Bankers Accuity's World Bank Directory and the Bank Directory (providers of reference data on the banking industry) (collectively, the "Bank Reference Books").  In our experience, these Bank Reference Books are a reliable and widely-utilized source of information in relation to various details regarding banking institutions and the financial services sector in general.

9

31.     The Correspondent Banks have been identified by the Receivers as having acted as a correspondent bank for an identified Beneficiary Bank. The information held by the Correspondent Banks will help the Receivers to identify the destination of funds sent by known Receivership accounts.  The Receivers have good reason to believe that this will identify further accounts held by Receivership companies.  This information is therefore critical for the Receivers' ability to achieve their duties.

32.     For these reasons, we anticipate that the Correspondent Banks named in this application have documentation similar to that provided in response to the prior subpoenas. In other words, we anticipate that the Correspondent Banks hold information about assets of the Receivership, which will support the Receivers in their duty to identify, secure, and protect the assets of the Receivership.

### The Importance of the Specific Transactions

33.     The Receivers have identified the Specific Transactions based on our review of information received from other banks, corporate service providers, and other third parties.  The information we have received is provided in Exhibit F, showing transactions of more than $1 million that were transferred by companies of the Receivership Order to non-Receivership companies.

34.     We have reason to believe that the funds sent to the beneficiaries in Exhibit F were later transferred to further beneficiaries.  In this way, the Exhibit F beneficiaries became remitters in new onward transactions of funds that we believe are Receivership assets or hold information about Receivership assets.

10

35.     For this reason, our requests to the Correspondent Banks (located in Annex B) include the parties who were beneficiaries in Exhibit F as the new remitters. The Receivers need to know the destination of these payments to identify and protect the assets of the Receivership.

36.     The Receivers have made their best efforts to reduce the number of transactions they are tracing by conducting research on all recipients to identify and eliminate genuine third parties. Where recipients appear to be genuine third parties based on internet and public records searches, we have removed these transactions from our list of transactions. Where recipient companies cannot be identified as genuine third parties, the Receivers have good reason to believe that these transactions may have dissipated the assets of the Receivership. We collectively refer to these 72 transactions as the "Specific Transactions."

37.     The usefulness of the information we expect to receive from the Correspondent Banks is demonstrated by an example of tracing work we have already done concerning one transaction. The Receivers have received voluntary disclosure from two banks in Cyprus that have allowed us to pursue a high value and relatively recent transaction (the "Millenium-Proteus Transaction"). Millennium Support Group Limited (Ex. A at Schedule 3B) transferred $25 million and $22.9 million to Proteus Group Holdings Ltd ("Proteus") (Ex. A at Schedule 3D) on January 18, 2011 and April 15, 2011, respectively. Subsequent to this, on April 19, 2011, Proteus transferred $27.4 million and $20 million to Desimon Ventures Limited ("Desimon") and Credo Ventures Limited ("Credo") respectively. Based on information provided to the Receivers from some of the banks involved, Desimon and Credo (neither named

11

in the Receivership Order), transferred the funds to a UAE-registered company, Amber Limited, and an individual named Askar Amangeldiyev, respectively.

38.    The information we have gained so far has provided information about a transfer of funds from a company in the Receivership to companies and an individual.  We have reason to believe that this is a dissipation of the assets of the Receivership.  Therefore, obtaining information about this asset is critical for us to fulfill our duty to secure and protect the assets of the Receivership.

39.    From the information currently available to the Receivers, we believe that all of the Specific Transactions are similar to the Millenium-Proteus Transaction and therefore are likely to be assets of the Receivership.  We are therefore entitled to either (a) the traceable proceeds of this asset, if the transaction represents a fraudulent dissipation; or (b) the receivable due under these funding arrangements, if the transfers are disbursements of loans (or other similar transactions).

40.    For these reasons, the supporting documentation from the banks that received funds from the Receivership Companies will assist the Receivers in fulfilling their duties to identify, preserve, and protect the assets of the Receivership.

### The Relevance of the Discovery Sought

41.    Given the importance of the Beneficiary Banks with respect to loans to companies in the Receivership and the number of companies holding accounts at these banks, I expect that the relevant correspondent banking documentation relating to the Beneficiary Banks will provide details such as the names of companies and individuals who received funds from companies in the Receivership Order, bank account numbers, and jurisdictions.  In other words,

2776445.5

I anticipate receiving similar documentation as we have received from JPMC but concerning other relevant transactions.

42.    We have reason to believe that this information will allow us to fulfill our duties to identify, secure and protect assets of the Receivership. Specifically, this information will be instrumental in the following matters:

> (a) Preserving and protecting Disclosed and Undisclosed Assets that are subject to debt-recovery proceedings in Russia. Information obtained regarding these companies' accounts will help us to understand (a) whether the loans were received as claimed; (b) whether some or all of the funds were paid back; and/or (c) whether the funds were sent to other companies – potentially allowing us to recover some or all of the debts enforced against Receivership Companies.
>
> (b) Helping the Receivers to understand whether there are other assets of Receivership companies of which we are currently unaware. This will assist the Receivers in fulfilling their duty to preserve and protect the assets of the Receivership Companies.
>
> (c) Helping the Receivers to receive the traceable proceeds of the Eleven Transactions.
>
> (d) Helping the Receivers to receive the traceable proceeds of the Specific Transactions.

43.    Accordingly, the Receivers request that the Correspondent Banks search for certain incoming and outgoing SWIFT messages for Beneficiary Bank transactions on Receivership companies' accounts and/or certain transactions related to the Specific Transactions.

## Documents Sought by the Receivers

44.    In Annex B we have listed the requests we wish to make to each Correspondent Bank. In most cases, this includes two requests: one relating to transactions that

took place on the accounts of Receivership Companies (the "Bank Account Request") and the other relating to the Specific Transactions (the "Specific Transaction Request").

45.     The Receivers are willing to provide the Correspondent Banks with further information to allow them to minimize the time and cost burden of these searches.  For example, we are willing to discuss the exact search terms, and to provide electronic copies of all of the lists contained in the Annexes to this Application.

Bank Account Requests

46.     The Receivers request that certain Correspondent Banks named in Annex B, which we have identified as having a correspondent banking relationship with the Beneficiary Banks named in the same Annex B, disclose all incoming and outgoing SWIFT messages between January 1, 2005 and December 31, 2012.  We request this information for all transactions where the remitter or beneficiary is an account in the name of the Receivership Companies listed in Annex A.

47.     The Receivers request that certain Correspondent Banks listed in Annex B search for all of the Receivership Companies listed in Annex A, limiting by the relevant Beneficiary Banks for which they served as correspondent banks, as detailed in Annex B.  This approach will help to limit the number of "false positive" results – i.e., results that are not responsive to the Receivers' requests.

48.     We outline below the practical steps that we request that the Correspondent Banks take to identify the information sought by this application.  In short, the banks should conduct searches limited by (a) account names, (b) remitting or beneficiary banks, (c) dates and (d) transaction types:

14

(a) **Account names:** SWIFT fields 50 and 59 identify references to the company as the ordering and beneficiary customer. In Annex A, we have provided the Correspondent Banks with a list of search terms to be entered in each of these fields.

(b) **Remitting or beneficiary banks:** SWIFT fields 52 and 57 identify any reference to the bank which holds the account of the ordering or beneficiary customer (defined as Ordering Institution and Account With Institution in the SWIFT messages). These fields can contain either words or BICs (Bank Identification Codes). In Annex B we have provided a list of the current and previous names of the Beneficiary Banks and the BIC codes to be entered into these search fields.

(c) **Dates:** The date of the SWIFT message should fall within the date range specified in the request (2005-2012). The date of SWIFT messages is recorded in the header of the message, which also shows the sender, receiver, and message type.

(d) **Type of transactions:** The Correspondent Banks should limit their searches to MT103, MT202 and MT202COV messages when processing the search requests, as we are looking for SWIFTs in relation to payments between individuals and entities. (There are other types of SWIFT messages, which would therefore be excluded.)

Exhibit G provides background information on MT103, MT202, and MT202COV SWIFT message types.

<u>Specific Transaction Requests</u>

49. The Receivers also request that certain Correspondent Banks disclose all outgoing SWIFT messages in relation to the Specific Transactions listed in Annex B.

50. The Receivers request that certain Correspondent Banks search for all outgoing SWIFT messages received from the remitting bank where the remitter matches the details listed in the Specific Transactions assigned to each Correspondent Bank. The searches should be limited for results up to two months from the date of each Specific Transaction.

51.     We outline below the practical steps that we require the Correspondent Banks to take to identify the information sought by this application.  In short, the banks should conduct searches limiting by (a) remitter name, (b) remitting bank, (c) dates, and (d) transaction types:

> (a) **Remitter names:**   SWIFT field 50 identifies references to the company as the ordering customer (remitter).  We have provided the Correspondent Banks with a list of search terms ("Remitter Details") to be entered in this field in Annex B.
>
> (b) **Remitting banks:**   SWIFT field 52 identifies any reference to the bank which holds the account of the remitting customer (the Ordering Institution).  This field can contain either words or BICs (Bank Identification Codes).  In Annex B we have provided a list of the ordering banks at the time of the transaction ("Remitting Bank") and the BIC codes to be entered into this search field.
>
> (c) **Dates:** The date of the SWIFT message should fall within two months of the date of the Specific Transaction aligned with each Correspondent Bank.  The date of SWIFT messages is recorded in the header of the message, which also shows the sender, receiver and message type.
>
> (d) **Type of transactions:** The Correspondent Banks should limit their searches to MT103, MT202 and MT202COV when processing the search requests, as we are looking for SWIFTs in relation to payments between individuals and entities.  (There are other types of SWIFT messages, which would therefore be excluded.)

52.     We believe that these clear instructions – with which all of the Correspondent Banks will be familiar – will help the Correspondent Banks find the information sought by the Receivers in a timely and straightforward manner.  In addition, we will make ourselves available to answer any questions from the Correspondent Banks named in this application, and we will work with the banks to assist them in carrying out this work.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:    London, England
December 31, 2012

_____
Jeremy James Outen

# EXHIBIT A

IN THE HIGH COURT OF JUSTICE                    Claim no: 2009 Folio 1099
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
Before Mr Justice Teare
Dated 6 August 2010 (as amended on 10th November 2010, 26th January 2011, 8th April 2011, 27
May 2011, 9 June 2011, 8 March 2012, 24 April 2012, 22 May 2012, 9 August 2012 and 23 August
2012)

IN PRIVATE

B E T W E E N :

JSC BTA BANK

Claimant/Applicant

and

(1) MUKHTAR ABLYAZOV

First Defendant/Respondent

(2) ROMAN SOLODCHENKO
(3) ZHAKSYLYK ZHARIMBETOV
(4) DREY ASSOCIATES LIMITED
(5) ANTHONY EDWARD THOMAS STROUD
(6) JOHN DOMINIC WILSON
(7) SARAH JULIET WILSON
(8) INTERFUNDING FACILITIES LIMITED
(9) ALEXANDER UDOVENKO
(10) OOO MARION PLUS
(11) OOO TETROCONSULT
(12) OOO KHUDRED-SERVICE 5
(13) OOO TRAIKER
(14) OOO STEK-1000
(15) OOO AMK-INVEST
(16) TURANALEM CAPITAL LLC
(17) ZRL BETEILIGUNGS LLC

Defendants



---

ORDER

---

If you Mukhtar Ablyazov disobey this order and/or interfere with the Receivers exercising their
powers or performing their duties under this order you may be held to be in contempt of court
and may be imprisoned, fined or have your assets seized.

Any other person who knows of this order and does anything which helps or permits Mukhtar
Ablyazov or any other person to breach its terms may also be held to be in contempt of court and
may be imprisoned, fined or have their assets seized.

Upon the First Defendant by his solicitors, without prejudice to his application to the Supreme Court for permission to appeal against the making of this Order, not opposing the variations made within this Order to Schedules 1 and 3 of the Order made by Mr Justice Teare on 6 August 2010 (as varied by paragraph 1 of the Order of the Court of Appeal dated 5 November 2010, and excluding paragraphs 28 (permission to appeal) and 29 (stay) and Schedule 2(2) (First Defendant's undertakings) thereof)

And upon the Court reading the written evidence set out in Schedule 1 to this Order

And upon the Court accepting the undertakings set out in Schedule 2 to this Order

And upon the Court on 8 April 2011 hearing the without notice application of the Claimant for an extension of this order ("the **April Extension Application**")

And upon the Court on 27 May 2011 hearing the without notice application of the Claimant for an extension of this order ("the **May Extension Application**")

And upon the Court on 8 March 2012 hearing the without notice application of the Claimant seeking variations to this order ("the **March 2012 Application**")

And upon the Court on 24 April 2012 hearing the without notice application of the Claimant seeking variations to this order ("the **April 2012 Application**")

And upon hearing Counsel for the Claimant

And upon the following terms having the following meanings for the purposes of this Order:-

"The **Freezing Order**"            shall mean the Order of Mr Justice Blair made herein on 13 August 2009 as continued by the Order of Mr Justice Teare made on 12 November 2009 and as amended from time to time thereafter (in particular by Orders made on 11 December 2009, 29 March, 6 May 2010, 16 August and 5 October 2010 and 26 January, 8 April, 27 May 2011 and 26 March 2012)

"**Direct Assets**"            shall mean any assets held by a company listed in either Schedule 3A, 3B, 3C or 3D in its own name

"**Indirect Assets**"            shall mean any assets either (i) held for or on behalf of a company listed in either Schedule 3A, 3B, 3C or 3D or (ii) held by or for a subsidiary (as defined by s 1159 of the Companies Act 2006) of a company listed in Schedule 3A, 3B, 3C or 3D

"The **Disclosed Assets**"            shall mean all the legal and beneficial interests in the assets set out in Schedule 3 to this Order being assets of the First Defendant disclosed by him to the Claimant in the course of this claim to the date hereof pursuant to the disclosure provisions of the Freezing Order including for the avoidance of doubt, the legal and beneficial interests, direct or indirect, in each of the companies in the structures

holding such assets identified in Schedule 3

"The **Undisclosed Assets**"  shall mean all the legal and beneficial interests in the shares in, and (from the moment of service of this order on Mr Ablyazov's solicitors) the Direct and Indirect Assets of, the companies listed in Schedule 3A hereto

"The **Further Undisclosed Assets**"  shall mean all the legal and beneficial interests in the shares in, and (from the moment of service of this order on Mr Ablyazov's solicitors) the Direct and Indirect Assets of, the companies listed in Schedule 3B hereto

"The **Additional Undisclosed Assets**"  shall mean all the legal and beneficial interests in the shares in, and (from the moment of service of this order on Mr Ablyazov's solicitors) the Direct and Indirect Assets of, the companies listed in Schedule 3C hereto.

"The **Extra Undisclosed Assets**"  shall mean all the legal and beneficial interests in the shares in, and the Direct and Indirect Assets of, the companies listed in Schedule 3D hereto.

"The **UK Properties**"  shall mean those properties listed at paragraph 5A(b)(i), (ii) and (iv) of the Freezing Order

"**Reserved Assets**"  shall mean those properties listed at paragraph 5A(b)(iii) and (v) of the Freezing Order

"**Valenora Proceedings**"  shall mean proceedings instituted in the Larnaca District Court, Cyprus by Valenora Co Limited against Usarel Investments Limited under Action Number 672/2012

**IT IS ORDERED THAT:**

## APPOINTMENT OF RECEIVERS

1.  Save for the Reserved Assets, Jeremy Outen, David Standish and John Milsom, partners of KPMG LLP, of 8 Salisbury Square, London EC4Y 8BB ("the **Receivers**"), be appointed joint receivers to receive all the Disclosed Assets, Undisclosed Assets, Further Undisclosed Assets and all the Additional Undisclosed Assets, the UK Properties and the Extra Undisclosed Assets.

1A. The Receivers shall also be appointed as managers of (a) the companies listed for the purposes of this paragraph in Schedule 3 to this order, (b) Chrysopa Holding B.V. (listed in row 93 of Schedule 3B hereto), International Petroleum Services Group Limited (listed in row 20 of Schedule 3D hereto) and Valenora Co Limited (listed in row 23 of Schedule 3D hereto), and (c) Mount Properties Limited (listed in row 248 of Schedule 3B hereto) and Lafe Technology Limited (listed in row 210 of Schedule 3B hereto).  The said appointment shall, upon

3

recognition of this order in the jurisdiction of incorporation of the said companies, suspend the powers of the directors of those companies (such powers to be assumed by the Receivers or persons acting on their instructions) save in so far as (i) any director thereof is authorised by the Receivers in writing to exercise any of those powers and/or (ii) such powers relate to the conduct of the arbitration proceedings and litigation referred to in Schedule 4(2)(ii) and (iii) hereto.

2.   The Receivers shall further be appointed receivers to receive

    a.   the US$5,750,000 (and the traceable proceeds of it or any part of it) paid to Julia Seliverstova on 27 June 2008 by Devesta Limited.

    b.   The US$41,100,000 (and the traceable proceeds of it or any part of it) paid to FM Company on 27 June 2008 by Devesta Limited.

    c.   The US$2,000,000 (and the traceable proceeds of it or any part of it) being the balance of a total sum of US$50,000,000 received by Devesta Limited from Drey Associates Limited on 25 June 2008 which was not paid to the Claimant.

    d.   The US$1,939, 500 (and the traceable proceeds of it or any part of it) paid by Amador Investment Limited to Toscana Group Limited on 3 July 2008.

    e.   The US$1,060,500 (and the traceable proceeds of it or any part of it) paid by Amador Investment Limited to Evanda Trading S.A. on 2 July 2008.

    f.   The US$815,000 (and the traceable proceeds of it or any part of it) paid by Aha Management Inc to Industrial Complex AMK Invest on 24 October 2008.

    g.   The US$750,000 (and the traceable proceeds of it or any part of it) paid by City Ventures Limited to Atlant LLP on 27 June 2008.

    h.   The US$720,000 (and the traceable proceeds of it or any part of it) paid by Tradestock Inc to Denmar Assets Management Inc on 22 October 2008.

    i.   The US$500,000 (and the traceable proceeds of it or any part of it) being the balance of a total sum of US$4,000,000 received by Klostrade Financial Group from Amador Investment Limited on 27 June 2008 which was not paid to the Claimant.

    j.   The US$400,000 (and the traceable proceeds of it or any part of it) received by Caprio Limited from Swain River Limited on 27 June 2008.

    k.   The US$297,642 (and the traceable proceeds of it or any part of it) being the balance of a total sum of US$900,000 received by Ditron Solutions Limited from Darfield Limited on 1 July 2008 which was not paid to the Claimant.

Provided that this clause shall not apply to any property, assets or interests which have been acquired by a *bona fide* third party purchaser for value.

3. The Disclosed Assets and the assets referred to in paragraph 2 above (hereafter together called "the **Property**") and the Undisclosed Assets, Further Undisclosed Assets, Additional Undisclosed Assets, the UK Properties and the Extra Undisclosed Assets shall be held by the Receivers to the order of the Court.

4. Subject to paragraph 7, below, the appointment of the Receivers shall continue until further order of the Court.

5. The Receivers shall have power to take all such steps as may seem expedient to recover and preserve the Property and the Undisclosed, Further Undisclosed, Additional Undisclosed Assets, the UK Properties and the Extra Undisclosed Assets and in particular shall have the powers set out in Schedule 4 hereto. The powers vested in the Receivers may be exercised jointly or individually.

Provided always that (in relation to the Property and the Undisclosed, Further Undisclosed, Additional Undisclosed and Extra Undisclosed Assets and the UK Properties) once the Receivers certify that they have control over assets with a value exceeding the value stated from time to time in paragraph 4(a) of the Freezing Order or in the equivalent paragraph of any order which replaces that order, this Order shall cease to apply to any other assets constituting the Property and Undisclosed, Further Undisclosed, Additional Undisclosed and Extra Undisclosed Assets and the UK Properties. For the avoidance of doubt, the Claimant shall have permission to apply to seek a variation of this provision.

### EXTENSION APPLICATION—THE EXTRA UNDISCLOSED ASSETS

5A. The amendments made to this order on 24 April 2012 ("the **April 2012 Amendments**") were made at a hearing without notice to the First Defendant. The First Defendant has a right to apply to the court to vary or discharge such amendments and the amendments made to this order on 26 January 2011 ("the **January 2011 Amendments**"), 8 April 2011 ("the **April 2011 Amendments**") and/or 27 May 2011 ("the **May 2011 Amendments**") and 8 March 2012 ("the **March 2012 Amendments**")– see paragraph 5C, below.

5B. The Court will (if required) reconsider the April 2012 Amendments as soon as possible at an appointment to be fixed through the usual channels to be heard by Teare J if possible.

5C. Anyone served with or notified of this order may apply to the court at any time to vary or discharge the January and/or April and/or May 2011 and/or March 2012 and/or April 2012 Amendments (in so far as those amendments affect that person), but they must first inform the Claimant's solicitors. If evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Claimant's solicitors in advance.

5D. The Claimant is permitted, pursuant to CPR rule 3.2(1)(a), to delay service of the April 2012 Application, this order, supporting evidence and associated documentation on Mr Ablyazov (by service on his solicitors) until 4 pm on 8 May 2012.

5E. No documentation relating to the April 2012 Application, including this order itself, shall be put on the court file until after service of this order. The Claimant's solicitors shall notify the Court as soon as reasonably practicable after such service has been effected.

5F.    The costs of the April and May 2011 Extension Applications and the March and April 2012 Application are reserved.

## FREEZING ORDER – THE EXTRA UNDISCLOSED ASSETS

5G.    The Freezing Order shall be varied by the inclusion of a new Schedule F, in identical terms to Schedule 3D to this Order.


## SECURITY

6.    The Receivers do within eight days of the date of this order coming into force provide security in the sum of £5 million by filing written evidence of the bonds provided by them to cover appointment as a court appointed receiver.

7.    If the Receivers have not given such security within eight days of the date of this order coming into force or within such further time as the Court may allow, their appointment as Receivers is immediately to cease.

8.    The Claimant having given the undertakings in Schedule 2 and having made the payments and given the notifications referred to in 8A and 8B, below, the Receivers have permission to act.


## FURTHER FORTIFICATION

8A.    As further fortification for the undertaking in damages in paragraphs (i), (ii) and (iii) of Schedule 2 hereto, the Claimant shall pay the sum of £45 million into Court forthwith (and shall forthwith thereafter send written notification of such payment to the First Defendant's solicitors and the Receivers).

8B.    The Claimant shall pay the sum of £7.5 million into Court in respect of the costs of the receivership forthwith (and shall forthwith thereafter send written notification of such payment to the First Defendant's solicitors and the Receivers).

8C.    The First Defendant shall have liberty to apply in respect of the sufficiency of the fortification of the undertakings and in respect of the sum paid in relation to costs.

## DELIVERY UP

9.    The First Defendant shall, as soon as reasonably practicable:

       a.    use his best endeavours to deliver or cause to be delivered to the Receivers such of the Property and such of the Undisclosed, Further Undisclosed, Additional Undisclosed and Extra Undisclosed Assets and the UK Properties as are in his possession, under his control, or in respect of which he has the power to dispose or deal;

b.  use his best endeavours to deliver or cause to be delivered to the Receivers all share certificates, securities, books, instruments evidencing title and other documents and records (whether electronic or otherwise) relating to the Property or relating to the Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets or the UK Properties (or any part thereof) as are in his control (as defined by CPR rule 31.8);

c.  use his best endeavours to irrevocably instruct all nominees, trustees, agents, attorneys or other persons who hold or control the Property or the Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets or the UK Properties (or any part thereof), whether directly or indirectly, to deliver it and the documents referred to in sub-paragraph (b) above, to the Receivers. In particular, but without limitation, the First Defendant shall use his best endeavours to give such instructions to:

    i.  Erzhan Kadesov (also known as Urshan Kavisof);
    ii.  Rinat Batyrgareyev;
    iii.  Askhat Seitov;
    iv.  Julie Seliverstova (also known as Julia Seliverstova);
    v.  Abilkhan Amangeldiev;
    vi.  Helmedt Seitz (also known as H. Seitz);
    vii.  Paul Kythreotis;
    viii.  B. Littman;
    ix.  Panagitis Pavlides;
    x.  Joahna Linzi Rita Alcindor;
    xi.  Fiona Paraskeva;
    xii.  Ize Zviburle;
    xiii.  Maria Antoniadou;
    xiv.  Syrym Shalabayev;
    xv.  Alexander Udovenko;
    xvi.  Jason Hercules;
    xvii.  Zhaiykbek Burkitbayev;
    xviii.  Safuan Zhadikov;
    xix.  Yerlan Kossayev;
    xx.  Yuliya Degtyareva;
    xxi.  Tatyana Aleinova;
    xxii.  Edward Pakhomov (also known as Vitaliy Pakhomov and Eduard Pakhomov);
    xxiii.  Ella Ligai;
    xxiv.  Galina Batyrgareyeva; and
    xxv.  Alexander Frolov.

d.  use his best endeavours to irrevocably instruct the nominees, trustees, agents, attorneys or other persons who have the power to do so, to forthwith execute or cause to be executed share transfer forms in a form capable of being registered in the names of the Receivers (or their nominees or agents on their behalf) for all of the shares identified as the Disclosed Assets within Schedule 3 hereto (in the form of that

Schedule prior to the amendments made to it on 8 March 2012) and for all of the shares identified as the Undisclosed Assets, Further Undisclosed Assets, Additional Undisclosed or Extra Undisclosed Assets within Schedules 3A, 3B, 3C and 3D hereto and to provide those executed transfers to the Receivers forthwith.

e.   use his best endeavours to irrevocably instruct the nominees, trustees, agents, attorneys or other persons who have the power to do so, to confirm in writing to the Receivers that they will not issue, or allow to be issued, any new shares in the entity in respect of which they exercise control, or to otherwise take any step that would alter the management structure or capital structure of the relevant entity unless the Receivers first provide their written consent to such action being taken.

f.   provide to the Receivers copies of all written instructions and details of all oral instructions given in accordance with sub-paragraphs (c), (d) and (e) above including (as appropriate) details of: the name and address of the person being instructed; the date when the instruction was given; the method by which the instruction was given; the nature of the asset to which the instructions referred; and the gist of any words said when giving those instructions.

10.  The First Defendant (in addition to the Orders at paragraph 9(c), (d) and (e) above) shall, as soon as reasonably practicable, provide to the Receivers copies of all subsequent written communications and details of all subsequent oral communications concerning any actual or potential dealing with or disposal of any of the Property or any of the Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets or the UK Properties between himself (including by any employee or agent or otherwise howsoever) and each person (whether by themselves their employees or agents or otherwise howsoever) to whom instructions were given in accordance with sub-paragraph 9(c), (d) and (e) above including (as appropriate) details of: the name and address of the person with whom he was communicating; the date of the communication; the method of communication; and the gist of any words said.

11.  If so requested in writing by the Receivers, the First Defendant shall, as soon as reasonably practicable, use his best endeavours to irrevocably instruct the nominees, trustees, agents or other persons who have the power to do so,  forthwith to cause the Receivers (or their nominees or agents on their behalf) to be registered as the holders of the shares (or equivalent participation rights as may exist in the relevant jurisdiction) identified as amongst the Disclosed Assets in Schedule 3 to this Order (in the form of that Schedule prior to the amendments made to it on 8 March 2012) or the Undisclosed Assets in Schedule 3A to this Order or the Further Undisclosed Assets in Schedule 3B to this Order or the Additional Undisclosed Assets in Schedule 3C to the Order or the Extra Undisclosed Assets in Schedule 3D to the Order.

## OBLIGATIONS OF THE FIRST DEFENDANT

12.  The First Defendant shall:

a.   give to the Receivers such information and documentation relating to the Property and the Undisclosed, Further Undisclosed, Additional Undisclosed and Extra Undisclosed Assets and the UK Properties and where the said Property or

Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets consist of shares in companies used by the First Defendant as a part of a structure through which to hold his interests in a business or asset, such information and documentation relating to all companies and their respective businesses and assets within that structure,

    b.   attend on the Receivers at all such times, and

    c.   do all such things (including, without limitation, use his best endeavours to procure his agents, nominees, trustees or attorneys to do all such things),

as the Receivers may reasonably require for the purposes of getting in the Property and the Undisclosed, Further Undisclosed, Additional Undisclosed and Extra Undisclosed Assets and the UK Properties and carrying out their functions.

12A.   The First Defendant shall use his best endeavours to procure that the directors of, and holders of powers of attorney in relation to, the companies listed in Schedules 3A, 3B, 3C and 3D hereto and their subsidiaries shall not deal with or dispose of the shares in, or the Direct or Indirect Assets of, those companies save in accordance with the Freezing Order (as amended). Without prejudice to the generality of this obligation, the First Defendant shall, as soon as reasonably practicable, issue appropriate written instructions to all such directors and holders of powers of attorney of which he has knowledge (copies of which shall be provided to the Claimant's solicitors and the Receivers).

### THIRD PARTIES

12B.   The Receivers shall have power to request any information from any third party within the jurisdiction or who falls within paragraph 20(2) (including without limitation those persons specified in Schedule 5) as the Receivers may reasonably require for the purposes of getting in the Disclosed, Undisclosed, Further Undisclosed, Additional Undisclosed and Extra Undisclosed Assets and the UK Properties and carrying out their functions in relation thereto.

12C.   Any person upon whom this order is served within this jurisdiction or who falls within paragraph 20(2) (including without limitation those persons specified in Schedule 5), shall:

    a.   give to the Receivers such information and documentation relating to the Disclosed, Undisclosed, Further Undisclosed, Additional Undisclosed and Extra Undisclosed Assets and the UK Properties,

    b.   attend on the Receivers at all such times, and

    c.   do all such things,

as the Receivers may reasonably require for the purposes of getting in the Disclosed, Undisclosed, Further Undisclosed, Additional Undisclosed and Extra Undisclosed Assets and the UK Properties and carrying out their functions in relation thereto.

### DISCLOSURE OF INFORMATION

13.   The First Defendant shall, within 6 working days of this order, file and serve on the Claimant and the Receivers a witness statement confirming whether the disclosure given by his third witness statement dated 16 April 2010 of the assets which ought to be disclosed pursuant to

the disclosure provisions of the Freezing Order remains (as at the date of the further witness statement) accurate (and, if not, providing full details of the ways in which the said disclosure is inaccurate).

14. To the extent not already provided, the Claimant's solicitors shall be at liberty to provide to the Receivers all information and documentation disclosed by the First Defendant or his solicitors pursuant to (i) the Freezing Order; (ii) the cross-examination of the First Defendant ordered by Mr Justice Teare on 16 October 2009; (iii) the evidence served in opposition to this application to appoint the Receivers; and (iv) the hearing of the application for their appointment.

## REPORTS

15. The Receivers do submit a report to the Court, the Claimant's solicitors and the First Defendant within 6 weeks after the coming into force of this Order, giving details of the nature and value of the money, assets and property received by them pursuant to this Order and the quantum of their remuneration, expenses and costs. Thereafter, the Receivers shall submit reports to the Court, the Claimant's solicitors and the First Defendant at quarterly intervals from the date of their first report or more frequently if the Receivers believe that it is necessary or appropriate to do so.

16. The Claimant's solicitors may only circulate the said reports in a manner which is consistent with paragraph 15 of the Order of Mr Justice Teare dated 12 November 2009 (as subsequently amended).

## RECEIVERS' COSTS AND EXPENSES

17. The Receivers shall be entitled to reasonable remuneration and reasonable costs and expenses properly incurred in the performance of their duties and the exercise of their powers as receivers, such remuneration, costs and expenses to be taken (if not paid directly by the Bank) from the sum paid into Court by the Bank in accordance with paragraph 8B, above, provided that both the Bank and the First Defendant shall have liberty to apply to the court for a determination of the reasonableness of such remuneration, costs and expenses, and upon such application being made the Court shall determine the same. The Bank shall have liberty to apply to seek an order that it be reimbursed for the said remuneration, costs and expenses by (a) the First Defendant and/or (b) the sale of asset(s) held by the Receivers.

18. The Receivers shall have a lien over the Property for the payment of their fees, costs and expenses (provided that such a lien may only be enforced with the leave of the court).

## THIRD PARTIES

19. It is a contempt of court for any person notified of this Order knowingly to assist in or permit a breach of it. Any person doing so may be sent to prison, fined or have his assets seized.

## PERSONS OUTSIDE ENGLAND AND WALES

20. (1)     Except as provided in paragraph (2) below, the terms of this order do not affect or

concern anyone outside the jurisdiction of this court.

(2)    The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court-

    (a)    the First Defendant, or any nominee, trustee, agent or attorney appointed by him or holding assets (whether directly or indirectly) for him.

    (b)    any person who-

        (i)    is subject to the jurisdiction of this court;

        (ii)    has been given written notice of this order at his residence or place of business within the jurisdiction of this court; and

        (iii)    is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order; and

    (c)    any person, only to the extent that this order is declared enforceable by or is enforced by a court or is recognised in that country or state.

(3)    The persons referred to in paragraphs 20(2)(a) and/or 20(2)(c) above shall include (without limitation) those persons listed in Schedule 5 hereto.

## ASSETS LOCATED OUTSIDE ENGLAND AND WALES

21.    Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party (save for the persons referred to in paragraph 20(2) above) from complying with—

(1)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated; and

(2)    any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Claimant's solicitors.

## LIBERTY TO APPLY AND APPLICATIONS

22.    The Claimant, First Defendant and Receivers shall have liberty to apply. The receivership application is transferred to the Chancery Division pursuant to CPR rule 30.5, to which division all applications relating to the receivership shall be made.

## COSTS

23.    The First Defendant do pay 80% of the Claimant's costs of the receivership application (which for the avoidance of doubt are to include 80% of the costs of the hearing as regards all applications on 4-6 August 2010) on the standard basis, to be assessed if not agreed. The First Defendant do pay the Claimant's costs of the application made on 10 November 2010 on the standard basis, to be assessed if not agreed. The Claimant's application for a payment on

account of such costs shall be stood over in order that the solicitors for the Claimant and First Defendant can attempt to agree the amount of such payment in correspondence.

## PRIVACY AND RESTRICTED INFORMATION

24. The judgments of Mr Justice Teare dated 17 March and 16 July 2010 and this order may be made publicly available after the names of all individuals, companies and other entities which are subject to the restricted information regime imposed by paragraph 15 of the order of Mr Justice Teare dated 12 November 2009 (as subsequently amended) have been appropriately anonymised by agreement between the solicitors for the Claimant and the First Defendant or by direction of the court. For the avoidance of doubt, the Receivers may use and/or disclose the full terms of this order (including the schedule hereto) as they consider necessary for the purposes of the receivership.

25. Any publication and/or use of this order by the Receivers pursuant to paragraph 24, above, shall not be a breach of the order of Mr Justice Teare dated 17 March 2010.

26. The order of Mr Justice Teare dated 17 March 2010 shall be varied in order to permit the Claimant to inform the following entities as to the outcome of the receivership application, the terms of this order, and significant developments in the progress of the receivership and the appeal referred to below: (i) PriceWaterhouseCoopers; (ii) White & Case LLP; and (iii) Samruk-Kazyna (to whom the Claimant may also disclose information relating to the costs of the receivership).

27. The Receivers shall be permitted to use and/or disclose all information that has come, or will come, into their possession for the purposes of the receivership and no such use shall be restricted by or be a breach of paragraph 15 of the order of Mr Justice Teare dated 12 November 2009 (as subsequently amended) and/or paragraph 5 of the order of Mr Justice Teare dated 22 April 2010, save that such disclosure (insofar as it relates to information provided by the First Defendant), if directed towards the Claimant, shall in the first instance be provided to the Claimant's solicitors, Hogan Lovells International LLP, who shall continue to comply with paragraph 15 of the order of Mr Justice Teare dated 12 November 2009 (as subsequently amended) absent further order.

12

# SCHEDULE 1

## *Evidence read by the Court*

1. The tenth witness statement of Christopher George Hardman dated 18 February 2010.

2. The statement of fitness of Warren Foot dated 18 February 2010.

3. The statement of fitness of Joseph Stewart Farquharson Plant dated 18 February 2010.

4. The eleventh witness statement of Christopher George Hardman dated 22 February 2010.

5. The witness statement of David Edward Langley dated 15 March 2010.

6. The second witness statement of Mukhtar Ablyazov dated 16 March 2010.

7. The third witness statement of Mukhtar Ablyazov dated 16 April 2010 ("**MKA 3**").

8. The fourth witness statement of Alan Bercow dated 16 April 2010.

9. The expert report of Richard Hainsworth dated 16 April 2010.

10. The expert report of Christopher Morris dated 16 April 2010.

11. The third expert report of Professor William Bowring dated 16 April 2010.

12. The expert report of Scott Jonas Newton dated 14 April 2010.

13. The fifteenth witness statement of Christopher George Hardman dated 11 May 2010.

14. The second witness statement of Arman Dunayev dated 11 May 2010.

15. The witness statement of Mukhit Abdrasilov dated 10 May 2010.

16. The statement of the proposed joint receivers dated 11 May 2010.

17. The expert report of Vsevolod Markov dated 11 May 2010.

18. The expert report of Alexander Handruev dated 11 May 2010.

19. The fourth witness statement of Mukhtar Ablyazov dated 17 May 2010 ("**MKA 4**").

20. The expert report of Professor Maggs dated 17 May 2010.

21. The supplemental report of Christopher Morris dated 17 May 2010.

22. The fifth witness statement of Mukhtar Ablyazov dated 24 May 2010.

23. The first witness statement of Aram Iosifyan dated 24 May 2010.

24. The first witness statement of Rinat Batyrgareyev dated 4 June 2010.

25. The sixth witness statement of Mukhtar Ablyazov dated 4 June 2010.

26. The second witness statement of Cary Kochberg dated 7 June 2010.

27. The seventh witness statement of Mukhtar Ablyazov dated 14 June 2010.

28. The eighth witness statement of Mukhtar Ablyazov dated 18 June 2010.

29. The sixteenth witness statement of Christopher George Hardman dated 29 June 2010.

30. The second expert report of Professor Maggs dated 7 July 2010.

31. The first witness statement of Louis Flannery dated 15 July 2010.

32. The ninth witness statement of Mukhtar Ablyazov dated 15 July 2010.

33. The seventh witness statement of Alan Bercow dated 29 July 2010.

34. The seventeenth witness statement of Christopher George Hardman dated 2 August 2010.

35. The eleventh witness statement of Mukhtar Ablyazov dated 8 November 2010

36. The first report to the Court of the Joint Receivers dated 21 December 2010.

37. The twenty third witness statement of Christopher George Hardman dated 24 January 2011.

38. The statement of the joint receivers dated 24 January 2011.

39. The first affirmation of Mukhtar Ablyazov dated 9 February 2011.

40. The second report to the Court of the Joint Receivers dated 21 March 2011.

41. The twenty fifth witness statement of Christopher George Hardman dated 7 April 2011.

42. The statement of the Joint Receivers dated 7 April 2011.

43. The twenty sixth witness statement of Christopher George Hardman dated 26 May 2011.

44. The statement of the Joint Receivers dated 26th May 2011.

45. The report of the Joint Receivers dated 27 May 2011.

46. The twenty eighth witness statement of Christopher George Hardman dated 8 June 2011.

47. The second witness statement of John Milsom dated 8 June 2011.

48. The thirty-seventh witness statement of Christopher George Hardman dated 7 March 2012.

49. The report of the Joint Receivers dated 6 March 2012.

50. The thirty-ninth witness statement of Christopher George Hardman dated 23 April 2012

51. The report of the Joint Receivers dated 23 April 2012


### SCHEDULE 2

#### *Undertakings given to the Court by the Claimant*

(i)    The Claimant undertakes to be answerable for what the Receivers may receive or become liable to pay until they have given the security directed in this Order.

(ii)   If the Court later finds that the appointment or any act or omission of the Receivers has caused loss to the First Defendant, and decides that the First Defendant should be compensated for that loss, the Claimant undertakes that it will comply with any order that the Court may make.

(iii)  If the Court later finds that (i) the First Defendant is not the beneficial owner of an Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Asset or the UK Properties (whether in whole or in part), and (ii) the appointment or any act or omission of the Receivers in relation to the said Undisclosed Asset, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Asset or the UK Properties has caused loss to third party owner(s) of the same, and (iii) that the said third party owner(s) should be compensated for that loss, the Claimant undertakes that it will comply with any order that the Court may make.

(iv)   That it will, subject to the proviso set out below, serve the following documents on the First Defendant's solicitors by the time specified in paragraph 5D, above:

     a.    Copies of the witness statements, reports and associated exhibits containing the evidence relied upon by the Claimant in support of the Extension Application (but only insofar as such documentation has not previously been relied upon at an inter partes hearing);

     b.    A copy of the transcript or a solicitor's note of today's hearing; and

     c.    This order.

(v)    The Claimant will pay the reasonable costs of anyone other than the First Defendant and those persons referred to in paragraph 9(c), above, which have been incurred as a result of this order, including the costs of finding out whether that person holds any of the Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets or the UK Properties.

(vi)     That if for any reason this Order ceases to have effect the Claimant will forthwith take all reasonable steps to inform, in writing, any person to whom it has given notice of this Order or of whom it has reasonable grounds for supposing may act on this Order, that it has ceased to have effect.

## SCHEDULE 3

### *The Disclosed Assets*

In this Schedule reference is made to companies in the following categories:

(a)  Companies over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order;

(b)  Intermediate holding companies; and

(c)  Local operating companies to which Schedule 4, paragraph 2(i) of this order applies.

**(1)     The First Defendant's Interest in AMT** (See Appendix 2 to the Third Affidavit of the First Defendant herein ("MKA 3"))

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
-        Venezzia Trading Limited (BVI)
-        Omada Trading Limited (BVI)
-        Squarecut Trading Ltd (BVI)
-        AHA Management Inc (Commonwealth of Dominica)
-        Crosbie Tech Limited (BVI)
-        Daniels Tradecorp Inc (BVI)
-        Drey Associates Limited (United Kingdom)
-        Interfunding Facilities Limited (United Kingdom)
-        Powermatic Data Limited (Seychelles)
-        Solent Management Limited (BVI)

The intermediate holding companies (to which paragraph 1A of this Order does not apply) are:-
-        Delta Torg LLC (Russia)
-        Rikas Finance LLC (Russia)
-        TuranAlem Capital LLC (Russia)
-        PSK Finance AMK Invest LLC (Russia)

The relevant local operating company for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) is:-
-        AMT Bank LLC

**(2)     The First Defendant's Interest in BTA Ukraine** (See Appendix 3 to MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
- Randers Company Inc (BVI)
- Lakeland Commercial Ltd (BVI)
- Sundycoast Processing Ltd (BVI)
- Venezzia Trading Limited (BVI)
- Goldfine Import Limited (BVI)
- Squarecut Trading Limited (BVI)
- Drobo Trade Ltd (BVI)
- Impulse Capital Corp (Seychelles)
- Stantis Ltd (Cyprus)
- Crosbie Tech Limited (BVI)
- Interfunding Facilities Limited (United Kingdom)
- Pointview Services Limited (BVI)
- Steffler Global Inc (BVI)
- ZRL Beteiligungs AG (Austria)

The intermediate holding companies (to which paragraph 1A of this Order does not apply) are:-
- Absolut Investment LLP (Ukraine)
- Afina Trade LLP (Ukraine)
- DP MP Invest (Ukraine)
- DP Jupiter Trade (Ukraine)
- Drobo Trade Investments LLP (Ukraine)
- Goldfine Import Investments LLP (Ukraine)
- Impulse Capital Investments LLP (Ukraine)
- IPG Eurasia Ukraine LLC (Ukraine)
- Lakeland Investments LLP (Ukraine)

The relevant local operating company for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) is:-
- BTA Ukraine

(3)     **The First Defendant's Interest in BTA Georgia** (See Appendix 4 to MKA3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
- Venezzia Trading Limited
- Sundycoast Processing Ltd (BVI)
- Crosbie Tech Limited (BVI)
- Interfunding Facilities Limited (United Kingdom)
- Pointview Services Limited (BVI)
- ZRL Beteiligungs AG (Austria)

The relevant local operating company for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) is:-
- BTA Georgia

(4)     **The First Defendant's Interest in BTA Armenia** (See Appendix 5 to MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
-        Sundycoast Processing Ltd (BVI)
-        AHA Management Inc (Commonwealth of Dominica)
-        Pointview Services Limited (BVI)
-        Squarecut Trading Limited (BVI)
-        ZRL Beteiligungs AG (Austria)

The intermediate holding company (to which paragraph 1A of this Order does not apply) is:-
-        PSK Finance AMK Invest LLC (Russia)

The relevant local operating company for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) is:-
-        BTA Armenia

(5)     **The First Defendant's 25% shareholding in in Temirbank** (See para. 301 MKA3)

(6)     **The First Defendant's Interest in BTA Kazakhstan** (See para. 303 MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
-        AST Holdings Ltd (St Vincent's and the Grenadines)
-        Vartexo Trading Ltd (Cyprus)
-        Revil Securities SA (Panama)
-        Crosbie Tech (BVI)
-        Venezzia Trading Limited (BVI)
-        KT Asia Investment Group BV (Holland)
-        KSC International Ltd (BVI)
-        Omada Trading Ltd (BVI)
-        Sundycoast Processing Ltd (BVI)
-        Biofusion Limited (BVI)
-        Boscobel International Corp (BVI)
-        Delaware Capital Inc (BVI)
-        Drey Associates Limited (United Kingdom)
-        Eurobusiness Group Inc (Panama)
-        GEM Equity Management Holding AG (Austria)
-        Gemestra Limited (BVI)
-        Interfunding Facilities Limited (United Kingdom)
-        KT Asia Investment Group C.V (Netherlands)
-        Lucky Kingdom Investments (Seychelles)
-        Merenko Limited (Cyprus)
-        Pointview Services Limited (BVI)
-        Powermatic Data Limited (Seychelles)

18

- Strident Energy Limited (United Kingdom)
-
- Tollo Holdings S.a.r.l (Luxembourg)
- ZRL Beteiligungs AG (Austria)

The intermediate holding companies (to which paragraph 1A of this Order does not apply) are:-
- Companiya Invest Capital LLP (Ukraine)
- Agroinvest LLP (Kazakhstan)
- Kazcapital Invest LLP
- Makta Aral Company LLP (Kazakhstan)
- Orken Kapital LLP
- SMKK LLP (Kazakhstan)
- Yassy Invest LLP (Kazakhstan)

The relevant local operating companies for the purposes of Schedule 4, paragraph 2 of this Order are:-
- JSC BTA Bank

(7)  **The First Defendant's 60% shareholding in Real Estate Commercial Company, a company holding property in Kazakhstan** (See para. 306 MKA 3)

(8)  **The First Defendant's Interest in Business Centre at Tsvetnoi Boulevard Moscow** (See para. 314 MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
- Helia Investments Ltd (BVI)
- Clerante Holdings Limited (Cyprus)
- Yarla Investments Limited (BVI)

The relevant local operating company for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) is:-
- Tekhstroy Alliance CJSC (Russia)

(9)  **The First Defendant's Interest in Oceanarium, Moscow** (See para. 324 MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
- Legendcatch Services Limited (Cyprus)
- Livehouse International Ltd (BVI)
- Salvino Services Limited (Cyprus)

The relevant local operating companies for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) are:-
- OOO Marine Gardens

19

(10)    **The First Defendant's Interest in Business Centre at Kutuzovsky Prospect, Moscow** (See para. 328 MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
-        Jadason Enterprises Ltd (Seychelles)
-        Minlin Estates Limited (Cyprus)

The relevant local operating companies for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) are:-
-        Dik Nedvizhimost CJSC (Russia)
-        Financial Centre Micex CJSC (Russia)

(11)    **The First Defendant's Interest at Pavletskaya Square, Moscow** (See para. 338 MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
-        Investclub Investments Ltd (BVI)
-        Salvino Services Limited (Cyprus)
-        Ringbell Investments Limited (BVI)
-        Simplecity Holdings Limited (Cyprus)

The relevant local operating company for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) is:-
-        Paveletskaya OJSC (Russia)

(12)    **The First Defendant's Interest in land at Kaluzkhoye Highway. Moscow** (See para. 350 MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
-        Avalle Consulting Limited (Seychelles)
-        Avgur Group Limited (Seychelles)
-        Beststage International Ltd (BVI)
-        Terrazone Investments Ltd (BVI)
-        Bayshore Marketing Inc (BVI)
-        Salvino Services Limited (Cyprus)
-        Varna Limited (Seychelles)

The relevant local operating companies for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply)  are:-
-        Pakhra Fields LLC (Russia)
-        PK Yurovo LLC (Russia)
-        PO Bylovo LLC (Russia)

(13)    **The First Defendant's Interest in Vitino Port** (See para. 355 MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
-        Direct Logistic Solutions Ltd
-        Lux Investing Limited (BVI)
-        Tedcom Finance Limited (Seychelles)

The intermediate holding companies (to which paragraph 1A of this Order does not apply) are:-
-        Usarel Investments Limited
-        White Sea Complex B.V (Netherlands)

The relevant local operating companies for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) are:-
-        Belomorskaya Neftebaza CJSC (Russia)
-        N-Terminal LLC (Russia)
-        Nord Shipping Inc (Belize)
-        Northern Operations N.V (Netherlands Antilles)
-        Sea Specialised Port Vitino LLC (Russia)

(14)        **The First Defendant's Interest in mine in Kyrgyzstan** (See para. 361 MKA3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
-        Delaware Capital Inc (BVI)
-        Merenko Limited (Cyprus)

The relevant local operating companies for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) are:-
-        IPG Eurasia LLC (Russia)
-        OOO Saryjaz Mineral Mining Co

(15)        **The First Defendant's Interest in oil reserves in Kazakhstan through a 33.3% shareholding in Parasat Group NV** (See para. 366 MKA 3)

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
-        Ancilla Beteiligungs – Verwaltungs GmbH (Austria)
-        Bondhouse Holdings Limited (Cyprus)
-        Riverstreet Investments Ltd (BVI)

The intermediate holding company (to which paragraph 1A of this Order does not apply) is:-
-        Parasat Group NV

The relevant local operating companies for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) are:-
-        NOO MK Caspian Zhuldyz

- TOO Caspian Tristar

(16) **The First Defendant's Interest in Cosmos Hotel, Moscow being a 25.19% shareholding in OAO Gostinichniy Kompleks Cosmos (See para. 370 MKA 3)**

The relevant companies in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order are:-
- Eminota Limited (Cyprus)
- Lemur Holdings Ltd (Cyprus)
- Fexon International Ltd (Seychelles)

The relevant local operating company for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) is:-
- OAO Gostinichniy Kompleks Cosmos

(17) **The First Defendant's 10% shareholding in New Tobacco Company (See para. 377 MKA 3)**

The relevant company in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order is:-
- Instem Holdings Ltd (Cyp)

The relevant local operating company for the purposes of Schedule 4, paragraph 2 of this Order (to which paragraph 1A of this Order does not apply) is:-
- OOO Novaya Tabachnaya Companiya

(18) **The First Defendant's interest in the proceeds of sale Eurasia Tower in Moscow (see para. 16(4) MKA 4)**

The relevant company in respect of this asset over which the Receivers are appointed as managers pursuant to paragraph 1A of this Order is:-
- Handcart Investments Limited

**And In Addition**

The First Defendant's bank accounts with BTA Bank, Moscow, now called AMT including account number 103-0003779-04.

The First Defendant's bank accounts with EFG Bank, Switzerland including account numbers N534746, 534746.150.0 GBP and IBAN CH22 0866 7005 3474 6150 0.

SCHEDULE 3A

The Undisclosed Assets

*The shares in, and (from the moment of service of this order on Mr Ablyazov's solicitors) the Direct and Indirect Assets of, the following companies:*

|   | Company name | Subsidiaries | Jurisdiction | Reg. no. |
|---|---|---|---|---|
| 1. | ABREMIN HOLDINGS LIMITED | | Cyprus | |
| 2. | AEG SYSTEMS INC. | | BVI | 492383 |
| 3. | AFRELTA HOLDINGS LIMITED | | | |
| 4. | ALARA INTERNATIONAL INC. | SAMAL PROPERTIES | BVI | 304518 |
| 5. | ALDAN GLOBAL LIMITED | | BVI | |
| 6. | ALDRIDGE VENTURES LTD | | Seychelles | |
| 7. | ALEDAR HOLDINGS LIMITED | | BVI | 1494228 |
| 8. | ALPHASEA INVESTMENTS LIMITED | | BVI | 1474198 |
| 9. | AMADOR INVESTMENTS LTD. | | Cyprus | 176354 |
| 10. | AMBERWAY LIMITED | | Seychelles | |
| 11. | AMELCA INVESTMENTS LIMITED | | | |
| 12. | AMOREUX LIMITED | SALWICK HOLDING S. À R.L. | Cyprus | HE221463 |
| 13. | ANITAL LLC | | Delaware | 3764432 |
| 14. | ARACELA HOLDINGS LIMITED | | Cyprus | |
| 15. | ARANA CONSTRUCTIONS LIMITED | | BVI | 1495434 |
| 16. | ARGONEX INVEST CORP | LLP AGROCENTER-ASTANA | BVI | 511956 |
| 17. | ARKRIDGE TELECOM LIMITED | SANDOWN HOLDING S. À R.L. | Cyprus | |
| 18. | ARTOUNOA HOLDINGS LIMITED | | Cyprus | |
| 19. | ASINO HOLDINGS LIMITED | | BVI | 1495405 |
| 20. | ASMELTA INVESTMENTS LIMITED | | Cyprus | HE231313 |
| 21. | ASPELICA INVESTMENTS LIMITED | | Cyprus | |
| 22. | ASSET GROUP HOLDINGS LIMITED | | BVI | 1420763 |
| 23. | ASTERATO MANAGEMENT LIMITED | | | |
| 24. | ASTROGOLD CORP. | | BVI | 1374174 |

23

|  | Company name | Subsidiaries | Jurisdiction | Reg. no. |
|---|---|---|---|---|
| 25. | AUSTIN UNIVERSAL INC. | | BVI | 1377358 |
| 26. | AVASIA HOLDINGS LIMITED | | | |
| 27. | AVGOUSTA HOLDINGS LIMITED (FORMERLY MOLYNEUX LTD.) | | | |
| 28. | AVONHILL VENTURES LTD. | | BVI | 682000 |
| 29. | BALGAVEN INVEST INC. | | BVI | 300853 |
| 30. | BARDANE LIMITED | SEAHAM HOLDING S.À R.L | Cyprus | |
| 31. | BAYMAK SERVICES LIMITED | | BVI | 1495416 |
| 32. | BELINIA HOLDINGS LIMITED | [JSC АТЫРАУМУНАЙГАЗГЕОЛОГИЯ] | Cyprus | |
| 33. | BENFLEET HOLDING SARL | | Luxemburg-Kirchberg | B138,496 |
| 34. | BERIT LIMITED | | BVI | 1375691 |
| 35. | BERMENT VENTURES LTD. | | BVI | 1058546 |
| 36. | BLACKSTEEL EXPERTS CORP | | BVI | 1376758 |
| 37. | BLERACE LIMITED | | Cyprus | |
| 38. | BOLOT WORLDWIDE LIMITED | | BVI | 610502 |
| 39. | BONVEST ADVISORS LIMITED | | BVI | |
| 40. | BRANDEN & ASSOCIATES LIMITED | JSC АТЫРАУМУНАЙГАЗГЕОЛОГИ | Seychelles | 024595 |
| 41. | BTA INTERNATIONAL GROUP LIMITED | | BVI | 1518591 |
| 42. | BUBRECA LIMITED | | | |
| 43. | BUSINESS CODE LIMITED | | Seychelles | 25953 |
| 44. | CALERNEN FINANCE INC. | | BVI | 300833 |
| 45. | CALESHA LIMITED | | Cyprus | |
| 46. | CARGOMAX MERCHANTS LIMITED | | BVI | 1374188 |
| 47. | CELINA HOLDINGS INVESTMENTS LIMITED (FORMERLY BUBRIS INVESTMENTS LIMITED) | | | |

| | Company name | Subsidiaries | Jurisdiction | Reg. no. |
|---|---|---|---|---|
| 48. | COMET MERCHANTS LTD. | | BVI | 578198 |
| 49. | COMWORK LTD | | BVI | 580838 |
| 50. | CONCARDO LIMITED | SHALFORD HOLDING S. À R. L. | Cyprus | HE221263 |
| 51. | CORBIERE UNIVERSAL LIMITED | | BVI | |
| 52. | CRESHIA HOLDINGS LIMITED | | Cyprus | |
| 53. | DANA TRADE CORP. | | Seychelles | |
| 54. | DELCHELVA HOLDINGS LIMITED | | Cyprus | |
| 55. | DELTONA SERVICES LIMITED | | BVI | 1495431 |
| 56. | DERBENT SERVICES LIMITED | | BVI | 1495422 |
| 57. | DERNECO LIMITED | | | |
| 58. | DORBEA INVESTMENTS LIMITED | | BVI | 1453089 |
| 59. | ELANESCA INVESTMENTS LIMITED | | Cyprus | |
| 60. | ELGIN ASSETS & VENTURES LIMITED | | BVI | 610503 |
| 61. | ELISHA HOLDINGS LIMITED | | | |
| 62. | ELISTA TRADING INTERNATIONAL LIMITED | | BVI | 1495415 |
| 63. | ERGEN TRADING LTD | | BVI | 1062904 |
| 64. | ERGO TRANSIT CORP. | | BVI | 1380623 |
| 65. | ESTREA MANAGEMENT LIMITED | | BVI | 1453021 |
| 66. | EXTRACORD COMPANY LIMITED | | BVI | 1374177 |
| 67. | FAMESCA INVESTMENTS LIMITED | | Cyprus | |
| 68. | FOUNTAIN HILLS TRADING LIMITED | | BVI | 1495411 |
| 69. | FROLOVO HOLDINGS LIMITED | | BVI | 1495823 |
| 70. | G.R.V. GRECO VENTURES LIMITED | BATHGATE HOLDING S. À R. L. | Cyprus | HE204398 |
| 71. | GEMINI LIMITED | | Seychelles | |
| 72. | GLOBAL TEAM COMPANY | | Seychelles | 036979 |

| | Company name | Subsidiaries | Jurisdiction | Reg. no. |
|---|---|---|---|---|
| 73. | GOLD ARRIS LIMITED | BALDOCK HOLDING S. À R.L., | Cyprus | C221362 |
| 74. | GORAZAR LIMITED | | Cyprus | HE209166 |
| 75. | GREBORE LIMITED | | Cyprus | |
| 76. | GREPAS SERVICES LIMITED | | BVI | 1494529 |
| 77. | GRUNDBERG INC. | | Seychelles | 27871 |
| 78. | HALLMER LIMITED | BANAVIE HOLDING S. À R.L. | Cyprus | 221342 |
| 79. | HILBERTON TRADING LTD. | | BVI | |
| 80. | HILLSPAR HOLDING LIMITED | BANGOR HOLDING S. À R.L. | Cyprus | HE221271 |
| 81. | IDRIAL LIMITED | BARDON HOLDING S. À R. L. | Cyprus | |
| 82. | JACROBI LIMITED | | BVI | 1540549 |
| 83. | JOHNSON INTERTRANS INC. | | BVI | 682017 |
| 84. | JOJOLAND VENTURES LTD | | Cyprus | |
| 85. | JOYTAS HOLDINGS LIMITED | | BVI | 1494520 |
| 86. | KAPSY LIMITED | | BVI | 1494232 |
| 87. | KENTAVIR LIMITED | BARNHILL HOLDING S. À R.L. | Cyprus | HE221289 |
| 88. | KINMATE TRADING LIMITED | | Seychelles | |
| 89. | KLOSTRADE FINANCIAL GROUP LTD. | | | |
| 90. | KSC INTERNATIONAL CORP. | | Seychelles | |
| 91. | KUTUZOV WORLDWIDE ENTERPRISES LIMITED | | BVI | 610814 |
| 92. | LALLARTE LTD | | | |
| 93. | LALLARTE PROPERTIES LIMITED | | Cyprus | |
| 94. | LAPLOUS GROUP LTD. | "ОМСК-ПОЛИМЕР" - OMSK-POLYMER | BVI | 660218 |
| 95. | LAQUIAN LIMITED | BEMPTON HOLDING S. À R.L. | Cyprus | |
| 96. | LATRECIA INVESTMENTS LIMITED | | Cyprus | |
| 97. | LEARNA HOLDINGS LIMITED | | Cyprus | HE 22136 |
| 98. | LEONCA HOLDINGS LIMITED | | Cyprus | |

| | Company name | Subsidiaries | Jurisdiction | Reg. no. |
|---|---|---|---|---|
| 99. | LERCINA HOLDING LTD | | | |
| 100. | LERCINA HOLDINGS LIMITED | | | |
| 101. | LERNICE INVESTMENTS LIMITED | | Cyprus | |
| 102. | LINGARD INDUSTRY LIMITED | | BVI | [1051505] |
| 103. | LINKWOOD LIMITED | | Seychelles | |
| 104. | LOREMAIN LIMITED | BERWICH HOLDING S.À R.L. | Cyprus | HE204395 |
| 105. | M.T.H. MARITIME HOLDINGS LIMITED | BILLBROOK HOLDING S.À R.L. | Cyprus | |
| 106. | MABCO INC. | | BVI | 492132 |
| 107. | MALABAR INVESTMENTS GROUP LIMITED | | BVI | 1495414 |
| 108. | MALAKIY RESOURCES LIMITED | | BVI | 1528963 |
| 109. | MARCENICA INVESTMENTS LIMITED | | Cyprus | |
| 110. | MARCIANA INVESTMENTS LIMITED | | Cyprus | |
| 111. | MASOUR HOLDINGS LIMITED | | BVI | 1494229 |
| 112. | MELINDRA HOLDINGS LIMITED | | Cyprus | HE235065 |
| 113. | MER INVESTMENTS LIMITED | | BVI | 1472376 |
| 114. | MERCIELO LIMITED | | Cyprus | |
| 115. | MINTEX TRADING LTD. | | BVI | |
| 116. | MISHIA INVESTMENTS LIMITED | | BVI | 1474162 |
| 117. | MORANTA INVEST (CYPRUS) LIMITED | | Cyprus | 177050 |
| 118. | MORTECIA INVESTMENTS LIMITED | | Cyprus | |
| 119. | MYMANA INVESTMENT HOLDINGS LIMITED (FORMERLY KYMA INVESTMENT HOLDINGS LIMITED) | | | |
| 120. | NAFAZKO INVESTMENTS LIMITED | | BVI | |
| 121. | NARABAK HOLDINGS LIMITED | | BVI | 1474174 |
| 122. | NETGOLD SERVICES LTD | | | |
| 123. | NOSTRAS LIMITED | BILLINGHAM HOLDING S. À R.L. | | |
| 124. | NUERTO LIMITED | | | |
| 125. | OLOFU INVESTMENT HOLDINGS LIMITED | | | |

| | Company name | Subsidiaries | Jurisdiction | Reg. no. |
|---|---|---|---|---|
| 126. | OOO STROIINVEST-KAZAN | | Russia | 1071690047 164 |
| 127. | OOO STROI-RESOURCE | | Russia | |
| 128. | OOO INVESTPROEKT | | Russia | 1065260110 080 |
| 129. | OOO ATLANT-T | | Russia | 1087154007 203 |
| 130. | [OOO] REGION-INVEST LLC | | Russia | 1080278009 261 |
| 131. | [OOO] INVEST DEVELOPMENT LLC | | Russia | 1087746609 840 |
| 132. | OPIS INVESTMENTS LIMITED | | BVI | 1474166 |
| 133. | PADOGE LIMITED | | | |
| 134. | PASU INVESTMENTS LIMITED | | BVI | 1494521 |
| 135. | PERFETA LIMITED | | | |
| 136. | PKM INVEST LIMITED | | | |
| 137. | PLARUM LIMITED | BARLASTON HOLDING S. À R.L. | | |
| 138. | PORFITTO TRADING LIMITED | BARMING HOLDING S. À R.L. | | |
| 139. | PRESTONA HOLDINGS LIMITED | | BVI | 1472753 |
| 140. | PREVIA LIMITED | | Cyprus | |
| 141. | PROLIFERONE LIMITED | BROCKLEY HOLDING S. À R.L. | Cyprus | HE 223867 |
| 142. | QUASONT LIMITED | BEXLEY HOLDING S. À R.L.<br><br>BIZNESELIT | Cyprus | 201456 |
| 143. | REBLANCA HOLDINGS LIMITED | | Cyprus | |
| 144. | REME INVESTMENTS LIMITED | | BVI | 1494523 |
| 145. | RETRICA HOLDINGS LIMITED | | Cyprus | |
| 146. | REUEL LIMITED | | BVI | 1494227 |
| 147. | RIHANCA HOLDINGS LIMITED | | Cyprus | |
| 148. | ROCKLANE PROPERTIES LIMITED | | BVI | 454885 |
| 149. | ROSPOZANT LIMITED | BLACKBURN HOLDING S. À R.L. | Cyprus | 204378 |

28

| | Company name | Subsidiaries | Jurisdiction | Reg. no. |
|---|---|---|---|---|
| 150. | RUBYWAY LIMITED | | Seychelles | |
| 151. | S.L. SCHOOLDESK LICENSING LIMITED | BUCKLEY HOLDING S. À R.L. | Cyprus | |
| 152. | SAMAL PROPERTIES LIMITED LIABILITY PARTNERSHIP | | Kazakhstan | 38888318 |
| 153. | SAMERA HOLDINGS LIMITED | BRUNDALL HOLDING S. À R.L. | Cyprus | HE 221374 |
| 154. | SANBRETA INVESTMENTS LIMITED | | Cyprus | HE 237114 |
| 155. | SANTE TRADING LIMITED [SANTE TRADING GROUP LIMITED] | | BVI | 1495417 |
| 156. | SEERIA ALLIANCE LTD. | | BVI | 507352 |
| 157. | SHORELINE INVESTMENT HOLDINGS LIMITED (FORMERLY GRANTA INVESTMENT HOLDINGS LIMITED) | | BVI | 1453140 |
| 158. | SIMONIE HOLDINGS LIMITED | BELLGROVE HOLDING S. À R.L. | Cyprus | 221278 |
| 159. | SOMERSET PROJECTS INC. | | BVI | 1045876 |
| 160. | STRASECA HOLDINGS LIMITED | | Cyprus | |
| 161. | SUNSTONE VENTURES LTD. | | BVI | 584478 |
| 162. | SURMAKA SERVICES LIMITED | | Cyprus | |
| 163. | SVELGATE ALLIANCE CORP. | | BVI | |
| 164. | TACTICA ENTERPRISES LTD. | | BVI | 682002 |
| 165. | TAHOKA LIMITED | BULWELL HOLDING S. À R.L. | Cyprus | |
| 166. | TARANSKI LIMITED | BRANHALL HOLDING S. À R.L. | Cyprus | |
| 167. | TELFORD FINANCIERS CORP. | | BVI | 1374186 |
| 168. | TICKER SERVICES AND CONSULTING LIMITED | | BVI | 1494530 |
| 169. | | | | |
| 170. | TOPGEO HOLDINGS LIMITED | | Cyprus | 175798 |
| 171. | TRADESTOCK INC. | | Panama | |
| 172. | TRAMLANES INVESTMENTS LIMITED (FORMERLY BERGTRANS CONTRACTS CORP) | | BVI | 1374191 |

| | Company name | Subsidiaries | Jurisdiction | Reg. no. |
|---|---|---|---|---|
| 173. | TRASNATIONAL ASSETS LIMITED | | | |
| 174. | TRASNATIONAL CAPITAL AND INVESTMENTS LIMITED | | BVI | 610501 |
| 175. | TRIONFALE LIMITED | | Cyprus | 183346 |
| 176. | TSENTR-INVEST LIMITED LIABILITY COMPANY | | | |
| 177. | UNITED CLEARING & PROCESSING COMPANY LTD. | | BVI | 1062737 |
| 178. | VALEFORD CONSORTIUM CORP. | EXCELLENT GLIDE | BVI | 682014 |
| 179. | VANESCA HOLDINGS LIMITED | | BVI | |
| 180. | VANESCA INVESTMENTS LIMITED | | Cyprus | |
| 181. | VARKIZA INVESTMENTS LIMITED | | BVI | 1474168 |
| 182. | VIANDEN LIMITED | | Cyprus | HE201422 |
| 183. | VOREDA INVESTMENTS LIMITED | | BVI | 1472752 |
| 184. | VULIER INVESTMENTS LIMITED | | BVI | 1474163 |
| 185. | WESTRADE LTD. | | BVI | 53136 |
| 186. | WIDLEY WORLDWIDE INC. | | BVI | 610505 |
| 187. | WOODBRIDGE GROUP LTD. | | BVI | 569250 |
| 188. | WORLDWIDE CITY INVESTMENTS LIMITED | | BVI | 610506 |
| 189. | YORK RESOURCES CAPITAL CORP. | | BVI | 682013 |
| 190. | YUMA HOLDINGS LIMITED | | BVI | 1495418 |
| 191. | ZAFFERANT PARTNERS INC. | | BVI | 1044166 |
| 192. | ZALOU INVESTMENTS LIMITED | | BVI | 1474161 |
| 193. | ZANGYLA HOLDINGS LIMITED | | Cyprus | |
| 194. | ZATHEN HOLDING INVESTMENTS LIMITED (FORMERLY CARSONWAY LIMITED) | | BVI | 601702 |
| 195. | ZED CANDY LIMITED | | | |
| 196. | ZEPHYRANTH LIMITED | | | |
| 197. | AFRICAN SKY TRADING LIMITED | | Cyprus | |
| 198. | ALEXAR TRADING LIMITED | | BVI | 1064299 |
| 199. | BATITRAV RESOURCES LIMITED | | Cyprus | 193524 |
| 200. | BILLION TRADER LTD | | | |
| 201. | DAYEN ENVIRONMENTAL LIMITED | | | |
| 202. | DEVESTA LIMITED | | BVI | 1065560 |
| 203. | HUDSONA LIMITED | | Cyprus | |

| | Company name | Subsidiaries | Jurisdiction | Reg. no. |
|---|---|---|---|---|
| 204. | I.R.E.LAND LIMITED | | Cyprus | |
| 205. | KEPPEL LAND LIMITED | | Cyprus | |
| 206. | RIMOS LIMITED | | Seychelles | 030747 |
| 207. | MOLDINA INVESTMENTS LTD | | Cyprus | C171998 |
| 208. | STARWOOD CONTRACTS LIMITED | - | Seychelles | 029790 |
| 209. | TARIONO LIMITED | | Cyprus | HE153123 |
| 210. | URBAS INDUSTRIAL LIMITED | | Cyprus | 194828 |
| 211. | VANBAS LIMITED | | BVI | 1064295 |
| 212. | WINTERRA HOLDINGS LIMITED | | | |

## SCHEDULE 3B

### The Further Undisclosed Assets

*The shares in, and (from the moment of service of this order on Mr Ablyazov's solicitors) the Direct and Indirect Assets of, the following companies:*

|  | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 1. | Acalan Holdings Limited | Cyprus |  | Bluecenter Holdings |
| 2. | Adamaris Investments Ltd | Cyprus |  |  |
| 3. | Adarma Holdings Limited | Cyprus | 273978 |  |
| 4. | Addes International Limited |  |  |  |
| 5. | Adventex Trading Limited | BVI | 1494656 |  |
| 6. | Agrippa Trading Limited | BVI | 1622121 |  |
| 7. | Aharon Incorporated | Seychelles | 081241 |  |
| 8. | AIST LLC | Russia | 0127739396024 |  |
| 9. | Alfa Consultancy Limited | Seychelles | 079481 |  |
| 10. | Alterson Limited |  | 027874 |  |
| 11. | Amirar Limited | Cyprus | 172083 |  |
| 12. | AMT Services Limited | BVI | 1537759 |  |
| 13. | Angeland Investments Limited | BVI | 1401999 |  |
| 14. | Anibell Trading Limited | BVI | 1524142 |  |
| 15. | Antlia Corp | BVI | 1385816 |  |
| 16. | Anzion Holdings Limited | BVI | 1532863 |  |
| 17. | Apa Services Limited | BVI | 1621339 |  |
| 18. | Archeston Solutions Inc | BVI | 1045432 | Business-Engineering |
| 19. | Ardrock Holdings Limited | Cyprus |  |  |
| 20. | Armotage Trading Limited | Cyprus |  |  |
| 21. | Artvision Limited |  |  |  |
| 22. | Aruma Holdings Limited |  |  |  |
| 23. | Asenet Services Limited | BVI |  |  |

|  | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 24. | Aurland Production Inc | BVI | 1067872 | |
| 25. | Avredinar Holdings Limited | Kazakhstan | | |
| 26. | Bainsder Investments Limited | | | |
| 27. | Baldock Holding S.a.r.l. | Luxembourg | 138147 | |
| 28. | Balladfield Holdings Limited | Cyprus | | |
| 29. | Balladplace Enterprises Limited | Cyprus | | |
| 30. | Balladream Holdings Limited | Cyprus | | |
| 31. | Balladroad Enterprises Limited | | | |
| 32. | Baltinvest LLC | Russia | 1083925030595 | |
| 33. | Baltyk Idea Limited | | | |
| 34. | Banavie Holding S.a.r.l. | Luxembourg | 138297 | |
| 35. | Bangor Holding S.a.r.l | Luxembourg | 138296 | |
| 36. | Bardon Holding S.a.r.l. | Luxembourg | 138148 | |
| 37. | Barlaston Holding S.a.r.l. | Luxembourg | 138150 | |
| 38. | Barming Holding S.a.r.l. | Luxembourg | 138243 | |
| 39. | Barnhill Holding S.a.r.l. | Luxembourg | | |
| 40. | Baruch & Co Limited | Seychelles | | |
| 41. | Bathgate Holding S.a.r.l. | Luxembourg | 138146 | |
| 42. | Beenap Limited | BVI | 1049720 | |
| 43. | Belgrave Logistics Limited | Seychelles | 028509 | |
| 44. | Bellgrove Holding S.a.r.l | Luxembourg | | |
| 45. | Beltas Development Corp | BVI | 1069733 | |
| 46. | Beltor Ltd | Seychelles | 027292 | Moranta Invest (Cyprus) |
| 47. | Bemet Investments Limited | | | |
| 48. | Bempton Holding S.a.r.l. | Luxembourg | | |
| 49. | Bensbourogh Trading Inc | BVI | 1468356 | |
| 50. | Berger International Limited | Seychelles | 027001 | |
| 51. | Berniling Investments Limited | Cyprus | | |

33

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 52. | Berwich Holding S.a.r.l. | Luxembourg | 138344 | |
| 53. | Bestcatch Trading Limited | Cyprus | | |
| 54. | Bestshot Services Limited | Cyprus | | |
| 55. | Bexley Holding S.a.r.l. | Luxembourg | 138290 | |
| 56. | Biancini United S.A. | BVI | 1532375 | |
| 57. | Billbrook Holding S.a.r.l. | Luxembourg | 138343 | |
| 58. | Billingham Holding S.a.r.l. | Luxembourg | | |
| 59. | Bion Services Limited | BVI | 1622096 | |
| 60. | Blackburn Holding S.a.r.l. | Luxembourg | 8138293 | |
| 61. | Bluecenter Holdings Limited | BVI | 1522557 | |
| 62. | Bluestate Investments Limited | BVI | 1494647 | |
| 63. | Bogara Tech Limited | | | |
| 64. | Bondiza Consulting Limited | BVI | 1049725 | |
| 65. | Bondmore Holdings Limited | | | |
| 66. | Bondrain Holdings Limited | Cyprus | | |
| 67. | Bondyear Enterprises Limited | | | |
| 68. | Bramilt Enterprises Limited | Cyprus | | |
| 69. | Branhall Holding S.a.r.l. | Luxembourg | | |
| 70. | Brighton Corp. | Seychelles | 27875 | |
| 71. | Britar Holdings Ltd | BVI | 1524113 | |
| 72. | Broadlife Trading Limited | | | |
| 73. | Brockley Holding S.a.r.l. | Luxembourg | 138253 | |
| 74. | Brundall Holding S.a.r.l. | Luxembourg | 138281 | |
| 75. | Buckley Holding S.a.r.l. | Luxembourg | | |
| 76. | Bular Trading Limited | BVI | 300852 | |
| 77. | Bulwell Holding S.a.r.l. | Luxembourg | | |
| 78. | Business Engineering LLC | Russia | 5067746967492 | |
| 79. | Business Expert LLC | Russia | 009105499 | |

34

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 80. | Cabcharge Limited | | | |
| 81. | Caprio LLC/Kaprio LLC | Russia | 1077758540067 | |
| 82. | Carlower Enterprises Limited | Cyprus | | |
| 83. | Carsonway Limited | BVI | 601702 | |
| 84. | Caspineft Holding B.V. | | | |
| 85. | Center-Invest | Russia | 1087746826804 | |
| 86. | Centile Resources Inc | BVI | 1062916 | |
| 87. | Cerebos Limited | | | |
| 88. | CF & Morgan Russia Equity Fund, LP | Russia | | Russian GS |
| 89. | Chapelhill Enterprises Limited | Cyprus | | |
| 90. | Chapelroad Enterprises Limited | Cyprus | | |
| 91. | Chefa Limited | Cyprus | | |
| 92. | Chesterland Invest Corp | BVI | 1045430 | |
| 93. | Chrysopa Holding B.V. | Netherlands | 27222830 | |
| 94. | City Ventures limited | Seychelles | 025955 | |
| 95. | Colberg Division Limited | Cyprus | 181252 | |
| 96. | Colex Trading Limited | Seychelles | 27187 | |
| 97. | Company Support Limited | | | |
| 98. | Cona Trading Limited | BVI | 1524143 | |
| 99. | Constance Services Limited | BVI | 1562723 | |
| 100. | Core Network Limited | Seychelles | 079482 | |
| 101. | Cornerways Services Limited | | | |
| 102. | Crondale Finance Limited | Seychelles | | |
| 103. | Cronberry Overseas Limited | Cyprus | | |
| 104. | Crossaction Enterprises Limited | Cyprus | 220226 | |
| 105. | Cyten Trading Inc | BVI | 1058557 | |
| 106. | Danionics Enterprises Limited | | | |

|  | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 107. | Darfield Limited | BVI | 251302 | |
| 108. | Denacom Limited | Cyprus | | |
| 109. | Denmar Assets Management Inc | BVI | 1069586 | |
| 110. | Develcan Ventures Limited | BVI | 1042062 | Stockstair Holdings Ltd |
| 111. | Dinfield Inc | | | Grosburg Inc |
| 112. | Donlant Ventures Inc | BVI | 1044187 | |
| 113. | Doren Trading Limited | BVI | 1375696 | |
| 114. | Dowring & Associates Inc | BVI | 1058558 | |
| 115. | Dreamlife Holdings Ltd | BVI | 1462349 | |
| 116. | Dregon Land Ltd | Cyprus | 176394 | |
| 117. | Drofal Holding Limited | BVI | 1049729 | |
| 118. | Easy Concept Processing Ltd | BVI | 1462346 | |
| 119. | Edmisonon Holdings Limited | Cyprus | 183260 | |
| 120. | Eklarius Limited | Cyprus | | |
| 121. | Eldoro Holdings Limited | Cyprus | | |
| 122. | Elias Import/Export Limited | BVI | 1045427 | |
| 123. | Elsinore Consultants Limited | Cyprus | 214829 | |
| 124. | Emesin Trading Limited | Cyprus | 178449 | |
| 125. | Emsort Holdings Limited | Cyprus | | |
| 126. | Engelor Trading Limited | | | |
| 127. | Enverolt Marketing Limited | BVI | 1041139 | |
| 128. | Equipe Holdings Limited | BVI | 1041185 | |
| 129. | Ernalco Investments Limited | Cyprus | | |
| 130. | Escantre Holdings Limited | | | |
| 131. | Estar Developments Limited | BVI | 1049271 | |
| 132. | Euroguard Assets Limited | Cyprus | 157940 | |
| 133. | Europtronic Limited | Seychelles | 027188 | |

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 134. | Facebook Trading Limited | Cyprus | | |
| 135. | Famelink Investments Limited | Cyprus | 220859 | |
| 136. | Famille Solutions Limited | BVI | 1562730 | |
| 137. | Fanal Holdings Limited | Cyprus | | |
| 138. | Farcape Services Limited | BVI | 1524082 | |
| 139. | Farpost Holdings Ltd | BVI | 1524144 | |
| 140. | Fastservice Consultants Limited | BVI | 1494649 | |
| 141. | Fedelm Corp | BVI | 1376422 | |
| 142. | Fenella Service Limited | | | |
| 143. | Fernwood Resources Limited | Seychelles | 029775 | |
| 144. | Fers Limited | Cyprus | 178489 | Holder Dom LLC |
| 145. | Feston Limited | Seychelles | 027872 | |
| 146. | Fieldport Networks Corp | Seychelles | | |
| 147. | Fitcherly Holdings Limited | BVI | 1584171 | |
| 148. | Flairis Technologies Limited | Cyprus | 176452 | |
| 149. | Fletcher Investors Corp | BVI | 1045424 | |
| 150. | Flightplan Services Limited | Cyprus | | |
| 151. | Flyajet Investments Limited | BVI | 1524141 | |
| 152. | FM - Company Limited | Marshall Is | | |
| 153. | Fora Corporation | | | |
| 154. | Forestcrystal Holdings Limited | Cyprus | | |
| 155. | Foresthouse Holdings Limited | Cyprus | | |
| 156. | Forlani Investments Ltd | Cyprus | | |
| 157. | Formiga Limited | | | |
| 158. | Francis Alliance Limited | BVI | 1045423 | |
| 159. | Francont Trading Limited | | | |
| 160. | Freshway Financial Consulting Limited | BVI | 1044167 | |

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 161. | Frontline Technology Limited | Seychelles | | |
| 162. | Fugishia Trading Limited | BVI | 1519025 | |
| 163. | Galanz Productions Limited | BVI | 1041143 | |
| 164. | Gambac Limited | BVI | 666463 | |
| 165. | Gamematch Payment Ltd | BVI | 1462354 | |
| 166. | Gasten Group Limited | BVI | 1070393 | |
| 167. | Gatova Holdings Limited | Cyprus | | |
| 168. | Gemnet Services Limited | BVI | 1519027 | |
| 169. | Gemwave Systems Limited | | | |
| 170. | Genemedix Enterprises Ltd | | | |
| 171. | Gestel Marketing Inc | BVI | 1063845 | |
| 172. | Giftrock Trading Limited | Cyprus | | |
| 173. | Global King Enterprises Limited | | | |
| 174. | Globetrade Management Ltd | BVI | 1462202 | |
| 175. | Goldboat Investments Limited | BVI | | |
| 176. | Goldenstage Trading Limited | Cyprus | | |
| 177. | Graceway Commerce Limited | | 181354 | |
| 178. | Greenbridge Services Limited | BVI | 1540522 | |
| 179. | Grosburg Limited | Cyprus | 181247 | LLC Stroyinvest MSC |
| 180. | Gurtall Management Limited | BVI | 1540510 | |
| 181. | Harnfield Resources Limited | BVI | 1063847 | |
| 182. | Heavenview Investments Ltd | BVI | 1462238 | |
| 183. | Heklon Management Ltd | BVI | 300828 | |
| 184. | Highbond Associates Ltd | Seychelles | 028969 | |
| 185. | Highview Limited | Seychelles | 102630 | |
| 186. | Hillrose Developments Limited | Seychelles | | |
| 187. | Hilton Consulting Limited | BVI | 1070782 | |

38

| | Company Name | Jurisdiction | Registration No. | Subsidiaries |
|---|---|---|---|---|
| 188. | Honeynet Trading Limited | BVI | 1494645 | |
| 189. | Humaninvest International Limited | BVI | 1462234 | |
| 190. | Iamgold Corporation Limited | | | |
| 191. | Imex Management Inc | BVI | 1071477 | |
| 192. | Inkaville Holdings Limited | BVI | 1532830 | |
| 193. | Intellectual Creative Solutions Ltd | BVI | 1009715 | |
| 194. | IvoryTower Consultants Limited | Cyprus | | |
| 195. | Jacks International Limited | | | |
| 196. | Jet Fame Industries Limited | Seychelles | | |
| 197. | Jifkor Holdings Limited | BVI | 1049731 | |
| 198. | Jollafield Holdings Limited | Cyprus | | |
| 199. | Jollastreet Enterprises Limited | Cyprus | 185640 | |
| 200. | Jollatower Enterprises Limited | | | |
| 201. | Jollawood Trading & Investments Ltd | Cyprus | 184905 | |
| 202. | Kailani Limited | BVI | 1396985 | |
| 203. | Kalliyan Investments Limited | BVI | 1484566 | |
| 204. | Karola Holdings Limited | BVI | 1524127 | |
| 205. | Kells Services Limited | BVI | 1540631 | |
| 206. | Keywave International Ltd | BVI | 1462222 | |
| 207. | Kimoce Limited | | | |
| 208. | Kinslev Productions Ltd | Seychelles | | |
| 209. | Koasiatrata Investments Limited | | | |
| 210. | Lafe Technology Limited | Seychelles | 27002 | |
| 211. | Lake Resources Limited | Seychelles | | |
| 212. | Langit Consulting Limited | BVI | 1396993 | |

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 213. | Lankom Limited | Seychelles | | |
| 214. | Lavec Estates Limited | Cyprus | | |
| 215. | Lebrica Holdings Limited | Cyprus | | |
| 216. | Lende Trading Corp | Marshall Is | | |
| 217. | Levelbest Trading Limited | Cyprus | | |
| 218. | Lexman Inc | Seychelles | 027870 | Colberg Division |
| 219. | Lifetone Services Limtied | Cyprus | 218027 | |
| 220. | Liftmann Limited | Cyprus | 197893 | |
| 221. | Lightland Consultants Limited | BVI | 1420951 | |
| 222. | Lion Asiapac Limited | | | |
| 223. | Lionhead Trading Limited | BVI | 1494648 | |
| 224. | Loginet Services Limited | BVI | 1522548 | Eldoro Holdings |
| 225. | Logopark Kolpino CJSC | Russia | | |
| 226. | Logopark Mezhdureche CJSC | Russia | | |
| 227. | Logopark Pyshma LLC | | | |
| 228. | Lomtel Limited | BVI | 682683 | |
| 229. | Lotaro Trading Limited | Cyprus | | |
| 230. | Lyriten Production Inc | BVI | 1062905 | |
| 231. | Maden Holding Inc | BVI | 1064833 | |
| 232. | Maintop Trading Limited | Cyprus | 217353 | |
| 233. | Marinor Limited | Cyrpus | | |
| 234. | Matheca Holdings Limited | Cyprus | | |
| 235. | Maximus Resources Limited | Seychelles | 644290 | |
| 236. | | | | |
| 237. | Mega Property Limited | Marshall Islands | | Mount Properties |
| 238. | Melchia Trading Limited | | | |
| 239. | Mergilot Trading Limited | Cyprus | | |

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 240. | Microview Trading Limited | Cyprus | 218651 | |
| 241. | Migina Limited | BVI | 1396992 | |
| 242. | Millennium Support Group Limited | Seychelles | | |
| 243. | Minik Limited | | | |
| 244. | Misatone Limited | | | |
| 245. | Mitchell Technologies Inc | BVI | 1045871 | |
| 246. | Mosdel Finance Limited | BVI | 535012 | |
| 247. | Motzo Holdings Limited | BVI | 1507648 | |
| 248. | Mount Properties Limited | BVI | 337597 | |
| 249. | Nalden Industries Inc | | | |
| 250. | Neshani Investments Limited | Cyprus | 204400 | |
| 251. | Newform Company Ltd | Seychelles | | |
| 252. | Newhomeland Investments Ltd | BVI | 1462874 | |
| 253. | Nextrata Investments Limited | Cyprus | | |
| 254. | Nicedeal Investments Limited | BVI | 1524056 | |
| 255. | Nipremena Holdings Limited | Cyprus | 186409 | |
| 256. | Nitnelav Holdings Limited | Cyprus | | |
| 257. | Normen (Overseas) Ltd | Cyprus | 146521 | |
| 258. | Nupto Limited | Russia | 1049721 | |
| 259. | Oldroad International Ltd | BVI | 1392377 | |
| 260. | Orwell Import/Export Limited | BVI | 1045872 | |
| 261. | Ostel Holdings Limited | BVI | 1614863 | |
| 262. | Paller Products Limited | | | |
| 263. | Palmgate Enterprises Limited | Cyprus | 184874 | |
| 264. | Pancontinental Inc | Belize | | |
| 265. | Parakmi Logistics Limited | Cyprus | | |
| 266. | Pekan Trading Ltd | BVI | 1500339 | |

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 267. | Peperera Investments Limited | | | |
| 268. | Perspective Communications Inc | BVI | 1009714 | |
| 269. | Philadelphia Tradecorp Inc | BVI | 1045873 | |
| 270. | Pilotlight Holdings Limited | Cyprus | 220874 | |
| 271. | Placefield Holdings Limited | Cyprus | 184898 | |
| 272. | Placehouse Enterprises Limited | Cyprus | 184892 | |
| 273. | Planetzone Investments Limited | BVI | 1494630 | |
| 274. | Platform Trustees Limited | Cyprus | 77910 | |
| 275. | Potbel Holdings Ltd | Cyprus | | |
| 276. | Potiza Holdings Limited | | | |
| 277. | Power Factor Trading Limited | | | |
| 278. | Powerboat Investments Limited | BVI | 1522546 | Giftrock Trading |
| 279. | Primesupport Holdings Ltd | Cyprus | | |
| 280. | Prockshere Limited | Seychelles | | |
| 281. | Progen Limited | BVI | 544629 | |
| 282. | ProjectLand Investments Ltd | Cyprus | | |
| 283. | Promwell Holdings Limited | | | |
| 284. | Prosperous Century Inc | BVI | 1009694 | |
| 285. | Quickselect Investments Limited | BVI | 1494632 | |
| 286. | Quinn Services Limited | BVI | 1554073 | |
| 287. | Ratin Investment Limited | BVI | 527985 | |
| 288. | Rayfield Productions Corp | BVI | 1044183 | |
| 289. | Reclif Developments Limited | | | |
| 290. | Refgen Technologies Inc | BVI | 660231 | |
| 291. | Regal View Trading Limited | Cyprus | 204492 | |
| 292. | Reigen Technologies Limited | | | |
| 293. | Reklod Limited | BVI | 1069727 | |

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 294. | Ringfors Enterprises Limited | Cyprus | | |
| 295. | Roadnext Holdings Limited | | | |
| 296. | Rochester Invest Corporation | BVI | 1045874 | |
| 297. | Rockgarden Enterprises Limited | BVI | 1522547 | |
| 298. | Romelo Holdings Limited | BVI | 1524125 | |
| 299. | Rospanico Investments Limited | | | Samuel Finance |
| 300. | Rovert Import/Export Limited | BVI | 1069657 | |
| 301. | Royford Inc | BVI | | |
| 302. | Rushotel LLC | Russia | 5077746954160 | |
| 303. | Rusotels Limited | BVI | 1407339 | Liftman Limited |
| 304. | Russian GS Limited | Cyprus | | |
| 305. | Salwick Holding S.a.r.l. | Luxembourg | | |
| 306. | Samuel Finance S.a.r.l. | Luxembourg | 108566 | |
| 307. | Sandown Holding S.a.r.l. | Luxembourg | | |
| 308. | Sarova Holdings Limited | BVI | 1524130 | |
| 309. | Seaham Holding S.a.r.l. | Luxembourg | 138141 | |
| 310. | Secretcorner Trading Limited | BVI | 1462350 | |
| 311. | SellBrook Company Corp | Seychelles | | |
| 312. | | | | |
| 313. | Shalford Holding S.a.r.l. | Luxembourg | | |
| 314. | SIG Assets Management Limited | Seychelles | 012024 | |
| 315. | Silverall Holdings Ltd | Cyprus | | |
| 316. | Silverghost Trading Limited | Cyprus | 220949 | |
| 317. | Silworld Holdings Limited | Cyprus | | |
| 318. | Skywatch Services Ltd | BVI | 1523632 | |
| 319. | Smarthead Investments Limited | BVI | 1494629 | |

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 320. | Smartinvest Services Limited | BVI | | |
| 321. | Smileworld Investments Ltd | BVI | 1494644 | |
| 322. | Sovstar 1 (Cyprus) Limited | Cyprus | 153130 | |
| 323. | Spacenet Services Limited | BVI | 1522549 | |
| 324. | Specialrace Trading Ltd | Cyprus | | |
| 325. | Spiritbase Services Limited | Cyprus | | |
| 326. | Sprenwood Holdings Limited | BVI | 1605749 | |
| 327. | Stanton Universal Limited | BVI | 547197 | |
| 328. | Star-Atlantic Holding Inc | BVI | 1045877 | |
| 329. | Statedown Enterprises Limited | Cyprus | 184903 | |
| 330. | Statetower Enterprises Limited | Cyprus | 184996 | |
| 331. | Steiman Corp | | | |
| 332. | STL Company LLC | Russia | | |
| 333. | Stockstair Holdings Limited | Cyprus | 198005 | AIST LLC |
| 334. | Storin Limited | BVI | 544628 | |
| 335. | Striks Investments Limited | | | |
| 336. | StroyInvest Kazan LLC | Russia | 1071690047164 | |
| 337. | Stylewest Holdings Limited | Cyprus | | |
| 338. | Subona Trading Limited | Cyprus | | |
| 339. | Subtower Trading Limited | Cyprus | | |
| 340. | Sunwell Distributors Inc | BVI | 1066692 | |
| 341. | Superleague Services Limited | Cyprus | | |
| 342. | Suprisimo Investments Limited | | | |
| 343. | Svanlake Holding Limited | Cyprus | 190960 | |
| 344. | Swainriver Holdings Limited | Cyprus | | |
| 345. | Sylvan Assets Inc | BVI | 1562721 | |
| 346. | Tableros Holdings Limited | Cyprus | | |
| 347. | Tanna Holding S.a.r.l. | Luxembourg | 131216 | |

|  | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 348. | Techlink Consulting Ltd | BVI | 1044178 | |
| 349. | Top Quality Consulting Limited | BVI | 1009713 | |
| 350. | Topwide Trading limited | Cyprus | 246499 | |
| 351. | Topworld Services Limited | BVI | 1420842 | |
| 352. | Torland Production Inc | BVI | 1062907 | |
| 353. | Toros Limited | Seychelles | 030746 | |
| 354. | Tortuga Limited | Seychelles | | |
| 355. | Tossima Limited | BVI | 1064289 | |
| 356. | Trademarket International Limited | BVI | 1462348 | |
| 357. | Trainor Alley Corporation | Seychelles | | |
| 358. | Trasemino Investments Limited | Cyprus | | |
| 359. | Trefor Limited | BVI | 1420482 | |
| 360. | Trombest Holdings Limited | BVI | | |
| 361. | Ungromado Limited | Cyprus | | |
| 362. | | | | |
| 363. | Uniflex Global Limited | | | |
| 364. | Unishare Trading Limited | | | |
| 365. | Urie Services Limited | BVI | 1540532 | |
| 366. | Vaida Trading Limited | BVI | 1607475 | |
| 367. | Velocita Holding B.V. | Holland | | |
| 368. | Venizon Holdings Limited | BVI | 1524060 | |
| 369. | Venta LLC | Russia | 1107746544454 | |
| 370. | Vern Trading Corporation | Seychelles | 029805 | |
| 371. | Vernex Inc | Seychelles | | |
| 372. | Vetro Limited | BVI | 1065558 | |
| 373. | Viascal Holdings Limited | Cyprus | | |
| 374. | Victan Limited | BVI | 1064296 | |

| | Company Name | Jurisdiction | Registration No | Subsidiaries |
|---|---|---|---|---|
| 375. | Victoryland Investments Limited | Cyprus | 246238 | |
| 376. | | | | |
| 377. | Vinsaw Investments Limited | BVI | 1049727 | |
| 378. | Webcare Marketing Limited | Cyprus | | |
| 379. | Wenus Products Limited | Seychelles | 028982 | |
| 380. | Whipland Investments Limited | BVI | 1420874 | |
| 381. | White Avenue Limited | BVI | 1562125 | |
| 382. | Wintop Services Limited | BVI | 1522550 | |
| 383. | Xtrainvest Investments limited | Cyprus | 206428 | |
| 384. | Yorkline Corp | | | |
| 385. | Zaforim Investments Limited | Cyprus | | |
| 386. | Zaidies Limited | | | |
| 387. | Zardoya Holding Limited | | | |
| 388. | Zlatano Limited | Cyprus | | |
| 389. | Zociac Enterprises Limited | BVI | 1462239 | |

## SCHEDULE 3C

### The Additional Undisclosed Assets

*The shares in, and (from the moment of service of this order on Mr Ablyazov's solicitors) the Direct and Indirect Assets of, the following companies:*

|     | Company Name | Jurisdiction | Registration number |
| --- | --- | --- | --- |
| 1. | Airwood Corporation Limited | | |
| 2. | Algoway Investments Limited | Cyprus | |
| 3. | Arfikona Limited | Seychelles | 021188 |
| 4. | Devonton Investments Limited | Cyprus | 183691 |
| 5. | Dinamic Tide Trading | | |
| 6. | Eurasia Logistics Limited | Jersey | 98767 |
| 7. | Govery Trading Limited | | |
| 8. | Haphaestion Holdings Limited | Cyprus | |
| 9. | Harmony Technology Limited | | |
| 10. | Heritam Management Limited | BVI | 1070778 |
| 11. | Innovalues Precision Limited | | |
| 12. | Irwood Commercial Limited | BVI | 570048 |
| 13. | Linuxo Properties Limited | | |
| 14. | Mignola Services S.A. | Seychelles | |
| 15. | Notula Trading Limited | Cyprus | |
| 16. | Roskon Limited | BVI | 1379210 |
| 17. | Seaworld Processing Limited | BVI | 1420851 |
| 18. | Solmar Technologies Corp. | BVI | 1044181 |
| 19. | Vetta (UK) LLP | UK | OC314091 |
| 20. | Warren Worldwide LLC | Seychelles | |
| 21. | Whitestorm Holdings Limited | BVI | 1420837 |
| 22. | Asa Trading Limited | | |
| 23. | Aston Color Limited | BVI | 1064298 |

| 24. | Azure Way Limited | Seychelles | |
| 25. | Casalake Trading Limited | Cyprus | |
| 26. | Cryosphere Limited | | |
| 27. | | | |
| 28. | | | |
| 29. | Erawanco Limited | | |
| 30. | Holder Dom LLC / OOO Kholder Dom | Russia | 1067746721591 |
| 31. | Konami Corporation Limited | Seychelles | 26999 |
| 32. | Palmridge Holdings Limited | Cyprus | 184906 |
| 33. | Salvepar Resources Limited | | |
| 34. | Smartwhere Limited | BVI | 1517915 |
| 35. | Tunnelsink Holdings Limited | BVI | 1517905 |

## SCHEDULE 3D

### The Extra Undisclosed Assets

*The shares in, and the Direct and Indirect Assets of, the following companies:*

|     | Company Name | Jurisdiction | Registration number |
|-----|--------------|--------------|---------------------|
| 1.  | Alasus Holding Limited | Cyprus | |
| 2.  | Asterius Holdings Limited | Cyprus | |
| 3.  | Creterius Finance Limited | Cyprus | |
| 4.  | Fendus Holding Limited | Cyprus | HE 251906 |
| 5.  | Gallamist Investments Limited | Cyprus | |
| 6.  | Global Scale Corporation | Seychelles | |
| 7.  | Ladyhawk Holdings Limited | BVI | 1532832 |
| 8.  | Landusaco Holding Limited | Cyprus | |
| 9.  | Ludostad Properties Limited | BVI | 1536275 |
| 10. | Melkus Finance Ltd | Cyprus | HE245410 |
| 11. | Parasus Finance Limited | Cyprus | HE 251918 |
| 12. | Peristar Holdings Limited | BVI | 1536191 |
| 13. | Shallowlake Holdings Limited | Cyprus | |
| 14. | Staterax Holding Limited | Cyprus | |
| 15. | Stempel Holdings Ltd | BVI | 1522709 |
| 16. | Utara Investments Ltd | BVI | 1532811 |
| 17. | Xendus Holding Limited | Cyprus | |
| 18. | Handcart Investments Limited | BVI | 1420942 |
| 19. | Imerys Limited | Cyprus | C195218 |
| 20. | International Petroleum Services Group Limited | BVI | 489785 |
| 21. | Proteus Group Holdings Limited | Seychelles | 081568 |
| 22. | Septrade Limited | Seychelles | 027294 |
| 23. | Valenora Co Limited | Cyprus | C196265 |

# SCHEDULE 4

*Powers of each of the Receivers (in addition to all other powers vested in each Receiver by virtue of his appointment)*

1. Power to take possession of, collect, get in, receive and preserve the Property and the Undisclosed, Further Undisclosed, Additional Undisclosed and Extra Undisclosed Assets and the UK Properties.

2. Power to carry on the business of or associated with any part of the Property including, for the avoidance of doubt, the companies referred to in paragraph 1A of this order or any part of the Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets or the UK Properties insofar as may be necessary for the preservation of its value provided for the avoidance of doubt that: (i) the Receivers shall not without further order of the Court carry on any business of the local operating companies identified in Schedule 3 of this order; (ii) the Receivers shall have no powers and take no steps in relation to any arbitral proceedings to which KT Asia Investment Group BV is a party (as to which the Bank and the Receivers shall have liberty to apply); and (iii) the Receivers shall have no powers and take no steps in relation to any claims brought by the Bank against the companies referred to in Schedules 3, 3A, 3B, 3C and 3D hereto (as to which the Bank and the Receivers shall have liberty to apply).

3. Power to retain and operate existing bank accounts and to transfer such of the Property and such of the Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets as he is able to transfer into an account in his own name or under his control.

4. Power to transfer any shares, assets, property or ownership rights that are the subject of his appointment to himself or to a suitable person to hold the same on trust or as nominee or agent on his behalf.

5. Power to exercise such voting or other rights or powers attaching to any shareholding or other security (including, without limitation, power to exercise such voting or other rights to change the membership of a legal entity's board of directors or other governing body).

6. Power to take all such steps as may be necessary to cause the registration of themselves (or their nominees) as the registered holders of any shares included in the Property or the Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets.

7. Power to take all such steps as may be necessary to prevent or rectify any alteration of the share capital or ownership of any company whose shares are included in the Property or in the Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets or the alteration or variation of the classes or of the class rights of its shares which would adversely affect that shareholding whether by reduction of capital or the issuing or allotment of new shares or otherwise howsoever.

8. Power to take all such steps as may be necessary to prevent or rectify any acts that adversely affect the value of any shares included in the Property or the Undisclosed,

Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets (subject to paragraph 2 above).

9.    Power to assign the benefit of any contract to himself or a trustee, nominee or agent on his behalf.

10.   Power to bring or defend any action or other legal proceedings in the Courts of this or any other country in order to achieve the purposes of the receivership. For the avoidance of doubt and without limitation, the Receivers shall have power to take all such steps as they deem expedient in relation to (i) the Valenora Proceedings (whether in their own name and/or in the name of Valenora Co Limited), including (if appropriate) to discontinue the same and (ii) such further proceedings as relate to such monies as are due to Chrysopa Holding BV ("**Chrysopa**") or International Petroleum Services Group Limited ("**IPSG**") and/or Valenora Co Limited ("**Valenora**") pursuant to a purported sub-loan agreement entered into between Chrysopa and Usarel Investments Limited dated 10 July 2008 (as subsequently amended) (whether by way of amendments to the Valenora Proceedings or otherwise and whether brought by the Receivers in their own name and/or in the name of Chrysopa and/or IPSG and/or Valenora).

11.   Power to appoint a solicitor, accountant and/or other appropriate person (including his partners, divisions within and employees of his firm) to assist him in the performance of his duties.

12.   Power to do all such things as may be necessary for the preservation and maintenance of the Property and the Undisclosed, Further Undisclosed, Additional Undisclosed or Extra Undisclosed Assets or the UK Properties or any of the share certificates, securities, books, instruments evidencing title and other documents and records (whether electronic or otherwise) that are required hereunder to be delivered up.

13.   Power to appoint any trustee, nominee or agent to take any step which he is unable to do himself or which can more conveniently be done by such person.

14.   Power to effect or maintain policies of insurance in respect of any property or assets within his possession or control.

15.   Power to do any act or execute any deed, receipt or document or to make any payment which is necessary or incidental to his functions or the exercise of the foregoing powers.

## SCHEDULE 5

*Persons referred to in paragraph 20(3) above*

### 1. CSPs, AFFILATED LAW FIRMS AND OTHER THIRD PARTIES

Alick Lawrence Attorney at Law

Andreas P. Dimitriadis & Synergates

Andreas Sofocleous & Co

Ashbury & Bloom Ltd

Aspen Trust Group Ltd

Christodoulos G. Vassiliades

Christodoulos G. Vassiliades & Co LLC

Chrysses Demetriades & Co LLC

Consulco

Consulco & Partners

DS Express

Elias Christofi & Co.

Fiduserve Overseas Limited

GMA Auditors Limited

GWM Center

Hugh F Shaw & Co

International Overseas Services Inc

K. Treppides & Co

Karibouni Corporate Services Limited

Michael Berry

N.K. Oriaka Management Limited

Papachristophorou & Co

PNO Law Firm LLC

Profserve Limited

Proteus Consulting & Services Limited

Quijado & Asociados

Starport Nominees Limited

Unitrust Corporate Services Limited

Worldwide Corporate Services Limited

## 2. REGISTERED AGENTS

A.C.T. - Offshore Limited

Aleman, Cordero, Galindo & Lee Trust (BVI) Limited

All About Offshore (Seychelles) Limited

Alpha IBC Secretaries Ltd

AMS Financial Services

AMS Trustees Limited

Andreas Demetriades

Annie Yeap

Apollo Business Solutions (PTY)

Aspen Secretarial Services Limited

Augi Kalogirou

Avomar Limited

Belserve Consultants Limited

Benedetti & Benedetti

Best Corporate Services Inc

Cherkoules Jason Christian

Christofi Secretarial Limited

Clifton SC Limited

Commonwealth Trust Limited

Cyproservus Co. Limited

Daria Kozlova

Derbent Services Limited

Dilea Secretarial Limited

DMS Corporate Services Ltd

Elena Hadjiroussou

Equity Trust (BVI) Limited

Equity Trust Co (Luxembourg) SA

Fidappoint Secretarial Limited

Fidelity Corporate Services Ltd

Fiduserve Management Limited

Georgia Karides

Giorgoula Zinonos

Harneys Corporate Services Limited


ILS Fiduciary (BVI) Limited

ING Trust (BVI) Limited

International Investment Services Ltd.

International Law & Corporate Services (Pty) Ltd

Intershore Consult (Pty) Ltd

Jordans (Caribbean) Ltd

Jordans (Seychelles) Limited

Mayfair Trust Group Limited

Medwell Holdings Limited

Morgan & Morgan Trust Corporation Limited

Mossack Fonseca & Co. (BVI) Ltd

Mossack Fonseca & Co. (Panama)

Mossack Fonseca & Co. (Seychelles) Ltd

Nikolaou Charalampous Despoina

Orthodoxia Pericleous

Panayiota Eleftheriou

Panayiotis Savva

Patton, Moreno & Asvat (BVI) Limited

Paul Kythreotis

Platform Trustees Ltd

Case 1:13-mc-00230-LAK   Document 316   Filed 04/25/13   Page 56 of 135

Plenexus Limited

PKM Management Limited

Portcullis TrustNet (BVI) Limited

PPT Secretarial Limited

Primeserve Secretarial Limited

Regiserve Secretarial Limited

St Vincent Trust Service Limited

Skysec Secretarial Limited

Starport Secretaries Limited

Sucre & Sucre Trust (BVI) Limited

The Trust Company of the Marshall Islands Inc.

Top Secretarial Limited

Totalserve Trust Company Limited

Trea Secretarial Limited

Trident Trust Company (BVI) Limited

Trustone Services Limited

Vimatex Ltd

Waterlow Registrars Limited

Woodmax Investments Limited

Zoulian Limited

## 3. BANKS

Alpha Bank

OJSC Promsvyazbank

Marfin Popular Bank

Hellenic Bank

Bank of Cyprus

Baltikums Bank AS

Commerzbank (Eurasija) SAO

European American Investment Bank AG

Eurohypo AG

ING Bank (Luxembourg) SA

LGT (Schweiz) Bank

AS Rietumu Banka

Trasta Komercbanka

Eurobank EFG Cyprus Limited

## 4. LIQUIDATORS

Christina Cornelia van den Berg

Damjan Glusica

Edward Petre-Mears

Sarah Petre-Mears

# EXHIBIT B



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System

## U.S. Securities and Exchange Commission

# EDGAR
## Search Results

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

## BANK OF AMERICA NA /MSD CIK#: 0000009586 (see all company filings)

State location: NY

formerly: BANK OF AMERICA NA /MSD (filings through 2007-10-12)

| | |
|---|---|
| Business Address | Mailing Address |
| ONE BRYANT PARK, NY1-100-04-01 NEW YORK NY 10036 6468552236 | 901 W. TRADE STREET NC1-003-04-26 CHARLOTTE NC 28255 |

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ◉ include ◯ exclude ◯ only | Limit Results Per Page 40 Entries | [Search] [Show All] |
|---|---|---|---|---|---|

Items 1 - 15. 🔲 RSS Feed

| Filings | Format | Description | Filing Date | File/Film Number |
|---|---|---|---|---|
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-12-010921 (34 Act)  Size: 1 KB | 2012-06-22 | 086-00146 12061887 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-12-010903 (34 Act)  Size: 1 KB | 2012-05-23 | 086-00146 12061832 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-12-010918 (34 Act)  Size: 1 KB | 2011-06-13 | 086-00146 11025135 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-11-000763 (34 Act)  Size: 1 KB | 2011-01-24 | 086-00146 11015231 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-11-000754 (34 Act)  Size: 1 KB | 2010-12-03 | 086-00146 10032702 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-10-016654 (34 Act)  Size: 1 KB | 2010-08-06 | 086-00146 10031719 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-10-017676 (34 Act)  Size: 1 KB | 2010-05-05 | 086-00146 10031942 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-09-026629 (34 Act)  Size: 1 KB | 2009-10-21 | 086-00146 09042663 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-09-022868 (34 Act)  Size: 1 KB | 2009-07-14 | 086-00146 09041913 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-08-045232 (34 Act)  Size: 1 KB | 2008-11-03 | 086-00146 08032298 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-08-032273 (34 Act)  Size: 1 KB | 2008-07-16 | 086-00146 08032180 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-08-026033 (34 Act)  Size: 1 KB | 2008-05-21 | 086-00146 08031730 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-08-005384 (34 Act)  Size: 1 KB | 2008-01-25 | 086-00146 08025280 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-07-052074 (34 Act)  Size: 1 KB | 2007-10-12 | 086-00146 07008077 |
| MSD/A | [Documents] | **[Amend][Paper]**Registration of Municipal Securities Dealer Acc-no: 9999999997-08-000066 (34 Act)  Size: 1 KB | 2007-05-07 | 086-00146 07000139 |

Case 1:13-mc-00001-LAK   Document 3-1   Filed 01/02/13   Page 60 of 137

*http://www.sec.gov/cgi-bin/browse-edgar*



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System
**EDGAR**
**U.S. Securities and Exchange Commission**

**Search Results**

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

**BARCLAYS BANK PLC/G/ /GFN CIK#: 0001042452**
**(see all company filings)**

State location: NY

Business Address          Mailing Address
75 WALL ST                222 BROADWAY
NEW YORK NY 10265 NEW YORK NY 10038
2124123544

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ⊙ include ⊙ exclude ⊙ only | Limit Results Per Page 40 Entries | Search Show All |
|---|---|---|---|---|---|

Items 1 - 1 📶 RSS Feed

| Filings | Format | Description | Filing Date | File/Film Number |
|---|---|---|---|---|
| G-FIN/A | Documents | **[Amend][Paper]**notification by financial institutions of status Acc-no: 9999999997-03-020334 Size: 1 KB | 2003-04-11 | 011-00375 03018553 |

*http://www.sec.gov/cgi-bin/browse-edgar*

Home | Search the Next-Generation EDGAR System | Previous Page                    Modified 03/14/2012

 **BNP PARIBAS** | The bank for a changing world

About us | News | Investors / Shareholders | Careers | Corporate Philanthropy | Sustainable Development | Sponsoring | Our locations

Home > Our locations

**Corporate & Institutional**

**Wealth Management**
**Individuals**

**Contact us**

Print this page

# Our locations

Contact us        Our locations

## By city or region

- Bank of the West branches
- First Hawaiian Bank branches
- BNP Paribas Dallas Texas
- BNP Paribas Chicago
- BNP Paribas Houston
- BNP Paribas King of Prussia
- BNP Paribas New York

**The Equitable Center**

787 Seventh Avenue
New York, NY 10019
Tel.: 212-841-2000
Fax: 212-841-3251

 Map and route

**Jersey City**

525 Washington Blvd,
Jersey City, NJ, 07310
Tel: 201-850-4000

 Map and route

**Fischer Francis Trees & Watts**

200 Park Avenue,
New York, NY 10166
Tel.: 212-681-3000
Fax: 212-681-3250

Map and route

- BNP Paribas Miami
- BNP Paribas San Francisco



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System

**U.S. Securities and Exchange Commission**

# EDGAR
## Search Results

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

## CITIBANK NA CIK#: 0000036684 (see all company filings)

State location: NY | Fiscal Year End: 1231
Get **insider transactions** for this **reporting owner**.

Business Address
*399 PARK AVENUE*
*NEW YORK NY 10043*
*2125591000*

Mailing Address
*C/O LEGAL AFFAIRS*
OFFICE
*425 PARK AVENUE*
*2ND FLOOR*
*NEW YORK NY 10043*

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ⦿ include ○ exclude ○ only | Limit Results Per Page 40 Entries ▾ | Search Show All |
|---|---|---|---|---|---|

Items 1 - 40  📶 RSS Feed

Next 40

| Filings | Format | Description | Filing Date | File/Film Number |
|---|---|---|---|---|
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-12-000269 (34 Act) Size: 2 KB | 2012-11-14 | 028-04287 121201272 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-12-000192 (34 Act) Size: 2 KB | 2012-08-14 | 028-04287 121029908 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-12-000121 (34 Act) Size: 2 KB | 2012-05-15 | 028-04287 12841312 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-12-000045 (34 Act) Size: 2 KB | 2012-02-14 | 028-04287 12602818 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-11-000336 (34 Act) Size: 2 KB | 2011-11-14 | 028-04287 111201013 |
| 13F-NT/A | Documents | [Amend]Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-11-000292 (34 Act) Size: 2 KB | 2011-11-01 | 028-04287 111172095 |
| 40-APP | Documents | Application for exemption and other relief filed under the Investment Company Act of 1940 Acc-no: 0001144204-11-058535 (40 Act) Size: 308 KB | 2011-10-20 | 812-13970-05 111148767 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-11-000244 (34 Act) Size: 2 KB | 2011-08-15 | 028-04287 111033654 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-11-000133 (34 Act) Size: 2 KB | 2011-05-16 | 028-04287 11843952 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-11-000044 (34 Act) Size: 3 KB | 2011-02-14 | 028-04287 11603908 |
| APP ORDR | Documents | 40-APP Order Acc-no: 9999999997-10-019633 (40 Act) Size: 27 KB | 2010-11-24 | 812-13808-05 101197445 |
| APP NTC | Documents | 40-APP Notice Acc-no: 9999999997-10-019632 (40 Act) Size: 50 KB | 2010-11-24 | 812-13808-05 101197425 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000831001-10-000272 (34 Act) Size: 3 KB | 2010-11-15 | 028-04287 101190942 |
| 40-APP/A | Documents | [Amend]Application for exemption and other relief filed under the Investment Company Act of 1940 Acc-no: 0001144204-10-054401 (40 Act) Size: 281 KB | 2010-10-19 | 812-13808-05 101130043 |
| 13F-NT | Documents | | | |

| | | | | |
|---|---|---|---|---|
| | | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-10-000194 (34 Act)  Size: 3 KB | 2010-08-13 | 028-04287<br>101013384 |
| 40-APP/A | Documents | [Amend]Application for exemption and other relief filed under<br>the Investment Company Act of 1940<br>Acc-no: 0001144204-10-040425 (40 Act)  Size: 281 KB | 2010-07-30 | 812-13808-05<br>10981554 |
| 40-APP | Documents | Application for exemption and other relief filed under the<br>Investment Company Act of 1940<br>Acc-no: 0001144204-10-040081 (40 Act)  Size: 281 KB | 2010-07-29 | 812-13808-05<br>10978088 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-10-000125 (34 Act)  Size: 3 KB | 2010-05-17 | 028-04287<br>10837488 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-10-000036 (34 Act)  Size: 3 KB | 2010-02-12 | 028-04287<br>10595364 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-09-002272 (34 Act)  Size: 3 KB | 2009-11-10 | 028-04287<br>091172016 |
| CORRESP | Documents | [Cover]Correspondence<br>Acc-no: 0001104659-09-058519 Size: 602 KB | 2009-10-09 | |
| 40-APP/A | Documents | [Amend]Application for exemption and other relief filed under<br>the Investment Company Act of 1940<br>Acc-no: 0001104659-09-058494 (40 Act)  Size: 794 KB | 2009-10-09 | 812-13656-22<br>091114245 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-09-002170 (34 Act)  Size: 3 KB | 2009-08-14 | 028-04287<br>091013087 |
| 40-APP/A | Documents | [Amend]Application for exemption and other relief filed under<br>the Investment Company Act of 1940<br>Acc-no: 0001104659-09-048493 (40 Act)  Size: 724 KB | 2009-08-10 | 812-13656-22<br>09998649 |
| 40-APP/A | Documents | [Amend]Application for exemption and other relief filed under<br>the Investment Company Act of 1940<br>Acc-no: 0001104659-09-038382 (40 Act)  Size: 701 KB | 2009-06-16 | 812-13656-22<br>09894547 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-09-001401 (34 Act)  Size: 3 KB | 2009-05-15 | 028-04287<br>09829498 |
| 40-APP | Documents | Application for exemption and other relief filed under the<br>Investment Company Act of 1940<br>Acc-no: 0001104659-09-028708 (40 Act)  Size: 754 KB | 2009-05-04 | 812-13656-22<br>09790978 |
| 40-APP | Documents | Application for exemption and other relief filed under the<br>Investment Company Act of 1940<br>Acc-no: 0001144204-09-013637 (40 Act)  Size: 288 KB | 2009-03-12 | 812-13641-03<br>09676588 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-09-000421 (34 Act)  Size: 3 KB | 2009-02-11 | 028-04287<br>09588764 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-08-001136 (34 Act)  Size: 3 KB | 2008-11-13 | 028-04287<br>081183966 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-08-000474 (34 Act)  Size: 3 KB | 2008-08-14 | 028-04287<br>081014550 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-08-000383 (34 Act)  Size: 3 KB | 2008-05-14 | 028-04287<br>08831806 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-08-000055 (34 Act)  Size: 3 KB | 2008-02-14 | 028-04287<br>08613177 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-07-000361 (34 Act)  Size: 3 KB | 2007-11-14 | 028-04287<br>071244277 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-07-000240 (34 Act)  Size: 3 KB | 2007-08-14 | 028-04287<br>071054966 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-07-000161 (34 Act)  Size: 3 KB | 2007-05-15 | 028-04287<br>07852353 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-07-000083 (34 Act)  Size: 3 KB | 2007-02-14 | 028-04287<br>07620395 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-06-000392 (34 Act)  Size: 3 KB | 2006-11-13 | 028-04287<br>061210320 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-06-000264 (34 Act)  Size: 3 KB | 2006-08-14 | 028-04287<br>061029939 |
| 13F-NT | Documents | | | |

| | | | |
|---|---|---|---|
| Quarterly report filed by institutional managers, Notice<br>Acc-no: 0000831001-06-000179 (34 Act)  Size: 3 KB | | 2006-05-15 | 028-04287<br>06840291 |

Next 40

*http://www.sec.gov/cgi-bin/browse-edgar*



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System

**U.S. Securities and Exchange Commission**

**EDGAR**
**Search Results**

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

## COMMERZBANK AG /ADR/ CIK#: 0000839463 (see all company filings)

SIC: 8880 - UNKNOWN SIC - 8880
State location: NY | State of Inc.: **2M** | Fiscal Year End: 1231
(Assistant Director Office: 99)

| Business Address | Mailing Address |
|---|---|
| *2 WORLD FINANCIAL CENTER* | *2 WORLD FINANCIAL CENTER* |
| *NEW YORK NY 10281* | *NEW YORK NY 10281* |
| 2122667581 | |

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ◉ include ◉ exclude ◉ only | Limit Results Per Page 40 Entries ▾ | Search Show All |
|---|---|---|---|---|---|

Items 1 - 8 🔊 RSS Feed

| Filings | Format | Description | Filed/Effective | File/Film Number |
|---|---|---|---|---|
| EFFECT | Documents | Notice of Effectiveness Acc-no: 9999999995-11-002741 (33 Act)  Size: 1 KB | 2011-09-16 09:00:00 | 333-176649 111096360 |
| F-6 | Documents | Registration of American Depository Receipt shares, not immediately effective Acc-no: 0001019155-11-000405 (33 Act)  Size: 185 KB | 2011-09-02 | 333-176649 111072852 |
| F-6EF | Documents | Registration of American Depository Receipt shares, immediately effective Acc-no: 0001019155-05-000127 (33 Act)  Size: 120 KB | 2005-06-17 | 333-125896 05902618 |
| SC 13G/A | Documents | [Amend]Statement of acquisition of beneficial ownership by individuals Acc-no: 0000903423-05-000014 Size: 9 KB | 2005-01-06 | |
| SC 13G | Documents | Statement of acquisition of beneficial ownership by individuals Acc-no: 0000903423-04-000953 Size: 9 KB | 2004-10-21 | |
| SC 13G/A | Documents | [Amend]Statement of acquisition of beneficial ownership by individuals Acc-no: 0000903423-04-000924 Size: 9 KB | 2004-10-07 | |
| SC 13G | Documents | Statement of acquisition of beneficial ownership by individuals Acc-no: 0000903423-04-000801 Size: 10 KB | 2004-08-23 | |
| SC 13G/A | Documents | [Amend]Statement of acquisition of beneficial ownership by individuals Acc-no: 0000839463-03-000002 Size: 10 KB | 2003-08-12 | |

*http://www.sec.gov/cgi-bin/browse-edgar*



In the United States and Canada, Crédit Agricole CIB offers the full range of the Corporate and Investment Bank's expertise through four dedicated business lines:
• Coverage: of large corporates and financial institutions, both large US clients and international group clients,
• the Structured Finance teams: a renowned expertise, particularly in the energy, infrastructure, transportation, real estate, and lodging sectors.
• the Capital Markets division: strong expertise in foreigne exchange, interest rates, commodities, USD bonds, and securitisation solutions,
• Equity Brokerage activities which pull together European (CA Cheuvreux), Asian (CLSA), and US research and sales expertise.

Crédit Agricole CIB's long-term relationships with US-based and international customers are based on the Bank's capacity to provide competitive and differentiated products.
Worth noting is the Bank's particular expertise in energy and infrastructure, including structured financing of Public and Private Partnerships (PPPs) and renewable energy projects.
In capital markets, Crédit Agricole CIB provides unique solutions, for example in commodities hedging, USD bond primary issues, and trade receivables or term ABSAsset-Backed Security: fixed income securitiy issued by a special purpose vehicle (SPV) to refinance the purchase from a bank or other financial institution, a corporate, public entity or other seller of specified assets (e.g. bank loans). The ABS interest and principal repayments are paid out of cash-flow generated by the purchased assets. securitisations.

A specialised client focus complements longstanding coverage of corporate clients through the banking teams in the United States, Canada and Latin America. Crédit Agricole CIB in the Americas has developed a client base of more than 200 companies. Crédit Agricole CIB Americas' headquarters are in New York City, with other US offices in Chicago, Houston and Boston as well as offices in Canada, Mexico, Argentina and Brazil.

Located in New York, the Crédit Agricole Group Liaison Desk in the United States assists Crédit Agricole's mid-capCompanies with a Market capitalisationIt corresponds to the value of a company as determined by the market. It is calculated by multiplying the number of

outstanding shares by the current market price of a share. of between EUR 250 million and EUR 1,000 million. corporate customers with their international operations, by providing expertise on the local environment as well as by securing access to a wide spectrum of banking services abroad.

Contact:
Crédit Agricole Group Liaison desk in North America
1301 Avenue of the Americas,
NEW YORK, NY 10019

More information

---

Communications
infoamericas@ca-cib.com



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System

**U.S. Securities and Exchange Commission**

### EDGAR
### Search Results

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

**DEUTSCHE BANK TRUST CO AMERICAS CIK#: 0001173854 (see all company filings)**

State location: NY

Business Address
60 WALL STREET
25TH FLOOR
NEW YORK NY 10005
2126023761

Mailing Address

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ● include ○ exclude ○ only | Limit Results Per Page 40 Entries | Search  Show All |

Items 1 - 16 📶 RSS Feed

| Filings | Format | Description | Filing Date | File/Film Number |
|---------|--------|-------------|-------------|------------------|
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-12-000125 (34 Act) Size: 2 KB | 2012-11-19 | 028-13777 121212783 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-12-000102 (34 Act) Size: 2 KB | 2012-08-15 | 028-13777 121035666 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-12-000071 (34 Act) Size: 2 KB | 2012-05-15 | 028-13777 12843469 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-12-000044 (34 Act) Size: 2 KB | 2012-02-15 | 028-13777 12615033 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-11-000129 (34 Act) Size: 2 KB | 2011-11-14 | 028-13777 111201962 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-11-000105 (34 Act) Size: 2 KB | 2011-08-15 | 028-13777 111035251 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-11-000076 (34 Act) Size: 2 KB | 2011-05-16 | 028-13777 11844098 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-11-000041 (34 Act) Size: 3 KB | 2011-02-14 | 028-13777 11607990 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-10-000203 (34 Act) Size: 3 KB | 2010-11-17 | 028-13777 101198399 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-10-000181 (34 Act) Size: 3 KB | 2010-11-15 | 028-13777 101192104 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-10-000142 (34 Act) Size: 3 KB | 2010-08-13 | 028-13777 101013458 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-10-000084 (34 Act) Size: 3 KB | 2010-05-14 | 028-13777 10831952 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000948046-10-000043 (34 Act) Size: 3 KB | 2010-02-16 | 028-13777 10602379 |
| 40-6C/A | Documents | **[Amend][Paper]**Application for exemption and other relief [Section 6(c)] Acc-no: 9999999997-06-050075 (40 Act) Size: 1 KB | 2006-12-21 | 812-13212 06065107 |
| 40-6C | Documents | **[Paper]**Application for exemption and other relief [Section 6(c)] Acc-no: 9999999997-05-031138 (40 Act) Size: 1 KB | 2005-07-07 | 812-13212 05059852 |
| 40-6C | Documents | | | |

| **[Paper]**Application for exemption and other relief [Section 6(c)] | 2002-05-01 | 812-12822-01 |
| Acc-no: 9999999997-02-030053 Size: 3 KB | | 02035703 |

*http://www.sec.gov/cgi-bin/browse-edgar*

---

Home | Search the Next-Generation EDGAR System | Previous Page          Modified 03/14/2012



## Habib American Bank

December 17, 2012

Consumer Banking    Corporate Banking    Institutional Banking    Trade Finance    About Us

**About Us**
¶ Corporate Profile
¶ Mission Statement
¶ Core Values
¶ Board of Directors
¶ Management
¶ Locations
¶ Employment

## About Us

### Corporate Profile

Habib American Bank (HAB) was incorporated in 1983 as a New York State Chartered Bank. HAB is a member of Federal Deposit Insurance Corporation (FDIC). Headquartered in New York, the bank expanded by opening branches in Queens, New York, and subsequently in Los Angeles, California and New Jersey. HAB also has an International Banking Facility (IBF) that provides correspondent services to international banks.

HAB specializes in Financial Institution Services, International Trade Finance, Asset Based Lending, Commercial and Residential Mortgages and Consumer Banking Services. Our family of Consumer Banking Products includes HAB eBanking, Remote Deposit Capture, Habib Access Debit Card, Visa Credit Card & 24 Hour Telephone Banking.

As we celebrate our 3rd decade of operations, we continue to emphasize our focus on adding value to services provided to our niche consisting of corporate, consumer and correspondent banking customers. HAB is indeed......

**"Your Local Bank with International Experience"**

### Mission Statement

Habib American Bank's mission is to provide a broad range of commercial and personal banking products and services to a diverse community of globally oriented customers. Our customers can expect that we will consistently deliver exceptional customer service in every aspect of our business dealings resulting in profitable long-term relationships.

### Core Values

Every employee will strive to provide superior service with the best possible value, above the industry standard, thereby encouraging customers to choose and remain with our bank as their preferred banking partner.

We will adhere to the highest levels of honesty, integrity and efficiency in providing value added services to our customers, thereby creating an ongoing relationship of trust and confidence in all their dealings with the bank.

We will manage and grow our assets with exceptional fiduciary care yet strive to produce a profit which will enable us to enhance the lives of our employees, customers and the communities in which we live and work.

Our management team will provide continuity in leadership, demonstrate vision in a competitive marketplace and strive always to inspire confidence and trust in their relationships with their employees and customers.

Recognizing that our employees are our most valuable asset and our competitive advantage, we will provide them with the resources and services needed to support the achievement of our mission and endeavor to protect the special values and culture of our organization.

### Board of Directors

Our Board of Directors, mentioned below, consists of present as well as former bankers with extensive experience in the field of banking.

| | |
|---|---|
| **A.G. Abbasi** | Chairman |
| **Arvid Nelson** | Vice Chairman |
| **Muhammad H. Habib** | Director |
| **Douglas A. Russell** | Director |
| **William S. Mason, Jr.** | Director |

| Dennis Dunn | Director |
|---|---|
| **Navneet S. Chugh** | Director |
| **Saleem Iqbal** | Director |

## Management

Our Management Team consists of experienced bankers with extensive banking experience. The following are members of our management team.

| Saleem Iqbal | President & Chief Executive Officer |
|---|---|
| **Mirza Ejaz Hussain** | S.E.V.P. & Head of Correspondent Banking Division |
| **Rizwan Qureshi** | S.E.V.P. & Chief Compliance Officer |
| **Javed Karim** | E.V.P.& Senior Credit Officer |
| **Zilay Wahidy** | S.V.P.& Marketing Executive |
| **Abbas Somjee** | 2nd Vice President & Financial Controller |
| **Amina Hashim** | Secretary to the Board |

## Locations

**Manhattan Branch**
99 Madison Avenue
New York, NY 10016
Monday-Friday 9:00 AM-3:30 PM
Telephone: (212) 532-4444
Fax: (212) 532-8273

**Jackson Heights Branch**
74-05/07 37th Avenues
Jackson Heights, NY 11372
Monday-Friday 9:00 AM - 3:30 PM
Saturday 11:00 AM - 2:00 PM
Telephone: (718) 397-0890
Fax: (718) 397-0871

**Los Angeles Branch**
110 East 9th Street
Los Angeles, CA 90079
Monday-Friday 9:00 AM - 4:00 PM
Telephone: (213) 362-1200
Fax: (213) 362-1201

**Artesia Branch**
18357 Pioneer Boulevard
Artesia, CA 90701
Monday - Friday 9:00 AM - 4:00 PM
Saturday 10:00 AM - 2:00 PM
Telephone: (562) 924-7500
Fax: (562) 924-7521

**Iselin Branch**
1585 Oak Tree Road
Iselin, NJ 08830
Monday-Friday 9:00 AM - 4:00 PM
Saturday 10:00 AM - 1:00 PM
Telephone: (732) 205-1777
Fax: (732) 205-1772

**Hicksville Branch**
421 South Broadway
Hicksville, NY 11801
Monday - Friday 9:00 AM - 4:00 PM
Saturday 10:00 AM - 2:00 PM
Telephone: (516) 681-5200
Fax: (516) 681-5267

**Richmond Hill Branch**
112-17/19 Liberty Avenue
Richmond Hill, NY 11419
Monday - Friday 9:00 AM - 4:00 PM
Saturday 10:00 AM - 2:00 PM
Telephone: (718) 659-9000



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System
**EDGAR**

**U.S. Securities and Exchange Commission**

## Search Results

SEC Home »Search the Next-Generation EDGAR System »Company Search »*Current Page*

## HSBC BANK USA /GFN CIK#: 0000823422 (see all company filings)

State location: NY

Business Address          Mailing Address
*452 FIFTH AVE*
*NEW YORK NY 10018*

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ● include ● exclude ● only | Limit Results Per Page 40 Entries | Search Show All |
|---|---|---|---|---|---|

Items 1 - 1  📶 RSS Feed

| Filings | Format | Description | Filing Date | File/Film Number |
|---|---|---|---|---|
| G-FIN/A | Documents | **[Amend][Paper]**notification by financial institutions of status Acc-no: 9999999997-03-020852 Size: 1 KB | 2003-04-11 | 011-00045 03018554 |

*http://www.sec.gov/cgi-bin/browse-edgar*

Home | Search the Next-Generation EDGAR System | Previous Page          Modified 03/14/2012



- Home
- About Us
- Contact Us
- IDB Bank News
- Careers
- Site Map



- Banking Services
  - Personal Banking
  - Business Banking
  - U.S. Private Banking
  - International Private Banking
  - Cash Management
  - Investment Management & Trust
  - Capital Markets
- Lending Services
- International
  - International Private Banking
  - Trade and Finance
- Investments
  - Time Deposits
  - Structured Time Deposits



Contact Us

- Head Office
- Staten Island Branch
- Short Hills Branch
- Aventura Branch
- Beverly Hills Branch
- Downtown Los Angeles Branch
- Cayman Islands Branch
- Personal Banking
- Business Banking
- U.S. Private Banking
- International Private Banking
- Middle Market Lending
- Asset Based Lending
- Trade and Finance
- Commercial Real Estate Lending
- Trademark Financing
- IDB Factors®
- PRO2PRO® for Professional Firms
- Not-For-Profit Pros®

- Corporate Communications
- Careers
- Representative Offices
- Broker-Dealer Services through IDB Capital Corp.

**MEMBER FDIC**

# Contact Us

**To report a lost or stolen ATM/Debit card call 1-866-IDB-5825**

HOURS OF OPERATION:

IDB Bank branch hours are 9:00am – 3:30pm in their respective time zones.
IDB Bank office hours are 9:00am – 5:00pm in their respective time zones.

BANK HOLIDAYS:

Please be advised that the Bank and all of its branches will be officially closed in observance of the following holidays:

**2012**
January 2 - New Year's Day (Sun. observed Mon.)
January 16 - Dr. Martin Luther King, Jr. Day
February 20 - President's Day
April 13 - Passover (7th Day)
May 28 - Shavuot (2nd Day)/Memorial Day
July 4 - Independence Day
September 3 - Labor Day
September 17 - Rosh Hashanah (1st Day)
September 18 - Rosh Hashanah (2nd Day)
September 26 - Yom Kippur
October1 - Sukkot (1st Day)
October 2 - Sukkot (2nd Day)
October 8 - Shemini Atzeret/Columbus Day
October 9 - Simchat Torah
November 12 - Veteran's Day (Sun. observed Mon.)
November 22 - Thanksgiving Day
December 25 - Christmas Day

NEW YORK

Head Office

IDB Bank
511 Fifth Avenue
New York, NY 10017
Tel: (212) 551-8500

Staten Island Branch

IDB Bank
201 Edward Curry Avenue, Suite 204
Staten Island, NY 10314
Tel: (718) 698-4892

NEW JERSEYShort Hills Branch

IDB Bank
150 JFK Parkway
Short Hills, NJ 07078
Tel: (973) 379-8699

FLORIDA

Aventura Branch

IDB Bank
Harbour Centre
18851 NE 29th Avenue, Suite 600
Aventura, FL 33180
Tel: (305) 682-3700

Telecommunication Device for the Hearing Impaired:
(305) 682-3792

CALIFORNIA

Beverly Hills Branch

IDB Bank
9401 Wilshire Blvd., Suite 600
Beverly Hills, CA 90212
Tel: (310) 860-6320

Downtown Los Angeles Branch

IDB Bank
888 South Figueroa Street, Suite 550
Los Angeles, CA 90017
Tel: (213) 861-6440

Telecommunication Device for the Hearing Impaired:
(310) 276-8437

CAYMAN ISLANDS

Cayman Islands Branch

P. O. Box 694GT
George Town
Grand Cayman, British West Indies

Personal Banking

**New York**

Elliot Tolchin, FVP
Tel: (212) 551-8708

Terry Nidich, AVP
Tel: (212) 714-5662

**California**

Moti Levy-Tsedek, FVP & Branch Manager
Tel: (213) 861-6455

---

Business Banking

**New York**

Elliot Tolchin, FVP
Tel: (212) 551-8708

Terry Nidich, AVP
Tel: (212) 714-5662

**Florida**

Moise Hillel, EVP & Regional Manager
Tel: (305) 682-3725

**California**

Moti Levy-Tsedek, FVP & Branch Manager
Tel: (213) 861-6455

---

U.S. Private Banking

**New York**

James LoGatto, EVP
Tel: (212) 551-8508
IDB Bank
511 5th Avenue, NY 10017

**California**

Gal Ben-Naim, FVP
Tel: (310) 860-6334

**Florida**

Charles K. Miller, FVP
Tel: (305) 682-3739

---

International Private Banking

---

Middle Market Lending

**New York**

Lissa Baum, EVP and Group Leader
Tel: (212) 551-8751

Howard Weinberg, FSVP and Group Head
Tel: (212) 551-8085

George Commander, SVP
Tel: (212)551-8755

**Florida**

Roger Arsham, SVP Middle Market & Corporate Lending
Tel: (305) 682-3781

**California**

Yoav Peled, EVP and Regional Manager for California
Tel: (310) 860-6350

---

Asset Based Lending

Roy Grossman, SVP 1 and Department Head
Tel: (212) 551-8550

---

Trade and Finance

Vincent A. Forzano, VP
350 Fifth Avenue
New York, NY 10118-2091
20th Floor, Suite 2001
(212) 216-1042

---

Commercial Real Estate Lending

**New York**

Sten F.B. Sandlund, SVP, Manager, NY Real Estate Lending
Tel: (212) 551-8127

**Florida**

John White, SVP Commercial Real Estate Lending
Tel: (305) 682-3734

**California**

Yoav Peled, EVP & Regional Manager for California
Tel: (310) 860-6322

Lorraine Drasser, SVP, Los Angeles Real Estate Division
Tel: (213) 861-6444

---

T®ADEMARK FINAN©ING[SM]

Howard Weinberg, FSVP and Group Head
IDB Bank
511 5th Avenue
New York, NY 10017
Tel: (212) 551-8085

---

<u>IDB Factors</u>® (division of IDB Bank)

**New York**

Louis G. Barone, SVP and Division Head
IDB Factors
511 Fifth Avenue
New York, NY 10017
Tel: (212) 551-8778

**California**

IDB Factors
888 South Figueroa Street, Suite 550
Los Angeles, CA 90017
Tel: (310) 860-6330

---

<u>PRO2PRO</u>®

---

<u>Not-for-Profit Pros</u>®

---

Corporate Communications

Teresa Murphy, VP
Tel: (212) 551-8927

---

REPRESENTATIVE OFFICES

**Israel**
Ofek House
8 Ha'Manofim Street, 3rd Floor
P.O. Box 12406
Herzliya Pituach, 46733
Israel

**Chile**

Av. Vitacura 2771, Of. 804
Santiago, Chile

---

SUBSIDIARY BANK

**Discount Bank Latin America**
Rincón 390
Montevideo, Uruguay

---

Broker-Dealer Services

---

<u>IDB Capital Corp.</u> (subsidiary of IDB Bank)

---



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System
# EDGAR

## U.S. Securities and Exchange Commission

## Search Results

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

## JP MORGAN CHASE BANK CIK#: 0001208636 (see all company filings)

SIC: 8880 - UNKNOWN SIC - 8880
State location: NY
(Assistant Director Office: 99)
Get **insider transactions** for this **reporting owner.**

Business Address          Mailing Address
*1CHASE*
*MANHATTAN PLAZA*
*40TH FLOOR*
*NEW YORK NY 10081*
*2125524904*

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ○ include ◉ exclude ○ only | Limit Results Per Page 40 Entries | Search |
|---|---|---|---|---|---|
| | | | | | Show All |

Items 1 - 2 🔊 RSS Feed

| Filings | Format | Description | Filing Date | File/Film Number |
|---|---|---|---|---|
| ARS | Documents | **[Paper]**Annual Report to Security Holders Acc-no: 9999999997-08-021431 (34 Act) Size: 1 KB | 2008-04-01 | 333-107610 08016127 |
| F-6EF | Documents | Registration of American Depository Receipt shares, immediately effective Acc-no: 0000950117-03-003399 Size: 51 KB | 2003-08-01 | 333-107610 03818833 |

*http://www.sec.gov/cgi-bin/browse-edgar*



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System
# EDGAR
**U.S. Securities and Exchange Commission**
## Search Results

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

## SOCIETE GENERALE NEW YORK BRANCH CIK#: 0001238163 (see all company filings)

State location: NY

Business Address
*1221 AVENUE OF THE AMERICAS NEW YORK NY 10020 212-278-7028*

Mailing Address

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ◉ include ◉ exclude ◉ only | Limit Results Per Page 40 Entries | Search Show All |
|---|---|---|---|---|---|

Items 1 - 1 RSS Feed

| Filings | Format | Description | Filing Date | File/Film Number |
|---|---|---|---|---|
| G-FIN | Documents | **[Paper]**notification by financial institutions of status Acc-no: 9999999997-03-023854 Size: 1 KB | 2003-04-30 | 011-00512 03053427 |

*http://www.sec.gov/cgi-bin/browse-edgar*

Home | Search the Next-Generation EDGAR System | Previous Page

Modified 03/14/2012

**WHOLESALE BANKING**

**USA**

**New York, New York**

Standard Chartered Bank
1095 Avenue of the Americas
New York, NY 10036
Tel: +1 212 667 0700
Fax: +1 212 667 0380

**Newark, New Jersey**

Standard Chartered Bank
Two Gateway Center, 13th Floor
Newark, NJ 07102
Tel: +1 201 706 5000
No General Fax Number

**Jersey City, New Jersey**

Standard Chartered Bank
One Evertrust Plaza, 11th floor
Jersey City, NJ, 07302
Tel: +1 201 915 8529
Fax: +1 201 209 0572; +1 201 209 0871

**Houston, Texas**

Standard Chartered Bank
3 Riverway, Suite 1330
Houston, Texas 77056
Tel: +1 713 877 9588
Fax: +1 713 877 9129

**Los Angeles, California**

Standard Chartered Bank
601 South Figueroa Street, Suite 2775
Los Angeles, CA 90017
Tel: +1 626 639 8000
Fax: +1 626 639 8010

**San Francisco, California**

Standard Chartered Bank
50 Freemont Street, Suite 2210
San Francisco, CA 94104
Tel: +1 415 294 8400
Fax: +1 415 294 8499

**CANADA**

**Calgary**

Standard Chartered Bank
420, 635 8th Avenue SW
Calgary, Alberta T2P 3M3, Canada
Tel: +1 403 444 2804
Fax: +1 403 444 2841

**Toronto**

Gryphon Partners Canada Inc. 1 A Standard Chartered group company
20 Adelaide Street East, Suite 1105
Toronto, ON, M5C 2T6, Canada
Tel: +1 416 368 0040
Fax: +1 416 368 0046

**CARIBBEAN**

**Cayman Islands**

Standard Chartered Trust (Cayman) Limited
24 Howard Street
George Town
Grand Cayman, KY1-1107, Cayman Islands
Tel: +345 949 8806

Fax: +345 949 0261

Nassau, Bahamas

Please contact Standard Chartered in New York

## LATIN AMERICA

Buenos Aires, Argentina

Standard Chartered Bank
Av. Leandro N. Alem 855 – 18th floor
Buenos Aires (C1001AAD) Argentina
Tel: +54 11 4875 0500
Fax: +54 11 4875 0520

São Paulo, Brazil

Standard Chartered Bank
Av. Brigadeiro Faria Lima, 3600 – 7th Floor
04538-132 – Itaim Bibi
São Paulo - SP - Brazil
Tel: +55 11 2789 6800
Fax: +55 11 2789 6894

Santiago, Chile

Standard Chartered Bank
Isidora Goyenechea 3621
10th Floor, Las Condes
Santiago, Chile
Tel: +562 350 67 00
Fax: +562 350 67 48

Bogota, Colombia

Standard Chartered Bank
Carrera 7 # 71-52
Torre A Of. 702
Bogota, Colombia
Tel: +57 1 326 4030
Fax: +57 1 312 0313

We cover Panama and Central America clients from Bogota.

Mexico City, Mexico

Standard Chartered Bank
Paseo de las Palmas 239-401
Lomas de Chapultepec
Mexico, D.F. 11000, Mexico
Tel: +52 55 5387 1300
Fax: +52 55 5387 1399

Lima, Peru

Standard Chartered Bank
Av. Canaval y Moreyra Number 380, Of. 1001
Lima 27, Peru
Tel: + 51 1 710 8000
Fax: +51 1 710 8040

We cover Bolivia, Ecuador, and Venezuela clients from Lima.



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System

**U.S. Securities and Exchange Commission**

**EDGAR**

**Search Results**

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

## BANK OF NEW YORK MELLON CIK#: 0001497973
(see all company filings)

State location: NY | State of Inc.: **DE** | Fiscal Year End: 1210

Business Address
*ONE WALL STREET*
*NEW YORK NY 10286*
*212-495-1784*

Mailing Address
ONE WALL STREET
NEW YORK NY 10286

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ◉ include ◯ exclude ◯ only | Limit Results Per Page 40 Entries | Search Show All |
|---|---|---|---|---|---|

Items 1 - 4 📶 RSS Feed

| Filings | Format | Description | Filing Date | File/Film Number |
|---|---|---|---|---|
| APP WD | Documents | Withdrawal of an Application for exemption [Section 12(g)] or from filing certain reports [Section 13(a)] Acc-no: 0000945621-11-000254 (40 Act)  Size: 19 KB | 2011-11-28 | 812-13823-02 111228282 |
| 40-APP/A | Documents | [Amend]Application for exemption and other relief filed under the Investment Company Act of 1940 Acc-no: 0000894579-11-000130 (40 Act)  Size: 298 KB | 2011-03-21 | 812-13823-02 11699460 |
| APP WD | Documents | Withdrawal of an Application for exemption [Section 12(g)] or from filing certain reports [Section 13(a)] Acc-no: 0000894579-11-000127 (40 Act)  Size: 8 KB | 2011-03-21 | 812-13824 11699448 |
| 40-APP | Documents | Application for exemption and other relief filed under the Investment Company Act of 1940 Acc-no: 0000945621-10-000164 (40 Act)  Size: 221 KB | 2010-09-17 | 812-13824 101078546 |

*http://www.sec.gov/cgi-bin/browse-edgar*

Home | Search the Next-Generation EDGAR System | Previous Page

Modified 03/14/2012

Contact Us

Home | Contact Us | Locations | Locations & ATMs

---

**The Northern Trust Company**
65 East 55th Street
24th Floor
New York, NY  10022
ABA Routing: 072471887
Fax: 1-212-339-7274

**1-212-339-7474**

---

**Driving Directions**

---

**View a Map**

---

GENERAL CONTACT



**John F. Hoffman**
President - PFS New York

---

**Get in Touch**

---

**1-212-339-7474**

---

John Hoffman was appointed President of PFS – New York in June 2011 and is responsible for managing all aspects of the market including client service, talent management, new business development and brand awareness. He joined Northern Trust in 2003 as a wealth advisor specializing in financial, estate, investment and tax planning for high-net-worth individuals, senior executives and wealthy families.

Previously, Hoffman worked at the US Trust Company for eight years, where he served as a Senior Vice President in its high-net-worth planning group. Prior to that, he worked at AYCO Company LP as a Senior Financial Planner and as a member of the firm's investment planning committee.

Hoffman holds an MBA and a BBA from Hofstra University, he also received his CIMA designation from the University of Pennsylvania's Wharton School and his CPWA designation from the University of Chicago. Hoffman is a member of the New York Society of Security Analysts and the Investment Management

Consultants Association (IMCA) and sits on the editorial advisory board for the IMCA publication Investments and Wealth Monitor. He is also active with the New York Public Library.

**Teller Services**
Monday  Friday: 9:00 a.m. to 4:00 p.m.
Holidays, Saturday and Sunday: Closed

Full Site    Site Map

© 2012 Northern Trust Corporation

Privacy Policy     Legal Terms & Conditions

IRS Circular 230 Notice



Home | Latest Filings | Previous Page

Search the Next-Generation
EDGAR System

**U.S. Securities and Exchange Commission**

**EDGAR**

**Search Results**

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

### UBS AG NEW YORK BRANCH CIK#: 0001070765 (see all company filings)

State location: NY

Business Address
10 E 50TH STREET
NEW YORK NY 10022
2037198960

Mailing Address

| Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ● include ○ exclude ○ only | Limit Results Per Page 40 Entries | Search  Show All |
|---|---|---|---|---|---|

Items 1 - 40 🔊 RSS Feed

Next 40

| Filings | Format | Description | Filing Date | File/Film Number |
|---|---|---|---|---|
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0001070765-12-000004 (34 Act) Size: 2 KB | 2012-10-30 | 028-07344 121168386 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-12-000018 (34 Act) Size: 2 KB | 2012-08-03 | 028-07344 121005444 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0001070765-12-000003 (34 Act) Size: 2 KB | 2012-05-11 | 028-07344 12835156 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0001070765-12-000002 (34 Act) Size: 2 KB | 2012-02-13 | 028-07344 12594361 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0001070765-11-000005 (34 Act) Size: 2 KB | 2011-11-14 | 028-07344 111202326 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0001070765-11-000003 (34 Act) Size: 2 KB | 2011-07-28 | 028-07344 11993591 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-11-000019 (34 Act) Size: 2 KB | 2011-04-04 | 028-07344 11732923 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0001070765-11-000001 (34 Act) Size: 2 KB | 2011-01-03 | 028-07344 11500763 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0001070765-10-000005 (34 Act) Size: 2 KB | 2010-10-01 | 028-07344 101101228 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0001070765-10-000004 (34 Act) Size: 2 KB | 2010-07-30 | 028-07344 10981712 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-08-000067 (34 Act) Size: 2 KB | 2008-08-14 | 028-07344 081015758 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-08-000058 (34 Act) Size: 2 KB | 2008-02-13 | 028-07344 08601716 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-07-000104 (34 Act) Size: 2 KB | 2007-12-04 | 028-07344 071282203 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-07-000087 (34 Act) Size: 2 KB | 2007-05-15 | 028-07344 07850975 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-07-000001 (34 Act) Size: 2 KB | 2007-02-05 | 028-07344 07579830 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-06-000053 (34 Act) Size: 2 KB | 2006-11-15 | 028-07344 061220516 |

| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-06-000044 (34 Act)  Size: 2 KB | 2006-07-19 | 028-07344 06969472 |
|---|---|---|---|---|
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-06-000041 (34 Act)  Size: 2 KB | 2006-05-12 | 028-07344 06832704 |
| 13F-HR/A | Documents | [Amend]Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-06-000039 (34 Act)  Size: 2 KB | 2006-04-21 | 028-07344 06772007 |
| 13F-NT | Documents | Quarterly report filed by institutional managers, Notice Acc-no: 0000861177-06-000003 (34 Act)  Size: 2 KB | 2006-02-10 | 028-07344 06596448 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-06-000001 (34 Act)  Size: 153 KB | 2006-01-27 | 028-07344 06556063 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-05-000032 (34 Act)  Size: 17 KB | 2005-11-21 | 028-07344 051216772 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-05-000027 (34 Act)  Size: 18 KB | 2005-08-12 | 028-07344 051019754 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-05-000024 (34 Act)  Size: 11 KB | 2005-06-07 | 028-07344 05882211 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-05-000003 (34 Act)  Size: 11 KB | 2005-02-15 | 028-07344 05616604 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-04-000031 (34 Act)  Size: 10 KB | 2004-11-17 | 028-07344 041153043 |
| 13F-HR/A | Documents | [Amend]Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-04-000025 Size: 9 KB | 2004-08-23 | 028-07344 04992207 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-04-000024 Size: 14 KB | 2004-08-17 | 028-07344 04981155 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-04-000016 Size: 14 KB | 2004-05-12 | 028-07344 04798640 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-04-000001 Size: 15 KB | 2004-02-17 | 028-07344 04607020 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-03-000034 Size: 14 KB | 2003-11-17 | 028-07344 031007783 |
| 13F-HR/A | Documents | [Amend]Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-03-000030 Size: 13 KB | 2003-08-18 | 028-07344 03853778 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0000861177-03-000029 Size: 11 KB | 2003-08-14 | 028-07344 03847737 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0001070765-03-000005 Size: 10 KB | 2003-05-12 | 028-07344 03691772 |
| 13F-HR/A | Documents | [Amend]Quarterly report filed by institutional managers, Holdings Acc-no: 0001070765-03-000004 Size: 18 KB | 2003-04-29 | 028-07344 03669606 |
| 13F-HR/A | Documents | [Amend]Quarterly report filed by institutional managers, Holdings Acc-no: 0001070765-03-000003 Size: 18 KB | 2003-02-18 | 028-07344 03571189 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0001070765-03-000001 Size: 214 KB | 2003-02-18 | 028-07344 03569762 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0001070765-02-000004 Size: 11 KB | 2002-11-14 | 028-07344 02828953 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0001070765-02-000003 Size: 10 KB | 2002-08-13 | 028-07344 02730073 |
| 13F-HR | Documents | Quarterly report filed by institutional managers, Holdings Acc-no: 0001070765-02-000002 Size: 11 KB | 2002-06-05 | 028-07344 02671180 |

Next 40

Case 1:13-mc-00001-AK   Document 3-1   Filed 01/02/13   Page 89 of 119

# Find a Union Bank Branch Bank & ATM in New York, NY

All Locations <u>All Locations</u> > New York <u>New York</u> > New York <u>New York</u> >

New York Commercial Branch

1251 Avenue of the Americas (6th Avenue)

New York , NY 10002

Financial Services Division - East

1251 Avenue of the Americas 19th Floor

New York , NY 10020

800 418-6466



## ATM and Banking Locations - Search Results

**1  Bank and ATM | 0.57 miles**
BROADWAY & GRAND
463 BROADWAY
NEW YORK, NY, 10013
Phone: 212-941-4440

**Lobby Hours**
Mon-Fri 09:00 AM-07:00 PM
Sat 11:00 AM-04:00 PM
Sun closed

**ATMs (2)**
24 hours
**ATM Deposit Cutoff**
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**2  Bank and ATM | 1.43 miles**
JERSEY CITY DOWNTOWN
101 HUDSON ST
JERSEY CITY, NJ, 07302
Phone: 201-413-6607

**Lobby Hours**
Mon-Wed 09:00 AM-05:00 PM
Thu 09:00 AM-06:00 PM
Fri 09:00 AM-05:00 PM
Sat-Sun closed

**ATMs (2)**
24 hours
**ATM Deposit Cutoff**
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**3  Bank and ATM | 1.44 miles**
BROADWAY & 10TH
784 BROADWAY
NEW YORK, NY, 10007
Phone: 212-677-5693

**Lobby Hours**
Mon 09:00 AM-07:00 PM
Tue 09:00 AM-06:00 PM
Wed 09:00 AM-07:00 PM
Thu-Fri 09:00 AM-06:00 PM
Sat 10:00 AM-03:00 PM
Sun closed

**ATMs (2)**
24 hours
**ATM Deposit Cutoff**
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**4  Bank and ATM | 1.76 miles**
JERSEY CITY NEWPORT
145 THOMAS GANGEMI DR
JERSEY CITY, NJ, 07310
Phone: 201-795-7239

**Lobby Hours**
Mon-Wed 09:00 AM-05:00 PM
Thu-Fri 09:00 AM-06:00 PM
Sat 09:00 AM-02:00 PM
Sun closed

**Drive-Up Hours**
Mon-Wed 09:00 AM-05:00 PM
Thu-Fri 09:00 AM-06:00 PM
Sat 09:00 AM-02:00 PM
Sun closed

**ATMs (2)**
24 hours
**ATM Deposit Cutoff**
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**5  Bank and ATM | 1.87 miles**
NINTH AVENUE & 15TH STREET
66 9TH AVE
NEW YORK, NY, 10011
Phone: 646-336-0300

**Lobby Hours**
Mon-Fri 09:00 AM-06:00 PM
Sat-Sun closed

**ATMs (2)**
24 hours
**ATM Deposit Cutoff**
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**6  Bank and ATM | 1.87 miles**
SEVENTH & 17TH STREET
120 7TH AVE
NEW YORK, NY, 10011
Phone: 212-488-5180

**Lobby Hours**
Mon 09:00 AM-06:00 PM
Tue 09:00 AM-07:00 PM
Wed 09:00 AM-06:00 PM
Thu 09:00 AM-07:00 PM
Fri 09:00 AM-06:00 PM

Sat 10:00 AM-03:00 PM
Sun closed

ATMs (2)
24 hours
ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**7  Bank Only | 1.92 miles**
HOBOKEN
95 RIVER ST
HOBOKEN, NJ, 07030
Phone: 201-239-9659

This location is temporarily closed. For more
information, please call 1-800-869-3557.
Lobby Hours
Mon-Wed 09:00 AM-05:00 PM
Thu-Fri 08:00 AM-06:00 PM
Sat 09:00 AM-02:00 PM
Sun closed

---

**8  ATM | 2.45 miles**
PENN STATION MAIN LOBBY- AMTRAK
7TH AVENUE & WEST 31ST
NEW YORK, NY, 10001
Phone: 800-869-3557

Features
Withdrawals only - no deposits
Wheel Chair accessible
Talking

ATMs (3)
24 hours

---

**9  Bank and ATM | 2.61 miles**
MADISON & 34TH
180 MADISON AVE
NEW YORK, NY, 10016
Phone: 212-213-0936

Lobby Hours
Mon-Fri 09:00 AM-06:00 PM
Sat 10:00 AM-03:00 PM
Sun closed

ATMs (2)
24 hours
ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**10  Bank and ATM | 2.83 miles**
HOBOKEN 14TH STREET
2 14TH ST
HOBOKEN, NJ, 07030
Phone: 201-234-3800

Lobby Hours
Mon-Wed 09:00 AM-05:00 PM
Thu-Fri 09:00 AM-06:00 PM
Sat 10:00 AM-02:00 PM
Sun closed

ATMs (1)
24 hours
ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**11  Bank and ATM | 2.89 miles**
SEVENTH & 39TH
535 7TH AVE
NEW YORK, NY, 10018
Phone: 212-764-8260

Lobby Hours
Mon-Fri 09:00 AM-06:00 PM
Sat 10:00 AM-03:00 PM
Sun closed

ATMs (3)
24 hours
ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**12  Bank and ATM | 2.92 miles**
PARK & 40TH
99 PARK AVE
NEW YORK, NY, 10016
Phone: 917-332-3620

Lobby Hours
Mon-Fri 08:30 AM-06:00 PM
Sat-Sun closed

ATMs (2)
Hours vary
ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**13  ATM | 2.95 miles**
PIER 79 MIDTOWN TERMINAL
459 12TH AVENUE
NEW YORK, NY, 10018
Phone: 800-869-3557

Features
Withdrawals only - no deposits
Wheel Chair accessible
Sells Stamps
Talking

ATMs (1)
Hours vary

---

**14  Bank and ATM | 3.04 miles**
THIRD AVENUE & 42ND STREET
686 3RD AVE
NEW YORK, NY, 10017

Lobby Hours
Mon-Fri 09:00 AM-06:00 PM
Sat 10:00 AM-03:00 PM
Sun closed

Phone: 212-692-5060

ATMs (2)
24 hours

ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**15 ATM | 3.04 miles**
HBO BUILDING
1100 AVENUE OF THE AMERICA'S
NEW YORK, NY, 10169
Phone: 800-869-3557

Features
Envelope-Free$^{SM}$ ATM
Wheel Chair accessible
Sells Stamps
Talking

ATMs (4)
24 hours

ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**16 ATM | 3.06 miles**
TIMES SQUARE SUBWAY MTA
42ND ST TIMES SQUARE SUBWAY STATION
NEW YORK, NY, 10036
Phone: 800-869-3557

Features
Envelope-Free$^{SM}$ ATM
Wheel Chair accessible
Sells Stamps
Talking

ATMs (3)
24 hours

ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**17 Bank and ATM | 3.11 miles**
JERSEY CITY
356 CENTRAL AVE
JERSEY CITY, NJ, 07307
Phone: 201-420-8788

Lobby Hours
Mon-Wed 09:00 AM-05:00 PM
Thu-Fri 09:00 AM-06:00 PM
Sat 09:00 AM-01:00 PM
Sun closed

ATMs (2)
24 hours
ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**18 Bank and ATM | 3.18 miles**
MADISON & 45TH STREET
360 MADISON AVE
NEW YORK, NY, 10017
Phone: 212-885-6200

Lobby Hours
Mon-Fri 09:00 AM-06:00 PM
Sat-Sun closed

ATMs (2)
24 hours
ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**19 Bank and ATM | 3.18 miles**
SIXTH AVENUE & 45TH STREET
1156 AVE OF THE AMERICAS
NEW YORK, NY, 10036
Phone: 212-596-1400

Lobby Hours
Mon-Fri 09:00 AM-06:00 PM
Sat-Sun closed

ATMs (2)
24 hours
ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**20 ATM | 3.19 miles**
PARK AVE @ GRAND CENTRAL
230 PARK AVE.
NEW YORK, NY, 10169
Phone: 800-869-3557

Features
Envelope-Free$^{SM}$ ATM
Wheel Chair accessible
Sells Stamps
Talking

ATMs (3)
Hours vary

ATM Deposit Cutoff
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

---

**21 Bank and ATM | 3.22 miles**
JERSEY CITY JOURNAL SQUARE
40 JOURNAL SQ
JERSEY CITY, NJ, 07306
Phone: 201-413-6677

Lobby Hours
Mon-Wed 09:00 AM-05:00 PM
Thu-Fri 09:00 AM-06:00 PM
Sat 09:00 AM-02:00 PM
Sun closed

ATMs (2)
24 hours
**ATM Deposit Cutoff**
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

**22 Bank and ATM | 3.29 miles**
THIRD AVENUE & 47TH STREET
757 3RD AVE
NEW YORK, NY, 10017
Phone: 917-322-6500

**Lobby Hours**
Mon-Fri 09:00 AM-06:00 PM
Sat-Sun closed

ATMs (2)
24 hours
**ATM Deposit Cutoff**
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

**23 ATM | 3.31 miles**
BROADWAY AND 47TH STREET
DOUBLETREE HOTEL
NEW YORK, NY, 10036
Phone: 800-869-3557

**Features**
Envelope-Free$^{SM}$ ATM
Wheel Chair accessible
Sells Stamps
Talking

ATMs (2)
24 hours

**ATM Deposit Cutoff**
Mon-Fri 09:00 PM same day
Sat-Sun closed & holidays: Next business day

**24 ATM | 3.34 miles**
PORT IMPERIAL WEEHAWKEN TERMINAL
4800 AVENUE & PORT IMPERIAL
WEEHAWKEN, NJ, 07086
Phone: 800-869-3557

**Features**
Withdrawals only - no deposits
Wheel Chair accessible
Sells Stamps
Talking

ATMs (1)
Hours vary

**25 Bank and ATM | 3.38 miles**
MADISON & 49TH STREET
437 MADISON AVE
NEW YORK, NY, 10022
Phone: 917-322-6660

**Lobby Hours**
Mon-Fri 09:00 AM-06:00 PM
Sat-Sun closed

ATMs (3)
Hours vary
**ATM Deposit Cutoff**
Mon-Fri 09:00 PM same day



Case 1:19-mc-00001-AK   Document 3-6   Filed 04/05/13   Page 113 of 297



s Financial Network, LLC, Members SIPC, non-

**Equal Housing Lender**

© 1999 - 2012 Wells Fargo. All rights reserved. NMLSR ID 399801

# EXHIBIT C

# TAB 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF JEREMY
OUTEN, JOHN MILSOM AND DAVID
STANDISH, AS COURT-APPOINTED
RECEIVERS, FOR JUDICIAL
ASSISTANCE PURSUANT TO 28 U.S.C.
§ 1782

## DECLARATION OF JEREMY JAMES OUTEN

JEREMY JAMES OUTEN, declares, pursuant to 28 U.S.C. § 1746, as follows:

I.      I currently serve, along with John Milsom and David Standish (collectively, the "Receivers"), as a Receiver appointed pursuant to an Order made by the High Court of England and Wales (the "High Court") on August 6, 2010 (as amended on November 10, 2010 and on January 26 2011) (the "Receivership Order") in the matter titled *JSC BTA Bank* v. *Ablyazov, et. al.* (High Court of Justice, Queen's Bench Division, Commercial Court, Claim no: 2009 Folio 1099) (the "Bank Action").  (A copy of the Receivership Order is attached as Exhibit A to this Declaration.)  I submit this Declaration on behalf of the Receivers in support of our application, pursuant to 28 U.S.C. § 1782, for an order allowing the service of subpoenas on Standard Chartered Bank International (Americas) Limited ("SCB") and JP Morgan Chase Bank NA ("JPMC" and, collectively with SCB, the "Correspondent Banks").

### My Background

2.      I am a forensic accountant with over 19 years of forensic accounting experience.  I have been a partner of KPMG in London for over ten years.  I attended Cambridge University, became a chartered accountant and am currently a fellow of the Institute

Doc#: US1-6766953v8

of Chartered Accountants in England and Wales. My fellow Receivers are also members of KPMG in London.

3.      I am currently head of KPMG's fraud and investigations group in the United Kingdom (the "U.K."). I specialize in forensic accounting work, including the tracing of assets, and have performed such services on behalf of numerous private entities and various government bodies, including law enforcement agencies. In my 19 years of experience, I have been involved in numerous international fraud and asset tracing investigations. These matters include a case involving the collapse of the Kuwait Investment Office's investments in Spain, where I was responsible for the cash and asset tracing aspects of that case. I also worked on a matter concerning the collapse of SBS-Agro in Moscow, where I investigated, through various methods including cash and asset tracing, losses of approximately $2 billion.

## Introduction: the Receivership Order

4.      In February 2009, the Republic of Kazakhstan took control of JSC BTA Bank, a Kazakhstan bank (the "Bank"), due to significant concerns regarding the Bank's ability to continue as a going concern. The Bank's financial statements for the year ending December 31, 2008 recorded a negative equity of approximately $6.1 billion. After an investigation, the Bank brought the Bank Action in the U.K. against Mr. Ablyazov (now located in the U.K.), the former Chairman of the Bank, accusing him of misappropriating over $1 billion from the Bank.

5.      The High Court initially entered an order in the Bank Action freezing Mr. Ablyazov's assets (the "Freezing Order"), pending a trial of the Bank's claims against Mr. Ablyazov. The High Court later found that the Freezing Order provided inadequate protection, and entered the Receivership Order, appointing myself and Messrs. Milsom and Standish, as

2

Receivers, also pending the trial of the Bank's claims. In connection with the Receivership Order, the High Court found that there was a "serious risk that Mr. Ablyazov will dissipate his assets" and that his "disclosure of assets has been evasive." (Ex. B at ¶ 36; *id.* at ¶¶ 126-27.)

      6.    The Receivership Order grants the Receivers the "power to take all such steps as may seem expedient to recover and preserve" the assets understood to be controlled by Mr. Ablyazov (the "Property"). (Ex. A at ¶ 5.)

      7.    The Receivership Order further grants the Receivers the "[p]ower to bring or defend any action or other legal proceedings in the Courts of this or any other country in order to achieve the purposes of the receivership." (Ex. A at Schedule 4, ¶ 10.)

### The Eleven Transfers

      8.    The Receivership Order directs the Receivers to "receive" a variety of assets (referred to in the Order as the "Disclosed Assets" and "Undisclosed Assets"). (Ex. A at ¶¶ 1-2 and Schedules 3 and 3A.) Among other things, the Receivers have been appointed to "receive" and to "recover and preserve" funds relating to eleven individual cash transfers, totaling $55,332,642, made between June 25 and October 24, 2008 (the "Transfers"). (Ex. A at ¶ 2.) The flow of these funds has yet to be confirmed through third party documentation, but from records my staff and I have reviewed, it appears that all of the Transfers originated with payments (the "Payments") made from the Bank to an account held by Drey Associates Limited ("Drey"), a company controlled by Mr. Ablyazov and incorporated in the U.K., at Trasta Komercbanka in Riga, Latvia ("Trasta"). It further appears that the funds subsequently passed

3

through a variety of different entities (and one individual) and, to my understanding, did not all return to the Bank.

9.   The purported purpose for the Payments from the Bank to Drey was in relation to "compensation agreements" concerning the supposed acquisition of shares in BTA Ukraine, BTA Belarus and BTA Moscow.  The total amount transferred from the Bank to Drey in relation to these agreements is believed to be $295 million.  Approximately $240 million of that sum was ultimately returned to the Bank (hence the remaining amount of approximately $55 million in transfers that is at issue in the Receivership Order).

10.   An overview of the eleven Transfers set forth in the Receivership Order has been provided by Mr. Ablyazov in connection with the Bank Action, and is attached as Exhibit C to this Declaration.  This overview suggests that the eleven Transfers were all conducted in U.S. Dollars, often in round sum amounts, and having previously passed through numerous entities over a short period of time (sometimes as little as a few days and never more than a month).  Consistent with their duties under the Receivership Order, the Receivers are interested in finding out further information about—and ultimately securing the funds involved with—these Transfers.

### The Prominence of Trasta Komercbanka

11.   Through the documentation we have been provided in connection with the Bank Action and otherwise, we have identified bank accounts held in the names of some of the entities directly involved in the eleven Transfers of funds.  These bank accounts therefore may be relevant to the eleven Transfers at issue in the Receivership Order.

4

12.     Interestingly, the majority of the bank accounts we have identified are held at the same banking institution, Trasta, at which Drey held its account. The other accounts were held by a variety of entities, even though the entities themselves were registered or located outside of Latvia. (For example, an entity could be registered in Panama and yet hold a bank account with Trasta in Latvia.)

13.     Given the prominence of Trasta, we believe that obtaining banking documentation relating to Trasta's activities (and the flow of funds through it) would substantially assist us in our investigation into the eleven Transfers at issue.

## Identification of the Correspondent Banks

14.     As described above, the eleven Transfers at issue originated with the Payments made by the Bank to Drey. The Payments were made in four tranches in June and October 2008. The Bank has disclosed the relevant banking documentation relating to these four Payments from the Bank to Drey. We have no other banking documents, however, relating to the eleven Transfers in the Receivership Order (apart from one banking transfer document relating to a payment for US$815,000, which has been recently received and which I am currently investigating) , or the flow of funds leading from the four Payments to the eleven Transfers. The four Payments thus represent the start of the trail leading to the eleven Transfers included in the Receivership Order that we seek to reconstruct.

15.     Our review of the documentation confirms that the four Payments originated from the Bank and ended with Drey's bank account at Trasta as the beneficiary institution, but also involved two correspondent bank accounts and one intermediary bank account to facilitate the

5

processing of the Payments. A correspondent bank is typically a financial institution that provides services on behalf of another financial institution usually located in a different jurisdiction and/or financial market (one that typically does not want to bear the expense of opening its own branch in the correspondent bank's jurisdiction). Services provided by the correspondent bank can include processing transactions, accepting deposits and other services, depending on the agreement made between the two financial institutions.

16. It is not uncommon, in my experience, for banking institutions such as Trasta (a bank which has limited scope in terms of markets and geography), to use a correspondent bank and/or an intermediary bank to process its foreign currency transactions.

17. The correspondent bank account for Trasta used in two of the four Payments made to Drey was held at American Express Bank Limited (Bank Identifier Code ("BIC") AEIBUS33). I understand that American Express Bank Ltd is now SCB. The other correspondent bank account for Trasta, used in the two remaining Payments made to Drey, was held at JPMC (BIC CHASUS33).

18. Attached as Exhibits D through G to this Declaration are the banking reports relating to the four payments from the Bank to Drey, which show SCB and JPMC as the Correspondent Banks for Trasta. The Payments for which SCB acted as the Correspondent Bank were: $50 million on June 24, 2008 (Exhibit D) and $11,349,840 on October 3, 2008 (Exhibit E). The Payments for which JPMC acted as the Correspondent Bank were: $876,080 on June 23, 2008 (Exhibit F) and $83 million on June 24, 2008 (Exhibit G). In addition to noting the Correspondent Banks, these reports detail the names and accounts of the originating and beneficiary banks (BTA and Trasta, respectively), as well as Drey itself.

19.     According to Mr. Ablyazov's schedule of the eleven Transfers (Exhibit C), an entity called Devesta Limited ("Devesta") subsequently received from Drey nearly all of the two Payments made to Drey via SCB as set forth above ($50 million and $11,341,328 (approximately $8,500 less than the amount received by Drey )).  Our findings suggest that Devesta also holds a bank account at Trasta—the same beneficiary bank to which the Payments to Drey were made.

20.     Two remaining Payments to Drey were, according to Mr. Ablyazov, subsequently transferred by Drey to an entity called KSC International Limited ("KSC") (totalling $83,776,080, or $100,000 less than the Payments received by Drey via JPMC). We have yet to identify a banking institution which holds an account for KSC.

21.     Based on the information available to us, the Receivers have compiled a list of transactions (the "Transactions") (a copy of which is attached as Exhibit H to this Declaration), that appear to be involved in tracing the funds at issue from the initial Payments to the eleven Transfers set forth in the Receivership Order.

## The Relevance of the Discovery Sought

22.     Given the similar characteristics of all of these movements of funds (they were generally all conducted in U.S. dollars, they were mostly in round sum amounts, and they were made over short periods of time), as well as the prominence of Trasta with respect to all of the transactions, based on my experience, I anticipate that the relevant correspondent banking documentation relating to Trasta at SCB and JPMC would not only provide further detail as to the Payments from the Bank to Drey, but might very well also shed light on the subsequent transfers from Drey to Devesta and KSC and the other Transactions.  For example, the information could

7

potentially indicate the next stage in the fund flow following the Payments (if these beneficiary entities also held accounts at Trasta and conducted their relevant transactions in U.S. dollars). In any event, I expect the information from the Correspondent Banks may include information relevant to the Transactions which are relevant to the flow of funds relating to the eleven Transfers at issue in the Receivership Order. I therefore consider such information relevant to the cash tracing exercise the High Court has appointed the Receivers to conduct.

23.   Also, in my experience, documentation from Correspondent Banks can be instrumental in conducting cash tracing investigations such as this one, particularly given that, in this case, the banking documentation is limited, and Mr. Ablyazov's explanations of the movements of the funds are vague and unclear.

### Documents Sought by the Receivers

24.   Given our findings, as detailed above, we believe that documentation from SCB and JPMC could be beneficial in helping the Receivers meet our obligations under the Receivership Order. Specifically, we seek the following materials from the Correspondent Banks:

(a)   Account statements for the period June 1, 2008 through the present for the U.S. dollar correspondent bank account held at SCB on behalf of Trasta (account number 400072391) and for the U.S. dollar correspondent bank account held at JPMC on behalf of Trasta (account number 001072058); and

(b)   Documents relating to each of the Transactions which, based on our current knowledge, we believe to be relevant to tracing the assets relating to the eleven Transfers at issue in the Receivership Order, including the relevant SWIFT reports or other inter-banking

8

communications (known as Message Types), any documentation regarding the applicable ordering/beneficiary correspondent bank, any intermediary bank and the ordering/beneficiary institution, and any other communications or correspondence regarding the Transactions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:     London, England
              March 11, 2011

_____
Jeremy James Outen

# TAB 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**11 MISC 00291**

--------------------------------------------x
:
IN RE APPLICATION OF JEREMY OUTEN,      :
JOHN MILSOM AND DAVID STANDISH,         :      Civil Action No.
AS COURT-APPOINTED RECEIVERS, FOR       :
JUDICIAL ASSISTANCE PURSUANT TO         :
28 U.S.C. § 1782.                       :
:
--------------------------------------------x



## DECLARATION OF JEREMY JAMES OUTEN

JEREMY JAMES OUTEN declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      I currently serve, along with John Milsom and David Standish
(collectively, the "Receivers"), as a Receiver appointed pursuant to an Order made by the High
Court of England and Wales (the "High Court") on August 6, 2010 (as amended on November
10, 2010, January 26, 2011, April 8, 2011, May 27, 2011 and June 9, 2011) (the "Receivership
Order") in the matter titled *JSC BTA Bank* v. *Ablyazov, et. al.* (High Court of Justice, Queen's
Bench Division, Commercial Court, Claim no: 2009 Folio 1099) (the "Bank Action"). (A copy
of the Receivership Order is attached as Exhibit A to this Declaration.) I submit this Declaration
on behalf of the Receivers in support of our application, pursuant to 28 U.S.C. § 1782, for an order
allowing the service of a subpoena on Citibank NA ("Citibank") (known as the "Correspondent
Bank").

2.      This is the second such declaration I have submitted in relation to the
Receivership Order (and in support of an application pursuant to 28 U.S.C. § 1782). My first
declaration, dated 11 March 2011, (the "March Declaration") was in relation to Standard Chartered
Bank International (Americas) Limited ("SCB") and JP Morgan Chase Bank NA ("JPMC"). (A
copy of the March Declaration (without exhibits) is attached as Exhibit B to this Declaration.)

1024655.5

Following the service of subpoenas on SCB and JPMC (the "March Subpoenas"), various banking documents were provided by SCB and JPMC. A review of these documents has identified a need for a subpoena to be served on the Correspondent Bank.

### My Background

3.     I am a forensic accountant with over 19 years of forensic accounting experience. I have been a partner of KPMG in London for over ten years. I attended Cambridge University, became a chartered accountant and am a fellow of the Institute of Chartered Accountants in England and Wales. My fellow Receivers are also members of KPMG in London.

4.     I am currently head of KPMG's fraud and investigations group in the United Kingdom (the "U.K."). I specialize in forensic accounting work, including the tracing of assets, and have performed such services on behalf of numerous private entities and various government bodies, including law enforcement agencies. In my 19 years of experience, I have been involved in numerous international fraud and asset tracing investigations. These matters include a case involving the collapse of the Kuwait Investment Office's investments in Spain, where I was responsible for the cash and asset tracing aspects of that case. I also worked on a matter concerning the collapse of SBS-Agro in Moscow, where I investigated, through various methods including cash and asset tracing, losses of approximately $2 billion.

### Introduction:  The Receivership Order

5.     In February 2009, the Republic of Kazakhstan took control of JSC BTA Bank, a Kazakhstan bank (the "Bank"), due to significant concerns regarding the Bank's ability to continue as a going concern. The Bank's financial statements for the year ending December 31, 2008 recorded a negative equity of approximately $6.1 billion. After an investigation, the

2

Bank brought the Bank Action in the U.K. against Mukhtar Ablyazov (now located in the U.K.), the former Chairman of the Bank, accusing him of misappropriating over $4 billion from the Bank.

6.      The High Court initially entered an order in the Bank Action freezing Mr. Ablyazov's assets (the "Freezing Order"), pending a trial of the Bank's claims against Mr. Ablyazov.  The High Court later found that the Freezing Order provided inadequate protection, and entered the Receivership Order, appointing myself and Messrs. Milsom and Standish, as Receivers, also pending the trial of the Bank's claims.  In connection with the Receivership Order, the High Court found, in a Judgment dated July 16, 2010 (attached as Exhibit C), that there was a "serious risk that Mr. Ablyazov will dissipate his assets" and that his "disclosure of assets has been evasive."  (Ex. C at ¶ 36; *id.* at ¶¶ 126-27.)

7.      The Receivership Order grants the Receivers the "power to take all such steps as may seem expedient to recover and preserve" the assets understood to be controlled by Mr. Ablyazov (the "Property").  (Ex. A at ¶ 5.)

8.      The Receivership Order further grants the Receivers the "[p]ower to bring or defend any action or other legal proceedings in the Courts of this or any other country in order to achieve the purposes of the receivership."  (Ex. A at Schedule 4, ¶ 10.)

### The Eleven Transfers

9.      The Receivership Order directs the Receivers to "receive" a variety of assets (referred to in the Order as the "Disclosed Assets," "Undisclosed Assets," "Further Undisclosed Assets" and "Additional Undisclosed Assets").  (Ex. A at ¶¶ 1-2 and Schedules 3, 3A, 3B and 3C.)  Among other things, the Receivers have been appointed to "receive" and to "recover and preserve" funds relating to eleven individual cash transfers, totaling $55,332,642,

3

made between June 25 and October 24, 2008 (the "Transfers"). (Ex. A at ¶ 2.) The flow of these funds has yet to be confirmed through third-party documentation, but from records my staff and I have reviewed, it appears that all of the Transfers originated with payments (the "Payments") made from the Bank to an account held by Drey Associates Limited ("Drey"), a company controlled by Mr. Ablyazov and incorporated in the U.K., at Trasta Komercbanka in Riga, Latvia ("Trasta"). It further appears that the funds subsequently passed through a variety of different entities (and one individual) and, to my understanding, did not all return to the Bank.

10. The purported purpose for the Payments from the Bank to Drey was in relation to "compensation agreements" concerning the supposed acquisition of shares in BTA Ukraine, BTA Belarus and BTA Moscow. The total amount transferred from the Bank to Drey in relation to these agreements is believed to be $295 million. Approximately $240 million of that sum was ultimately returned to the Bank (hence the remaining amount of approximately $55 million in Transfers that is at issue in the Receivership Order).

11. An overview of the Transfers set forth in the Receivership Order has been provided by Mr. Ablyazov in connection with the Bank Action and is attached as Exhibit D to this Declaration. This overview suggests that the Transfers were all conducted in U.S. dollars, often in round sum amounts, and previously passed through numerous entities over a short period of time (sometimes as little as a few days and never more than a month). Consistent with their duties under the Receivership Order, the Receivers are interested in finding out further information about—and ultimately securing the funds involved with—these Transfers.

12. Based on the information available to us, the Receivers have compiled a list of transactions (the "Transactions") (a copy of which is attached as Exhibit E to this

4

Declaration); that appear to be involved in tracing the funds at issue from the initial Payments to the eleven Transfers set forth in the Receivership Order.

### The Prominence of Trasta Komercbanka

13.     Through the documentation we have been provided in connection with the Bank Action, the March Subpoenas, and otherwise, we have identified the relevant bank accounts held in the names of some of the entities directly involved in the Transfers.

14.     The majority of the bank accounts we have identified are held at the same banking institution, Trasta, at which Drey held its account. The other accounts were held by a variety of entities, even though the entities themselves were registered or located outside of Latvia. (For example, an entity could be registered in Panama and yet hold a bank account with Trasta in Latvia.)

15.     The list of the Transactions (Exhibit E) highlights the prominence of Trasta as a bank used in relation to the Transfers and their associated cash flows. Of the twenty entities involved in the Transfers and their associated cash flows, ten of them appear to have accounts with Trasta. Given this prominence of Trasta, we believe that obtaining banking documentation relating to Trasta's activities (and the flow of funds through it) will substantially assist us in our investigation into the Transfers.

### Previous Application for Relief Pursuant to 28 U.S.C. § 1782

16.     My March Declaration submitted was in support of an application for an order allowing the service of subpoenas on JPMC and SCB. This application was granted, and the March Subpoenas were served accordingly. JPMC provided responsive documents on May 16, 2011, and SCB provided responsive documents on May 22 and May 24, 2011.

5

17.     The March Declaration contains a detailed explanation as to the reasoning for selecting JPMC and SCB as relevant institutions. In brief, the Bank provided documents identifying JPMC and American Express Bank Ltd. (now called SCB) as two U.S. banks serving as correspondent banks for payments made by the Bank to Drey relating to the "compensation agreements" referenced in paragraph 10 above. These payments (four in total) represented the start of the trail leading to the Transfers included in the Receivership Order that we seek to reconstruct.

18.     Due to the prominence of Trasta regarding the entities involved in the Transfers and their associated cash flows, and the similar characteristics of all of these movements of funds (see ¶ 11), I anticipated that the JPMC and SCB documents would provide not only details of the payments between the Bank and Drey but that they would also shed light on the Transactions.

19.     As a result of the March Subpoenas, JPMC provided documentation (the "JPMC Documentation") relating to five of the thirty-five Transactions. (The cover letter from JPMC is attached as Exhibit F.) For three of the Transactions, the JPMC Documentation identified a correspondence bank account (number 544702991) in the name of Raiffeisen Zentralbank Osterreich AG in Austria ("Raiffeisen"). (The JPMC Documentation identifying Raiffeisen is attached as Exhibits G -I.)

20.     Thus, the JPMC Documentation shows that for each of these three transactions the ordering institution was Trasta, and Raiffeisen acted as the intermediary institution or what is sometimes referred to as the "buffer bank." In other words, the JPMC Documentation suggests that funds passed from Trasta through Raiffeisen and then onto the beneficiary institution. JPMC became involved in these transactions because the transactions

were carried out in U.S. dollars, and Raiffeisen, according to JPMC, held a correspondent bank account with JPMC.

21.     It is not uncommon, in my experience, for banking institutions such as Trasta (or Raiffeisen) (banks which have a limited scope in terms of markets and geography), to use a correspondent bank and/or an intermediary bank to process their foreign currency transactions.

22.     The JPMC Documentation provides us with additional bank account details, which were unknown to us previously, for entities involved in the Transfers and their associated cash flows.  For example, the JPMC Documentation includes bank account details for a company called FM Company Limited ("FM Company") which is the largest recipient of funds from the Transfers, totaling $41.1 million in June 2008 (as listed in Exhibit E).  The funds transferred to FM Company represent approximately seventy-five percent of the total funds we are to trace in accordance with the Receivership Order.

23.     The JPMC Documentation is relevant not only to our cash-tracing investigation (as briefly described above regarding FM Company), but also to the much wider investigation regarding the protection and valuation of Mr. Ablyazov's assets, as stipulated by the Receivership Order.  For example, we have been able to identify other potential sources of information (such as additional U.S. banking institutions), and we have been able to develop a wider investigation strategy (such as adding support to various issues including recognition of the Receivership Order in jurisdictions outside of the U.K.).

7

**Identification of Citibank**

24.     As explained above, the JPMC Documentation provided the underlying banking detail for five of the Transactions (as identified in Exhibit E) involved in the Transfers and their associated cash flows.

25.     Based upon the documentation currently provided with respect to these Transactions, I understand that all of them were carried out in U.S. dollars and therefore would have required the services of a U.S. correspondent bank. Thus, we anticipate that there are other U.S. banking institutions that would have documentation similar to that of JPMC relevant to the Transactions (excluding the five already detailed in the JPMC Documentation).

26.     Given the prominence of Trasta in relation to the entities involved in the Transactions, we also anticipate that the specific U.S. banking institutions would serve a similar role to that of JPMC. In other words, these U.S. banks would act as the U.S. correspondent bank on behalf of Trasta, with the potential added involvement of an intermediary bank.

27.     In order to identify other U.S. banks which may act for Trasta as correspondent banks, we have consulted various publicly-available, third-party sources including databases such as Bankers' Almanac (a provider of reference data on the banking industry), and we have conducted various searches on the internet. In my experience, the Bankers' Almanac (published bi-annually) is a reliable source of information of various details regarding banking institutions and the financial services sector in general.

28.     Bankers' Almanac shows that a U.S. correspondent bank for Trasta for the period June to October 2008 was Raiffeisen Zentralbank Oesterreich AG (Raiffeisen) in Austria

8

1024655.5

(Exhibit J at 3.).[1] Consistent with the JPMC Documentation and the fact that Raiffeisen is not in the U.S., it appears the Bankers' Almanac report regarding Trasta details the *intermediary* banks Trasta uses for its U.S. transactions and not the ultimate U.S. banking institutions.

      29.     However, using Bankers' Almanac, we have identified that the U.S. correspondent banks for Raiffeisen are JPMC *and Citibank* (Exhibit K at 3).[2]

      30.     Thus, we understand that JPMC and Citibank are the U.S. correspondent banks which executed U.S. dollar transactions on behalf of Trasta (though Raiffeisen) from June to October 2008. This is corroborated by the information provided by the JPMC Documentation, which revealed that JPMC was holding a correspondent account on behalf of Trasta, through the intermediary bank Raiffeisen. In other words, since Citibank was the other U.S. correspondent bank for Trasta's intermediary bank Raiffeisen, we believe that Citbank, like JPMC, will have documentation relevant to the Transactions.

      31.     As we already have the relevant information from JPMC, obtained through the March Subpoenas, we now seek to obtain similar documentation from Citibank.

### The Relevance of the Discovery Sought

      32.     Given the similar characteristics of all of these movements of funds (they were generally all conducted in U.S. dollars, they were mostly in round sum amounts, and they

---

[1] Bankers' Almanac also lists Commerzbank AG as a U.S. correspondent bank for Trasta. However, we received correspondence from Amanda Parr, a Senior International Account Executive at Bankers Almanac (attached as Exhibit L), indicating that Commerzbank AG did not begin serving as a correspondent bank for Trasta until 2009 (thus post-dating the Transfers at issue). (Ex. L at 1.)

[2] According to Bankers' Almanac, in October 2010 Raiffeisen transferred its international banking business to Raiffeisen Bank International ("RBI"). (Ex. L at 2.) Thus, the relevant Bankers' Almanac report (dated June 2011) refers to RBI and not Raiffeisen.

were made over short periods of time), as well as the prominence of Trasta with respect to all of the transactions, I anticipate that the relevant correspondent banking documentation relating to Trasta at Citibank would provide details such as bank account numbers and jurisdictions of the Transactions. In other words, I anticipate receiving similar documentation as we have received from JPMC but concerning some of the other Transactions. I also anticipate that the information sought from Citibank will shed light on subsequent transfers beyond what we currently know (Exhibits D and E) (if these ordering entities also held accounts at Trasta and conducted their relevant transactions in U.S. dollars).

33.     In any event, I expect the information from the Correspondent Bank may include information relevant to the Transactions which are relevant to the flow of funds relating to the Transfers at issue in the Receivership Order. I therefore consider such information highly relevant to the cash-tracing exercise the High Court has appointed the Receivers to conduct.

34.     Also, in my experience, documentation from correspondent banks can be instrumental in conducting cash-tracing investigations such as this one, particularly given that, in this case, the banking documentation is limited, and Mr. Ablyazov's explanations of the movements of the funds are vague and unclear.

### Documents Sought by the Receivers

35.     Given our findings, as detailed above, we believe that documentation from Citibank could be beneficial in helping to meet our obligations under the Receivership Order. Specifically, we seek the following materials from the Correspondent Bank:

(a)   Account statements for the period June 1, 2008 through the present for the U.S. dollar correspondent bank account held at Citibank indirectly on behalf of Trasta (account

1024655.5

number unknown) (with Raiffeisen as the intermediary bank (account number with Trasta being 70-55.047.617));

(b)  Documents relating to each of the Transactions (other than the five transactions for which we previously received documentation from JPMC), including the relevant SWIFT reports or other inter-banking communications (known as Message Types), any documentation regarding the applicable ordering/beneficiary correspondent bank, any intermediary bank and the ordering/beneficiary institution, and any other communications or correspondence regarding those Transactions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:   London, England
              August 11, 2011

_____
Jeremy James Outen

# EXHIBIT D

Case No: 2009 Folio 1099

Neutral Citation Number: [2010] EWHC 1779 (Comm)
**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**IN PRIVATE**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 16/07/2010

Before :

**MR. JUSTICE TEARE**
- - - - - - - - - - - - - - - - - - - - -
Between :

**JSC BTA BANK**                                           **Claimant**
- and -
**MUKHTAR ABLYAZOV**                              **Defendant**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Stephen Smith QC, Clive Jones and Tim Akkouh** (instructed by **Hogan Lovells International LLP**) for the **Claimant**
**Anthony Trace QC, Duncan Matthews QC, Lawrence Akka, Thomas Grant and Alexander Winter** (instructed by **Stephenson Harwood**) for the **Defendant**

Hearing dates: 25-28 May and 8 June 2010 (with further evidence and written submissions being completed on 7 July 2010)
- - - - - - - - - - - - - - - - - - - - -
Judgment

**Mr. Justice Teare:**

1.  This is an extraordinary case.

2.  The Claimant ("the Bank") is a bank in Kazakhstan, 75.1% of whose share capital has, since 2 February 2009, been owned by the State of Kazakhstan through a sovereign wealth fund, Samruk-Kazyna. On that date the State effectively took control of the Bank when, according to the evidence of the Bank, there was significant concern as to the ability of the Bank to continue as a going concern. The Bank's accounts for the year ending 31 December 2008 recorded a negative equity of about US$6.1 billion. Its debts, which are said to amount to US$12 billion, are being restructured pursuant to the law of Kazakhstan.

3.  The Defendant ("Mr. Ablyazov") is the former chairman of the Bank and is accused by the Bank of "widespread misappropriation of the Bank's funds." It is said that he has treated the Bank "as if it were his own private source of funds". Four claims have now been issued in this jurisdiction against Mr. Ablyazov. The total sum claimed is in excess of US$1.8 billion. Further claims are anticipated which I was told will bring the total sum claimed to US$4 billion.

4.  Mr. Ablyazov denies these claims. He states that the claims are an attempt by the President of Kazakhstan, Nursultan Nazarbayev, to take control of his assets in support of a politically motivated claim against Mr. Ablyazov, who is a leading figure in Kazakhstan's democratic opposition. His evidence paints a chilling picture of life in Kazakhstan where power resides with the President and the members of his family and close associates, where the rule of law is not respected and where dissent is ruthlessly eliminated. In 2003 Mr. Ablyazov was arrested and imprisoned and his assets seized after what he and others have said was a politically motivated trial. Whilst imprisoned on what he says were "trumped-up" charges he says that he was subjected to mistreatment, torture and an unsuccessful plot to assassinate him and that his assets were "distributed to the President's coterie". He says that political assassination is used in Kazakhstan as a means of silencing opposition and that there was a further attempt to assassinate him in 2004 in Moscow. His evidence suggests that Kazakhstan has much in common with Ancient Rome.

5.  In late January 2009 Mr. Ablyazov was forced to leave Kazakhstan hurriedly. He arrived in London where he now lives with his wife and three of his four children in a house in Bishop's Avenue . He is seeking permanent leave to remain in this country. In August 2009 these proceedings were commenced and a Freezing Order was issued against him together with an order restraining him from leaving the jurisdiction and requiring him to surrender his passport.

6.  When he disclosed his assets pursuant to the Freezing Order they were said to be worth, in total, several billion US dollars. Since then, as a result of corrections and further evidence, he appears to value his assets in a somewhat smaller figure but the valuation is still in excess of one billion US dollars.

7.  Mr. Ablyazov does not hold his assets in his own name. Rather, a trusted associate appears to hold shares in a holding company on his behalf and by that means controls the shareholdings in a chain of other companies at the bottom of which chain is an operating business. The use of a nominee and of companies registered in offshore

jurisdictions makes it difficult to trace his assets. He says that the elaborate scheme by which he owns his assets is necessary to protect him from unlawful depredations by the President of Kazakhstan.

8.      The Court has to determine three applications. The first is an application by the Bank for the appointment of a receiver over Mr. Ablyazov's assets in support of the Freezing Order ("the receivership application"). The second is an application by Mr. Ablyazov for clarification as to the ambit of the *Angel Bell* liberty to deal with assets in the ordinary course of business ("the clarification application"). The third is an application by Mr. Ablyazov for the return of his passport ("the passport application").

9.      Although this case is still only at an interlocutory stage it is apparent that it is being fought by means of the forensic equivalent of trench warfare. Very considerable evidence in writing has been exchanged. A great many points have been taken. Every response is met with a determined counter attack on a related but different point to which in turn a response is provided. And so the process goes on. Progress, if any, is slow. The Skeleton Argument of Mr. Smith QC on behalf of the Bank ran to some 91 pages. The Skeleton Argument of Mr. Trace QC for Mr. Ablyazov on the receivership application ran to some 110 pages and the Skeleton Argument of Mr. Matthews QC on behalf of Mr. Ablyazov on the clarification and passport applications ran to a modest 30 pages. The hearing required 4 and half days. Liberty was given for further evidence on discrete topics, together with further written submissions, to be filed after the hearing.

10.     Whilst I have attempted to consider all of the many points canvassed in evidence and argument I have restricted this judgment, in order to ensure that it is of manageable size, to the principal points taken by the parties and in particular to those points which have enabled me to decide the applications before the Court.

The Receivership Application

11.     Pursuant to a judgment and order of mine dated 17 March 2010 this application is being heard in private.

12.     The court's power to order the appointment of a receiver derives from section 37 of the Supreme Court (now Senior Courts) Court Act 1981. The court may appoint a receiver "in all cases in which appears to the court to be just and convenient to do so."

13.     In deciding whether it is just and convenient to make the order all the circumstances of the case must be considered. Those circumstances cannot be exhaustively defined but the context of the present case, where a Receivership Order is sought in support of a Freezing Order, suggests, as a matter of principle, that at least the following matters should be considered.

14.     The appointment of a receiver prior to judgment displaces the defendant as the person in control of his assets. It is therefore an invasive remedy. When a Receivership Order is sought in support of a Freezing Order the court should therefore ask itself whether the Freezing Order has provided the claimant with adequate protection against the risk that the defendant's assets may be dissipated prior to judgment. For if it does provide

adequate protection the Receivership Order will not be necessary and it will therefore be neither just nor convenient to grant the invasive remedy of a Receivership Order.

15.     In a case where there is evidence that a defendant has breached or is about to breach the terms of a Freezing Order the court may well conclude that the Freezing Order does not provide the claimant with adequate protection against the risk that a defendant's assets may be dissipated before judgment. It was suggested that such evidence is the only evidence capable of founding such a conclusion. I disagree. There may be other circumstances which show that the defendant cannot be trusted to obey the Freezing Order. In the present case reliance is placed on the defendant's inadequate disclosure of his assets. In my judgment inadequate disclosure may, depending on the circumstances of the case, enable the court to conclude that the Freezing Order does not provide the claimant with adequate protection.

16.     The risk that the appointment of a receiver may cause harm to the interests of the defendant will also have to be considered as will the adequacy of the claimant's undertaking in damages and any fortification of that undertaking which is offered. The potential for harm is greater where, as in this case, the application is to appoint a receiver over all of a defendant's assets. In such a case precisely how the receivers plan to take control of the defendant's assets will be a material consideration because it will have a bearing upon the damage likely to be caused to the defendant's interests.

17.     In all cases the court will have to weigh the competing factors in order to determine whether the making of a Receivership Order is just and convenient.

18.     I have been referred to two cases in which the power to make a Receivership Order has been exercised in support of a Freezing Order prior to judgment; *Derby v Weldon* (Nos. 3 and 4) 7 November 1988 (unreported at first instance) and [1990] Ch.65 in the Court of Appeal and *ICIC v Adham* [1998] BCC 134. In *Don King Productions Inc. v Warren* [1999] 2 Lloyd's Reports 392 the court decided not to exercise the power.

19.     Since both parties have relied upon these cases it is necessary to note the approach of the court in each of those cases.

20.     In *Derby v Weldon* Sir Nicholas Browne-Wilkinson, Vice Chancellor, appointed receivers over assets of a defendant against whom a freezing order had earlier been issued. The cause of action alleged was conspiracy to defraud and the amount of the claim was in excess of £25m. During the application for a freezing order the stance of the defendant had been one of "taciturnity" and non-disclosure. But on the last day of the hearing it was said that the defendant held certain assets. Another defendant, to whom over £50m. had been paid, had no assets. That disclosure led to the application for a receivership order. Counsel for the defendant against whom the receivership order was sought presented no argument to the court on the question whether receivers should be appointed. The Vice Chancellor granted the order sought. He held that there was jurisdiction to appoint a receiver in aid of a freezing order. That should be done where "the proper preservation" of assets required the introduction of a receiver to hold the assets. He said that the history of the case had given rise to suspicion and alarm and there was a pattern of dissipation of assets. There was an appeal from that decision and the decision to grant a freezing order. The Court of Appeal dismissed the appeal. The argument on appeal concerned the grant of the freezing order and the extra-territorial effect of that order and the receivership order.

The basis on which the Vice-Chancellor had made the receivership order was not disturbed and little was said about it. The decision is therefore consistent with the principle that a receiver may be appointed in support of a freezing order where to do so is necessary to preserve assets and prevent their dissipation prior to trial.

21.   In *ICIC v Adham* a receiver had been appointed ex parte. The cause of action relied upon was again fraud and it appears that a court in the Cayman Islands had already found some or all of the defendants liable in respect of fraud. A receiver was appointed in support of a freezing order. The subject of the receivership order was real property. An application was made to discharge or vary the ex parte order. Robert Walker J. refused to do so. He was not convinced that the defendants could be "trusted" to obey the orders of the court and "not to continue to do their best to evade orders that have been made against them". He said that:

> "the court will, on appropriate occasions, take drastic action and will not allow its orders to be evaded by manipulation of shadowy offshore trusts and companies formed in jurisdictions where secrecy is highly prized and official regulation is at a low level."

22.   Again, the decision is consistent with the principle that a receiver may be appointed in support of a freezing order where to do so is necessary to preserve assets and prevent their dissipation prior to trial.

23.   In *Don King Productions Inc. v Warren* a winding up of the affairs of a partnership and a freezing order had been ordered. The claimants said that neither order had been complied with and sought the appointment of a receiver. It was submitted that the court should make such an order

> "where there is a Mareva injunction and a protective regime and where there is strong evidence to suggest at an interlocutory stage that the Mareva injunction and the protective regime are being breached."

24.   Neuberger J. accepted that submission "as a matter of principle". However, the judge declined to appoint a receiver. He reached the conclusion that, "balancing the various competing factors, it would not be right to appoint a receiver…." Amongst the matters he took into account were "the real risk of substantial irrevocable damage to Mr. Warren's business ……as a result of the appointment of a receiver" and that additional protection could be given to the claimants by certain undertakings offered by Mr. Warren. This decision not only supports the principle that a receiver may be appointed in support of a freezing order where to do so is necessary to preserve assets and prevent their dissipation prior to trial but also supports the principle that the court must consider the effect of the order on the defendant and ultimately balance the competing factors in order to decide whether the appointment of a receiver is just and convenient in all the circumstances of the case.

25.   I consider that these cases illustrate the type of circumstances in which the court may conclude that it is just and convenient to make a Receivership Order. They support the approach which I consider should be followed as a matter of principle where a receivership order is sought in support of a freezing order. It was submitted by Mr.

Trace QC (counsel for Mr. Ablyazov on the receivership application) that where a receivership order is sought in support of a freezing order there must be strong evidence that the freezing order is being breached. Whilst such evidence will clearly support a submission that a receivership order is necessary to prevent dissipation of assets notwithstanding the existence of a freezing order I do not consider that such evidence of breach must always exist before a receivership order can be made in support of a freezing order. I do not understand the comments of Neuberger J. in *Don King Productions Inc. v Warren* to require such evidence. There was such evidence in that case and a submission was made on the basis of such evidence. The acceptance of that submission does not entail that such evidence must be adduced where a receivership order is sought in support of a freezing order.

26.    The following passage in *Gee on Commercial Injunctions* 5th ed. at paragraph 16.008 reflects what I consider to be the right approach:

> "The nature of the remedy [receivership] is more intrusive, more expensive, and less reversible than the granting of an injunction. The receiver has to be paid. The defendant no longer has control of the assets. Irreparable damage may be done to the business of the defendant through the publicity. The claimant must show that the appointment is appropriate because other less invasive remedies would be inadequate. If the claimant has contractual or other rights as to how assets may or may not be used (eg a negative pledge), then before appointing a receiver the court will consider whether damages or an injunction is a sufficient remedy. The court, in exercising its discretion, will take into account the likely costs of the appointment. Ordinarily an unsecured creditor is left to obtain judgment and then to enforce his judgment with the assistance of a receiver."

27.    Mr. Trace relied upon passages in textbooks and suggested that they showed that a clear case must be established and that the risk to the defendant must be very small; see *The Law Relating to Receivers, Managers, and Administrators by Picarda* 4th ed. at p.359, *Kerr and Hunter on Receivers and Administrators* 19th ed. at 2-35 and *Halsbury's Laws* Vol. 39(2) at paragraph 339. The principle relied upon by Mr. Trace was said to derive support from the case of *Owen v Homan* (1853) 4 HL Cas 997.

28.    *Owen v Homan* was a case in which the defendant was being sued under promissory notes which purported to have been executed jointly by the defendant and her nephew. The defendant denied liability and alleged that she had been defrauded by her nephew. The plaintiff thereupon sought the appointment of a receiver. The Lord Chancellor said at p.1032-3:

> "No positive unvarying rule can be laid down as to whether the Court will or will not interfere by this kind of interim protection of the property. ........... But where the object of the Plaintiff is to assert a right to the property of which which the Defendant is in the enjoyment, the case is necessarily involved in further questions. The Court by taking possession at the instance of the Plaintiff may be doing a wrong to the

Defendant; in some cases an irreparable wrong. If the Plaintiff should eventually fail in establishing his right against the defendant, the Court may by its interim interference have caused mischief to the defendant for which the subsequent restoration of the property may afford no adequate compensation. In all cases, therefore, where the Court interferes by appointing a receiver of property in the possession of the Defendant before a title of the Defendant is established by decree, it exercises a discretion to be governed by all the circumstances of the case.

When the evidence on which the Court is to act …..is very clear in favour of the Plaintiff, then the risk of eventual injury to the Defendant is very small, and the Court does not hesitate to act. Where there is more of a doubt, there is of course more of difficulty; the question is one of degree, as to which, therefore, it is impossible to lay down any precise and unvarying rule………"

29.   It is apparent from that passage that whilst a receivership order may be expected in a clear case with a small risk of injury to the Defendant those are not the only cases where a receivership order may be obtained. I am therefore unable to accept Mr. Trace's submission that a clear case and small risk of injury are always required. That submission does not faithfully reflect what was said in *Owen v Homan*.

30.   *Owen v Homan* did not consider the grant of a Receivership Order in support of a Freezing Order (such an order did not then exist) but the three modern cases to which I have referred did. The latter cases may therefore be considered as better guides to the appropriate exercise of the court's discretion in this case than *Owen v Homan*.

31.   I was also referred to authorities from other jurisdictions, in particular the Australian cases of *Ballabil Holdings Pty Ltd. v Hospital Products Ltd.* (1985) 1 NSWLR 155 and *National Australia Bank v Bond Brewing Holdings* [1991] VLR 386 and the Singaporean case of *Wallace Kevin James v Merrill Lynch International Bank* [1998] 1 SLR 785.

32.   In *Ballabil Holdings Pty Ltd. v Hospital Products Ltd.* Street CJ observed that if the jurisdiction to appoint a receiver pending determination of a claim existed "it would obviously require a most exceptional case for it to be exercised, bearing in mind the grave consequences which ensue to a company placed under receivership."

33.   In *National Australia Bank v Bond Brewing Holdings* the Appeal Division of the Supreme Court of Victoria emphasised that particular caution is required when a receiver is sought over all of a defendant's assets.

"...the appointment of a receiver in such a case authorises an irresistible invasion and that even if the army of occupation is withdrawn after only a short time things may never be the same again…..No court will make such an order unless convinced of its necessity. A case for some kind and degree of interlocutory relief may be made out which falls short of this extremely

> drastic remedy; for example, the court may not be satisfied – and it is of course for the applicant to persuade the court that nothing less than what he seeks will do – that in all the circumstances it should do more than grant an injunction. At times the court will be induced to refuse the remedy of a receiver by undertakings offered by the defendant."

34.     That approach was followed by the Court of Appeal of Singapore in *Wallace Kevin James v Merrill Lynch International Bank*.

35.     These authorities from other common law jurisdictions highlight the damage which a receivership order may cause. They therefore emphasise that good reason must be shown to appoint a receiver and that in all cases the consequences to the defendant must always be carefully weighed in the balance before concluding that it is just and convenient to appoint the receiver.

**The matters relied upon in the present case**

36.     Mr. Smith QC, counsel for the Bank, relied upon 13 matters in support of his submission that the Receivership Order was just and convenient. They may be reduced to 8 (because some are different aspects of the same point) as follows:

i)      The Bank has a good arguable case that Mr. Ablyazov has defrauded it of huge sums of money and there is a serious risk that Mr. Ablyazov will dissipate his assets.

ii)     The structure by which Mr. Ablyazov holds his assets is "more than a paradigm example" of the sort of case which cries out for a Receivership Order. In particular, the nominees who act for Mr. Ablyazov do whatever Mr. Ablyazov requires and use is made of corporate structures in jurisdictions "renowned for their secrecy and light regulation."

iii)    Mr. Ablyazov has breached the Freezing Order.

iv)     Mr. Ablyazov's disclosure of his assets has been evasive which has been underscored by his failure to reveal dealings in his assets.

v)      The Restricted Information regime (by which information disclosed by Mr. Ablyazov can only be seen by those advising the Bank, rather than the Bank itself) is a serious fetter on the ability of the Bank to police the Freezing Order and there is reason to believe that Mr. Ablyazov has an ulterior motive for insisting on the Restricted Information regime, namely, seeking to ensure that the Bank does not learn that other bad "loans" made by the Bank were in connection with assets now claimed by Mr. Ablyazov.

vi)     Drey, the Fourth Defendant, sought to assert the privilege against self-incrimination in circumstances which suggested money laundering offences by Mr. Ablyazov.

vii)    The proposed Receivership Order is proportionate and reasonable.

viii)   There is no good reason for not making the Receivership Order.

Good arguable case and risk of dissipation

37. These two matters reflect my decision to continue the Freezing Order on 12 November 2009. On that occasion Mr. Ablyazov did not contend that the Bank lacked a good arguable case that Mr. Ablyazov had defrauded the Bank of $295m. ("the Drey Proceedings"). The position on the present applications (after some discussion) is the same save that Mr. Ablyazov contends that the Bank does not have a good arguable case with regard to its proprietary claim and he has now issued an application to stay the Drey Proceedings (and presumably the other two sets of proceedings brought against him, namely, the Chrysopa Proceedings and the Tekhinvest Proceedings) on the grounds that they are an abuse of the process of the court. Mr. Ablyazov maintains that he has good defences not only to the Drey Proceedings but also to the other two sets of proceedings issued in this court. However, no argument was addressed to me on the merits of either the claims or the defences (save with regard to the proprietary claim in the Drey Proceedings). In those circumstances I shall proceed on the basis that the Bank has a good arguable claim in each of the three sets of proceedings. With regard to the proprietary claim in the Drey Proceedings I shall comment on that later in this judgment. Mr. Trace has reserved Mr. Ablyazov's right to argue on any future application that the Bank lacks a good arguable case.

38. In my judgment of 12 November 2009 [2009] EWHC 2840 (Comm) I held that there was a real risk that Mr. Ablyazov's assets would be dissipated prior to trial; see paragraphs 10-19 of that judgment.

39. So far as I am aware there was no appeal against my decision to continue the Freezing Order. Mr. Trace submitted that a risk of dissipation by itself was insufficient justification for making a Receivership Order. I agree. That finding underpins the Freezing Order. In order to show that a Receivership Order is just and convenient it will usually be necessary to show that the Freezing Order does not provide the claimant with adequate protection against the risk of dissipation. Mr. Trace further submitted that whatever may have been the position on 12 November 2009 the position now is that there is no risk of dissipation because Mr. Ablyazov has "bared his soul" with regard to his assets and the Court can "trust" him to obey the Freezing Order. Whether this is so can only be determined after I have considered the other matters relied upon by Mr. Smith.

The structure by which Mr. Ablyazov holds his assets

40. It is common ground that the structure by which Mr. Ablyazov holds his assets makes it difficult for anyone who wishes to identify and seize his assets to do so. The structure also enables Mr. Ablyazov to instruct his nominee to dispose of an asset or to transfer an asset from one offshore company controlled by the nominee to another, also controlled by the nominee. However, Mr. Ablyazov says that this structure was not designed to keep creditors at bay but to keep his assets free from the unlawful depredations of President Nazarbayev. That is not accepted by the Bank. I cannot determine that particular dispute on this application. The question I must decide on this application is whether, whatever the reasons were for the creation of the structure, there is a real risk that Mr. Ablyazov will use the structure to deal with his assets in breach of the Freezing Order with the aim of ensuring that there are no assets on which the Bank can execute any judgment it obtains in this court.

41.    Mr. Ablyazov has said in his Third Witness Statement dated 16 April 2010 that he finds "the suggestion that I would dissipate my assets so as to thwart an English judgment both ludicrous and offensive." He wishes "to make it absolutely clear that I would never knowingly breach an Order of the English Court." Whether I can trust that assurance depends upon the other matters relied upon by Mr. Smith.

Breach of the Freezing Order

42.    Although Mr. Smith's Skeleton Argument and the witness statements of his instructing solicitor Mr. Hardman suggested that there had been several breaches of the Freezing Order, only two were relied upon by Mr. Smith in his oral submissions. The reason why Mr. Smith's oral submissions were restricted in this way is that until 11 December 2009 Mr. Ablyazov was entitled to dispose of or deal with assets outside England and Wales so long as the total of his assets whether in or outside England and Wales remained above £175m. Since the Bank is not in a position to assess whether Mr. Ablyazov's assets had that value on the evidence currently available it is not in a position to allege a breach with regard to dealings before 11 December 2009. However, for the reasons given in my judgment on that date the Freezing Order was amended so that he could only deal with his assets so long as the total value of his assets within England and Wales exceeded £175m. Mr. Ablyazov does not claim to have assets of that value in England and Wales. Thus disposals or dealings in assets after that date will be a breach of the Freezing Order unless they are "in the ordinary and proper course of any business conducted by Mr. Ablyazov personally."

43.    The first breach of the Freezing Order alleged by Mr. Smith was in relation to the sale of Mr. Ablyazov's interest in Omsk Bank. The second was the use of the proceeds of sale to acquire Tier 2 subordinated debt in BTA Moscow.

44.    Mr. Ablyazov held an interest in Omsk Bank through a nominee and, in particular, four companies Rikas Finance, TuranAlem Capital, Delta Torg and AMK-Invest. Those four companies sold their shares in Omsk Bank on 22 January 2010. The proceeds of sale were used to purchase debt in BTA Moscow on 11 February 2010.

45.    Mr. Ablyazov has explained the circumstances in which these transactions took place in his Second Witness Statement dated 16 March 2010 as follows. The shares in Omsk Bank were owned by BTA Moscow (as to 19.99%), Rikas Finance (19.99%), TuranAlem Capital (19.92%), Delta Torg (18.98%) and AMK Invest (9.99%). The remainder were held by other parties unconnected with the dispute between the Bank and Mr. Ablyazov. BTA Moscow had a branch in Omsk and so was a competitor of Omsk Bank. It decided in 2007 to divest itself of its shares in Omsk Bank and concentrate on building the business of BTA Moscow. The Claimant Bank had a nominee on the board of BTA Moscow, Mr. Yuldashev, who was aware of this strategy. It was always intended that when BTA Moscow sold its shares in Omsk Bank, the four companies controlled by Mr. Ablyazov would do the same. In January 2010 the sale was completed. BTA Moscow received US$2.9m. for its shares, Rikas Finance received US$2.6m. for its shares, TuranAlem received US$2.6m. for its shares, Delta Torg received US$2.5m for its shares and AMK Invest received US$1.3m. for its shares. On 11 February 2010 the four companies purchased subordinated debt in BTA Moscow which carries interest at 10% and, in Mr. Ablyazov's view, was a "less risky investment than the holdings in Omsk Bank."

46.     Although the Bank does not accept that these transactions were in the ordinary course of the companies' business or of any business conducted personally by Mr. Ablyazov, Mr. Ablyazov's account of the transactions has not been challenged (save that some of the detail has been questioned by Mr. Hardman in his Fifteenth Witness Statement dated 11 May 2010 to which Mr. Ablyazov replied in his Fourth Witness statement dated 17 May 2010).  With regard to the purchase of subordinated debt in BTA Moscow Mr. Hardman has referred to credit ratings of BTA Moscow which suggest that it is a very risky investment. He suggests that in any event the correct comparison is between the cash received for the sale of the shares and the subordinated debt in BTA Moscow.

47.     Mr. Matthews QC, who argued the Clarification Application on behalf of Mr. Ablyazov (which encompassed the question of breach) submitted that the sale of Omsk Bank and the purchase of debt in BTA Moscow were transactions in the ordinary course of business and so were not forbidden by the Freezing Order.

48.     The Clarification Application raised a question of construction of the Freezing Order which it is convenient to deal with in the present context.

49.     Paragraphs 4 and 5 of the Freezing Order prohibit Mr. Ablyazov from dealing with any of his assets, including those which he has the power directly or indirectly to dispose of or deal with as if they were his own. He is to be regarded as having that power if a third party holds or controls an asset in accordance with his direct or indirect instructions.

50.     Paragraph 9 states that the Freezing Order does not prohibit Mr. Ablyazov from dealing with his assets "in the ordinary and proper course of any business conducted by him personally." I refer to this as the *Angel Bell* liberty (see *Iraqi Ministry of Defence v Arcepey Shipping (The Angel Bell)* [1981] 1 QB 65).

51.     Having regard to the purpose of a Freezing Order, namely, to prevent a defendant from dissipating his assets in order to evade enforcement of a judgment rather than to prevent a defendant from dealing with his assets in the ordinary and proper course of business, the natural construction of paragraph 9 is that it applies to all assets otherwise caught by the Freezing Order, that is, those defined in paragraphs 4 and 5 of the Order. This is the construction for which Mr. Matthews contends on behalf of Mr. Ablyazov.

52.     Mr. Smith contends on behalf of the Bank that although the assets of a company in which Mr. Ablyazov is an indirect but controlling shareholder are caught by paragraphs 4 and 5 of the Freezing Order it is the company that carries on the business and not Mr. Ablyazov. Accordingly, the *Angel Bell* liberty in paragraph 9 does not apply because that only applies to dealings which are in the ordinary and proper course of a business conducted by him personally. Thus, on Mr. Smith's construction of the Freezing Order, there are assets caught by the Freezing Order which cannot be dealt with even if it is sought to deal with them in the ordinary and proper course of business. This seems to me to be a construction of the order which is unwarranted by the purpose underlying a Freezing Order.

53.     I consider Mr. Smith's construction of the Freezing Order to be mistaken. Paragraph 5 of the Freezing Order provides a very wide definition of the assets of a defendant.

They include not only assets owned by him in his own name but also assets in respect of which he has the power, directly or indirectly, to dispose of or deal with as if they were his own. This wide definition is necessary because companies and individuals "hold" their assets and conduct their businesses not only in their own name but, for a variety of reasons, through other entities in which they hold a controlling interest. If a narrow definition of assets were adopted, so that only assets held in the name of the defendant were included within the definition, it would be easy for companies and individuals to avoid the reach of a Freezing Order. However, it has long been recognised, ever since the decision in *The Angel Bell* [1981] 1 QB 65, that a Freezing Order is not intended to prevent a defendant from dealing with his assets in the ordinary and proper course of his business. Where a defendant holds his assets and conducts his business in his own name he will be entitled, notwithstanding the Freezing Order, to deal with his assets in the ordinary and proper course of his business. Where a defendant holds his assets and conducts his business through other entities in which he holds a controlling interest there is no reason, having regard to the principle underlying a Freezing Order, why he should not be able to deal with those assets in the ordinary and proper course of his business, notwithstanding that the "dealing" is in the name of the entity which nominally holds the asset and conducts the business.

54.    The position would be different where a defendant is a minority shareholder in a company and so does not control it. The assets of that company would not be within the extended definition of assets found in paragraph 5 of the Freezing Order. The defendant would not have the power, directly or indirectly, to deal with the assets of the company as if they were his own. Thus the assets of the company would not be caught by the Freezing Order. Similarly any dealing with the assets of the company in the ordinary and proper course of business would be in the ordinary and proper course of the business of the company and not of the defendant. The *Angel Bell* provision would not apply but there would be no need for it to apply.

55.    Mr. Smith seeks, by his construction of the Freezing Order, to obtain the benefit of the wide definition of asset in paragraph 5 of the Freezing Order, which is reflective of the way in which many assets are held and business conducted in the modern world (which makes considerable use, for example, of nominee off-shore companies) but then, when applying the *Angel Bell* provision, seeks to revert to a bygone world in which assets are held and business conducted only in the name of the defendant. This construction is, in my judgment, contrary to the underlying purpose and rationale of the Freezing Order. There is no justification in that underlying purpose and rationale for preventing a defendant, who conducts his business through other entities which he controls, from dealing with assets which he holds through those entities in the ordinary and proper course of that business.

56.    The Bank's further case is that Mr. Ablyazov does not conduct any business personally. Whilst he causes money to be applied in the purchase of assets and has power to deal with those assets Mr. Ablyazov was not, it is said, conducting a business when he exercised that power. Holding and managing one's own assets is not, it is said, the conduct of a business. The Bank further says that Mr. Ablyazov has not established that the sale of Omsk Bank and the purchase of debt in BTA Moscow was in the ordinary course of business because there is no evidence that any similar

sale has been effected before. Finally the Bank contends that the purchase of debt was an exceptionally poor investment and so not in the ordinary course of business.

57. Mr. Ablyazov holds a valuable portfolio of assets through a complex structure involving a nominee, a holding company, subsidiary companies and, at the base of the structure, the operating business. Mr. Smith submitted that holding and managing one's assets is not the conduct of a business but is the holding and managing of one's assets.

58. This submission raises both a question of law and a question of fact. The question of law is the proper construction of "the ordinary course of business" in the *Angel Bell* liberty. The question of fact is whether Mr. Ablyazov conducts a business.

59. In my judgment the answer to the question of law is to be found in *Normid Housing v Ralphs and Mansell* [1989] 1 Lloyd's Reports 274. Lloyd LJ, when referring to the *Angel Bell* principle at p.276 lhc, said :

> "But the principle extends beyond the payment of debts, or the incurring of ordinary living expenses. It applies also to all ordinary transactions in the course of life."

60. A little later, on p.276 rhc he said:

> "I do not propose myself to offer any definition of what is meant by "ordinary course of business". It can, perhaps, best be regarded as the obverse of the concept of dissipating a defendant's assets."

61. The *Angel Bell* liberty should therefore be construed widely and not narrowly. As such it should be construed as extending to the activity of holding and managing assets so long as it is not aimed at dissipating a defendant's assets. The distinction is drawn by Robert Goff J. in *The Angel Bell* itself at [1981] 1 QB 65 at pp.71-72:

> "...the point of the Mareva jurisdiction is to proceed by stealth, to pre-empt any action by the defendant to remove his assets from the jurisdiction. To achieve that result the injunction must be in a wide form because, for example, a transfer by the defendant to a collaborator in the jurisdiction could lead to the transfer of the assets abroad by that collaborator. But it does not follow that, having established the injunction, the court should not thereafter permit a qualification to it to allow a transfer of assets by the defendant if the defendant satisfies the court that he requires the money for a purpose which does not conflict with the policy underlying the Mareva jurisdiction..."

62. I therefore conclude that there is no reason in principle why the activity of holding and managing assets should not be regarded as a business (for the purposes of the *Angel Bell* liberty) so long as it is not aimed at ensuring that any judgment obtained against a defendant will be unenforceable. If it is so aimed then it conflicts with the policy underlying a Freezing Order and should be prohibited. A claimant is entitled to be protected against such "artificial" dealings. But where a sale of assets takes place

for reasons which are not aimed at ensuring that any judgment will be unenforceable, for example because the defendant wishes to reduce his holdings in a particular sector, the defendant may conduct such sale. Similarly, the Freezing Order will prevent the defendant from handing the proceeds of sale to a collaborator for the purpose of protecting them from being seized by a judgment creditor. But if the defendant uses the proceeds to purchase another asset to add to his portfolio of assets in the ordinary course of managing that portfolio such action does not conflict with the policy underlying the Freezing Order and is not prohibited by it.

63.    I therefore reject the narrow or restrictive interpretation of "business" in the *Angel Bell* liberty which has, I think, been advanced by Mr. Smith to the effect that it does not encompass the activity of holding and managing one's assets.

64.    But even if such narrow or restrictive interpretation were appropriate in some contexts I am unable to apply it in the present context. Thus, it may be that not everyone who holds and manages his assets can be said to be conducting "a business". A doctor, architect or lawyer may hold and manage a share portfolio but may be said not to be conducting a business in so doing. However, when a person's assets are as large as Mr. Ablyazov says his are, made up of controlling interests in several businesses, it seems to me unrealistic to say that holding and managing his assets is not his business. He manages them, not by managing the operating business at the base of the structure, but by giving instructions to his trusted nominees. It is reasonable to assume that such management occupies a lot of his time. When he provided his affidavit of assets dated 27 August 2009 he said that he had had to cope with "my normal business duties and the effects of the freezing order". That is likely to have been a reference to his business of managing his valuable portfolio of assets. I have taken into account that he has not disclosed any accounts or tax returns in respect of his business but I am unable to accept Mr. Smith's submission that Mr. Ablyazov does not conduct any business personally. On his evidence Mr. Ablyazov is "in business" on a grand scale. In his Third Witness Statement dated 16 April 2010 he said:

> "16. My business interests are varied, but frequently involve the purchase, development and onward sale of commercial companies and other assets. I currently hold interests in various sectors. I have in the past held interests in, for example, media, energy and sugar production businesses.
>
> ………
>
> 181. My business frequently involves purchasing assets which are considered to be good investments, and managing and developing those assets so as to increase their value and realise a profit; such assets are then either sold to realise a profit, or retained if they continue to be a desirable investment. In all cases, those assets are acquired and managed via holding companies, not by me acting as a sole trader."

65.    I have also taken into account that there is evidence that Mr. Ablyazov did not until recently rely upon the *Angel Bell* liberty to justify dealings with his assets. Thus Mr. Neocleous, a solicitor acting for Vetabet Holdings Limited, has said that Mr. Ablyazov regarded the amendment to the Freezing Order made on 11 December 2009

as preventing dealings in assets. However, I do not regard this as cogent evidence that Mr. Ablyazov does not conduct a business personally. It seems to me clear that he did but that until recently he did not appreciate that he could rely on the *Angel Bell* liberty to justify his dealing with his assets.

66. I am also unable to accept Mr. Smith's further submission that Mr. Ablyazov is not conducting his business personally when he exercises a power to deal with his assets. If Mr. Ablyazov held shares in his own name in Omsk Bank, as part of a portfolio of business interests which he managed, and decided to sell those shares, for example, as part of a business strategy to move out of banking and in to another business sector, such sale would be in the ordinary course of his business of asset management. If, instead and as is the case on his evidence, he holds his shares in Omsk Bank not in his own name but by means of the structure which he has described the same sale would be in the ordinary course of his business of asset management. He would sell his interest in Omsk Bank, not by selling shares in Omsk Bank in his own name (because he has none) but by instructing his nominee to cause Rikas Finance, TuranAlem Capital, Delta Torg and AMK-Invest to sell their shares in Omsk Bank. In other words, the precise mechanism by which Mr. Ablyazov holds and deals with his assets does not determine the question whether he is conducting his business when selling an asset.

67. The important question, in the context of a suggested breach of the Freezing Order, is whether the transactions in question were or were not in the ordinary course of his business. In the light of Mr. Smith's submission that Mr. Ablyazov has not established that the sale of Omsk Bank and the purchase of debt in BTA Moscow were in the ordinary course of business it is necessary to consider the burden of proof. That question was considered by Moore-Bick J. in *Nokia France v Interstone* [2004] EWHC 272 (Comm) at paragraphs 53-54. He held that the burden was on the person who alleged a breach, and therefore a contempt, of the Freezing Order, to establish such breach in "every essential respect". I respectfully agree. On the true construction of the Freezing Order a dealing in the ordinary course of the defendant's business is not a breach of the Freezing Order. The person who alleges a breach must therefore prove that the dealing in question was not in the ordinary course of business.

68. The only evidence before the court as to the circumstances in which Mr. Ablyazov's interest in Omsk Bank was sold comes from Mr. Ablyazov. His evidence is to the effect that the four companies controlled by him were always going to sell their shares in Omsk Bank when BTA Moscow sold its shares in Omsk Bank. BTA Moscow appears to have been considering selling its shares in Omsk Bank for some time for what it considered were sound business reasons. There is no evidence to the contrary and no basis on which I can reject that evidence. There is no evidence that the sales by the four companies were aimed at putting Mr. Ablyazov's interest in Omsk Bank beyond the reach of the Bank if and when it has the opportunity of executing a judgment against Mr. Ablyazov.

69. It was said that there is no evidence that any similar sales had been effected in the past. However, in principle I do not consider that this needs to be shown; cf *Normid Housing v Ralphs and Mansell* [1989] 1 Lloyd's Reports 274 at p.276 rhc per Lloyd LJ and p.278 lhc per Slade LJ. A transaction may be in the ordinary course of business even though it is done only once.

70. My conclusion, based on the evidence of Mr. Ablyazov which has not been challenged in this respect, is that the sale of his interests in Omsk Bank was in the ordinary course of his business.

71. With regard to the purchase of subordinated debt in BTA Moscow the Bank advanced a positive case that this was an exceptionally poor investment. The evidence set out in Mr. Hardman's Fifteenth Witness Statement as to the views of credit agencies supports this. In addition, Mr. Hainsworth, who founded a credit agency focussing on Russian banks and who has provided an opinion for Mr. Ablyazov, has described BTA Moscow as "balanced on a knife edge".

72. The mere fact that an investment is an exceptionally poor investment does not mean that it cannot be made in the ordinary course of business. A similar point arose in *Normid Housing v Ralphs and Mansell* where a firm of architects settled a claim. Paraphrasing the language used in that case by Ralph Gibson LJ at p.277 rhc and Slade LJ at p.278 rhc, the test is whether the investment is so inexplicable and unreasonable that there appears to be no reason why Mr. Ablyazov might have sensibly made the investment so that one can conclude that it was done in bad faith as part of a plan to cheat the Bank.

73. BTA Moscow is one of a number of assets in respect of which Mr. Ablyazov has declared ownership. It may well be that the proceeds of sale of Omsk Bank would be safer had they remained in cash and that using them to purchase subordinated debt in BTA Moscow is fraught with risk. But Mr. Ablyazov has said that the purchase of debt in BTA Moscow assists it to maintain its required capitalisation. In circumstances where Mr. Ablyazov is using the cash to provide funds to an ailing bank which he owns I am unable to find that the purchase was not in the ordinary course of his business. The Bank has adduced no evidence that the purchase of debt in BTA Moscow was aimed at putting the proceeds of sale beyond the reach of the Bank rather than being aimed at supporting BTA Moscow.

74. For these reasons I am unable to accept that Mr. Ablyazov has acted in breach of the Freezing Order with regard to the sale of his interests in Omsk Bank and in his dealings with the proceeds of sale.

Disclosure

75. At an earlier stage in these proceedings I ordered that Mr. Ablyazov be cross-examined as to his affidavit of assets on the grounds that his disclosure appeared at that stage to be inadequate. Much has happened since then. Mr. Ablyazov has been cross-examined for two days and he has provided a much fuller account of his assets in his Third Witness Statement dated 16 April 2010 at paras. 259-378. Mr. Smith has severely criticised Mr. Ablyazov's approach to disclosure of his assets. He says that the initial disclosure was incomplete and that some of his evidence when cross-examined was misleading. He invites the court to find that Mr. Ablyazov did not consider himself to be constrained to give the Bank (and the Court) a complete picture of his assets such that he cannot be trusted to obey the Freezing Order. By contrast Mr. Trace submitted that whatever the defects in the initial list of assets Mr. Ablyazov has now "bared his soul" and can be trusted. Although a great many points were made in Mr. Smith's Skeleton Argument and even more by Mr. Hardman, his instructing solicitor, in his witness statements I shall concentrate on what appear to be the four

most significant. They are (a) the initial disclosure of assets, (b) the "Schedule C" disclosure, (c) the failure to mention certain dealings with the assets and (d) the trust deeds.

(a) The initial disclosure of assets

76.  Mr. Ablyazov's initial list of assets attached to his affidavit dated 27 August 2009 (but delivered on 30 September 2009 after the Court of Appeal had dismissed his appeal from my order dated 21 August 2009) can now be compared with his Third Witness Statement in which he has identified a number of assets which are held by means of the structure to which I have already referred.

77.  It is helpful to illustrate the structure by reference to an example. In his initial list of assets no.15 was an "indirect interest in Blackdesert Holdings Limited", a British Virgin Islands company, valued at approximately US$50m. No clue was given as to the business or assets of Blackdesert Holdings Limited; and no explanation was given as to the nature of Mr. Ablyazov's indirect interest in Blackdesert Holdings Limited save that the documents supplied with the list included a share certificate stating that 5000 shares in Blackdesert were held by Handcart Investments Limited and a further share certificate stating that 10000 shares in Handcart were held by Company A. It was in those circumstances that cross-examination was ordered.

78.  Mr. Ablyazov has stated in his Third Witness Statement that the business or asset at the bottom of the structure ("the operating business") was Eurasia Tower, a tower block in Moscow comparable to Canary Wharf in London. When Mr. Ablyazov acquired the site in 2004 it was a "bare site". When finished it will be the tallest building in Europe made of steel and will have 75 storeys consisting of shops on the ground floor, office space to the 49th floor and apartments above. Some 50 storeys have so far been built. That asset was owned by a Russian company called ZAO Tekhinvest. Shares in Tekhinvest were owned by a Cypriot company, Company P. 99.9% of the shares in Company P were held by Blackdesert. 50% of the shares in Blackdesert were held by Handcart Investments Limited and 50% by MCG International Holding Limited, a company not owned by Mr. Ablyazov but by Mr. Pavel Fuchs. Thus the Eurasia Tower project was a joint venture between Mr. Ablyazov (through Handcart) and Mr. Fuchs (through MCG). Shares in Handcart were held by Company A on trust for a nominee who in turn held them on trust for Mr. Ablyazov.

79.  I have asked myself whether Mr. Ablyazov could reasonably have been expected to give the information provided in his Third Witness Statement as to Eurasia Tower in his affidavit of assets dated 29 August 2009 bearing in mind the circumstance that the Freezing Order had been served on him in London that month where, unable to speak English, he had only recently sought refuge with his family, having hurriedly left Kazakhstan.

80.  Eurasia Tower was one of his "assets". If it is comparable to Canary Wharf it is unlikely that he did not know he had a valuable share in it. Indeed he does not claim to have been ignorant of it. He in fact held a 50% interest in it through the chain I have described. He must also have known that a nominee held or controlled that interest on his behalf. Again he does not claim to have been ignorant of that. Mr.

Ablyazov accepts in his Third Witness Statement that he knew "the big picture of the assets in which I have an interest".

81. Although a refugee in London he had access to and advice from an experienced City solicitor, Clyde and Co. It seems to me that there are substantial grounds for concluding that he could reasonably have been expected, when informing the Bank's solicitors of his assets, to have informed them of at least two matters. First, he could reasonably have been expected to have informed them of the role of his nominee. He was Mr. Ablyazov's only direct link to Eurasia Tower. This nominee held shares in Handcart, via Company A, on trust for Mr. Ablyazov. His role as a trusted nominee was Mr. Ablyazov's most valuable asset. Second, he could reasonably have been expected to have informed the Bank's solicitors of the operating asset at the bottom of the structure, namely, Eurasia Tower in Moscow.

82. Why did he not mention these two matters but instead mention only his interest in a British Virgin Islands company, Blackdesert, in the middle of the chain and provide documents evidencing the holding of shares in that company by <u>Handcart</u> and in Handcart by Company A? Making every allowance for the position in which Mr. Ablyazov found himself in August 2009 there are substantial grounds to believe that the likely explanation is that he wished to give away as little information as possible about his assets and so make it difficult for the Bank's solicitors to enforce the Freezing Order. Without knowing who held shares in Company A (a nominee) and what his role was (nominee for Mr. Ablyazov), it would be difficult for the Bank's solicitors to identify how Mr. Ablyazov controlled Blackdesert. Without knowing what Blackdesert owned or controlled it would be difficult for the Bank's solicitors to identify the operating asset at the bottom of the chain. The position in relation to the other assets "disclosed" by Mr. Ablyazov in August/September 2009 is similar though in relation to one he did reveal the operating asset.

83. I have noted that Mr. Ablyazov has apologised to the court for the inadequacy of the information as to his assets provided in August/September 2009, that he has said that he had no intention of doing anything other than abiding by the orders of the court and that he has further said that he is extremely concerned that his disclosure has been criticised by the court. He does not feel that he was well served by Clyde and Co. However, even if Mr. Ablyazov did not know "the details of the holding structure" and even if "given the relatively complex nature of these holdings, [he did] not hold all the information in [his] head" that does not, it seems to me, provide an explanation for his failure to identify, in relation to Eurasia Tower, first, the role of the nominee and second, Eurasia Tower itself. They are the "big picture".

84. I note that reliance has been placed by Mr. Bercow, of Stephenson Harwood, the solicitors now acting for Mr. Ablyazov, on what was said by Mr. Smith on 4 November 2009 in response to a question from me. It is said that he conceded that it was not necessary for Mr. Ablyazov to disclose the operating asset. However, in the light of what has now been disclosed by Mr. Ablyazov as to his assets I consider that the underlying asset should have been disclosed in circumstances where the holding company is simply the vehicle for holding that asset. The position is to be contrasted with a case where a defendant owns shares in a company which he does not control and which owns many assets.

85.    I have noted that Mr. Ablyazov is very concerned that he is being "painted" by the Bank as a dishonest person and that no such conclusion should be reached by the court until he has given evidence at this trial. The present applications are made at the interlocutory stage of the proceedings. No findings can be made with regard to the issues to be resolved at trial.  On this application for a Receivership Order the court has to consider whether there is a real risk that the Bank may not obtain from the Freezing Order the protection against artificial dissipation of assets to which it is entitled. In that context it is relevant to consider, on the written evidence presently before it, whether there is a serious possibility that Mr. Ablyazov might have omitted to tell the Bank of the role of his nominee  and the operating assets in order to make it difficult for the Bank to enforce the Freezing Order. If there is such a serious possibility that is a reason in favour of making a Receivership Order. On the written material presently before the court that is a serious possibility. There are, as I have said, substantial grounds to believe that Mr. Ablyazov wished to make enforcement of the Freezing Order difficult. However, at trial when the question of Mr. Ablyazov's honesty with regard to the Drey, Chysopa and Tekhinvest transactions (and it seems other transactions) will be in issue there will, I have no doubt, be far more evidence, including, in particular, oral evidence from Mr. Ablyazov which the court will have to consider and weigh before reaching any conclusion as to honesty.

(b) The Schedule C disclosure

86.    The original defects in the disclosure of Mr. Ablyazov's assets have now been remedied by Mr. Ablyazov in his Third Witness Statement. That is the basis of Mr. Trace's submission that Mr. Ablyazov has "bared his soul". Mr. Smith does not accept that he has bared his soul and submits that Mr. Ablyazov has omitted to disclose his interest in a number of other companies which are mentioned in what is known in this case as the Schedule C disclosure.

87.    As part of the Freezing Order Mr. Ablyazov was required to answer questions concerning what had happened to $295m. paid by the Bank to Drey. This information was required to enable the Bank to trace and recover those monies. This is the Bank's "proprietary" claim. In response information was given and illustrated by a chart showing what had happened to the monies. This is the Schedule C disclosure.

88.    The chart indicated that very substantial sums were paid out to various companies and on to others within a very short period of time. But the chart also indicated that $215m. had found its way back to Bank. Although not initially accepted by the Bank enquiries have confirmed that that is true. $215m. appears to have been paid back to the Bank in discharge of loans made by the Bank to the companies who paid back the $215m. However US$41.1m paid to FM Company is still "missing". (A further US$30m. paid to Estar Developments Limited was also said to be missing but the Bank has recently stated that it found its way back to the Bank for a short period of time).

89.    Mr. Smith submits that Mr. Ablyazov must have an interest in the companies receiving and making these payments, which interest has not been disclosed. His reasons for making that submission are these:

    i)      Mr. Ablyazov could not otherwise have known or ascertained this information.

ii)    The speed and sequence of the payments would be incredible if the recipients were independent third parties.

iii)   Mr. Ablyazov has not disclosed any consideration or assets received in return for the payments made.

90.   When cross-examined Mr. Ablyazov denied any interest in the many companies mentioned in the chart other than Drey, Devesta, Company Z, AMK Invest and Company Y. He said that the chart had been provided by Mr. Y but he was no longer in touch with him. He did not know why $41m. had been paid by Drey to FM Company or why $30m. had been paid to Estar Developments Limited.

91.   In his Third Witness Statement he confirmed that his source of information was Mr. Y and that "since around September 2009" he has been unable to reach him. Mr. Y is said to be extremely concerned for his own safety.

92.   There appears to be some force in the points made by Mr. Smith. In the absence of any other explanation it seems likely that the reason why substantial payments were made quickly though a number of companies without, it appears, any assets or consideration being received in exchange is that the monies were being routed through companies in which Mr. Ablyazov was interested. Even allowing for Mr. Ablyazov being a very rich man and for his reliance on Mr. Y with whom he is no longer in contact it is surprising that he cannot say why $41m. and $30m. of his own money were paid to FM Company and Estar Developments. By contrast he was able to say why $5.75m. had been paid to Julia Seliverstrova, namely, the payment of a debt.

93.   This point was taken further when the Swift reports of the payments totalling $215m. which were ultimately paid to the Bank were analysed. That analysis revealed a number of connections between them and Mr. Ablyazov, including the following:

i)     Payments were made by allegedly independent companies from accounts with Trasta Komercbanka in Latvia or BTA Moscow ie the same banks which received the funds under the compensation agreements on behalf of Drey.

ii)    There were many links of incorporation and addresses between those companies.

iii)   There were numerous connections of addresses between those companies and offshore companies of Mr. Ablyazov.

94.   I gave Mr. Ablyazov leave to put in a further statement dealing with this matter if he wished. I asked Mr. Trace for his response to Mr. Smith's submission that Mr. Ablyazov must have an interest in the companies making and receiving the payments in the schedule. His answer did not address Mr. Smith's submission. Rather he said that he had not understood the point being made and that Mr. Ablyazov would deal with the matter in further evidence.

95.   Thus Mr. Ablyazov provided his Seventh Witness Statement. He explained the various connections identified by study of the Swift reports as follows. Trasta Komercbanka is a leading bank in Latvia and is often used by businessmen both

within and outside the CIS so there is nothing significant in that bank being used for making payments. BTA Moscow was used as a correspondent bank by Trasta Komercbanka. Offshore companies are used by many businesses and the same agents are often used. There is therefore nothing surprising in the companies listed in the schedule as having common addresses amongst themselves or with Mr. Ablyazov's companies. This explanation has been summarised by Mr. Trace in his further written submissions dated 18 June 2010 at paragraph 9.

96.     The explanation has been considered and rejected by those advising the Bank. Mr. Hardman has given further evidence about this matter in his Sixteenth Witness Statement dated 29 June 2010 and Mr. Smith has made detailed submissions on the topic at pp.4-8 of his further written submissions also dated 29 June 2010. There is a considerable dispute as to the inferences which may or may not properly be drawn from powers of attorney having been granted to persons in the Schedule C companies who also hold powers of attorney over companies controlled by Mr. Ablyazov.

97.     The Seventh Witness Statement of Mr. Ablyazov went further as Mr. Trace suggested it might. Mr. Ablyazov elaborated on the role of Mr Y and on his role in preparing the Schedule C answers. He said that Mr. Y arranged for short term loans from third parties and for the repayment of such loans. Mr. Y also made payments when assets were purchased by Mr. Ablyazov. He estimated that in any one year Mr. Y would handle payments between $500m. and $1b. Bearing those matters in mind he suggested that the various payments in the schedule prepared by Mr. Y are likely to represent the repayment of loans or payment for the purchase of assets (as was the case with Mrs. Seliverstrova). He suggested that the payment of $41.1m. to FM Company might have been in part a repayment of a loan and in part a repayment to Mrs. Seliverstrova by way of the purchase for her of a company from FM Company. He stated that it is not surprising that he is not able to look at the figure of $41.1m and be reminded of what the sum relates to. He maintains that he does not own directly or indirectly any of the companies in the schedule save for those in which he has already declared an interest.

98.     Mr. Ablyazov's Seventh Witness Statement seeks to answer the main thrust of Mr. Smith's submission though his evidence seems to be no more than informed speculation and the reasons for the payments of over $70m. to FM Company and Estar must remain in doubt. Mr. Smith has submitted that the speculation is implausible for reasons developed at paragraphs 4-13 of his written submissions dated 29 June 2010. Mr. Hardman goes further and appears to doubt even the existence of Mr. Y; see paragraphs 22-23 of his Sixteenth Witness Statement.

99.     Whilst Mr. Smith has identified reasons for doubting Mr. Ablyazov's explanation it would be a remarkable and brazen lie for Mr. Ablyazov to deny his interest in companies whose names were disclosed by Mr. Ablyazov himself in Schedule C. It would also be a remarkably stupid lie in circumstances where his honesty will be in issue at trial. In the result I am not persuaded on this application that Schedule C in fact lists other companies in which Mr. Ablyazov has an interest which he has not disclosed and refuses to disclose. Equally, I am not persuaded that Mr. Ablyazov has indeed "bared his soul" as to his assets. The most that I can say is there is a reasoned suspicion that he has not disclosed all his assets.

100.   But his explanation also reveals a remarkable state of affairs, namely, that Mr. Y, with whom Mr. Ablyazov is no longer in contact, has very considerable power over Mr. Ablyazov's funds. This emphasises the need for a receiver to be appointed in relation to the Bank's proprietary claim in respect of (at least) the missing $40m. paid to FM Company. (The $30m. payment to Estar has now been found to have made its way back to the Bank where it remained for a short period before being paid out to ABN Amro on a trade finance transaction.) Mr. Ablyazov has now denied owning Devesta, a company recorded by him as having made substantial transfers of the sums first paid to Drey. This apparent change of evidence (which he attributes to a mistranslation or a failure on his part to express himself) also emphasises the need for a receiver to be appointed.

101.   There is one other dispute I should mention in the context of whether Mr. Ablyazov has declared all his assets. I mention it in order to illustrate not only the Bank's efforts to uncover undisclosed assets of Mr. Ablyazov but also the difficulty of reaching any conclusion on the basis of the evidence adduced. Mr. Smith and Mr. Hardman say that Mr. Ablyazov has an interest in Glintmill Investments which he has not disclosed and which he has either sold or is on the market. Glintmill is said to hold (or to have held) a 70% interest in Gainsford Investments which in turn holds an indirect interest in the construction of the Holiday Inn hotel and EXPO centre in Belgrade. Mr. Ablyazov denies ever having had an interest in Glintmill.

102.   The Bank's evidence that Mr. Ablyazov has such an interest comes from discussions between two Serbian investors (who claimed to be the owners of the other 30% interest in Gainsford) and a representative of the Bank in Moscow in April 2009. Also in attendance at the meeting, apparently, was an officer of the KNB, the Kazakhstan security service. The Bank's case is supported by contact between the Serbian investors and Mr. Hardman in January 2010 and an arrangement to meet them after they had had a meeting with Clyde and Co. But such a meeting has been denied by Clyde and Co. and the meeting with Mr. Hardman was cancelled. Reliance is also placed by Mr. Smith on what has been said in certain Cypriot proceedings in relation to what might be the Glintmill investment by a lady who appears to have been imprisoned for 10 days, placed under house arrest, was in a depressed state and feared punishment by law enforcement authorities. After she had cooperated with the authorities the charges against her were dismissed. I am quite unable to resolve the dispute as to whether Mr. Ablyazov has an interest in Glintmill on this application.

(c) Failure to mention dealings in assets

103.   Mr. Smith submitted that the answers given by Mr. Ablyazov during his cross-examination were misleading. He submitted that Mr. Ablyazov failed to mention (i) the sale agreement in respect of his interest in the Eurasia Tower and (ii) the sale of his interest in BTA Kazan. Criticism has also been made of his failure to mention certain negotiations for the sale of assets. The Vitino Sea Port was mentioned in this context. I do not consider that much if anything can be made of a failure to mention negotiations.

(i) Eurasia Tower

104.   In his Third Witness Statement served on 16 April 2010 Mr. Ablyazov revealed that an agreement for the sale of his interest in Eurasia Tower had been made on 15

September 2009 for $50m. The purchaser was Mr. Fuchs. It was varied on 26 November 2009 and on 1 December 2009 the first tranche of $20m. was paid and title passed to the purchaser. The balance remains to be paid.

105.   Although the sale agreement was made on 15 September 2009 before Mr. Ablyazov's list of assets was disclosed on 30 September 2009, that list had been prepared and provided to Clydes at the end of August 2009 in accordance with my order. Mr. Ablyazov was cross-examined as to his list of assets on 27 October and 18 November 2009.

106.   On 27 October he said that Blackdesert owned a construction project which was presently frozen and that his share was valued at $50m. He did not mention that that was indeed the sale price which he had recently agreed for the sale of his share.

107.   On 18 November he said "I own 50% of Blackdesert." He did not mention that he had agreed to sell it.

108.   On 15 December 2009 Clyde and Co., who were then acting for Mr. Ablyazov, provided further information as to Mr. Ablyazov's assets. With regard to Blackdesert certain documents (trust deeds and share certificates) were referred to and it was stated that "Handcart Investments owns 50% of the shares in Blackdesert Holdings Limited." But as of the date of this letter this information was not correct. The title to the shares in Blackdesert had passed to Mr. Fuchs on 1 December.

109.   The question which arises is whether Mr. Ablyazov's failure to mention the sale until April 2010 is sinister in the sense that he deliberately avoided mention of it so that the Bank's solicitors would not learn of the sale and the sale proceeds.

110.   Mr. Ablyazov's explanation in his Third Witness Statement is that he did not expect Mr. Fuchs to pay the agreed price. Mr. Fuchs said he would pay by the end of September and then by 15 October and then again by 1 November.

> "At the time of my second cross-examination in November, I thought that the possibility of this asset being transferred to Mr. Fuchs was small if not non-existent, and accordingly the prospect of such a transfer is not something that it would have occurred to me to mention."

111.   In his Fourth Witness Statement he said that he understood the purpose of the cross examination was to ask him about the statements he had made in his affidavit of assets. As to Clydes' letter dated 15 December he said he could not remember whether or not he saw and approved the letter but even if he had he said that he would have assumed that it related to his assets as at the date of the original Freezing Order.

112.   Mr. Ablyazov's obligations under the Freezing Order were, by 27 August 2009, to inform the Bank's solicitors, to the best of his ability and after making all reasonable enquiries, of "the location, nature and value of all his assets......giving the value, location and details of all such assets." Since the sale agreement of his share in Blackdesert was not made until 15 September he was not required to mention that agreement when providing his affidavit to Clyde and Co. on 27 August (as he was required to do pending his appeal to the Court of Appeal). Ultimately, Mr. Smith did

not submit that there was an implied obligation under the Freezing Order to update information as to assets. It seems to me that since breaches of the Freezing Order are punishable as a contempt a party's obligations pursuant to an order should be set out expressly. I agree with the suggestion in *Gee on Commercial Injunctions* at paragraph 22.017 that the information should be up to date at the time of service of the affidavit. However, since the affidavit was provided to Clyde and Co. on 27 August but not served on Lovells until 30 September after the dismissal of the appeal it would have been an awkward submission to make that there had been a breach of duty in this respect.

113.   I think that caution should be exercised in criticising Mr. Ablyazov's answers in cross-examination which were given through an interpreter. Moreover, as at the date of both sessions of cross-examination he still owned, indirectly, 50% of Blackdesert and, because the sale agreement was not known to Mr. Smith, he was not asked about any sale. Nevertheless, I find it surprising that he did not mention the sale agreement. He mentioned a valuation of $50m. but did not mention that that was the price at which he had agreed to sell his interest. On the evidence presently available it appears that he did not tell Clyde and Co. about the sale. If he had told Clyde and Co. they would surely have made reference to it in their letter dated 15 December to ensure that their letter was not misleading. As a result the Bank, or more correctly, the Bank's advisers believed until April 2010 that Mr. Ablyazov owned 50% of Blackdesert and therefore of Eurasia Tower. In fact, after the second cross-examination and before Clydes' letter of 15 December, title had passed and Mr. Ablyazov had received US$20m. which was used on 3-4 December to discharge obligations to another company (which obligations were entered into on 10 October 2008, a guarantee by Handcart of payment obligations owed by Company E).

114.   Mr. Ablyazov has not denied that he failed to inform Clyde and Co. of the sale. The significant question for present purposes is whether there are substantial grounds to believe that Mr. Ablyazov chose not to inform Clyde and Co. and the Bank (or rather its solicitors) as to the sale of his interest in Blackdesert because he did not wish the Bank's solicitors to know about the sale and that he had received $20m. I consider that there are substantial grounds to believe, on the material currently before the court, that this was his purpose. It fits with his earlier inadequate disclosure which made the task of the Bank's advisers to enforce the Freezing Order very difficult. His suggestion that he thought that the (exclusive) focus of attention was his assets as at the date of the Freezing Order seems to me most improbable. There is evidence from Mr. Neocleous that Mr. Ablyazov considered that dealings in his assets were injuncted after the Freezing Order was amended on 11 December 2009 and that he did not, at that time, appreciate the significance of the *Angel Bell* liberty. This may explain why Clyde and Co. were not informed.

### (ii) BTA Kazan

115.   According to Mr. Ablyazov his interest in this bank was sold "in October 2009". Yet when cross-examined on 18 November 2009 he referred to the interest in BTA Kazan without mentioning that it had been sold the previous month. He said that Company F "owns" 34% of BTA Kazan. Nor was any mention of the sale made in Clyde and Co.'s letter dated 15 December 2009 which asserted that Company F owns Company G which in turn owns 50% of TuranAlemCapital which in turn "holds" 14.8% of BTA Kazan. Further shares in BTA Kazan were held in similar fashion through other

companies. The proceeds of sale were used to purchase subordinated debt in BTA Moscow.

116. Mr. Ablyazov has not denied that he failed to inform Clyde and Co. of the sale. Again, as with Eurasia Tower, the question is whether there are substantial grounds to believe that Mr. Ablyazov chose not to inform Clyde and Co. and the Bank (or rather its solicitors) as to his sale of his interest in Company F because he did not wish the Bank's solicitors to know of the sale and that he had received the proceeds of sale. As with Eurasia Tower, there are substantial grounds to believe that this was his purpose. It fits with his earlier inadequate disclosure which made the task of the Bank's advisers to enforce the Freezing Order very difficult.

117. Mr. Matthews submitted that there was evidence that this sale was not a secret. The Claimant Bank had been wishing to merge it into BTA Moscow. This did not take place and since February 2009 there has been deadlock because Mr. Ablyazov owed 51% of BTA Kazan and the Claimant Bank owned 47% of it. Eventually Mr. Ablyazov sold his shares to companies controlled by Mr. Pukhlikov, who has interests in oil and gas. Mr. Hardman himself referred to a press release issued by BTA Kazan referring to the sale. However, it is not clear to me from Mr. Ablyazov's evidence that the sale was known to the Claimant Bank before the issue of the press release. That press release is dated 30 November 2009.

118. Whilst, in the light of the press release, any expectation Mr. Ablyazov had of keeping the sale secret was unlikely to be realised, there remain grounds to believe that this was his aim.

(d) Trust deeds

119. A curious, Mr. Smith would say extraordinary, aspect of this case is the production of written trust deeds evidencing the relationship between Mr. Ablyazov and a nominee between the initial disclosure of assets and the completion of cross-examination. Mr. Ablyazov said, when cross-examined on the second occasion, that he dictated them in Russian to a nominee who prepared them in English and sent them to him through the post. It would appear that Clyde and Co. were not involved. Mr. Ablyazov states in his Third Witness Statement that "the creation of these trust deeds was intended to show transparency and as an act of good faith in this litigation. They formalised an existing relationship."

120. Mr. Ablyazov's account of the manner in which the trust deeds were produced is surprising. It is difficult to accept that he dictated the terms of these trust deeds in Russian to his nominee. It is also difficult to accept that his nominee translated them into English, for that nominee has now provided a witness statement in which he states that he speaks Russian and that the statement was translated into Russian for him. It now appears that at least one trust deed was in existence by 7 August 2009. If the deeds dated in October 2009 were produced on Mr. Ablyazov's instructions it seems to me more likely that he requested that they be produced in the form of the trust deed already in existence (but which was not disclosed with the initial list as it ought to have been). However, this is speculation. The important question is whether there was anything sinister in their production. Their production, after an affidavit of assets and before cross-examination as to that affidavit, is certainly unusual. Further, one would have expected someone in Mr. Ablyazov's position to have consulted

Clyde and Co. about the need to produce them and whether it was wise to do so. There is no evidence that he did. Mr. Trace submitted that their execution is not consistent with a desire on the part of Mr. Ablyazov to evade the court's judgment or put obstacles in the way of enforcement. There seems to me some force in this. The trust deeds provide a written record signed by the nominee of his trustee status. Without them there would be no record (save in one, perhaps two, cases) that he held shares on trust for Mr. Ablyazov. Thus the production of the trust deeds would seem to assist rather than frustrate enforcement of any judgment. Mr. Smith did not, I think, suggest in what way, if any, their production might frustrate enforcement. In those circumstances I am not persuaded that the production of the trust deeds suggests that Mr. Ablyazov is likely to disobey the Freezing Order.

121. Having reviewed the main criticisms on disclosure I have concluded that Mr. Ablyazov's initial disclosure and his failure to mention certain dealings with his assets to Clyde and Co. and hence to the Bank's advisers provide good reason to believe that the Freezing Order will, or may, not provide the Bank with adequate protection against the risk of dissipation of Mr. Ablyazov's assets prior to trial.

The Restricted Information regime

122. This regime was ordered by the Court of Appeal after it had been suggested by the Bank as a solution to Mr. Ablyazov's concerns as to information about his assets reaching the President of Kazakhstan via the Bank. I decided to continue it.

123. There have been two successful applications to relax it, one concerning the Schedule C disclosure and the other concerning four assets already in the pubic domain. Once the Schedule C disclosure was made known to the Bank it was learnt that the companies who had repaid $215m. to the Bank still owe the Bank some $642m. Once the Bank learnt of the four assets it was learnt that substantial sums had been borrowed from the Bank to purchase three of those assets. This has given rise to the suspicion that Mr. Ablyazov has an ulterior motive for insisting on the Restricted Information regime. However, Mr. Ablyazov clearly has his own reasons for insisting on the regime, namely his fears concerning the President of Kazakhstan, and I cannot, on this application, find that those reasons are bogus.

124. It is likely that the regime impedes the ability of the Bank's solicitors and other advisers to police the Freezing Order, for they are unable to discuss the disclosure with the Bank. But I do not consider that that is an adequate reason for making the Receivership Order.

Drey's claim that it was exposed to criminal proceedings

125. Drey attempted to rely upon the privilege against self-incrimination when ordered to give disclosure of its assets. It claimed that it might incriminate itself of an offence contrary to section 328 of the Proceeds of Crime Act 2002 of becoming concerned in an arrangement which facilitates the acquisition, retention, use or control of criminal property by or on behalf of another person. It is said that other person must have been Mr. Ablyazov since he owns and controls Drey which circumstance suggests a high risk of dissipation of assets. I am not sure that the other person must have been Mr. Ablyazov though if it were not him it must have been another company owned or controlled by him. But a risk of dissipation is in any event suggested by the fraud

alleged against Mr. Ablyazov. I do not consider that the circumstance of Drey claiming privilege against self-incrimination materially adds to that risk.

The reasons for a Receivership Order

126.  In summary therefore the circumstances which give reason to believe that the Freezing Order may not provide the Bank with adequate protection against the risk that Mr. Ablyazov's assets will be dissipated prior to any judgment that the Bank obtains are as follows:

i)  His initial disclosure of his assets can now be seen to have been seriously inadequate in that he failed to mention the crucial role of a nominee and the nature of the operating assets (save for one). There are grounds for believing that he wished to make it difficult for the Bank to enforce the Freezing Order.

ii)  There are grounds to believe that his failure to mention the sale of Eurasia Tower to Clyde and Co. was to avoid the Bank's solicitors learning of the sale and that $20m. had been received in part payment.

iii)  There are grounds to believe that his failure to mention the sale of BTA Kazan to Clyde and Co. was to avoid the Bank's solicitors learning of the sale and that the proceeds of sale had been received, though this was unlikely to succeed in the light of a press release by BTA Kazan.

127.  Those matters give rise to a real risk, in my judgment, that Mr. Ablyazov may use the structure by which he holds his assets to deal with them in breach of the Freezing Order. He has said that he will not do so and no breach has yet been proved but in the light of his prior conduct I am unable, on this application, to be sure that he will not do so in the future. There is therefore good reason for making the Receivership Order. It follows that I am unable to accept Mr. Trace's submission that whatever the position may have been in November 2009 there is no longer a risk of dissipation of assets.

128.  The unexplained whereabouts of at least $40m. paid out to Drey provide good reason for making the Receivership Order in support of the Bank's proprietary claim.

129.  However, all the circumstances of the case must be considered before a final decision can be reached as to whether it is just and convenient to make the Receivership Order.

The proposed receivers and method of operation

130.  The proposed receivers are Mr. Outen and Mr. Milsom who are partners in KPMG and Mr. Standish who is an associate partner in KPMG.

131.  No criticism has been made of their experience but they have been criticised for an absence of pre-planning. However, they were only given access to the Restricted Information on 21 April 2010. It may be that instead of agreeing to carry out the receivership the more prudent response would have been to decline to say whether or not they could carry out the receivership until they had been given access to more information. However, their expression of willingness to carry out the receivership

before having access to that information probably reflects their wish to do the work rather than an absence of the necessary professional skill and care.

132.   The proposed strategy is to seek to obtain control of Mr. Ablyazov's assets by obtaining control of the shares in the companies at the top of each chain which leads down to an operating business. The receivers do not envisage carrying on that business save with the consent of the court. The strategy has been described by them in these terms:

> "...[B]y securing the corporate structure we should be able to preserve the assets to a greater degree than currently exists and without directly intervening in the day to day management of the businesses in which [Mr. Ablyazov] has an interest."

133.   In addition they wish to "follow and secure the sums transferred by the Bank to [Drey]". Although they "do not anticipate becoming involved in the day to day management of the underlying operating businesses" they do intend to

> "monitor the performance of the businesses on a regular basis in order to ensure that the value of [Mr. Ablyazov's] interest is not being improperly diminished or dissipated".

134.   They envisage the co-operation of Mr. Ablyazov in this respect so as to "mitigate or eliminate the risk of knowledge of our appointment being widely disseminated or misunderstood." In the absence of such co-operation they may meet "an operational challenge".

135.   The draft receivership order contains wide terms designed to enable the above objectives to be achieved. In particular Mr. Ablyazov is to be obliged to "deliver or cause to be delivered to the Receivers such of the Property as is in his possession, under his control or in respect of which he has the power to dispose or deal" (see para.9(a)). In addition he is to "deliver or cause to be delivered to the Receivers all share certificates ......." (see para.9(b)). Further, nominees are to be instructed to execute share transfer forms in the names of the receivers (see para.9 (d).

136.   The strategy of the proposed receivers appears to me to be an attempt to do that which is necessary to secure the operating assets and no more. That is a reasonable and proportionate approach. It is plain that the strategy depends on Mr. Ablyazov's obligation to co-operate with the receivers. Nevertheless, the draft order imposes on Mr. Ablyazov wide obligations which may not be capable of fulfilment having regard to his evidence in this case. For instance unless he remains in touch with all his nominees he may not be able to comply with the order. The draft order requires him to give instructions to Mr.Y. On Mr. Ablyazov's evidence it is unclear how he is to do that.  There seems to me a case for the order being in terms of best endeavours rather than the absolute obligation which might be appropriate in other contexts.

137.   Mr. Trace submitted that if the envisaged strategy were the limit of what is intended a receivership order would not be required. Instead, an order for further information and disclosure from Mr. Ablyazov and confirmations from third parties would be required. Consistent with that submission Mr. Ablyazov has offered the court an undertaking in the following terms:

> "to use his best endeavours as soon as reasonably practicable to (i) procure letters to be written by the Companies in Schedule 1 and the individual nominees in Schedule 2 in the forms annexed hereto......and (ii) provide to the Court and Hogan Lovells LLP the most recent financial statements of the companies listed at Schedule 5."

138. The form of proposed letters from the companies provide for confirmation that the writer is aware of the Freezing Order, confirmation as to the ownership of shares, a list of the assets of the company and confirmation that no transfer of shares will be registered and that the assets will not be disposed of. The form of proposed letter from the nominees identifies assets held by the nominee and confirms that he is aware of the Freezing Order and that the assets will not be disposed of.

139. Whilst this undertaking would enable the first part of the strategy to be fulfilled it does not envisage delivery up to the receivers of the documentation held by the third parties which records or proves their title to the shares in the relevant companies. Delivery up of such documentation of title appears to me to be an essential step in the receivers assuring themselves that they have control of the relevant companies. I therefore accept Mr. Smith's submission that the undertaking does not go far enough.

140. Mr. Trace has submitted (in paragraph 14(1) of his written submissions dated 18 June 2010) that some title documentation has been disclosed. However, delivery up of documents of title is different from disclosure. As to delivery up it has been suggested that it "engages potential tax and regulatory questions" (see paragraph 18 of those submissions). They have not been identified and it has not been explained why the receivers cannot hold the relevant share certificates in order to ensure control of the corporate structure.

141. Mr. Trace also submits, with the support of Mr. Christopher Morris, someone with great experience as a receiver, that the proposed receivership will be expensive and time consuming and that knowledge of the receivers' appointment will spread down the chain with the consequent risk of damage to Mr. Ablyazov's assets. It is said that the proposed receivership is likely to lead, ultimately, to the receivers assuming control of the operating businesses and thereby causing considerable damage to them and to Mr. Ablyazov. Mr. Trace submits that the costs of the receivership, bearing in mind that "this litigation and connected proceedings are likely to continue for years" are likely to be "huge".

142. The costs of the receivership and the risk of damage to the operating businesses and hence to Mr. Ablyazov are highly material factors to bear in mind when deciding whether it is just and convenient to make the Receivership Order. There clearly is a risk that the costs of the receivership will be very substantial indeed. The three receivers are likely to have a team assisting them. Proposed hourly rates run from £220-£695 per hour in London and from £190 to £590 per hour in Moscow. They have engaged Freshfields to advise them on legal matters. There must also be a risk that the Receivership Order will be perceived as a form of insolvency procedure which is likely to be damaging to the operating businesses and to Mr. Ablyazov. In weighing these risks I have taken into account the following considerations on the other side of the balance:

i)   It is not in the interests of the receivers to damage either the operating businesses or Mr. Ablyazov. Their role and duty is to preserve his assets, not to damage them. I would therefore expect that they would strive to limit the damage which might be caused by assuming control of the operating assets through control of the companies at the top of the respective chains.

ii)  Mr. Ablyazov will be obliged to co-operate with the receivers. The greater the degree of co-operation the less the risk of damage to the operating businesses and to himself.

iii) Particular powers or provisions requested in the draft order may be excluded with liberty to apply to include them at a later stage. Thus the draft provides that a further order of the court is required before the receivers may manage a company's business.

iv)  The Bank must give an undertaking in damages. At present fortification of that undertaking by way of a £5m. bond is offered.  If greater fortification is required Mr. Smith has invited the court to bear in mind that companies controlled by Mr. Ablyazov still owe very considerable sums to the Bank. Thus in respect of Project D, the Oceanarium, Business Centre 1812, Paveletskaya and Project E, large sums are owed to the Bank. He has suggested that Mr. Ablyazov in effect already has security in those amounts. A charge can be created by the Bank to ensure that he has the benefit of that security.

143.  Mr. Trace has submitted that, if the Receivership Order is made, fortification in the sum of about £900m. should be required. This has been assessed by assessing Mr. Ablyazov's assets at about $5b. and assessing the loss likely to be caused by the Receivership Order at about 50% of that, namely, $2.5b. 50% of that sum is then "taken to represent the possible loss of value in relation to the assets as a whole", reducing the sum to $1.25b. (I am not sure I understand that step in the analysis. It may be that it is intended to represent a loss in value which might occur in any event.) In sterling terms that amounts to £870m. to which must be added a sum for the costs of the receivership over two years, giving a total of £900m.

144.  It is obvious that Mr. Trace has used an exceptionally broad brush. But it is difficult to estimate the losses which might be suffered by reason of the Receivership Order (which is itself a reason for exercising great caution before making the Order) and Mr. Smith has not identified the route by which £5m. is thought to be an appropriate sum for the purposes of fortification. Given the size and possible value of Mr. Ablyazov's assets fortification in the sum of £5m. may well be inadequate. Equally, £900m. does not seem to me to reflect either the receivers' duty to preserve rather than damage the assets or the ability of Mr. Ablyazov to minimise any damage by co-operating with the receivers. The court must, if it can, make a realistic or intelligent estimate of the harm which may be caused to Mr. Ablyazov. If the court cannot predict with certainty what loss will be caused the court must at least ensure that the cross-undertaking has real value. The court should take the course which is least likely to lead to an injustice; see *Bloomsbury International Limited and others v Holyoake and others* [2010] EWHC 1150 (Ch) at paragraphs 13,16, 17 and 30.

145. Mr. Trace has further questioned the enforceability of the charge offered by Mr. Smith as security. He has suggested that it might not be enforceable having regard to the fact that the Bank "is subject to an insolvency procedure in Kazakhstan". Such a charge may offend the *pari passu* principle. The Bank has now adduced evidence from White and Case Kazakhstan LLP to the effect that any claim to enforce such a charge would not be subject to the "restructuring" process underway in Kazakhstan and that "under the current situation of the Bank and the proposed restructuring arrangements there are and should be no impediments to the Bank granting security in this way". In response Mr. Ablyazov has adduced evidence from Professor Maggs to the effect that Article 158 of the Civil Procedure Code may render the proposed charge unenforceable. Further, if the Bank were placed into bankruptcy the administrator would have broad powers to rescind the proposed charge.

146. Having considered the receivers' strategy and the submissions of Mr. Trace I do not consider that the strategy is such that a Receivership Order should be ruled out. However, it will be necessary to examine carefully the terms of the proposed order and the extent to which the Bank's undertaking should be fortified.

147. Mr. Ablyazov has informed the Court and the Bank in his Sixth Witness Statement that he has appointed a nominee as sole director of certain companies in the various chains of companies. Mr. Smith has described this as "a blatant attempt to undermine the application by ensuring that a person whom Mr. Ablyazov trusts will stand between the receivers and the valuable assets at the bottom of the chains." By contrast Mr. Trace submits that this appointment ought to be "a source of reassurance, rather than concern" for the Bank. It is impossible for me to say which submission is correct. All that I can say is that whilst the appointment is a striking illustration of the manner in which Mr. Ablyazov can control the companies in the various chains of companies it also illustrates that cooperation by Mr. Ablyazov, in the form of appropriate instructions to his nominee, will reduce the risk that the receivership order will cause damage to Mr. Ablyazov and his assets.

Other reasons for not making the Receivership Order

(a) The political backdrop

148. Mr. Trace submitted, on the basis of extensive evidence from Mr. Ablyazov and others independent of him, that the President of Kazakhstan wishes to eliminate Mr. Ablyazov as a political force and so stifle democratic opposition. Mr. Trace has further submitted that the Bank is under the control of the President and that the actions before this court are motivated by an illegitimate intention to cause damage to Mr. Ablyazov's reputation and interests and so weaken him as a political opponent. It is necessary to note that Mr. Ablyazov has issued an application to stay the proceedings against him on the grounds that they are an abuse of the process of this court. The application was issued on 23 April 2010, that is after the receivership application was issued but before it was heard. Mr. Trace has submitted that if there is any risk of what he says is the illegitimate intention of the President and the Bank to damage Mr. Ablyazov being advanced by the Receivership Order then the Court should refuse to make it.

149. The Bank denies that its claims are motivated by an illegitimate intention to damage Mr. Ablyazov and weaken him as a political opponent of the President of Kazakhstan.

The Bank has adduced evidence that it is in very serious financial difficulties and that it is seeking, with the consent of its major Western creditors, to recover monies wrongfully misappropriated from it by Mr. Ablyazov for, in part, the benefit of those creditors. Mr. Smith submitted that the existence of a political dispute between the President of Kazakhstan and Mr. Ablyazov is not a good reason for allowing Mr. Ablyazov to keep monies which have been wrongfully misappropriated by him from the Bank.

150.    It is not possible for the court to make findings on this hearing as to the motivation behind the Bank's actions in this court against Mr. Ablyazov. There is a stark conflict of evidence. On the one hand the Bank has adduced evidence that it is seeking to recover those sums for the benefit of its creditors and it has not been disputed that the Bank has a good arguable case that Mr. Ablyazov has defrauded it of very considerable sums of money. On the other hand Mr. Ablyazov has adduced evidence that he has been the target of unlawful action by the President of Kazakhstan and that the board of directors of Samruk-Kazyna which now owns 75% of the Bank is headed by persons appointed by the President. He denies the claims which have been brought against him and says that they are politically motivated.

151.    The submissions of Mr. Trace and Mr. Smith as to how the court should deal with the political backdrop to this receivership application were simple and straightforward. Mr. Trace said that the court should guard against the risk that its processes are being used for improper collateral purposes by refusing the application. Mr. Smith said that the political backdrop was irrelevant.

152.    By contrast with the simplicity of counsel's submissions I have found this aspect of the case difficult, perhaps because the submissions of counsel were so simple, and worrying, because of the seriousness of the allegations on both sides. Having considered the matter I do not feel able to accept the submissions of either counsel as to how to deal with the political backdrop to this application. My approach to this aspect of the case is as follows.

i)      Freezing orders are granted where the claimant has a good arguable case. They are not denied because the defendant has an arguable defence. Since the Receivership Order is sought in support of the Freezing Order which has been granted in this case it also should not be denied merely because Mr. Ablyazov has an arguable defence.

ii)     The court cannot, in determining the receivership application, determine the question whether the proceedings before this court are an abuse of its process. That will have to be determined when the court hears the stay application. Indeed, it is accepted by Mr. Trace that the court cannot on this application make findings in relation to the stay application.

iii)    If the court were to refuse to make the Receivership Order on the grounds that there is a risk that such an order might advance the illegitimate ends of the President of Kazakhstan, as submitted by Mr. Trace, the court would, in effect, be saying that the outcome of the receivership application should await the determination of the stay application. Mr. Trace did not suggest that in terms. If he had done so I have no doubt that the suggestion would have been resisted by Mr. Smith on the grounds that directions for hearing the receivership

application were given in order to ensure that the application was heard as promptly as was consistent with justice, without any suggestion being made that the hearing of the application should be adjourned pending the determination of the stay application. The court should therefore seek to determine the receivership application on its merits.

iv) However, the fact that a stay application has been issued and will therefore have to be determined is not something which I can regard as irrelevant. For if the stay application were hereafter to succeed it would follow that the Receivership Order, if granted, would have to be rescinded. This is therefore a further reason why the undertaking in damages must be of real value.

(b) Human Rights

153.   Mr. Trace also submitted that the grant of the Receivership Order would give rise to serious interference with Mr. Ablyazov's rights under the European Convention on Human Rights.

154.   He first referred to Mr. Ablyazov's right under Article 1 of the First Protocol to the peaceful enjoyment of his possessions and his right not to be deprived of his possessions except in the public interest. Mr. Trace submitted that the Receivership Order must therefore be justified and proportional. He said that if the Freezing Order strikes a fair balance between the rights of Mr. Ablyazov and the rights of the Bank not to be deprived of the opportunity to enforce a judgment in this action by reason of illegitimate dissipation of assets, then the further restriction on Mr. Ablyazov's rights as owner imposed by the Receivership Application would neither be justified nor proportional. Mr. Trace accepted, however, that this was not a different test from that which the court would in any event apply when deciding whether the Receivership Order was just and convenient. It reinforced that test.

155.   Mr. Trace next referred to Mr. Ablyazov's rights under Article 8 of the Convention to respect for his private and family life. He submitted that the requirement in paragraph 12 of the proposed Receivership Order to attend upon the receivers at all times and do all such things "as the receivers may reasonably require for the purpose of getting in the Property and carrying out their functions" was extraordinarily wide and constituted a very substantial interference with his private life. It therefore required clear and compelling justification and must be proportionate. It was submitted that the Bank's interests are adequately protected by the Freezing Order and therefore that the interference with his private and family life inherent in paragraph 12 could not be justified. Mr. Trace again accepted that his reliance on Article 8 reinforced the court's general approach to the making of a receivership order in the circumstances of this case. (I would add that if the making of a Receivership Order is just and convenient, and therefore justified and proportionate, because adequate protection is not provided by the Freezing Order, a requirement that Mr. Ablyazov do such things as the receivers may *reasonably* require is unlikely to be disproportionately wide.)

156.   Finally, Mr. Trace relied upon Mr. Ablyazov's right to a fair trial under Article 6 of the Convention. He submitted that the grant of Receivership Order would involve the effective "determination" of Mr. Ablyazov's "civil rights and obligations" where there was a risk of irreversible damage to his business. In those circumstances it was submitted that he was entitled to have an opportunity fully to test the evidence being

adduced against him in support of the application. This required the cross-examination of the Bank's witnesses. The court should therefore require the Bank, if it is contemplating making the Receivership Order, to tender its witnesses for cross-examination. Upon the assumption that Mr. Ablyazov's Article 6 rights are engaged by the receivership application I am not persuaded that those rights required, in the context of this interim application, the opportunity to cross-examine the Bank's witnesses. No authority was cited in support of that submission. I consider that the form of hearing adopted for determining the receivership application, namely, one which provided for written (and voluminous) factual and expert evidence and for oral submissions (over 4 and a half days) on that material, enabled there to be a fair trial of the receivership application.

157.    Thus, although it is necessary that the Court be informed of the interaction between the receivership application and Mr. Ablyazov's rights under the European Convention on Human Rights (because the Court is under a legal obligation not to act inconsistently with his Convention rights) it does not appear that recognition of those rights would lead to any different conclusion from that which would flow from considering whether it was just and convenient to make the Receivership Order. I shall, however, in addition to considering whether it is just and convenient to make the order, consider whether such an order is justified and proportionate having regard to Article 1 of the First Protocol and Article 8 of the Convention.

(c) The proprietary claim

158.    Part of the Receivership Order concerned the Bank's proprietary claim to some $80m. Mr. Trace submitted that this claim was fatally flawed. The Bank relies upon the expert evidence of Kazakh law from Mr. Markov. Mr. Ablyazov relies upon the evidence of Mr. Newton and, because Mr. Newton's experience was called into question, on Professor Maggs. I have therefore had regard to the evidence of Mr. Markov for the Bank and Professor Maggs for Mr. Ablyazov.

159.    The dispute is whether Kazakh law recognises a proprietary claim to electronically transferred money. Mr. Markov says that it does pursuant to Chapters 15 and 48 of the Civil Code. Professor Maggs says that Chapter 15 concerns identifiable physical property and so does not extend to electronically transferred money. He says that the claim provided by Chapter 48 cannot be described as proprietary because the transferor retains no interest in the fund until the court provides a remedy.

160.    I do not have to decide this dispute. All that I have to decide is whether the Bank has a good arguable claim to a proprietary claim. Having considered the rival expert reports and counsel's submissions I consider that it does.

Conclusion

161.    Although Mr. Ablyazov has stated that he will obey the orders of this Court that statement has to be considered in the light of his conduct in this action. He has stated that he can be trusted but I have to have regard not only to what he has said but also to what he has done. Consideration of his conduct with regard to disclosure of his assets in August/September 2009 and of his failure to inform Clyde and Co. of dealings in the Eurasia Tower and BTA Kazan has left me unable to trust him not to deal with his assets in breach of the Freezing Order.

162.   Something more than the Freezing Order is therefore necessary to assure the Bank of the protection it is entitled to. A Receivership Order ought to ensure that protection. But a receivership of all of Mr. Ablyazov's assets is invasive and carries with it a risk of damage to those assets and to Mr. Ablyazov's interests. His freedom to buy, manage and sell his assets in the ordinary course of business will be curtailed and he will only be able to do so with the consent of the receivers or of the court. I have therefore asked myself whether something less than a receivership could give the Bank adequate protection such as a freezing order strengthened by appropriate undertakings from Mr. Ablyazov. What has been offered in that regard is not sufficient. Letters from the nominees and companies in the asset chain do not go far enough. The nominees and companies are not subject to the jurisdiction of this court and no provision is made for the shares or other evidence of title to be deposited in "safe" hands. It therefore appears that there is no alternative to a receivership.

163.   The risk of damage to Mr. Ablyazov can be reduced in several ways. The Receivership Order is designed to enable the receivers to assume control of the companies at the top of the respective chains. That should serve to limit very substantially the risk of damage to Mr. Ablyazov and the operating businesses for the operating businesses can be operated as before. In principle once share certificates or other instruments of control have been deposited with the receivers the assets should be "secured" and the receivership will have achieved its purpose. Any risk of damage caused by persons becoming aware of the receivership can be reduced by Mr. Ablyazov co-operating with the receivers. He can give appropriate instructions to his nominees and if necessary the operating businesses. In addition it is to be noted that the proposed order does not give the receivers power to carry on the business of a company without a further order of the court. The receivership ought not to interfere with *bona fide* decisions Mr. Ablyazov may wish to take with regard to the management of his investment portfolio. The policy underlying the Freezing Order does not prevent such decisions and there is therefore no reason why the Receivership Order, which is made in support of the Freezing Order, should prevent such decisions. Any disputes between the receivers and Mr. Ablyazov regarding such decisions will have to be resolved by the Court.

164.   It may be that some loss may still be caused. It is difficult to make a realistic or intelligent estimate of such loss in respect of which the Bank may be ordered to compensate Mr. Ablyazov should it hereafter be held that the Receivership Order should not have been granted (because the stay application succeeds or the Bank fails to establish its claims). However, I do not consider that that should lead to a refusal to make the Receivership Order. In the circumstances of this case, in particular the nature of the case against Mr. Ablyazov and the reasons why I am not convinced that he can be trusted to obey the Freezing Order, I consider that despite that difficulty the Receivership Order should be granted.

165.   In view of the financial condition of the Bank the Bank's undertaking in damages must be fortified. I am not satisfied, having read Professor Maggs' report, that any charge which the Bank grants (to ensure that the debts owed by certain of the companies controlled by Mr. Ablyazov can be applied in discharge of any damages which the court should hereafter order the Bank to pay Mr. Ablyazov) will be enforceable. There will therefore have to be some other form of fortification of the Bank's undertaking in damages. The cross-undertaking must be of real value. There

must be either a payment into court or a guarantee from a first class bank. I consider that a sum of £25 million would be appropriate having regard to the factors which serve to limit the risk of damage, namely, the proposed strategy and the ability of Mr. Ablyazov to limit any damage by co-operating with the receivers. That is in addition to the £7.5 million that has been provided as fortification of the undertaking in damages given to obtain the Freezing Order. In addition a further sum of £7.5 million should be provided in respect of the costs of the receivership. The sufficiency of the fortification and the sum in respect of costs should be kept under review. Finally, the £5 million bond offered in respect of the receivers' liabilities pursuant to CPR 69.5 should be put in place.

166.    For these reasons I have concluded that it is just and convenient to make the Receivership Order and that such order is justified and proportionate having regard to Article 1 of the First Protocol and Article 8 of the Convention.

167.    The terms of the draft Receivership Order nevertheless require some alteration. Paragraphs 6-8 (and Schedule 2) should be amended to take account of my conclusions as to the appropriate fortification of the undertaking in damages. The obligations in paragraphs 9 (a)-(d) and 11 should, in the light of Mr. Ablyazov's evidence, be ones of "best endeavours" and "as soon as practicable". Paragraph 10 should be amended by deleting the words "and in any event by no later than 7 days after the communication referred to below". Adverse comment has been made by Mr. Trace of paragraph 12 but since it is governed by the phrase "as the receivers may reasonably require" it does not appear to me to be objectionable.

168.    There was a dispute as to whether the property which is the subject of the Receivership Order can be ordered to "vest" in the receivers. I consider that it can but of course it would be held subject to the orders of the court. My reasons for so concluding are:

i)      The mere making of a receivership order does not vest the property of the defendant in the receiver; see *Vine v Raleigh* (1883) 24 Ch.D. 238 at p.243, *Claythorpe Properties v Evans* [1986] 1 WLR 1223 at p.1228, *Masri v Consolidated Contractors Int.* [2009] QB 450 at paras.53-54 and *Picarda on Receivers, Managers and Adminstrators* 4th ed. p.439.

ii)     Nevertheless it is open to the court to order that property of the defendant vest in the receiver if that is necessary for the purposes of the receivership. This seems to me to be right in principle and I can see no reason why it is wrong in principle. Although the property may vest in the receiver he holds the asset as directed by the court.

iii)    Mr. Smith did not refer me to any authority where this was specifically held to be the case. He did however refer me to the orders made in *Derby v Weldon*. In that case the Vice Chancellor ordered that assets be "delivered or transferred" to the receiver. In the Court of Appeal such an order was described as "usual"; see *Derby v Weldon* [1990] 1 WLR 1139 at p.1146 per Dillon LJ. At p.1150 Dillon LJ referred to "the traditional view that receivership assets ought to be held solely by the receiver appointed by the court." In some contexts delivery and transfer may refer just to possession. But the order of the Court of Appeal

in that case specifically ordered that the defendants procure that certain assets "be vested in the sole name and under the sole control of the Receiver."

iv)   *In re Sacker* (1888) 22 QBD 178 is not an authority to the contrary. It was there held that where an order had been made that a certain sum be paid to the receiver that receiver was not a "creditor" entitled to present a bankruptcy petition. The reasoning is at p.183. "There is no debt due to him from the appellant". I do not regard that decision as authority for the proposition that the court has no power to order that certain assets be vested in a receiver.

169.   I therefore see no objection in principle to paragraph 11 of the order or to the powers 3 and 4 in Schedule 4. In the circumstances of the present case where the shares are held by a nominee for Mr. Ablyazov that order and powers are appropriate.

170.   I ask the parties to agree the terms of a revised draft order. After judgment is formally handed down Counsel should also address me on the question whether future applications concerning the receivership should be in the Chancery Division or in this court; see para.22 of the draft order.

The Clarification Application

171.   By this application Mr. Ablyazov seeks clarification of the meaning of the Freezing Order, in particular, whether the assets which may be dealt with in the ordinary course of business (the *Angel Bell* liberty) include all of the assets otherwise caught by the Freezing Order. I have already dealt with this matter when dealing with Mr. Smith's allegations of breach; see paragraphs 48-74 above.

172.   Mr. Ablyazov also seeks a declaration that certain dealings with assets were not in breach of the Freezing Order, in particular, dealings with BTA Kazan, Omsk Bank, BTA Armenia, Project D, Paveletskaya Station Square and Eurasia Tower.

173.   Having regard to my decision to appoint receivers in respect of Mr. Ablyazov's assets this application loses much of its relevance so far as future dealings are concerned because decisions regarding the sale of assets will be in the hands of the receivers and, in the event of dispute, the court. But the application is still relevant so far as past dealings are concerned.

The past transactions

174.   Mr. Ablyazov seeks a declaration from the court that certain transactions were not in breach of the Freezing Order. The Bank says that it would not be appropriate to grant declarations.

175.   In so far as Mr. Ablyazov seeks declarations that certain proposed transactions will not be in breach of the Freezing Order I consider that it would not be appropriate for the court to grant the declarations. Whether or not a transaction is in the ordinary course of business can only be determined when that transaction has taken place.

176.   However, where a transaction has taken place and the Bank has asserted that it is a breach of the Freezing Order or questioned whether it is a breach it seems to me that the court ought to resolve the question. Whether or not there has been a breach of the

Freezing Order will not be an issue at the trial. In fairness to Mr. Ablyazov there ought to be a means by which he can ascertain whether a transaction, which the Bank does not accept was within the ordinary and proper course of his business, was or was not within it.

BTA Kazan

177.  The Bank does not, on this application, say that the sale of Mr. Ablyazov's interests in BTA Kazan in October 2009 to Mr. Pukhlikov was a breach of the Freezing Order because it cannot presently say whether Mr. Ablyazov's assets were or were not at that time in excess of the then maximum sum which applied to the Freezing Order. However, it does not accept that the sale was in the ordinary course of business.

178.  Mr. Ablyazov has said in his Second Witness Statement dated 16 March 2010 that the sale was in the ordinary course of his business. He has said that the sale was made pursuant to a long standing strategy of divesting from BTA Kazan. There is no evidence to the contrary. I have already rejected Mr. Smith's arguments to the effect that Mr. Ablyazov did not carry on a business personally. The burden of proof is on the Bank to establish that a transaction was not in the ordinary course of business. It has not discharged that burden of proof. It follows that Mr. Ablyazov is entitled to a declaration that the sale of his interest in BTA Kazan was in the ordinary course of his business.

Eurasia Tower

179.  Mr. Ablyazov has set out the circumstances in which his interest in Eurasia Tower was sold in his Third Witness Statement dated 16 April 2010. The events which led to the sale were the withdrawal of a line of credit of US$500m. from Sberbank after the "nationalisation" of the Bank in February 2009. Construction of the project stalled and Mr. Fuchs, who owned the other half of Eurasia Tower, suggested the provision of alternative finance or the sale of Mr. Ablyazov's interest. He began to make offers in April or May 2009. Negotiations continued during the summer of 2009. Sberbank was also making proposals which entailed Mr. Ablyazov buying out Mr. Fuchs and transferring a 25% interest in Eurasia Tower to Sberbank. In September 2009 Mr. Ablyazov agreed to sell his interest to Mr. Fuchs for $50m. Title eventually passed in December 2009.

180.  Mr. Ablyazov's account is consistent with the sale being in the ordinary course of his business. There is no evidence to the contrary. He is therefore entitled to a declaration that the sale was in the ordinary course of business.

Omsk Bank

181.  I have already rejected the Bank's case that the sale of Mr. Ablyazov's interest in Omsk Bank was not in the ordinary course of business.

182.  Declarations are also sought in respect of proposed sales of, or negotiations with regard to, his interests in BTA Armenia, Project D, and Paveletskaya Square. However, as I have already stated I do not consider it appropriate to make declarations until a transaction has actually taken place.

The Passport Application

183.    The order for delivery up and retention of Mr. Ablyazov's passport has been in force
        for over 8 months. The jurisdiction to make such an order was exercised so as to
        ensure that Mr. Ablyazov complied with the asset disclosure obligations under the
        Freezing Order. He sought return of his passport by an application dated 14 January
        2010. That application has been heard at the same time as the Receivership
        Application because the Bank says that the continuation of the order is necessary to
        ensure that he complies with his obligations under the Receivership Order.

184.    Mr. Matthews submits that it is not necessary for the order to remain in place. He says
        there is no risk that Mr. Ablyazov will leave this jurisdiction. Mr. Ablyazov is now
        settled here with his wife and three youngest children, two of whom are in school
        here. The eldest is soon to attend University in London. Mr. Ablyazov has applied for
        permanent leave to remain here. He has no incentive to leave this jurisdiction because
        he is contesting the litigation which has been commenced here against him by the
        Bank. To leave the jurisdiction and ignore his obligations under the Receivership
        Order would imperil his defence of the proceedings and be wholly contrary to his
        interests. Mr. Matthews says there is no evidence of any risk that he will leave the
        jurisdiction and ignore his obligations under court orders.

185.    Mr. Smith submitted that whilst Mr. Ablyazov is presently here there is no evidence
        that he has any assets here. His cross-examination did not suggest any. He has,
        however, access to considerable funds, as shown by the quality and quantity of his
        legal team, and he could easily move to another jurisdiction. If his assets abroad are
        not "secured" (using that word in a non-technical sense) he may leave this
        jurisdiction, confident that any judgment given against him cannot be enforced against
        his assets.

186.    The passport order is an interference with Mr. Ablyazov's freedom to travel. It should
        only be maintained if it is necessary to ensure that he complies with his obligations
        under the Receivership Order. I have given this matter anxious consideration. It is an
        unusual order. However, I am persuaded, in the light of (a) my conclusion that,
        considering his prior conduct, I am unable to trust him to obey the Freezing Order and
        (b) the points made by Mr. Smith, that the continuance of the passport order is
        necessary, at any rate for a short further period. The receivers' first report, which will
        be due in 6 weeks, is an appropriate and early time to consider whether it should be
        renewed thereafter. If by then Mr. Ablyazov has taken significant steps to arrange for
        share certificates in the companies at the top of the asset chains to be held by the
        receivers it may well be that the passport order should not be renewed. I will therefore
        continue the order but only until the receivers' first report at which time the Bank, if it
        wishes the order to be renewed, must apply for an order to that effect.

Conclusions as to the three applications:

187.    (i) The receivership application succeeds; see paragraphs 161-166.

        (ii) The clarification application succeeds; see paragraphs 48-74 and 171.
        Declarations may be made in respect of the sales of BTA Kazan, Omsk Bank and
        Eurasia Tower; see paragraphs 177-181.

(iii) The passport application fails; see paragraph 186.

188.    I adjourn the hearing pursuant to paragraph 4.3B of the Practice Direction to CPR 52 to enable the form of the order and other matters to be debated on a date to be arranged.

Postcript

Stephenson Harwood's letter to me dated 13 July 2010

189.    By a letter dated 13 July, after I had sent my draft judgment to counsel, the Defendant asked that I postpone giving judgment in this matter on the grounds that he has "after making the necessary enquiries, decided also to offer the provision of share certificates and documents establishing participation rights in the holding and nominee companies (so far as permissible by law) to [Stephenson Harwood] to be held to the Order of the Court." He asked that I should postpone giving judgment pending consideration of this further undertaking and further submissions. It was suggested that there should be a hearing to discuss the terms of the new undertaking. I declined to postpone giving judgment, for these reasons.

190.    When Mr. Smith replied to the submissions made on behalf of the Defendant on 28 May and 8 June 2010 he made the point that no undertaking had been offered to deliver up or supply documents of title or share certificates; see Transcript 28/5/10 at pp.169-170 and Transcript 8/6/10 p.22. That was 5-6 weeks or so ago. Since then there have been two further witness statements from Mr. Ablyazov, Nos. 7 and 8, dated 14 June and 18 June 2010 and further submissions by Mr. Trace dated 18 June 2010. The undertaking now offered was not offered in those further statements or submissions. On the contrary Mr. Trace submitted that the lodging of documents of title engaged "potential tax and regulatory questions, in relation to which [Mr. Ablyazov] is seeking advice. He will revert as soon as possible." He did not revert and no suggestion was made that an appropriate undertaking might be offered. Almost a month has passed since that submission was made. On 30 June Stephenson Harwood indicated a desire to reply to the final submissions and further evidence submitted by the Bank. A request was made to respond on the question of Kazakhstani insolvency law to which request I acceded. No mention was made that Mr. Ablyazov might offer a new undertaking. On 7 July I received from Stephenson Harwood Professor Maggs' report as to the enforceability of the charge offered by the Bank as fortification for the Bank's undertaking in damages. I was then able to complete my judgment. No suggestion was made on 7 July that a further undertaking might be offered. I completed my draft judgment over the weekend and my clerk sent it to counsel on Monday 12 July. Shortly thereafter Stephenson Harwood sent me "an amended version of the undertakings document" which contained a new undertaking "to provide (so far as is permissible by law) to Stephenson Harwood any and all share certificates and documents establishing rights which are within the First Defendant's possession or control in the companies named in Schedules 1,2 and 3, to be held by Stephenson Harwood."

191.    I dealt with the sufficiency of the undertakings offered at the hearing in paragraphs 137-140 of this judgment. I noted Mr. Trace's last written submission on the matter. I observed that the potential tax and regulatory questions had not been identified. That

remains the position. The new undertaking offered is prefaced "so far as permissible by law" without any explanation as to why delivery up may not be possible.

192.    I consider that the Defendant has had ample opportunity to offer the new undertaking since 28 May. In the event he offered it, without any warning that he might be about to do so, after I had sent out my draft judgment on 12 July following the completion of the service of written evidence on 7 July. I accept, as I have been informed by Stephenson Harwood, that the contents of the letter containing the new undertaking had been drafted before my draft judgment had been received. But the fact remains that Mr. Ablyazov had ample opportunity to provide this undertaking between 28 May and 7 July, when evidence and submissions were closed.

193.    Even if there were good reason for the delay in informing me of the new undertaking, it is unclear precisely what is being offered because the undertaking is prefaced "so far as is permissible by law" without any explanation offered as to what obstacles there might be. This appears to mirror Mr. Trace's submission that delivery up "engages potential tax and regulatory questions". (I have since been informed by Stephenson Harwood in a letter dated 15 July received at 1841 that the reason for the qualification is that companies in CIS countries do not produce share certificates. If so then the proposed undertaking in respect of CIS companies would offer no comfort.)

194.    In the circumstances I did not consider it fair and just to delay the giving of judgment in this matter any further in order to allow "further submissions" and "a hearing a discuss the terms of the undertaking".

<u>Further evidence received on 15 July from Stephenson Harwood</u>

195.    After I had informed Stephenson Harwood that I did not consider it appropriate to postpone formally handing down judgment my clerk received (by email at 1142 on 15 July) a further communication from Stephenson requesting me "to delay any decision as to handing down the judgment" until I had considered "key new evidence" which had been "unearthed overnight" and which related to "two key findings" in my draft judgment.

196.    Later that day (by fax at 1716) I received a witness statement from Mr. Flannery and Mr. Ablyazov's Ninth Witness statement.

197.    The content of these two statements relates to paragraphs 104-116 of my judgment and in particular to paragraphs 113-116. Evidence has now been provided that on 30 September 2009 Mr. Ablyazov, when asked by Clyde and Co. whether the list of assets had changed, replied "Yes. Eurasia agreement signed. BTA Kazan." These passages are said to be self – explanatory. I understand it to be said that the sales of Eurasia Tower and BTA Kazan had been disclosed by Mr. Ablyazov to Clyde and Co. on 30 September 2009.

198.    This issue had been raised by Mr. Smith in his submissions. He did so prominently and forcefully. He said that Mr. Ablyazov had misled his own solicitors (and hence the Bank and the Court) by not informing Clyde and Co. of the sales of Eurasia Tower and BTA Kazan; see the transcript for 26 May pages 68-77. Mr. Trace replied to those submissions on 27 May. Whilst Mr. Trace said that there was no evidence from Clyde and Co. no suggestion was made that such evidence would or might be obtained; see

the transcript for 27 May at pp.82-85. Mr. Smith returned to the matter in his reply on 8 June. He pointed out that if there was any relevant evidence to give it could have been given; see the transcript for 8 June at p.34.

199. Mindful that there might be further evidence on this matter at trial I expressly referred, in paragraph 113, to "the evidence presently available". Mindful that these were interlocutory proceedings when findings of fact with regard to issues to be resolved at trial could not be made I used the phrase "substantial grounds to believe" when dealing with what I regarded as the significant questions; see paragraphs 85,114,116 and 126 of the judgment.

200. Stephenson Harwood must have been aware of the point being made by Mr. Smith. It appears that no attempt was made to adduce evidence on the point until after Stephenson Harwood had seen my draft judgment. Mr. Flannery states that on reading my draft judgment he was surprised to read the "very serious findings". He then inquired into the matter with Mr. Ablyazov and Clyde and Co.

201. Mr. Flannery does not explain why these inquiries were not made on 26 May when Mr. Smith made the allegations in question, or on 27 May when Mr. Trace said there was no evidence from Clyde and Co. or on 8 June when Mr. Smith said that if there was any relevant evidence to give it could have been given. He does not explain why he was surprised by findings on matters which had been prominently canvassed in argument.

202. Draft judgments are sent to the parties to enable time and costs to be saved in formally handing down the judgment. They are not provided to enable a party to see what adverse findings have been made by the judge on matters argued before the judge so that he may then go about obtaining evidence to refute those findings before the Judge formally hands down his judgment. To use a draft judgment in that way is to abuse the practice by which judges provide draft judgments to counsel.

203. I therefore consider that it would be inappropriate for me to alter my judgment in order to take account of new evidence obtained in the circumstances that this new evidence has been obtained.

204. Notwithstanding the circumstances in which the new evidence has been obtained I have considered whether it would be unfair or unjust to Mr. Ablyazov not to review my judgment in the light of the new evidence. I am not persuaded that it would be, for these reasons.

   i) The new evidence is very sparse. Mr. Ablyazov does not say precisely what he told Clyde and Co. Mr. Flannery says that Mr. Ablyazov told him that "he was sure that he had informed Clyde and Co. about both of these transactions." In this regard it is to be noted that Mr. Hardman had raised the inconsistency between Mr. Ablyazov's disclosures as to the sale of Eurasia Tower and Clyde's letter dated 15 December 2009 in his Fifteenth Witness Statement at paragraph 40. Mr. Ablyazov replied to that in his Fourth Witness Statement at paragraph 11. I referred to his response in paragraph 111 of my judgment. He did not at that stage suggest that he had disclosed to Clyde Co. that Eurasia Tower had been sold. He offers no further details or explanation in his Ninth Witness Statement.

ii)     If, nevertheless, I were to hold, on the basis of the new evidence, that Mr. Ablyazov had told Clyde and Co. about the sale of Eurasia Tower and BTA Kazan, I would remain of the view that his seriously inadequate initial disclosure of his assets provides reason to believe that the Freezing Order may not provide the Bank with adequate protection against the risk that his assets may be dissipated prior to judgment. There would remain a risk that he may use the structure by which he holds his assets to deal with them in breach of the Freezing Order. I would still be left unable to trust him not to deal with his assets in breach of the Freezing Order.

iii)    I would therefore not alter my conclusion that it is just and convenient to make the Receivership Order and that such an order is justified and proportionate.

Case 1:13-mc-00001-AK   Document 3-2   Filed 04/02/13   Page 46 of 109

# EXHIBIT E

# JPMorganChase ◆

**Linda S. Lewis**
Vice President
Office of the General Counsel
Legal Department

May 16, 2011

Farrah Berse, Esq.
Paul Weiss, Rifkin
Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

      **RE:   Subpoena**

Dear Ms. Berse:

      I enclose for your review wire transfer requested in your subpoena.  Please be advised that a search was conducted of the 35 wires and was only able to locate five of them.  A further search was conducted and we do maintain two correspondence bank account 400015005 in the name of BTA Bank and 544702991 in the name of Raiffeisen Bank International.

                       Very truly yours,

                       Linda S. Lewis

Enclosure

Copy of Transaction Record:

| Transaction Details for TRN: 8843700175js | Region: US |
|---|---|
| **Instruction Date:** | 6/23/2008 |
| **Payment Date:** | 6/23/2008 |
| **Transaction Amount:** | $876,080.00 |
| **Transaction Type:** | BT |
| **Customer Swift ID:** | DRESDEFF |
| **Debit Fin Entity:** | 01 |
| **Credit Fin Entity:** | 01 |
| **Credit Reference:** | SWF OF 08/06/23 |
| **Debit Reference:** | 9435CHAS23060290 |
| **Sender's ID:** | SWF/ABKZK2KXSMK |
| **Bene Flag:** | B |
| **Debit Party:** | 00000400015005 |
|  | BANK TURANALEMNEW NOSTRO |
|  | 97 ZHOLDASBEKOV ST |
|  | ALMATY KAZAKHSTAN 05005-1 |
| **Bank to Bank Info:** | /BNF/PMNT ON AGREEMENT BETWEEN BTA |
|  | BANK AND DREY ASSOCIATES LIMITED |
|  | AD 20080512 |
| **Credit Party:** | 00000011319209 |
|  | DRESDNER BANK AG FRANKFURT |
|  | AUSLANDSBANKENBUCHHALTUNG |
|  | JUERGEN-PONTO-PLATZ 1 |
|  | FRANKFURT GERMANY D-60301 |
| **Account Party:** | AS TRASTA KOMERCBANKA |
|  | 9 MIESNIEKU STREET |
|  | LV RIGA LATVIA 1050 |
| **Bene:** | /LV18KBRB1111212941001 |
|  | DREY ASSOCIATES LIMITED |

Copy of incoming SWIFT instructions:

| | Type: SWIFT | Direction: R | | TRN: 884370017535 |
|---|---|---|---|---|
| Amount | 876,080.00/USD | | Type | SWIFT |
| TRN | 884370017535 | | Trans tmstmp | 6/23/2008 |
| Direction | R | | | |
| Field 20 | 9435CHAS23060290 | | Field 21 | NONREF |
| R Type | 0202 | | | |
| ISN | 894943 | | OSN | 988437 |
| Sender BIC | ABKZKZKX | | Receiver BIC | CHASUS33 |

```
(1 F01EHASUS33AXXX08651988437)
(2 O2021JJ6188062FBBKZKXKXASKK7673094I)000623094IN)
(3 (100 IBS-N975J166 EJR))
(4
 20    9435CHAS23060290
 21    NONREF
 32A   00062JUSD876080,
 56A   DRESDEFF
 57A   KBRBLV2X
 58D   /LV16KRBB1111212941001
DREY ASSOCIATES LIMITED
 72    /BNF/PYMT ON AGREEMENT BETWEEN
//BTR BANK AND DREY ASSOCIATES
//LIMITED RD 20080512
 )
(5 (MAC 5E1R0940)
(CHK B31666CE24668))
MSG TRACE
080623 054132 RCV FRM SWIFT VIA VBI FN
080623 054132 ROUTED IN NERVA
080623 054132 DUPL CHK OR1
080623 054132 DXILV TO STUFCWP
```

Copy of outgoing SWIFT:

| | Type: SWIFT | Direction: S | | TRN: 884370017535 |
|---|---|---|---|---|
| Amount | 876,080.00/USD | | Type | SWIFT |
| TRN | 884370017535 | | Trans tmstmp | 6 23/2008 |
| Direction | S | | | |
| R Type | I202 | | Field 1 | SWF-DF-08/06,23 |
| ISN | 189937 | | OSN | 000000 |
| Sender BIC | CHASUS33 | | Receiver BIC | DRESDEFF |

```
(1 F01H HASUS33 XXXX7457189937)
(2 I202DRESDEFFXXXXN)
(4
 20    884370017535
 21    SWF DF 08/06/23
 32A   00062JUSD876080,
 53A   ABKZKXKSML
 57A   KBRBLV2X
 58D   /LV16KRBB1111212941001
DREY ASSOCIATES LIMITED
 72    /BNF/PYMT ON AGREEMENT BETWEEN BTR
//BANK AND DREY ASSOCIATES LIMITED
//RD 20080512
//BOOK/884370017535
 -)
MSG TRACE
080623 054219 RCV FRM H.FPSWF   SEQ 036567
080623 054275 SENT TO VBI FN
080623 0542   ACK BY SWIFT
080623 054230 RCV RESP FRM VBI-FN
```

Copy of Transaction Record:

| Transaction Details for TRN: 6985300175fs | Region: US |
|---|---|
| **Instruction Date:** | 6/23/2008 |
| **Payment Date:** | 6/24/2008 |
| **Transaction Amount:** | $83,000,000.00 |
| **Transaction Type:** | BT |
| **Customer Swift ID:** | DRESDEFF |
| **Debit Fin Entity:** | 01 |
| **Credit Fin Entity:** | 01 |
| **Credit Reference:** | ABKZKX1205KBRB2X |
| **Debit Reference:** | 0348CHAS24060290 |
| **Sender's ID:** | SWF/ABKZKZKXSMK |
| **Bene Flag:** | B |
| **Debit Party:** | 00000400015005 |
| | BANK TURANALEMNEW NOSTRO |
| | 97 ZHOLDASBEKOV ST |
| | ALMATY KAZAKHSTAN 05005-1 |
| **Bank to Bank Info:** | /BNF/PMNT ON AGREEMENT BETWEEN BTA |
| | BANK AND DREY ASSOCIATES LIMITED |
| | AD 20080512 |
| **Credit Party:** | 00000011319209 |
| | DRESDNER BANK AG FRANKFURT |
| | AUSLANDSBANKENBUCHHALTUNG |
| | JUERGEN-PONTO-PLATZ 1 |
| | FRANKFURT GERMANY D-60301 |
| **Account Party:** | AS TRASTA KOMERCBANKA |
| | 9 MIESNIEKU STREET |
| | LV RIGA LATVIA 1050 |
| **Bene:** | /LV18KBRB1111212941001 |
| | DREY ASSOCIATES LIMITED |

Copy of incoming SWIFT instructions:

| | Type: SWIFT | Direction: R | | TRN: 6985300175FS |
|---|---|---|---|---|
| Amount | 83,000,000.00/USD | | Type | SWIFT |
| TRN | 6985300175FS | | Transaction Date | 6/24/2008 |
| Direction | R | | | |
| Field 20 | 0340HA474060290 | | Field 21 | ABK/KX1205KBRB2X |
| Swift Type | U202 | | | |
| LCN | 895479 | | UCN | 069853 |
| Sender BIC | ABK2KZKX | | Receiver BIC | CHASUS33 |

```
(1 F01CHASUS33AXXX8651069053)
(2 O2020942680624ABLZ22LXXSOK7575899547908062323 12N)
(3 (108 XBS-F4795112 BJE))
(4
 20   0340CKAS24060290
 21   ABK2KXX1205KBRB2X
 32A  080624USD83000000
 56A  BRETDEFF
 57A  KBRBLV2X
 58D  /LV18KBRB1111212941001
DERY ASSOCIATES LIMITED
 72   /BNF/PMNT ON ALRIWMENT BETWEEN
//FTA BANK AND BERY ASSOCIATES
//LIMITED RB 70008512
-)
(5 (MAC 10809598)
(CHK 136ERG87474F))
MSG TRACE-
080623 234242 RCV FRM SWIFT VIA WBX-FN
080623 234252 ROUTED IN MERVA
080623 234252 DUPL CHK OR1
080623 234252 DELIV TO SSWTGFP
```

Copy of outgoing SWIFT:

| | Type: SWIFT | Direction: S | | TRN: 6985300175FS |
|---|---|---|---|---|
| Amount | 83,000,000.00/USD | | Type | SWIFT |
| TRN | 6985300175FS | | Transaction Date | 6/24/2008 |
| Direction | S | | | |
| Field 20 | 6985300175FS | | Field 21 | ABK2KX1205KBRB2X |
| Swift Type | I202 | | | |
| LCN | 705615 | | UCN | 077142 |
| Sender BIC | CHASUS33 | | Receiver BIC | DRESDEFF |

```
(1 F01CHASUS33CXXX7167205615)
(2 I202DRESDEFFXXXXN)
(4
 20   6985300175FS
 21   ABK2KXX1205KBRB2X
 32A  080624USD83000000
 52A  ABLZL2LXXSOK
 57A  KBRBLV2X
 58D  /LV18KBRB1111212941001
DERY ASSOCIATES LIMITED
 72   /BNF/PMNT ON AGREEMENT BETWEEN BTB
//BANK AND BERY ASSOCIATES LIMITED
//RB 70008512
///ROOL/6985300175FS
-)
MSG TRACE
080624 011229 RCV FRM RGEPSWF   SEQ 145170
080624 011230 SENT TO WBT-FN
080624 0112   BLK BY SWIFT
080624 011242 RCV RESP FRM WBT-FN
```

Copy of Transaction Record:

| Transaction Details for TRN: 9508800179fs | Region: US |
|---|---|
| **Instruction Date:** | 6/27/2008 |
| **Payment Date:** | 6/27/2008 |
| **Transaction Amount:** | $41,100,000.00 |
| **Transaction Type:** | CHP |
| **Customer Swift ID:** | DRESUS33 |
| **Debit Fin Entity:** | 01 |
| **Credit Fin Entity:** | 01 |
| **Credit Reference:** | SWF OF 08/06/27 |
| **Debit Reference:** | ASW25499/270608 |
| **Sender's ID:** | SWF/RZBAATWW |
| **Bene Flag:** | N |
| **Order Party:** | /LV85KBRB1111212571001 |
| | DEVESTA LIMITED |
| | AKARA BLDG 24 DE CASTRO STR |
| | WICHAMS CAY I ROAD TOWN TORTOLA |
| | VIRGIN ISLANDS BRITISH |
| **Order Bank:** | AS TRASTA KOMERCBANKA |
| | 9 MIESNIEKU STREET |
| | LV RIGA LATVIA 1050 |
| **Debit Party:** | 00000544702991 |
| | RAIFFEISEN ZENTRALBANK |
| | OESTERREICH AG |
| | AM STADTPARK 9 |
| | 1030 VIENNAAUSTRIA |
| **Details of Payment:** | PAYMENT IN ACCORDANCE WITH |
| | SUB-CONTRACT AGREEMENT IN RESPECT |
| | OF COMPENSATION AGREEMENT DATED 18 |
| | JUNE 2008 |
| **Credit Party:** | MBR/0830 |
| | DRESDNER NY FEDERAL NY NY |
| | 1301 AVE OF THE AMERICAS |
| | NEW YORK NY 10019- |
| **Account Party:** | CHP/093933 |
| | DRESDNER BANK (SCHWEIZ) AG |
| | UTOQUAI 55 |
| | CH-8034 ZURICH, SWITZERLAND |
| **Bene:** | /CH6008736012554320201 |
| | FM COMPANY |
| | MARSHAL ISLAND, RUOTN TOWN, 21. |

Copy of incoming SWIFT instructions:

| | Type: SWIFT | Direction: R | | | TRN: 9508800179FS |
|---|---|---|---|---|---|
| Amount | 41,100,000.00/USD | | | Type | SWIFT |
| TRN | 9508800179FS | | | Transmission dt | 6/27/2008 |
| Direction | R | | | | |
| Field Ref | ASW25499/270008 | | | Field Ref | |
| swift Type | O103 | | | | |
| TxN | 129158 | | | TxN | 495008 |
| Inst BIC | R2BAATWW | | | From BIC | CHASUS33 |

```
(1 R01CHASUS33AXXX8651495088)
(2 O10314570B067 IREBRRTWWAXXX6775129150808067 095 N)
(3 (108 ASW25499/27060FR))
(119 STP))
(1
20    ASW25199/270608
21B   CRED
32A   080627USD11100000
33B   USD41100000
50K   /LV05XRRB1111212571001
DEVESTA LIMITED
AKARA BLDG   24 DE CASTRO STR
WICKAMS CRY L, ROAD TOWN, TORTOLA,
VIRGIN ISLANDS, BRITISH
52A   XBRBLVPX
53B   /B/544/02991
57A   DEBSCH22
59    /CR60087160125513782Q1
FW COMPANY
MARSHAL ISLAND  RUOTN TOWN  21
70    PAYMENT IN ACCORDANCE WITH SUB CONT
RACT AGREEMENT IN RESPECT OF COMPEN
SATION AGREEMENT DATED 18 JUNE 2008
71A   OUR
-)
(5 (MAC 0641C166)
(CHK 0374CA095DCB))
MSG TRACK
080627 085710 RCV FRM SWIFT VIA WRT-FW
080627 085719 ROUTED IN MERVA
080627 085719 DUPL CHK OR1
080627 085719 DELIV TO SSWFGFP
```

Copy of outgoing CHIPS Payment:

| | Type: CHIP | Direction: S | | | TRN: 9508800179FS |
|---|---|---|---|---|---|
| Amount | 41,100,000.00/USD | | | Type | CHIP |
| TRN | 9508800179FS | | | Transmission dt | 6/27/2008 |
| Direction | S | | | | |
| TxN | 0233538 | | | TxN | 000000 |
| Inst Type | 0030 | | | | |

```
10
[20]  0200806270002
[21]  0030511
[26]  004110000000
[78]  037205
[70]  2USD41100000 *
[32]  9508800179FS*
[42]  SUF OF 08/06/27*
[43]  C09293*
[42]  DLH60007760/564170201*
FW COMPANY
MARSHAL ISLAND, RUOTN TOWN, 21 *
[502] BLV05XRRB1111212571001*
DEVESTA LIMITED*
AKARA BLDG 24 DE CASTRO STR*
WICKAMS CRY X ROAD TOWN TORTOLA*
VIRGIN ISLANDS BRITISH*
[512] BKRBLVPX*
AS TRBSTB LOKRBBRBNKA*
9 MIRSMLKU STREET*
LV RLGA LATVTA 3050*
[522] RAIFFEISEN ZENTRALBANK*
ORSTERREICH AG*
RM STADTPARK 9 *
1030  WIRNRBUSTRIR*
[600] PAYMENT IN ACCORDANCE WITH*
SUB-CONTRACT AGREEMENT IN RESPECT*
OL COMPENSATION AGREEMENT DATED 18*
JUN  /000*
[650] /INS/KRRRATWW X 000/0070196P20080627 06 5003        MI 03  38
[038] 2200806270002101085804J/220507211023453800358020370950858033 1Q
```

Copy of Transaction Record:

| Transaction Details for TRN: 1757100184js | Region: US |
|---|---|
| **Instruction Date:** | 7/2/2008 |
| **Payment Date:** | 7/3/2008 |
| **Transaction Amount:** | $400,000.00 |
| **Transaction Type:** | BT |
| **Customer Swift ID:** | ITASRUMM |
| **Debit Fin Entity:** | 01 |
| **Credit Fin Entity:** | 01 |
| **Credit Reference:** | SWF OF 08/07/02 |
| **Debit Reference:** | ASW84420/020708 |
| **Sender's ID:** | SWF/RZBAATWW |
| **Bene Flag:** | N |
| **Order Party:** | /LV07KBRB1111213355001<br>CITY VENTURES LIMITED<br>306 VICTORIA HOUSE VICTORIA MAHE<br>SEYCHELLES |
| **Order Bank:** | AS TRASTA KOMERCBANKA<br>9 MIESNIEKU STREET<br>LV RIGA LATVIA 1050 |
| **Debit Party:** | 00000544702991<br>RAIFFEISEN ZENTRALBANK<br>OESTERREICH AG<br>AM STADTPARK 9<br>1030 VIENNAAUSTRIA |
| **Details of Payment:** | VIDACHA ZAIMA PO DOGOVORU B/N OT 27<br>/06/2008 NA FINANSIROVANIE<br>POGASHENIYA PROCENTOV PO ZAIMU |
| **Credit Party:** | 00000400951983<br>SLAVINVESTBANK<br>62 BLD 1 PROPESKT MIRA<br>MOSCOW 129110 RUSSIAN FEDERATION |
| **Account Party:** | /40807840200000200001<br>SWAINRIVER HOLDINGS LIMITED<br>AKROPOIEOS, 8, MABELLA COURT, P.C.<br>1300, NICOSIA, CYPRUS |

Copy of SWIFT Instructions:

| | Type: SWIFT | | Direction: R | | TRN: 175710018435 |
|---|---|---|---|---|---|

Amount 400,000.00/USD
TRN 175710018435
Direction R
Fed 20 ASW04420 020708
Swift Type O103
ISN 235926
Sender BIC R2BAATWW

Type SWIFT
Transaction Date 7/2/2008

Fed 21

ISN 9175/1
Receiver BIC CHASUS33

```
(1 F01CHASUS33BXXXX860)9175715)
(2 0103152320807022BANTWWXXXX67812795976000702102J2V)
(3 (108 ASW04420/020708FR))
(4
  20.   ASW04420/020708
  23B   CRED
  32A   080708USD400000
  33B   USD400000,
  50K   /LV0782RBB1111212)55001
CITY VENTURES LIMITED
306 VICTORIA HOUSE, VICTORIA, MAHE
SEYCHELLES
  52A   RZBBIVZX
  54B   /B/b41702991
  57A   ITASRUMM
  59    /10807640200000200001
SWAINRIVER HOLDINGS LIMITED
AKROPOIEOS  8, MARBLLA COURT, P C
1300, NICOSIA, CYPRUS
  70    VIBRCHA ZRIKA PO BOGOVORU B/N OT 27
/06/2008 NA FINANSIROVANIE POGASKEN
IYA PROCENTOV PO ZAIHU
  72A   OUR
  )
  (5 (MAC 957200KE)
  (CHK 9680C2RF2B203))
MSG TRACE
080707 102270 RCV FRM SWIFT VIA WBI-FN
080707 102271 ROUTED IN MIRVA
080702 102271 DUPL (KL OX1
080707 102271 DELIV TO SSWPLFP
```

Copy of outgoing SWIFT Message:

| | Type: SWIFT | | Direction: S | | TRN: 175710018435 |
|---|---|---|---|---|---|

Amount 399,989.00/USD
TRN 175710018435
Direction S
Fed 20 175710018435
Swift Type I103
ISN 376280
Sender BIC CHASUS33

Type SWIFT
Transaction Date 7/3/2008

Fed 21

OCN 621997
Receiver BIC ITASRUMM

```
(1 F01CHASUS33BXXX1913)76280)
(2 (10)ITASRUMMXXXXX)
(3 (119 STP))
(4
  20    175710018435
  23B   CRED
  32A   080708USD399989
  33B   USD400000
  50K   /LV0782RBB1111213)55001
CITY VENTURES LIMITED
306 VICTORIA HOUSE VICTORIA MAHE
SEYCHELLES
  52A   RZBBIVZX
  59    /10807640200000200001
SWAINRIVER HOLDINGS LIMITED
AKROPOIEOS  8, MARBLLA COURT, P C
1300, NICOSIA, CYPRUS
  70    VIBRCHA ZRIKA PO BOGOVORU B/N OT 27
/06/2008 NA FINANSIROVANIE
POGASHENIYA PROCENTOV PO ZAIMU
  71A   BEN
  71F   USD11 00
  72    /INS/R2BAATWW
///BNR/175710018435
  )
MSG TRACE
080702 205659 RCV FRM RLFPSWI  SEQ 427701
080702 205650 SENT TO WBI FN
080702 2057   ACK BY SWIFT
080702 211109 RCV RESP FRM WBI-FN
```

Copy of Transaction Record:

| Transaction Details for TRN: 8354900185js | Region: US |
| --- | --- |

| | |
| --- | --- |
| **Instruction Date:** | 7/3/2008 |
| **Payment Date:** | 7/3/2008 |
| **Transaction Amount:** | $750,000.00 |
| **Transaction Type:** | BT |
| **Customer Swift ID:** | ITASRUMM |
| **Debit Fin Entity:** | 01 |
| **Credit Fin Entity:** | 01 |
| **Credit Reference:** | SWF OF 08/07/03 |
| **Debit Reference:** | ASW91639/030708 |
| **Sender's ID:** | SWF/RZBAATWW |
| **Bene Flag:** | N |
| **Order Party:** | /LV07KBRB1111213355001<br>CITY VENTURES LIMITED<br>306 VICTORIA HOUSE VICTORIA MAHE<br>SEYCHELLES |
| **Order Bank:** | AS TRASTA KOMERCBANKA<br>9 MIESNIEKU STREET<br>LV RIGA LATVIA 1050 |
| **Debit Party:** | 00000544702991<br>RAIFFEISEN ZENTRALBANK<br>OESTERREICH AG<br>AM STADTPARK 9<br>1030 VIENNAAUSTRIA |
| **Details of Payment:** | OPLATA PO AGENTSKOMY DOGOVORY N21<br>/12/7 OT 21/12/07 ZA MARKETINGOVOE<br>ISSLEDOVANIE RINKA NEDVIZHIMOSTI V<br>EVROPE I SNG. |
| **Credit Party:** | 00000400951983<br>SLAVINVESTBANK<br>62 BLD 1 PROPESKT MIRA<br>MOSCOW 129110 RUSSIAN FEDERATION |
| **Account Party:** | /40702840300009001484<br>OOO ATLANT<br>109443.G.MOSKVA, UL.UNIH LENINCEV,<br>D.83, KORP.4 |

Copy of incoming SWIFT instructions:

| | Type: SWIFT | Direction: R | | TRN: 835490018SJS |
|---|---|---|---|---|
| Amount | 750,000.00/USD | | Type | SWIFT |
| TRN | 835490018SJS | | Transaction Date | 7/3/2008 |
| Direction | R | | Field 21 | |
| Format | ASW91639/030708 | | | |
| Swift Type | O103 | | | |
| ISN | 250792 | | ISN | 983549 |
| Sender BIC | RZBAATWW | | Receiver BIC | CHASUS33 |

```
(1 F01CHASUS33JXXXX8653983549)
(2 O1031080010703RZBAATWWAXXX47832507520807030400N)
(3 (108 ASW91639/030708YA))
(4
 70   ASW91639/030708
 71B  CRED
 32A  080703USD750000
 33B  USD750000
 50K  /LV073KRD3111123395001
CITY VENTURES LIMITED
306 VICTORIA HOUSE, VICTORIA  MAMI
SIN NELLIS
 52A  KBRBLV2X
 53B  /B/544782391
 57A  ITASRUMM
 59   /40702840300009001484
OOO ATLANT
109443 G MOSKVA, UL UNIN LENINCRV
D 03  KORP 4
 70   OPLATA PO AGENTSKOMY DOGOVORY N21/1
/2/7 OT 21/12/07 ZA MARKETINGOVON IS
SLEDOVANIE RINKA NEDVIZHIMOSTI V EV
ROPE I SNG
 71A  OUR
 -)
(5 (MAC 698BA67)
((MX KPO0MCR754N)))
MSG TRACE
080703 040816 RCV FRM SWIFT VIA VBI FN
080703 040816 ROUTED IN NERVA
080703 040816 DUPL CKK OR1
080703 040816 DELIV TO SSWFGFP
```

Copy of outgoing SWIFT Message:

| | Type: SWIFT | Direction: S | | TRN: 835490018SJS |
|---|---|---|---|---|
| Amount | 749,989.00/USD | | Type | SWIFT |
| TRN | 835490018SJS | | Transaction Date | 7/3/2008 |
| Direction | S | | Field 21 | |
| Field 20 | 835490018SJS | | | |
| Swift Type | I103 | | | |
| ISN | 392268 | | OSN | 928101 |
| Sender BIC | CHASUS33 | | Receiver BIC | ITASRUMM |

```
(1 F01CHASUS33JXXXX1913392260)
(2 I103ITASRUMMXXXXN.)
(3 (119 STP))
(4
 70   835490018SJS
 71D  CRED
 32A  080703USD749909.
 33B  USD750000,
 50K  /LV03KRD31112123395001
CITY VENTURES LIMITED
306 VICTORIA HOUSE VICTORIA MRMI
SINTNELLFS
 52A  KBRBLV2X
 59   /40702840300009001484
OOO ATLANT
109443 G MOSKVA, UL UNIN LENINCRV
D 03  KORP 4
 70   OPLATA PO AGENTSKOMY DOGOVORY N21
/12/7 OT 21/12/07 ZA MARKETINGOVOE
ISSLEDOVANIE RINKA NEDVIZHIMOSTI V
EVROPE I SNG
 71A  BEN
 71F  USD11 00
 72   /INS/RZBAATWW
///BNUK/875(9001065JS
 )
MSG TRACK
080703 040901 RCV FRM RGFPSUF, SFQ 551941
080703 040901 SENT TO URI-FN
080703 0409   ACK BY SWIFT
080703 040941 RCV RESP FRM UBI-FN
```

Case 1:13-mc-00001-P1   Document 3-2   Filed 01/02/13   Page 573 of 1087

REPORT TITLE: BKS OUTPUT REPORT      STANDARD CHARTERED BANK      REPORT DATE: 12/26/2012

Account No : 'N000755546    SRC: 'GMS      Acc Name : 'JSC BTA BANK-NEW NOSTRO ACCOUNT
AMT: $83,000,000.00 USD
VDATE:   20-Jun-08        ADV:
DEBIT:    'N000755546        DTI:
       'JSC BTA BANK-NEW NOSTRO ACCOUNT      CREDIT:   'N0830
       'JSC BTA BANK-NEW NOSTRO ACCOUNT        'DRESDNER KLEINWORT SECURITIES LLC
       '97 ZHOLDASBEKOV ST SAMAL TOWERS        'DRESDNER KLEINWORT SECURITIES LLC
       'ALMATY KAZAKHSTAN 050051        '(FORMERLY:DRESDNER BANK AG)
       '        'NEW YORK NEW YORK
             'N.Y.

SENDER:   'ABKZKZKXSMK        INTERM BK:   '
       'JSC BTA BANK-NEW NOSTRO ACCOUNT        '
       'JSC BTA BANK-NEW NOSTRO ACCOUNT        '
       '97 ZHOLDASBEKOV ST SAMAL TOWERS        '
       'ALMATY KAZAKHSTAN 050051        '

SEND REF : '8975AEIB20060290        RELATEDREF:   'ABKZKX1205KBRB2X
BBI :  '

ORDER BANK: '        BNF BANK :   'KBRBLV2X
       -        'TRASTA KOMERCBANKA
       -        'TRASTA KOMERCBANKA
       -        'MIESNIEKU IELA 9
       -        'RIGA LV 1050 LATVIA

ORIGNATOR: '        BNF:   'LV18KBRB111212941001
       -        'DREY ASSOCIATES LIMITED
       -        'DREY ASSOCIATES LIMITED
       -        '
       -        '

ORIG TO BNF INFO: 'PMNT ON AGREEMENT BETWEEN BTA BANK AND DREY
ASSOCIATES LIMITED AD 20080512
FED_IMAD_NO:        CHIP SSN NUM:   '0306244

TRN:   'N20080620000025977

REPORT TITLE:  BKS OUTPUT REPORT                    STANDARD CHARTERED BANK                              REPORT DATE: 12/26/2012

Account No :  'N000755546                          Acc Name :  'JSC BTA BANK-NEW NOSTRO ACCOUNT
AMT: $50,000,000.00  USD        SRC: 'GMS          ADV:                                                TRN:    'N2008062400023232
VDATE:     24-Jun-08                              DTI:
DEBIT:     'N000755546                            CREDIT:    'N000174482
           'JSC BTA BANK-NEW NOSTRO ACCOUNT                  'DRESDNER BANK A.G.
           'JSC BTA BANK-NEW NOSTRO ACCOUNT                  'DRESDNER BANK A.G.
           '97 ZHOLDASBEKOV ST  SAMAL TOWERS                 'KS FI/KBZ/GR.221.OG
           'ALMATY  KAZAKHSTAN 050051                        'D-60301 FRANKFURT–GERMANY

SENDER:    'ABKZKZKXSMK                           INTERM BK:  .
           'JSC BTA BANK-NEW NOSTRO ACCOUNT                   .
           'JSC BTA BANK-NEW NOSTRO ACCOUNT                   .
           '97 ZHOLDASBEKOV ST  SAMAL TOWERS                  .
           'ALMATY  KAZAKHSTAN 050051

SEND REF : '0972AEIB24060290                      RELATEDREF:  'ABKZKXKBRB2X
BBI :  '

ORDER BANK:  '                                    BNF BANK :   'KBRBLV2X
           .                                                  'TRASTA KOMERCBANKA
           .                                                  'TRASTA KOMERCBANKA
           .                                                  '9 MIESNIEKU IELA
           .                                                  'RIGA LV

ORIGNATOR:  .                                     BNF:         'LV18KBRB1111212941001
           .                                                  'DREY ASSOCIATES LIMITED
           .                                                  'DREY ASSOCIATES LIMITED
           .                                                  .
           .                                                  .

ORIG TO BNF INFO: 'PMNT ON AGREEMENT BETWEENBTA BANK AND DREY
ASSOCIATES LIMITED
FED_IMAD_NO:                                      CHIP SSN NUM:  '

REPORT TITLE: BKS OUTPUT REPORT

STANDARD CHARTERED BANK

REPORT DATE: 12/26/2012

Account No : 'N000755546                SRC: 'GMS

Acc Name : 'JSC BTA BANK-NEW NOSTRO ACCOUNT

TRN: 'N2008100300017661

AMT: $11,349,840.00  USD

VDATE:      3-Oct-08

DEBIT:      'N000755546
            'JSC BTA BANK-NEW NOSTRO ACCOUNT
            'JSC BTA BANK-NEW NOSTRO ACCOUNT
            '97 ZHOLDASBEKOV ST  SAMAL TOWERS
            'ALMATY KAZAKHSTAN 050051

ADV:
DTI:
CREDIT:     'N000174482
            'DRESDNER BANK A.G.
            'DRESDNER BANK A.G.
            'KS FI/KBZ/GR.2/21.OG
            'D-60301 FRANKFURT-GERMANY

SENDER:     'ABKZKZKXSMK
            'JSC BTA BANK-NEW NOSTRO ACCOUNT
            'JSC BTA BANK-NEW NOSTRO ACCOUNT
            '97 ZHOLDASBEKOV ST  SAMAL TOWERS
            'ALMATY KAZAKHSTAN 050051

INTERM BK:
            :
            :
            :
            :

SEND REF : '0974AEIB03100290
BBI : '

RELATEDREF : '

ORDER BANK : '
            :
            :
            :
            :

BNF BANK :  'KBRBLV2X
            'TRASTA KOMERCBANKA
            'TRASTA KOMERCBANKA
            '9 MIESNIEKU IELA
            'RIGA LV

ORIGINATOR: '
            :
            :
            :
            :

BNF:        'LV18KBRB1112129410 01
            'DREY ASSOCIATES LIMITED
            'DREY ASSOCIATES LIMITED
            :
            :

ORIG TO BNF INFO: 'PMNT ON AGREEMENT BETWEEN BTA BANK AND DREY
ASSOCIATES LIMITED AD 20080811

CHIP SSN NUM: '

FED_IMAD_NO:

Case 1:13-mc-00001-AK   Document 3-2   Filed 01/02/19   Page 61 of 109

| PROCESS ID | SEARCH ID | Search Data | Person ID | Search Group Name | Begin Search Date | END Search Date | Account Number | Account Name | TRN Number | Transaction Date | Source Transaction Type | Source System |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16783 | 14547 | 'DREY ASSOCIATES | '1394645 | 'DR608 | '1-Jun-08 | '31-Jul-08 | 'N000755546 | 'JSC BTA BANK-NEW NOSTRO ACCOUNT | 'N20080620000025977 | 20-Jun-08 | 'UNK | 'GMS |
| 16783 | 14547 | 'DREY ASSOCIATES | '1394645 | 'DR608 | '1-Jun-08 | '31-Jul-08 | 'N000755546 | 'JSC BTA BANK-NEW NOSTRO ACCOUNT | 'N20080624000023232 | 24-Jun-08 | 'UNK | 'GMS |
| 16783 | 14547 | 'DREY ASSOCIATES | '1394645 | 'DR1008 | '1-Oct-08 | '30-Nov-08 | 'N000755546 | 'JSC BTA BANK-NEW NOSTRO ACCOUNT | 'N20081003000017661 | 3-Oct-08 | 'UNK | 'GMS |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

| Message Type | Bank to Bank Flag | Currency | Amount | Originator | Beneficiary | SENDer's Ref. (TRN) | Related Reference | Remittance Reference | SCB Organization |
|---|---|---|---|---|---|---|---|---|---|
| - | Y | USD | $ 83,000,000.00 | - | 'DREY ASSOCIATES LIMITED | '8975AEIB20060290 | 'ABRZKX1205K0HB2X | 'PMNT ON AGREEMENT BETWEEN BTA BANK AND DREY ASSOCIATES LIMITED AD 20080512 | 'USWB |
| - | Y | USD | $ 50,000,000.00 | - | 'DREY ASSOCIATES LIMITED | '0972AEIB24060290 | 'ABRZKXKBR82X | 'PMNT ON AGREEMENT BETWEEN BTA BANK AND DREY ASSOCIATES LIMITED | 'USWB |
| - | Y | USD | $ 11,349,840.00 | - | 'DREY ASSOCIATES LIMITED | '0974AEIB03100290 | - | 'PMNT ON AGREEMENT BETWEEN BTA BANK AND DREY ASSOCIATES LIMITED AD 20080811 | 'USWB |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| CHIP SSN No | Debit Party Account Number | Debit Party | Debit Party Address Line1 | Debit Party Address Line 2 | Debit Party Address Line 3 | Debit Party Country Code | SENDing Bank Account Number |
|---|---|---|---|---|---|---|---|
| '0306244 | 'N000755546 | 'JSC BTA BANK-NEW NOSTRO ACCOUNT | 'JSC BTA BANK-NEW NOSTRO ACCOUNT | '97 ZHOLDASBEKOV ST  SAMAL TOWERS | 'ALMATY KAZAKHSTAN 050051 | 'KZ | 'ABKZKZKXSMK |
| ' | 'N000755546 | 'JSC BTA BANK-NEW NOSTRO ACCOUNT | 'JSC BTA BANK-NEW NOSTRO ACCOUNT | '97 ZHOLDASBEKOV ST  SAMAL TOWERS | 'ALMATY KAZAKHSTAN 050051 | 'KZ | 'ABKZKZKXSMK |
| ' | 'N000755546 | 'JSC BTA BANK-NEW NOSTRO ACCOUNT | 'JSC BTA BANK-NEW NOSTRO ACCOUNT | '97 ZHOLDASBEKOV ST  SAMAL TOWERS | 'ALMATY KAZAKHSTAN 050051 | 'KZ | 'ABKZKZKXSMK |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| SENDing Bank | SENDing Bank Address 1 | SENDing Bank Address 2 | SENDing Bank Address 3 | SENDing Bank Country code | Credit Party Account Number | Credit Party |
|---|---|---|---|---|---|---|
| JSC BTA BANK-NEW NOSTRO ACCOUNT | JSC BTA BANK-NEW NOSTRO ACCOUNT | '97 ZHOLDASBEKOV ST  SAMAL TOWERS | 'ALMATY  KAZAKHSTAN 050051 | KZ | 'N0830 | 'DRESDNER KLEINWORT SECURITIES LLC |
| JSC BTA BANK-NEW NOSTRO ACCOUNT | JSC BTA BANK-NEW NOSTRO ACCOUNT | '97 ZHOLDASBEKOV ST  SAMAL TOWERS | 'ALMATY  KAZAKHSTAN 050051 | KZ | 'N000174482 | 'DRESDNER BANK A.G. |
| JSC BTA BANK-NEW NOSTRO ACCOUNT | JSC BTA BANK-NEW NOSTRO ACCOUNT | '97 ZHOLDASBEKOV ST  SAMAL TOWERS | 'ALMATY  KAZAKHSTAN 050051 | KZ | 'N000174482 | 'DRESDNER BANK A.G. |

| Credit Party Address 1 | Credit Party Address 2 | Credit Party Address 3 | Credit Party Address 4 | Beneficiary Bank Account Number | Beneficiary Bank | Beneficiary Bank Address 1 | Beneficiary Bank Address 2 |
|---|---|---|---|---|---|---|---|
| 'DRESDNER KLEINWORT SECURITIES LLC | '(FORMERLY:DRESDNER BANK AG) | 'NEW YORK  NEW YORK | 'N.Y. | 'K8RBLV2X | 'TRASTA KOMERCBANKA | 'TRASTA KOMERCBANKA | 'MIESNIEKU IELA 9 |
| 'DRESDNER BANK A.G. | 'KS FI/K8Z/GR.2/21.OG | 'D-60301 FRANKFURT-GERMANY | ' | 'K8RBLV2X | 'TRASTA KOMERCBANKA | 'TRASTA KOMERCBANKA | '9  MIESNIEKU IELA |
| 'DRESDNER BANK A.G. | 'KS FI/K8Z/GR.2/21.OG | 'D-60301 FRANKFURT-GERMANY | ' | 'K8RBLV2X | 'TRASTA KOMERCBANKA | 'TRASTA KOMERCBANKA | '9  MIESNIEKU IELA |
| | | | | | | | |
| | | | | | | | |

| Beneficiary Bank Address 3 | Beneficiary Bank Country code | Beneficiary Account Number | Beneficiary Address 1 |
|---|---|---|---|
| RIGA LV 1050 LATVIA | LV | LV18KBRB111212941001 | DREY ASSOCIATES LIMITED |
| RIGA LV | LV | LV18KBRB111212941001 | DREY ASSOCIATES LIMITED |
| RIGA LV | LV | LV18KBRB111212941001 | DREY ASSOCIATES LIMITED |



| Rebecca J. Nelson | 388 Greenwich Street | Tel 212 816 4416 |
|---|---|---|
| Director | 17th Floor | Fax 646 6881945 |
| Associate General Counsel | New York, NY 10013 | rebecca.j.nelson@citi.com |

September 1, 2011

Hallie B. Levin, Esq.
Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, NY 10036

Re:     In Re Application of Jeremy Outen, John Milson and David Standish, as Court-
        Appointed Receivers, For Judicial Assistance Pursuant to 28 U.S.C. 1782
        Civil Action No. 1:11-mc-00291-P1

Dear Ms. Levin:

Kindly allow this letter to serve as the initial response to the subpoena, dated August 22, 2011, served on non-party Citibank, N.A. in the above matter.

At this time we object to the subpoena to the extent it imposes obligations beyond those imposed by the Civil Practice Law and Rules, all other applicable local rules and the case law interpreting each. In addition, we reserve our right to assert any and all other applicable objections, both general and specific. Any failure to object to the subpoenas on a particular ground shall not be construed as a waiver of our right to object on that ground or any additional ground at any time.

Furthermore, the production of any documents, at any time, in response to the subpoena is without waiver of any and all privileges, protections or immunities. In the event that material subject to the attorney-client privilege, work product protection or any other privilege or immunity is inadvertently produced, such inadvertent production shall not be deemed to constitute a waiver of such privilege, protection or immunity.

Subject to the above, please be advised that we are currently conducting a search for responsive documents and will produce any such documents shortly under separate cover. Please do not hesitate to contact me should you wish to discuss any aspect of this response. Thank you.

Very truly yours,

Rebecca J. Nelson
Office of the General Counsel



Rebecca J. Nelson
Director
Associate General Counsel

388 Greenwich Street
17th Floor
New York, NY 10013

Tel 212 816 4416
Fax 646 6881945
rebecca.j.nelson@citi.com

September 7, 2011

Hallie B. Levin, Esq.
Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, NY 10036

Re:    In Re Application of Jeremy Outen, John Milson and David Standish, as Court-
Appointed Receivers, For Judicial Assistance Pursuant to 28 U.S.C. 1782
Civil Action No. 1:11-mc-00291-P1

Dear Ms. Levin:

Kindly allow this letter to serve as a further response to the subpoena, dated August 22, 2011,
served on non-party Citibank, N.A. in the above matter.

Please be advised that following a diligent search, we were unable to locate any documents
responsive to the above referenced subpoena.

As before, please do not hesitate to contact me should you wish to discuss any aspect of this
response.  Thank you.

Very truly yours,

Rebecca J. Nelson
Office of the General Counsel

# EXHIBIT F

## Exhibit F

The following are excerpts from our bank statement database showing transactions over $1 million in value. The beneficiary of these transactions cannot be identified as a bona fide third party, and after research we believe these transactions are recoverable assets of the Receivership. These transactions correspond with the Specific Transactions listed in Annex B. We have also split them in this exhibit by the original beneficiary bank (which became the remitting bank in Annex B) to demonstrate that the transaction actually took place and is linked to the Receivership.

1) Beneficiary Bank: Abu Dhabi Islamic Bank

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 03-May-11 | Credo Ventures Ltd | Outside the Order | Eurobank EFG | 20,000,000.00 | Askar Amangeldiyev |

2) Beneficiary Bank: AMT Bank LLC

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|---|---|---|---|---|---|
| 04-Oct-06 | Flairis Technology Limited | 3B | Marfin Laiki Bank | 9,999,999.99 | JSC Eurasia M4 |
| 27-Oct-06 | Flairis Technology Limited | 3B | Marfin Laiki Bank | 1,500,517.22 | JSC Eurasia M4 |
| 01-Nov-06 | Flairis Technology Limited | 3B | Marfin Laiki Bank | 21,000,485.81 | JSC Eurasia M4 |
| 27-Nov-06 | Flairis Technology Limited | 3B | Marfin Laiki Bank | 25,000,478.13 | JSC Eurasia M4 |
| 05-Dec-06 | Flairis Technology Limited | 3B | Marfin Laiki Bank | 9,100,540.35 | JSC Eurasia M4 |
| 20-Dec-06 | Roadnext Holdings Limited | 3B | Baltikums Bank AS | 15,450,000.00 | OOO Stroi Elite Limited |
| 27-Dec-06 | Statedown Enterprises Limited | 3B | Baltikums Bank AS | 5,000,000.00 | LLC INVESTHOLDINGSTROI |
| 16-Jan-07 | Flairis Technology Limited | 3B | Marfin Laiki Bank | 7,200,525.39 | JSC Eurasia M4 |
| 30-Jan-07 | Roadnext Holdings Limited | 3B | Baltikums Bank AS | 8,836,750.00 | OOO Stroi Elite Limited |
| 07-Feb-07 | Flairis Technology Limited | 3B | Marfin Laiki Bank | 20,800,492.24 | JSC Eurasia M4 |
| 20-Apr-07 | Flairis Technology Limited | 3B | Marfin Laiki Bank | 3,500,000.04 | JSC Eurasia M4 |
| 11-Jul-07 | Statedown Enterprises Limited | 3B | Baltikums Bank AS | 1,225,181.00 | LLC INVESTHOLDINGSTROI |
| 04-Oct-07 | Investclub Investments Limited | 3 | Marfin Laiki Bank | 3,999,970.70 | Sanesta Investments Ltd |

| 19-Aug-08 | Branhall Holding S.a.r.l. | 3B | ING Bank (Luxembourg) S.A. | 6,040,000.00 | Barenholt Productions Inc |
| 24-Jul-09 | Bondyear Enterprises Limited | 3B | OJSC Promsvyazbank, Cyprus Branch | 13,107,000.00 | CJSC Stroyproekt |
| 22-Jan-10 | Trombest Holding Limited | 3B | OJSC Promsvyazbank, Cyprus Branch | 2,491,000.00 | CJSC CENTRO-CAR 2000 |

3) Beneficiary Bank: Bank of Cyprus Public Company Limited

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|--------------------------------|-----------------|-------------|---------------------|
| 09-Apr-10 | Cerebos Limited | 3B | OJSC Promsvyazbank, Cyprus Branch | 5,000,000.00 | Lumette Corporation |
| 27-Apr-10 | Cerebos Limited | 3B | OJSC Promsvyazbank, Cyprus Branch | 5,000,000.00 | Lumette Corporation |
| 18-Feb-11 | Zaforim Investments Ltd | 3B | BANK OF CYPRUS | 2,002,506.96 | Bryllant Group Limited |

4) Beneficiary Bank: Barclays Bank PLC

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|--------------|----------------------------------|-----------------|-------------|---------------------|
| 01-Nov-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 2,046,000.00 | Claver Holdings Group Limited |

5) Beneficiary Bank: BNP Paribas (Suisse) SA

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|------------------|-------------|---------------------|
| 23-Feb-09 | PKM Invest Limited | 3A | Marfin Laiki Bank | 1,001,154.51 | EXPEDIA ENTERPRISES LIMITED |

6) Beneficiary Bank: RBS Coutts Bank

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 10-Aug-09 | Septrade Limited | 3D | Baltikums Bank AS | 1,750,000.00 | MTA Securities and Investments |

7) Beneficiary Bank: Emirates Bank

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 18-Oct-06 | FM Company Ltd | 3B | LGT (Schweiz) AG | 15,000,000.00 | Atex International (FZC) |

8) Beneficiary Bank: Eurobank EFG

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 22-Sep-08 | Goraza Limited | 3A | Bank of Cyprus | 4,350,533.97 | Georgios Papachristoforou |
| 23-Dec-10 | Ostel Holdings Limited | 3B | Marfin Laiki Bank | 1,000,989.84 | Credo Ventures Ltd |

9) Beneficiary Bank: FBME (Tanzania)

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|---|---|---|---|---|---|
| 09-Jun-11 | Desimon Ventures Limited | Outside the Order | Marfin Laiki | 27,400,000.00 | Amber Limited |

10) Beneficiary Bank: Hellenic Bank

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|--------------------------------|-----------------|-------------|---------------------|
| 18-Apr-11 | Apa Services Ltd | 3B | Bank of Cyprus | 1,990,966.41 | Sheldon Limited |
| 20-Apr-11 | Lende Trading Corp | 3B | Eurobank EFG | 1,992,000.00 | Sheldon Limited |

11) Beneficiary Bank: HSBC Bank PLC

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 16-Nov-09 | CEREBOS LIMITED | 3B | OJSC Promsvyazbank, Cyprus Branch | 2,247,000.00 | Mesano Managent S.A. |
| 26-Nov-09 | CEREBOS LIMITED | 3B | OJSC Promsvyazbank, Cyprus Branch | 2,400,000.00 | Concord Distributing Services Ltd |
| 23-Dec-09 | CEREBOS LIMITED | 3B | OJSC Promsvyazbank, Cyprus Branch | 1,178,000.00 | Concord Distributing Services Ltd |

12) Beneficiary Bank: ING N.V.

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 23-Nov-07 | FM Company Ltd | 3B | LGT (Schweiz) AG | 10,000,000.00 | New Power Systems Limited |
| 07-Dec-07 | FM Company Ltd | 3B | LGT (Schweiz) AG | 15,000,000.00 | New Power Systems Limited |
| 21-Dec-07 | FM Company Ltd | 3B | LGT (Schweiz) AG | 25,000,000.00 | New Power Systems Limited |

13) Beneficiary Bank: JSC The State Export-Import Bank of Ukraine

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|---|---|---|---|---|---|
| 13-Jun-08 | Valenora Co Limited | 3D | HELLENIC BANK | 1,211,270.00 | LLC Zemelyn Capital |
| 25-Jul-08 | Valenora Co Limited | 3D | HELLENIC BANK | 3,000,270.00 | LLC Zemelyn Capital |

14) Beneficiary Bank: Marfin Laiki Bank

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 21-Aug-08 | Berger International Limited | 3B | Marfin Laiki Bank | 4,000,000.00 | Amdover Limited |
| 22-Aug-08 | Berger International Limited | 3B | Marfin Laiki Bank | 4,000,000.00 | Amdover Limited |
| 26-Aug-08 | Berger International Limited | 3B | Marfin Laiki Bank | 4,000,000.00 | Amdover Limited |
| 28-Aug-08 | Berger International Limited | 3B | Marfin Laiki Bank | 4,000,000.00 | Amdover Limited |
| 01-Sep-08 | Berger International Limited | 3B | Marfin Laiki Bank | 4,000,000.00 | Amdover Limited |
| 03-Sep-08 | Berger International Limited | 3B | Marfin Laiki Bank | 1,700,000.00 | Amdover Limited |
| 09-Mar-10 | Jet Fame Industries Ltd | 3B | Bank of Cyprus | 1,082,919.30 | Tristana Holdings Limited |

15) Beneficiary Bank: OJSC Promsvyazbank, Cyprus Branch

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|---|---|---|---|---|---|
| 28-Apr-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 1,450,000.00 | Grey Culver Ltd |
| 06-Sep-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 1,012,500.00 | Agravein Services Ltd |
| 19-Sep-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 3,200,000.00 | Agravein Services Ltd |
| 25-Oct-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 2,993,000.00 | Agravein Services Ltd |
| 25-Oct-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 2,731,000.00 | Agravein Services Ltd |
| 25-Oct-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 1,776,000.00 | Agravein Services Ltd |
| 02-Nov-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 5,500,000.00 | Agravein Services Ltd |
| 13-Dec-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 3,000,000.00 | Alliance Invest Limited |

16) Beneficiary Bank: PJSC BTA Bank (Ukraine)

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|---|---|---|---|---|---|
| 29-May-09 | Stantis Limited | 3 | OJSC Promsvyazbank, Cyprus Branch | 1,000,000.00 | TOV SPOCC Max-Well |

17) Beneficiary Bank: Public Bank (Hong Kong) Limited

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 20-Oct-06 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 3,006,174.42 | Maxray Logistics Limited |

18) Beneficiary Bank: Rietumu Banka

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 08-Sep-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 8,489,008.00 | Barbaran LLC |
| 06-Jun-08 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 6,544,201.00 | Larsen Markets LLP |

19) Beneficiary Bank: SG Private Banking (Suisse) S.A.

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|---|---|---|---|---|---|
| 09-Jul-07 | Normen (Overseas) Limited | 3A | Credit Suisse | 2,000,004.11 | Tylex Co. Ltd |
| 06-Aug-07 | Normen (Overseas) Limited | 3A | Credit Suisse | 1,700,004.22 | Tylex Co. Ltd |
| 27-Sep-07 | Normen (Overseas) Limited | 3A | Credit Suisse | 1,000,004.27 | Tylex Co. Ltd |

20) Beneficiary Bank: Standard Chartered Bank, Abu Dhabi

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 18-Oct-06 | FM Company Ltd | 3B | LGT (Schweiz) AG | 15,000,000.00 | R&B Gulf & International Investment (FZE) |

21) Beneficiary Bank: Trasta Komercbanka

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|---|---|---|---|---|---|
| 15-Mar-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 7,000,000.00 | Bramex Management Inc |
| 18-Aug-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 9,449,555.00 | Craftway GmbH Inc. |
| 22-Sep-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 10,550,445.00 | Craftway GmbH Inc. |
| 20-Oct-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 7,271,975.59 | Craftway GmbH Inc. |
| 25-Nov-08 | Gamematch Payment Limited | 3B | Trasta Komercbanka (Cyprus) | 12,200,000.00 | Bluevelvet Services Ltd |
| 02-Apr-09 | Levelbest Trading Limited | 3B | Trasta Komercbanka (Cyprus) | 3,000,000.00 | Nyanga Ltd |
| 19-Aug-09 | Zalou Investments Limited | 3A | OJSC Promsvyazbank, Cyprus Branch | 1,000,000.00 | Perrycat Limited |
| 24-Sep-09 | Zalou Investments Limited | 3A | OJSC Promsvyazbank, Cyprus Branch | 1,000,000.00 | Perrycat Limited |
| 17-Dec-09 | Zalou Investments Limited | 3A | OJSC Promsvyazbank, Cyprus Branch | 1,000,000.00 | Perrycat Limited |
| 01-Feb-10 | Zalou Investments Limited | 3A | OJSC Promsvyazbank, Cyprus Branch | 1,000,000.00 | Perrycat Limited |
| 18-Jun-10 | Engelor Trading Limited | 3B | OJSC Promsvyazbank, Cyprus Branch | 1,000,000.00 | Perrycat Limited |

22) Beneficiary Bank: UBS AG

| Date | Remitter Name | Relationship to the Receivership | Remitter's Bank | Value (USD) | Beneficiary Details |
|------|---------------|----------------------------------|-----------------|-------------|---------------------|
| 11-Mar-05 | Casalake Trading Limited | 3C | OJSC Promsvyazbank, Cyprus Branch | 1,000,000.00 | Teronk Finance LLP |

Case 1:13-mc-00001-AK   Document 3-2   Filed 01/02/13   Page 96 of 109

# EXHIBIT G

# Payments - Customer Transfer (MT 103)

### How to enter Customer Transfer (MT 103) fields in Alliance Lite screens:

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| 20 | Sender's Reference | Required | Message Identification | Sender's Ref | If not entered, then this field is automatically set to a unique value (TNum). If entered, the entered value overrules the TNum. |
| 13C | Time Indication | | | - | AutoClient only. |
| 23B | Bank Operation Code | | | - | Automatically set to: 23B:CRED - not displayed. Other values can be entered through AutoClient. |
| 23E | Instruction Code | Optional | Instructions | Processing Instructions | Max. 4 processing instructions can be entered through GUI. If more than 4 are required, then use AutoClient. |
| 26T | Transaction Type Code | | | - | AutoClient only. |
| 32A | Value Date/Currency/Interbank Settled Amount | Required | Amount & Dates | Amount or Interbank Settled Amount (debit) Value Date | By default, a single Amount field is shown, and this Amount field is mapped to both 32A, and 33B. Only if Sender's or Receiver's charges are entered, or currency of Amount is changed by the user to be different from the currency of the Sender's Account, then 2 amount fields are shown: an Instructed |

Was this information helpful?   Yes   No

Case 1:13-cv-00001-P1 Document 3-2 Filed 01/02/13 Page 234 of 109

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| | | | | | Amount (credit) and Interbank Settled Amount (debit) instead of Amount.<br><br>The Interbank Settled Amount is calculated from the entered Instructed Amount, taking into account Exchange Rate and charges, unless user disables calculation. Calculation is as per Standards MT, Category 1, MT 103, Usage Rules for Amount Related Fields. |
| 33B | Currency/Instructed Amount | Required | Amount & Dates | Amount or Instructed Amount (credit) | By default, an Amount field is shown, and this Amount field is mapped to both 32A, and 33B. Only if Sender's or Receiver's charges are entered, or currency of Amount is changed to be different than currency of the Sender's Account, then show both Instructed Amount (credit) and Interbank Settled Amount (debit) instead of Amount. |
| 36 | Exchange Rate | Required | Amount & Dates | Exchange Rate | The Exchange Rate field is only shown if the currency of Amount is changed to be different from the currency of the selected Sender's Account. When shown, it is mandatory, unless user selects "disable calculation". |

Was this information helpful? Yes No

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| 50A | Ordering Customer (BIC format) | | | - | AutoClient only - on the screen, 50K can be entered |
| 50F | Ordering Customer (structured format) | | | - | AutoClient only - on the screen, 50K can be entered |
| 50K | Ordering Customer (account, name, and address format) | Optional | Originator | Name Account/ID Address 1 Address 2 Address 3 Country | If "Account at Receiver" checkbox is ticked in "Sender's Account to be debited", then Originator is auto-prefilled with owner of this account, or left empty. The user can overrule this. The account and owner of this account are defined by the Alliance Lite administrator in **Admin > Setup > Account > Add or Modify** |
| 52A | Ordering Institution (BIC format) | Optional | Originator's Bank | Bank Code | This field must only be entered, if the sending Alliance Lite user is sending or forwarding the MT 103 on behalf of another institution. |
| 52D | Ordering Institution (name, and address format) | Optional | Originator's Bank | Bank Code Name Address 1 Address 2 Address 3 Country | This field only must be entered, if the sending Alliance Lite user is sending or forwarding the MT 103 on behalf of another institution. |
| 53A | Sender's Correspondent (BIC format) | Optional | Sender's Correspondent Bank | Bank Code | Field open for input if "Account at Receiver" checkbox is unticked in "Sender's Account to be debited". Bank code type drop- |

Was this information helpful?   Yes   No

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| | | | | | down must be set to SWIFT. A BIC must be typed in Bank Code, or selected from the BIC Directory. For known BICs, their Name, Address and Country are displayed for convenience. |
| 53B | Sender's Correspondent (account) | Required | Sender's Account to be Debited | Account Number | If "Account at Receiver" checkbox is ticked in "Sender's Account to be debited", then the selected Account Number is put in field 53B. Note: if a branch location name must also be specified in 53B, then AutoClient must be used. |
| 53D | Sender's Correspondent (name, and address format) | Optional | Sender's Correspondent Bank | Bank Code Name Address 1 Address 2 Address 3 Country | Field by default not open for input (greyed out). Open for input if "Account at Receiver" checkbox is unchecked. If the user selects Other as Bank Code type, then the entered Bank Code (preceded by a single slash), Name, Address, and Country are put in 53D. |
| 54A | Receiver's Correspondent (BIC format) | Optional | Receiver's Correspondent Bank | Bank Code | Field open for input if "Account at Receiver" checkbox is unticked in "Sender's Account to be debited". Bank code type drop-down must be set to SWIFT. A BIC must be entered in Bank Code, or selected |

Was this information helpful?   Yes   No

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| | | | | | from the BIC Directory. For known BICs, their Name, Address and Country are displayed for convenience. |
| 54B | Receiver's Correspondent (account) | | | - | AutoClient only - on the screen, 54A or 54D can be entered. |
| 54D | Receiver's Correspondent (name, and address) | Optional | Receiver's Correspondent Bank | Bank Code Name Address 1 Address 2 Address 3 Country | Field open for input if "Account at Receiver" checkbox is unticked in "Sender's Account to be debited". If the user selects Other as Bank Code type, then the entered Bank Code (preceded by a single slash), Name, Address, and Country are put in 54D. |
| 55a | Third Reimbursement Institution | | | - | AutoClient only. |
| 56A | Intermediary Institution (BIC format) | Optional | Intermediary Bank | Bank Code | Bank code type drop-down must be set to SWIFT. A BIC must be entered in Bank Code, or selected from the BIC Directory. For known BICs, their Name, Address and Country are displayed for convenience. |
| 56C | Intermediary Institution (clearing code format) | Optional | Intermediary Bank | Bank Code | Bank code type drop-down must not be set to SWIFT or Other. A clearing code must be entered or selected from the directory. |

Was this information helpful?   Yes   No

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| | | | | | For known codes, their Name, Address and Country are displayed for convenience. |
| 56D | Intermediary Institution (name, and address format) | Optional | Intermediary Bank | Bank Code Name Address 1 Address 2 Address 3 Country | If the user selects Other as Bank Code type, then the entered Bank Code (preceded by a single slash), Name, Address, and Country are put in 56D. |
| 57A | Account With Institution (BIC format) | Required | Beneficiary Bank | Bank Code | Bank code type drop-down must be set to SWIFT, FW, or RT. A BIC must be entered in Bank Code, or selected from the BIC Directory. For known BICs, their Name, Address and Country are displayed for convenience. FW is an instruction that says "Pay this BIC by Fedwire" RT is an instruction that says "Pay this BIC by (domestic) Real Time Gross Settlement System" |
| 57B | Account With Institution (location) | | | - | AutoClient only - on the screen, 57A, 57C, or 57D can be entered |
| 57C | Account With Institution (clearing code format) | Required | Beneficiary Bank | Bank Code | Bank code type drop-down must not be set to SWIFT or Other. A clearing code must be entered or selected from the directory. For known codes, their Name, Address |

Was this information helpful?   Yes   No

| Standards MT | | | Alliance Lite web interface | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| | | | | | and Country are displayed for convenience. |
| 57D | Account With Institution (name, and address format) | Required | Beneficiary Bank | Bank Code Name Address 1 Address 2 Address 3 Country | If the user selects Other as Bank Code type, then the entered Bank Code (preceded by a single slash), Name, Address, and Country are put in 56D. |
| 59 | Beneficiary Customer | Required | Beneficiary | Name Account Address 1 Address 2 Address 3 Country | |
| 59A | Beneficiary Customer | | | - | AutoClient only. On the screen, 59 can be entered. |
| 70 | Remittance Information | Optional | Instructions | Information for Beneficiary (Remittance Info) | |
| 71A | Details of Charges | Required | Amount & Dates | Charges | Select from drop-down BEN, SHA, or OUR. Default is SHA. If BEN is selected, then Sender's Charges becomes mandatory (blue). If OUR is selected, then Sender's Charges is cleared and greyed out. |
| 71F | Sender's Charges | Required | Amount & Dates | Sender's Charges | only 1 occurrence can be entered |

Was this information helpful?    Yes    No

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| 71G | Receiver's Charges | Required | Amount & Dates | Receiver's Charges | currency of Receiver's Charges must be same as currency of Interbank Settled Amount. |
| 72 | Sender to Receiver Information | Optional | Instructions | Bank to Bank Instructions | Only 4 lines can be entered. If more than 4 are required, then use AutoClient. |
| 77B | Regulatory Reporting | Optional | Instructions | Regulatory Reporting | |
| 77T | Envelope Contents | | | - | AutoClient only |

# Payments - Institutional Transfer (MT 202)

### How to enter Institutional Transfer (MT 202) fields in Alliance Lite screens:

Alliance Lite fields

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| 20 | Transaction Reference Number | Required | Message Identification | Sender's Ref | If not entered, then this field is automatically set to a unique value (TNum). If entered, the entered value overrules the TNum. |
| 21 | Related Reference | Required | Message Identification | Related Ref | |
| 13C | Time Indication | | | - | AutoClient only |
| 32A | Value Date, Currency Code, Amount | Required | Amount & Dates | Credit Amount (Currency) Value Date | Currency is set to the currency of the selected Debit Account |
| 52a | Ordering Institution | | | - | AutoClient only |
| 53A | Sender's Correspondent | | | - | AutoClient only |
| 53B | Sender's Correspondent | Required | Debit Account | Account Number | |
| 53D | Sender's Correspondent | | | - | AutoClient only |
| 54a | Receiver's Correspondent | | | - | AutoClient only |
| 56A | Intermediary (BIC format) | Optional | Intermediary Bank | Bank Code | Bank code type drop-down must be set to SWIFT. A BIC must be typed in Bank Code, or selected from the BIC Directory. For |

Was this information helpful?    Yes    No

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| | | | | | known BICs, their Name, Address and Country are displayed for convenience. |
| 56D | Intermediary (name, and address format) | Optional | Intermediary Bank | Bank Code Name Address 1 Address 2 Address 3 Country | Bank code type drop-down must not be set to SWIFT. A clearing code must be entered or selected from the directory. For known codes, their Name, Address and Country are displayed for convenience. |
| 57A | Account With Institution (BIC format) | Required | Account With Institution | Account Bank Code | Bank code type drop-down must be set to SWIFT, FW, or RT. A BIC must be entered in Bank Code, or selected from the BIC Directory. For known BICs, their Name, Address and Country are displayed for convenience. Entering an Account is optional, and only possible if code type is SWIFT. FW is an instruction that says "Pay this BIC by Fedwire." RT is an instruction that says "Pay this BIC by (domestic) Real Time Gross Settlement System" |
| 57B | Account With Institution (location) | | | - | AutoClient only. On the screen, 57A or 57D can be entered. |
| 57D | Account With Institution (account or clearing code, name, and address) | Required | Account With Institution | Account Bank Code Name Address 1 Address 2 Address 3 Country | Bank code type drop-down must not be set to SWIFT. A clearing code must be entered or selected from the directory. For known codes, their Name, Address and Country are displayed for convenience. |
| 58A | Beneficiary Institution (BIC format) | Required | Beneficiary Institution | Account Bank Code | Bank code type drop-down must be set to SWIFT. A BIC must be entered in Bank Code, or selected from the BIC Directory. For known BICs, their Name, Address and Country are displayed for convenience. Entering an Account is optional. |

Was this information helpful?    Yes    No

Case 1:13-mc-00001-P1   Document 34-5   Filed 04/02/13   Page 107 of 109

| Standards MT | | Alliance Lite web interface | | | Comment |
|---|---|---|---|---|---|
| Field tag | Field name (and format) | Tab | Block | Field name | |
| 58D | Beneficiary Institution (name, and address) | Required | Beneficiary Institution | Bank Code Name Address 1 Address 2 Address 3 Country | Bank code type drop-down must not be set to SWIFT. A clearing code must be entered or selected from the directory. For known codes, their Name, Address and Country are displayed for convenience. |
| 72 | Sender to Receiver Information | Optional | Instructions | Sender to Receiver instructions | |

# MT 202 COV General Financial Institution Transfer

The MT 202 COV is a General Use message, that is, no registration in a Message User Group is necessary to send and receive this message.

The message contains a mandatory sequence to include information on an underlying customer credit transfer and has a maximum message length of 10,000 characters.

**IMPORTANT: To trigger the MT 202 COV format validation, the user header of the message (block 3) is mandatory and must contain the code COV in the validation flag field 119 ({3:{119:COV}}).**

## MT 202 COV Scope

This message is sent by or on behalf of the ordering institution directly, or through correspondent(s), to the financial institution of the beneficiary institution.

It must only be used to order the movement of funds related to an underlying customer credit transfer that was sent with the cover method.

The MT 202 COV must not be used for any other interbank transfer. For these transfers the MT 202 must be used.

## MT 202 COV Format Specifications

The MT 202 COV consists of two sequences:

- Sequence A General Information is a single occurrence sequence and contains information on the financial institution transfer between the ordering institution and beneficiary institution.

- Sequence B Underlying Customer Credit Transfer Details is a single occurrence sequence and is used to provide details on an individual underlying customer credit transfer that was sent with the cover method.

**MT 202 COV General Financial Institution Transfer**

| Status | Tag | Field Name | Content/Options | No. |
|--------|-----|-----------|-----------------|-----|
| **Mandatory Sequence A General Information** | | | | |
| M | 20 | Transaction Reference Number | 16x | *1* |
| M | 21 | Related Reference | 16x | *2* |
| ----> | | | | |
| O | 13C | Time Indication | /8c/4!n1!x4!n | *3* |
| ----| | | | | |
| M | 32A | Value Date, Currency Code, Amount | 6!n3!a15d | *4* |
| O | 52a | Ordering Institution | A or D | *5* |
| O | 53a | Sender's Correspondent | A, B, or D | *6* |
| O | 54a | Receiver's Correspondent | A, B, or D | *7* |
| O | 56a | Intermediary | A or D | *8* |

Category 2 - Financial Institution Transfers for Standards MT November 2009

| Status | Tag | Field Name | Content/Options | No. |
|--------|-----|-----------|-----------------|-----|
| O | 57a | Account With Institution | A, B, or D | 9 |
| M | 58a | Beneficiary Institution | A or D | 10 |
| O | 72 | Sender to Receiver Information | 6*35x | 11 |
| **End of Sequence A General Information** | | | | |
| **Mandatory Sequence B underlying customer credit transfer details** | | | | |
| M | 50a | Ordering Customer | A, F, or K | 12 |
| O | 52a | Ordering Institution | A or D | 13 |
| O | 56a | Intermediary Institution | A, C, or D | 14 |
| O | 57a | Account With Institution | A, B, C, or D | 15 |
| M | 59a | Beneficiary Customer | No letter option or A | 16 |
| O | 70 | Remittance Information | 4*35x | 17 |
| O | 72 | Sender to Receiver Information | 6*35x | 18 |
| O | 33B | Currency/Instructed Amount | 3!a15d | 19 |
| **End of Sequence B underlying customer credit transfer details** | | | | |
| M = Mandatory, O = Optional | | | | |

# MT 202 COV Network Validated Rules

**C1**   If field 56a is present in sequence A, then field 57a must also be present in sequence A (Error code(s): C81).

**C2**   If field 56a is present in sequence B, then field 57a must also be present in sequence B (Error code(s): C68).

# MT 202 COV Usage Rules

- All parties to the financial institution transfer (Sequence A) must be financial institutions.

- The transfer of funds between the ordering institution and the beneficiary institution is always related to an underlying customer credit transfer. Field 21 must refer to the underlying transaction.

- The MT 202 COV must not be used to convey customer credit transfer instructions; it is used to order the movement of funds related to an underlying customer credit transfer that was sent with the cover method.

- The MT 202 COV must not be forwarded to the beneficiary financial institution for reporting purposes.

# MT 202 COV Market Practice Rules

Guidelines for the use of the message have been published by the Payments Market Practice Group (PMPG).

For more details, see the relevant market practice document on **www.pmpg.info**.

# ANNEX A

ANNEX A –

RECEIVERSHIP COMPANIES

Abremin Holdings Limited

Absolut Investment LLP (ABSOLuT jNVESTMENT LLC)

Acalan Holdings Limited

Adamaris Investments Limited

Adarma Holdings Limited

Addes International Limited

Adventex Trading Limited

AEG Systems Inc

Afina Trade LLP (AFjNA TREiD)

Afrelta Holdings Limited

African Sky Trading Limited

Agrippa Trading Limited

Agroinvest LLP (AGROINVEST LLC)

AHA Management Inc

Aharon Incorporated

Airwood Corporation Limited

AIST LLC (AIST LLC)

Alara International Inc

Alasus Holding Limited

Aldan Global Limited

Aldridge Ventures Limited

Aledar Holdings Limited

Alexar Trading Limited

Alfa Consultancy Limited

Algoway Investments Limited

Alphasea Investments Limited

Alterson Limited

Amador Investments Limited

Amberway Limited

Amelca Investments Limited

Amirar Limited

Amoreux Limited

AMT Services Limited

Ancilla Beteiligungs-Verwaltungs GmbH

Angeland Investments Limited

Anibell Trading Limited

Anital LLC

Antlia Corp

Anzion Holdings Limited

Apa Services Limited

Aracela Holdings Limited

Arana Constructions Limited

Archeston Solutions Inc

Ardrock Holdings Limited

Arfikona Limited

Argonex Invest Corp

Arkridge Telecom Limited

Armotage Trading Limited

Artounoa Holdings Limited

Artvision Limited (TOO ARTVISION)

Aruma Holdings Limited

Asa Trading Limited

Asenet Services Limited

Asino Holdings Limited

Asmelta Investments Limited

Aspelica Investments Limited

Asset Group Holdings Limited

AST Holdings Limited

Asterato Management Limited

Asterius Holdings Limited

Aston Color Limited

Astrogold Corp

Atlant-T OOO (ATLANT-T LLC)

Aurland Production Inc

Austin Universal Inc

Avalle Consulting Limited

Avasia Holdings Limited

Avgousta Holdings Limited (formerly Molyneux Limited)

Avgur Group Limited

Avonhill Ventures Limited

Avredinar Holdings Limited

Azure Way Limited

Bainsder Investments Limited

Baldock Holding Sarl

Balgaven Invest Inc

Balladfield Holdings Limited

Balladplace Enterprises Limited

Balladream Holdings Limited

Balladroad Enterprises Limited

Baltinvest LLC (BALTINVEST LLC)

Baltyk Idea Limited

Banavie Holding Sarl

Bangor Holding Sarl

Bardane Limited

Bardon Holding Sarl

Barlaston Holding Sarl

Barming Holding Sarl

Barnhill Holding Sarl

Baruch & Co Limited

Bathgate Holding Sarl

Batitrav Resources Limited

Baymak Services Limited

Bayshore Marketing Inc

Beenap Limited

Belgrave Logistics Limited

Belinia Holdings Limited

Bellgrove Holding Sarl

Belomorskaya Neftebaza CJSC
(BELOMORSKAAa NEFTEBAZA CJSC)

Beltas Development Corp

Beltor Limited

Bemet Investments Limited

Bempton Holding Sarl

Benfleet Holding Sarl

Bensborough Trading Inc[1]

Berger International Limited

Berit Limited

Berment Ventures Limited

Berniling Investments Limited

Berwich Holding Sarl

Bestcatch Trading Limited

Bestshot Services Limited

Beststage International Limited

Bexley Holding Sarl

Biancini United SA

Billbrook Holding Sarl

Billingham Holding Sarl

Billion Trader Limited

Biofusion Limited

Bion Services Limited

Blackburn Holding Sarl

Blacksteel Experts Corp

Blerace Limited

Bluecenter Holdings Limited

Bluestate Investments Limited

Bogara Tech Limited

Bolot Worldwide Limited

Bondhouse Holdings Limited

Bondiza Consulting Limited

Bondmore Holdings Limited

Bondrain Holdings Limited

Bondyear Enterprises Limited

Bonvest Advisors Limited

Boscobel International Corp

Bramilt Enterprises Limited

Branden & Associates Limited

Branhall Holding Sarl

Brighton Corp

Britar Holdings Limited

Broadlife Trading Limited

Brockley Holding Sarl

Brundall Holding Sarl

BTA International Group Limited

Bubreca Limited

Buckley Holding Sarl

Bular Trading Limited

Bulwell Holding Sarl

---

[1] Incorrectly listed in the Receivership Order
as 'Bensbourogh Trading Inc'

Business Code Limited

Business Engineering LLC (BIZNES-INJINIRING LLC)

Business Expert LLC (BIZNES-eKSPERT LLC)

Cabcharge Limited

Calernen Finance Inc

Calesha Limited

Caprio LLC/Kaprio LLC (KAPRIO LLC)

Cargomax Merchants Limited

Carlower Enterprises Limited

Casalake Trading Limited

Caspineft Holdings BV

Celina Holding Investments Limited (formerly Bubris Investments Limited)[2]

Center-Invest (CENTR-INVEST LLC)

Centile Resources Inc

Cerebos Limited

CF & Morgan Russia Equity Fund, LP

Chapelhill Enterprises Limited

Chapelroad Enterprises Limited

Chefa Limited

Chesterland Invest Corp

Chrysopa Holding BV

City Ventures Limited

Clerante Holdings Limited

Colberg Division Limited

Colex Trading Limited

Comet Merchants Limited

Companiya Invest Capital LLP (KOMPANIa INVEST KAPITAL LLC)

Company Support Limited

Comwork Limited

Cona Trading Limited

Concardo Limited

Constance Services Limited

Corbiere Universal Limited

Core Network Limited

Cornerways Services Limited

Creshia Holdings Limited

Creterius Finance Limited

Cronberry Overseas Limited

Crondale Finance Limited

Crosbie Tech Limited

Crossaction Enterprises Limited

Cryosphere Limited

Cyten Trading Inc

Dana Trade Corp

Daniels Tradecorp Inc

Danionics Enterprises Limited

Darfield Limited

Dayen Environmental Limited

Delaware Capital Inc

Delchelva Holdings Limited

Delta Torg LLC (DELXTATORG LLC)

Deltona Services Limited

Denacom Limited

Denmar Assets Managements Inc

Derbent Services Limited

Derneco Limited

Develcan Ventures Limited

Devesta Limited

Devonton Investments Limited

Dik Nedvizhimost CJSC (DIK-NEDVIJIMOSTX CJSC)

Dinamic Tide Trading

Dinfield Inc

Direct Logistic Solutions Limited

Donlant Ventures Inc

Dorbea Investments Limited

Doren Trading Limited

Dowring & Associates Inc

DP Jupiter Trade (DP uPITER TREiD)

DP MP Invest (DOcIRNf PjDPRIfMSTVO MP Jnvest)

---

[2] Incorrectly listed in Receivership Order as Celina Holdings Investments Limited

Dreamlife Holdings Limited

Dregon Land Limited

Drey Associates Limited

Drobo Trade Investment LLP[3] (DROBO TREiD jNVESTMENT LLC)

Drobo Trade Limited

Drofal Holding Limited

Easy Concept Processing Limited

Eclarius Limited[4]

Edmisonon Holdings Limited

Elanesca Investments Limited

Eldoro Holdings Limited

Elgin Assets & Ventures Limited

Elias Import/Export Limited

Elisha Holdings Limited

Elista Trading International Limited

Elsinore Consultants Limited

Emesin Trading Limited

Eminota Limited

Emsort Holdings Limited

Engelor Trading Limited

Enverolt Marketing Limited

Equipe Holdings Limited

Erawanco Limited

Ergen Trading Limited

Ergo Transit Corp

Ernalco Investments Limited

Escantre Holdings Limited

Estar Developments Limited

Estrea Management Limited

Eurasia Logistics Limited

Eurobusiness Group Inc

Euroguard Assets Limited

Europtronic Limited

Extracord Company Limited

Facebook Trading Limited

Famelink Investments Limited

Famesca Investments Limited

Famille Solutions Limited

Fanal Holdings Limited

Farcape Services Limited

Farpost Holdings Limited

Fastservice Consultants Limited

Fedelm Corp

Fendus Holding Limited

Fenella Service Limited

Fernwood Resources Limited

Fers Limited

Feston Limited

Fexon International Limited

Fieldport Networks Corp

Financial Centre Micex CJSC (FINANSOVYi CENTR-MVB CJSC)

Fitcherly Holdings Limited

Flairis Technology Limited[5]

Fletcher Investor Corp

Flightplan Services Limited

Flyajet Investments Limited

FM - Company Limited

Fora Corporation

Forestcrystal Holdings Limited

Foresthouse Holdings Limited

Forlani Investments Limited

Formiga Limited

Fountain Hills Trading Limited

Francis Alliance Limited

Froncont Trading Limited

Freshway Financial Consulting Limited

Frolovo Holdings Limited

Frontline Technology Limited

Fugishia Trading Limited

---

[3] Incorrectly listed in Receivership Order as Drobo Trade Investments LLP
[4] Incorrectly listed in the Receivership Order as 'Eklarius Limited'

[5] Incorrectly listed in the Receivership Order as 'Flairis Technologies Limited'

G.R.V. Greco Ventures Limited

Galanz Productions Limited

Gallamist Investments Limited

Gambac Limited

Gamematch Payment Limited

Gasten Group Limited

Gatova Holdings Limited

GEM Equity Management Holding AG

Gemestra Limited

Gemini Limited

Gemnet Services Limited

Gemwave Systems Limited

Genemedix Enterprises Limited

Gestel Marketing Inc

Giftrock Trading Limited

Global King Enterprises Limited

Global Scale Corporation

Global Team Company

Globetrade Management Limited

Gold Arris Limited

Goldboat Investments Limited

Goldenstage Trading Limited

Goldfine Import Investment LLP[6] (GOLDFAiN jMPORT jNVESTMENT LLC)

Goldfine Import Limited

Gorazar Limited

Gostinichniy Kompleks Cosmos OAO (GK KOSMOS OJSC)

Govery Trading Limited

Graceway Commerce Limited

Grebore Limited

Greenbridge Services Limited

Grepas Services Limited

Grosburg Limited

Grundberg Inc

Gurtall Management Limited

Hallmer Limited

Handcart Investments Limited

Haphaestion Holdings Limited

Harmony Technology Limited

Harnfield Resources Limited

Heavenview Investments Limited

Heklon Management Limited

Helia Investments Limited

Heritam Management Limited

Highbond Associates Limited

Highview Limited

Hilberton Trading Limited

Hillrose Developments Limited

Hillspar Holdings Limited[7]

Hilton Consulting Limited

Holder Dom LLC / OOO Kholder Dom (HOLDER DOM LLC)

Honeynet Trading Limited

Hudsona Limited

Humaninvest International Limited

I.R.E.Land Limited

Iamgold Corporation Limited

Idrial Limited

Imerys Limited

Imex Management Inc

Impulse Capital Corp

Impulse Capital Investment LLP[8] (jMPULS KAPjTAL jNVESTMENT LLC)

Inkaville Holdings Limited

Innovalues Precision Limited

Instem Holdings Limited

Intellectual Creative Solutions Limited

Interfunding Facilities Limited

---

[6] Incorrectly listed in the Receivership Order as Goldfine Import Investments LLP

[7] Incorrectly listed in Receivership Order as Hillspar Holding Limited

[8] Incorrectly listed in the Receivership Order as Impulse Capital Investments LLP

International Petroleum Services Group Limited

Invest Development LLC (INVEST-DEVELOPMENT LLC)

Investclub Investments Limited

Investproekt OOO (INVESTPROEKT LLC)

IPG Eurasia LLC (IPG EVRAZIa LLC)

IPG Eurasia Ukraine LLC (jNVESTICJiNO PROMISLOVA GRUPA fVRAZja-UKRAyNA LLC) (jPG fVRAZja-UKRAyNA LLC)

Irwood Commercial Limited

Ivorytower Consultants Limited

Jacks International Limited

Jacrobi Limited

Jadason Enterprises Limited

Jet Fame Industries Limited

Jifkor Holdings Limited

Johnson Intertrans Inc

Jojoland Ventures Limited

Jollafield Holdings Limited

Jollastreet Enterprises Limited

Jollatower Enterprises Limited

Jollawood Trading & Investments Limited

Joytas Holdings Limited

Kailani Limited

Kalliyan Investments Limited

Kapsy Limited

Karola Holdings Limited

Kazcapital Invest LLP (Kaz Kapital LLC)

Kells Services Limited

Kentavir Limited

Keppel Land Limited

Keywave International Limited

Kimoce Limited

Kinmate Trading Limited

Kinslev Productions Limited

Klostrade Financial Group Limited

Koasiatrata Investments Limited

Konami Corporation Limited

KSC International Corp

KSC International Limited

KT Asia Investment Group BV

KT Asia Investment Group CV

Kutuzov Worldwide Enterprises Limited

Ladyhawk Holdings Limited

Lafe Technology Limited

Lake Resources Limited

Lakeland Commercial Limited

Lakeland Investments LLP (LEiKLEND jNVESTMENTS LLC)

Lallarte Limited

Lallarte Properties Limited

Landusaco Holding Limited

Langit Consulting Limited

Lankom Limited

Laplous Group Limited

Laquian Limited

Latrecia Investments Limited

Lavec Estates Limited

Learna Holdings Limited

Lebrica Holdings Limited

Legendcatch Services Limited

Lemur Holdings Limited

Lende Trading Corp

Leonca Holdings Limited

Lercina Holding Limited

Lercina Holdings Limited

Lernice Investments Limited

Levelbest Trading Limited

Lexman Inc

Lifetone Services Limited

Liftmann Limited

Lightland Consultants Limited

Lingard Industry Limited

Linkwood Limited

Linuxo Properties Limited

Lion Asiapac Limited

Lionhead Trading Limited

Livehouse International Limited

Loginet Services Limited

Logopark Kolpino CJSC (LOGOPARK KOLPINO CJSC)

Logopark Mezhdureche CJSC (LOGOPARK MEJDUREcXE CJSC)

Logopark Pyshma LLC (LOGOPARK PYQMA LLC)

Lomtel Limited

Loremain Limited

Lotaro Trading Limited

Lucky Kingdom Investments Limited[9]

Ludostad Properties Limited

Lux Investing Limited

Lyriten Production Inc

M.T.H. Maritime Holdings Limited

Mabco Inc

Maden Holding Inc

Maintop Trading Limited

Makta Aral Company LLP (MaktaAral LLC)

Malabar Investments Group Limited

Malakiy Resources Limited

Marcenica Investments Limited

Marciana Investments Limited

Marine Gardens OOO (MARIN GARDENS LLC)

Marinor Limited

Masour Holdings Limited

Matheca Holdings Limited

Maximus Resources Limited

Mega Property Limited

Melchia Trading Limited

Melindra Holdings Limited

Melkus Finance Limited

Mer Investments Limited

Mercielo Limited

Merenko Limited

Mergilot Trading Limited

Microview Trading Limited

Migina Limited

Mignola Services SA

Millennium Support Group Limited

Minik Limited

Minlin Estates Limited

Mintex Trading Limited

Misatone Limited

Mishia Investments Limited

Mitchell Technologies Inc

MK Caspian Zhuldyz NOO

Moldina Investments Limited

Moranta Invest (Cyprus) Limited

Mortecia Investments Limited

Mosdel Finance Limited

Motzo Holdings Limited

Mount Properties Limited

Mymana Investment Holdings Limited (formerly Kyma Investment Holdings Limited)

Nafazko Investments Limited

Nalden Industries Inc

Narabak Holdings Limited

Neshani Investments Limited

Netgold Services Limited

Newform Company Limited

Newhomeland Investments Limited

Nextrata Investments Limited

Nicedeal Investments Limited

Nipremena Holdings Limited

Nitnelav Holdings Limited

Nord Shipping Inc

Normen (Overseas) Limited

Northern Operations NV

---

[9] Incorrectly listed in the Receivership Order as Lucky Kingdom Investments

Nostras Limited

Notula Trading Limited

Novaya Tabachnaya Companiya OOO (NOVAa TABAcNAa KOMPANIa LLC) (NTK LLC)

N-Terminal LLC (N-TERMINAL LLC)

Nuerto Limited

Nupto Limited

Oldroad International Limited

Olofu Investment Holdings Limited

Omada Trading Limited

Opis Investments Limited

Orken Kapital LLP (ORKEN-KAPITAL LLC)

Orwell Import/Export Limited

Ostel Holdings Limited

Padoge Limited

Pakhra Fields LLC (PAHRA FILDZ LLC)

Paller Products Limited

Palmgate Enterprises Limited

Palmridge Holdings Limited

Pancontinental Inc

Parakmi Logistics Limited

Parasat Group NV

Parasus Finance Limited

Pasu Investments Limited

Paveletskaya OJSC (PAVELECKAa OJSC)

Pekan Trading Limited

Peperera Investments Limited

Perfeta Limited

Peristar Holdings Limited

Perspective Communications Inc

Philadelphia Tradecorp Inc

Pilotlight Holdings Limited

PK Yurovo LLC (PK uROVO LLC)

PKM Invest Limited

Placefield Holdings Limited

Placehouse Enterprises Limited

Planetzone Investments Limited

Plarum Limited

Platform Trustees Limited

PO Bylovo LLC (PO BYLOVO LLC)

Pointview Services Limited

Porfitto Trading Limited

Potbel Holdings Limited

Potiza Holdings Limited

Power Factor Trading Limited

Powerboat Investments Limited

Powermatic Data Limited

Prestona Holdings Limited

Previa Limited

Primesupport Holdings Limited

Prockshere Limited

Progen Limited

ProjectLand Investments Limited

Proliferone Limited

Promwel Holdings Limited[10]

Prosperous Century Inc

Proteus Group Holdings Limited

PSK Finance AMK Invest LLC (PROEKTNO-STROITELXNAa KOMPANIa AMK-INVEST LLC) (AMK-INVEST LLC)

Quasont Limited

Quickselect Investments Limited

Quinn Services Limited

Randers Company Inc

Ratin Investment Limited

Rayfield Productions Corp

Reblanca Holdings Limited

Reclif Developments Limited

Refgen Technologies Inc

Regal View Trading Limited

Region-Invest LLC (REGION-INVEST LLC)

---

[10] Incorrectly listed in the Receivership Order as Promwell Holdings Limited

Reigen Technologies Limited

Reklod Limited

Reme Investments Limited

Retrica Holdings Limited

Reuel Limited

Revil Securities SA

Rihanca Holdings Limited

Rikas Finance LLC (RIKAS FINANS LLC)

Rimos Limited

Ringbell Investments Limited

Ringfors Enterprises Limited

Riverstreet Investments Limited

Roadnext Holdings Limited

Rochester Invest Corporation

Rockgarden Enterprises Limited

Rocklane Properties Limited

Romelo Holdings Limited

Roskon Limited

Rospanico Investments Limited

Rospozant Limited

Rovert Import/Export Limited

Royford Inc

Rubyway Limited

Rushotel LLC (RUSOTELX LLC)

Rusotels Limited

Russian GS Limited

S.L. Schooldesk Licensing Limited (formerly Zephyranth Limited)

Salvepar Resources Limited

Salvino Services Limited

Salwick Holding Sarl

Samal Properties Limited Liability Partnership (SAMAL PROPERTIS LLC)

Samera Holdings Limited

Samuel Finance Sarl

Sanbreta Investments Limited

Sandown Holding Sarl

Sante Trading Limited [Sante Trading Group Limited]

Sarova Holdings Limited

Saryjaz Mineral Mining Co OOO (SARYDJAZ MINERAL MAiNING)

Sea Specialised Port Vitino LLC (MORSKOi SPECIALIZIROVANNYi PORT VITINO LLC)

Seaham Holding Sarl

Seaworld Processing Limited

Secretcorner Trading Limited

Seeria Alliance Limited

SellBrook Company Corp

Septrade Limited

Shalford Holding Sarl

Shallowlake Holdings Limited

Shoreline Investment Holdings Limited (formerly Granta Investment Holdings Limited)

SIG Assets Management Limited

Silverall Holdings Limited

Silverghost Trading Limited

Silworld Holdings Limited

Simonie Holdings Limited

Simplecity Holdings Limited

Skywatch Services Limited

Smarthead Investments Limited

Smartinvest Services Limited

Smartwhere Limited

Smileworld Investments Limited

SMKK LLP (SMKK LLC)

Solent Management Limited

Solmar Technologies Corp

Somerset Projects Inc

Sovstar 1 (Cyprus) Limited

Spacenet Services Limited

Specialrace Trading Limited

Spiritbase Services Limited

Sprenwood Holdings Limited

Squarecut Trading Limited

Stantis Limited

Stanton Universal Limited

Star-Atlantic Holding Inc

Starwood Contracts Limited

Statedown Enterprises Limited

Staterax Holding Limited

Statetower Enterprises Limited

Steffler Global Inc

Steiman Corp

Stempel Holdings Limited

STL Company LLC (STL-KOMPANIa LLC)

Stockstair Holdings Limited

Storin Limited

Straseca Holdings Limited

Strident Energy Limited

Striks Investments Limited

Stroiinvest-Kazan OOO (STROiINVEST-KAZANX LLC)

Stroi-Resource OOO (STROi-RESURS LLC)

StroyInvest Kazan LLC (STROiINVEST-KAZANX LLC)

Stylewest Holdings Limited

Subona Trading Limited

Subtower Trading Limited

Sundycoast Processing Limited

Sunstone Ventures Limited

Sunwell Distributors Inc

Superleague Services Limited

Suprisimo Investments Limited

Surmaka Services Limited

Svanlake Holding Limited

Svelgate Alliance Corp

Swainriver Holdings Limited

Sylvan Assets Inc

Tableros Holdings Limited

Tactica Enterprises Limited

Tahoka Limited

Tanna Holding Sarl

Taranski Limited

Tariono Limited

Techlink Consulting Limited

Tedcom Finance Limited

Tekhstroy Alliance CJSC (TEHSTROiALXaNS CJSC)

Telford Financiers Corp

Terrazone Investments Limited

Ticker Services and Consulting Limited

Tollo Holding Limited[11]

Caspian Tristar TOO (Kaspian Tristar LLC)

Top Quality Consulting Limited

Topgeo Holdings Limited

Topwide Trading Limited

Topworld Services Limited

Torland Production Inc

Toros Limited

Tortuga Limited

Tossima Limited

Trademarket International Limited

Tradestock Inc

Trainor Alley Corporation

Tramlanes Investments Limited (formerly Bergtrans Contracts Corp)

Trasemino Investments Limited

Trasnational Assets Limited

Trasnational Capital and Investments Limited

Trefor Limited

Trionfale Limited

Trombest Holdings Limited

Tsentr-Invest Limited Liability Company (CENTRINVEST LLC)

Tunnelsink Holdings Limited

---

[11] Incorrectly listed in the Receivership Order as Tollo Holdings S.a.r.l.

TuranAlem Capital LLC (TURANALEM KAPITAL LLC)

Ungromado Limited

Uniflex Global Limited

Unishare Trading Limited

United Clearing & Processing Company Limited

Urbas Industrial Limited

Urie Services Limited

Usarel Investments Limited

Utara Investments Limited

Vaida Trading Limited

Valeford Consortium Corp

Valenora Co Limited

Vanbas Limited

Vanesca Holdings Limited

Vanesca Investments Limited

Varkiza Investments Limited

Varna Limited

Vartexo Trading Limited

Velocita Holding BV

Venezzia Trading Limited

Venizon Holdings Limited

Venta LLC (VENTA LLC)

Vern Trading Corporation

Vernex Inc

Vetro Limited

Vetta (UK) LLP

Vianden Limited

Viascal Holdings Limited

Victan Limited

Victoryland Investments Limited

Vinsaw Investments Limited

Voreda Investments Limited

Vulier Investments Limited

Warren Worldwide LLC

Webcare Marketing Limited

Wenus Products Limited

Westrade Limited

Whipland Investments Limited

White Avenue Limited

White Sea Complex BV

Whitestorm Holdings Limited

Widley Worldwide Inc

Winterra Holdings Limited

Wintop Services Limited

Woodbridge Group Limited

Worldwide City Investments Limited

Xendus Holding Limited

Xtrainvest Investments Limited

Yarla Investments Limited

Yassy Invest LLP (aSSY-INVEST LLC)

York Resources Capital Corp

Yorkline Corp

Yuma Holdings Limited

Zafferant Partners Inc

Zaforim Investments Limited

Zaidies Limited

Zalou Investments Limited

Zangyla Holdings Limited

Zardoya Holding Limited

Zathen Holding Investments Limited (formerly Carsonway Limited)

Zed Candy Limited

Zephyranth Limited

Zlatano Limited

Zociac Enterprises Limited

ZRL Beteiligungs AG

# ANNEX B

## Annex B

### Request to Bank of America, N.A.

a) *Bank Account Request*: We request that Bank of America, N.A. provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| JSC Rietumu Bank | N/A | RTMBLV | National Westminster Bank PLC | N/A | NWBKGB / RBOSGB |
| Uralsib Bank OAO | N/A | AVTBRU | OTP Bank Ltd. | N/A | OTPVHU |

b) *Specific Transaction Request*: We request that Bank of America, N.A. provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: Abu Dhabi Islamic Bank (BIC: ABDIAE)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T1 | 20,000,000.00 | 03-May-11 | Askar Amangeldiyev | unknown |

ii) Remitting Bank: ING Bank, N.V. (BIC: INGBNL)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T33 | 10,000,000.00 | 23-Nov-07 | New Power Systems Limited | unknown |
| T34 | 15,000,000.00 | 07-Dec-07 | New Power Systems Limited | unknown |
| T35 | 25,000,000.00 | 21-Dec-07 | New Power Systems Limited | unknown |

2779855.1

iii) Remitting Bank: Marfin Laiki Bank (BIC: LIKICY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T38 | 4,000,000.00 | 21-Aug-08 | Andover Limited | 178-32-143752 |
| T39 | 4,000,000.00 | 22-Aug-08 | Andover Limited | 178-32-143752 |
| T40 | 4,000,000.00 | 26-Aug-08 | Andover Limited | 178-32-143752 |
| T41 | 4,000,000.00 | 28-Aug-08 | Andover Limited | 178-32-143752 |
| T42 | 4,000,000.00 | 01-Sep-08 | Andover Limited | 178-32-143752 |
| T43 | 1,700,000.00 | 03-Sep-08 | Andover Limited | 178-32-143752 |
| T44 | 1,082,919.30 | 09-Mar-10 | Tristana Holdings Limited | 178-32-192771 |

iv) Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB0000060806489 |

27799855.1

**Request to Barclays Bank PLC**

a) *Bank Account Request:* We request that Barclays Bank PLC provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|-----------|---------------|--------|-------------------|---------------|-----|
| Barclays Bank LLC | N/A | RTMBLV | N/A | N/A | N/A |

b) *Specific Transaction Request:* We request that Barclays Bank PLC provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: Barclays Bank PLC, Cyprus (BIC: BARCCY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|---------------------|
| T21 | 2,046,000.00 | 01-Nov-05 | Claver Holdings Group Limited | CY63108000100000000001020062 |

2779855.1

# Request to BNP Paribas

a) *Bank Account Request*: There is no Bank Account Request to BNP Paribas, New York.

b) *Specific Transaction Request*: We request that BNP Paribas, New York provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: BNP Paribas (Suisse) SA (BIC: BPPBCH)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T22 | 1,001,154.51 | 23-Feb-09 | Expedia Enterprises Limited | CH38 0868 6001 0861 5200 1 |

2779855.1

## Request to Citibank, N.A.

a) *Bank Account Request:* We request that Citibank, N.A. provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|-----------|---------------|-----|-------------------|---------------|-----|
| JSC Rietumu Bank | N/A | RTMBLV | National Westminster Bank PLC | N/A | NWBKGB / RBOSGB |
| JSC Trasta Komercbanka (BIC: KBRBLV) | N/A | KBRBLV | Raiffeisen Zentralbank Oestereich AG | N/A | RZBHATWW |

b) *Specific Transaction Request:* We request that Citibank, N.A. provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: Abu Dhabi Islamic Bank (BIC: ABDIAE)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T1 | 20,000,000.00 | 03-May-11 | Askar Amangeldiyev | unknown |

2779855.1

ii) Remitting Bank: Bank of Cyprus (BIC: BCYCPY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T18 | 5,000,000.00 | 09-Apr-10 | Lumette Corporation | CY52002001550000004073648806 |
| T19 | 5,000,000.00 | 27-Apr-10 | Lumette Corporation | CY52002001550000004073648806 |
| T20 | 2,002,506.96 | 18-Feb-11 | Bryllant Group Limited | CY22002003850000004033104606 |

iii) Remitting Bank: Eurobank EFG (BIC: EFGBCY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T25 | 4,350,533.97 | 22-Sep-08 | Georgios Papachristoforou | CY22018000300002013000002308 |
| T26 | 1,000,989.84 | 23-Dec-10 | Credo Ventures Ltd | 2011-00057523 |

iv) Remitting Bank: FBME Tanzania Ltd (BIC: FBMETZ)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T27 | 27,400,000.00 | 09-Jun-11 | Amber Limited | unknown |

v) Remitting Bank: Hellenic Bank (BIC: HEBACY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T28 | 1,990,966.41 | 18-Apr-11 | Sheldon Limited | 240-07-551637-01 |
| T29 | 1,992,000.00 | 20-Apr-11 | Sheldon Limited | 240-07-551637-01 |

2779855.1

vi) Remitting Bank: JSC The State Export-Import Bank of Ukraine (BIC: EXBSUA)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T36 | 1,211,270.00 | 13-Jun-08 | LLC Zemelny Capital | 2601 5010 0396 09 |
| T37 | 3,000,270.00 | 25-Jul-08 | LLC Zemelny Capital | 2600 5010 0396 09 |

vii) Remitting Bank: Marfin Laiki Bank (BIC: LIKICY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T38 | 4,000,000.00 | 21-Aug-08 | Amdover Limited | 178-32-143752 |
| T39 | 4,000,000.00 | 22-Aug-08 | Amdover Limited | 178-32-143752 |
| T40 | 4,000,000.00 | 26-Aug-08 | Amdover Limited | 178-32-143752 |
| T41 | 4,000,000.00 | 28-Aug-08 | Amdover Limited | 178-32-143752 |
| T42 | 4,000,000.00 | 01-Sep-08 | Amdover Limited | 178-32-143752 |
| T43 | 1,700,000.00 | 03-Sep-08 | Amdover Limited | 178-32-143752 |
| T44 | 1,082,919.30 | 09-Mar-10 | Tristana Holdings Limited | 178-32-192771 |

viii) Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB0000060806489 |

2779855.1

ix) Remitting Bank: Trasta Komercbanka (BIC: KBRBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T61 | 7,000,000.00 | 15-Mar-05 | Bramex Management Inc | LV55KBRB1111210649001 |
| T62 | 9,449,555.00 | 18-Aug-05 | Craftway GmbH Inc. | LV03KBRB1111211495001 |
| T63 | 10,550,445.00 | 22-Sep-05 | Craftway GmbH Inc. | LV03KBRB1111211495001 |
| T64 | 7,271,975.59 | 20-Oct-05 | Craftway GmbH Inc. | LV03KBRB1111211495001 |
| T65 | 12,200,000.00 | 25-Nov-08 | Bluevelvet Services Limited | LV74KBRB1111211337001 |
| T66 | 3,000,000.00 | 02-Apr-09 | Nyanga Ltd | LV20KBRB1111252380001 |
| T67 | 1,000,000.00 | 19-Aug-09 | Perrycat Limited | LV05KBRB1111213686001 |
| T68 | 1,000,000.00 | 24-Sep-09 | Perrycat Limited | LV05KBRB1111213686001 |
| T69 | 1,000,000.00 | 17-Dec-09 | Perrycat Limited | LV05KBRB1111213686001 |
| T70 | 1,000,000.00 | 01-Feb-10 | Perrycat Limited | LV05KBRB1111213686001 |
| T71 | 1,000,000.00 | 18-Jun-10 | Perrycat Limited | LV05KBRB1111213686001 |

2779855.1

**Request to Commerzbank AG**

Commerzbank AG Requests

a) *Bank Account Request:* We request that Commerzbank AG, New York provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| Commerzbank (Eurasija) SAO | N/A | COBARU | N/A | N/A | N/A |
| Hypothekenbank Frankfurt AG | Eurohypo AG | EHYPDE /HYESDE | N/A | N/A | N/A |
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | Commerzbank AG, Frankfurt | N/A | COBADEFF |
| JSC Trasta Komercbanka (BIC: KBRBLV) | N/A | KBRBLV | Commerzbank AG, Frankfurt | N/A | COBADEFF |

b) *Specific Transaction Request:* We request that Commerzbank AG, New York provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

   i) Remitting Bank: FBME Tanzania Ltd (BIC: FBMETZ)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T27 | 27,400,000.00 | 09-Jun-11 | Amber Limited | unknown |

2779855.1

ii) Remitting Bank: PJSC BTA Bank (Ukraine) (BIC: UCTBUA)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T53 | 1,000,000.00 | 29-May-09 | TOV SPOCC Max-Well | 2600200130328 |
| T53 | 1,000,000.00 | 29-May-09 | TOV SPOCC Max-Well | 2600200130328 |
| T53 | 1,000,000.00 | 29-May-09 | TOV SPOCC Max-Well | 2600200130328 |

iii) Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T55 | 8,489,008.00 | 08-Sep-05 | BARBARAN LLC | LV13RTMB00015580 6293 |
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB00060680 6489 |

## Dresdner Bank AG Requests[1]

a) *Bank Account Request:* We request that Commerzbank AG New York provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| JSC Trasta Komercbanka (BIC: KBRBLV) | N/A | RTMBLV | N/A | N/A | N/A |
| LGT Schweiz AG | Dresdner Bank Switzerland ltd. | BLFLCHBB | N/A | N/A | N/A |

---

[1] These requests pertain to accounts and transactions connected with Dresdner Bank AG, which was acquired by Commerzbank AG in 2009.

27779855.1

b) *Specific Transaction Request:* We request that Commerzbank AG New York provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below.  The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

   i)  Remitting Bank: Trasta Komercbanka (BIC: KBRBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T62 | 9,449,555.00 | 18-Aug-05 | CRAFTWAY GmbH Inc. | LV03KBRB1111211495001 |
| T63 | 10,550,445.00 | 22-Sep-05 | CRAFTWAY GmbH Inc. | LV03KBRB1111211495001 |
| T64 | 7,271,975.59 | 20-Oct-05 | CRAFTWAY GmbH Inc. | LV03KBRB1111211495001 |

2779855.1

**Request to Crédit Agricole CIB (previously known as Calyon N.A.)**

a) *Bank Account Request:* We request that Crédit Agricole provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Page Reference | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|---|
| Uralsib Bank OAO | N/A | AVTBRU | 71 | VTB Bank (France) SA | Banque Commerciale pour lEurope du Nord | EUROFRPP |

b) *Specific Transaction Request:* There is no Specific Transaction Request to Crédit Agricole.

2779855.1

**Request to Deutsche Bank Trust Company Americas**

a) *Bank Account Request:* We request that Deutsche Bank Trust Company Americas provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A.  The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| AMT Bank LLC (BIC: ITASRU) | BTA Moscow LLS and Slavinvestbank LLC | ITASRU | N/A | N/A | N/A |
| Hypothekenbank Frankfurt AG | Eurohypo AG | EHYPDE/ HYESDE | N/A | N/A | N/A |
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | N/A | N/A | N/A |
| JSC Trasta Komercbanka (BIC: KBRBLV) | N/A | KBRBLV | N/A | N/A | N/A |
| Uralsib Bank OAO | N/A | AVTBRU | N/A | N/A | N/A |

b) *Specific Transaction Request:* We request that Deutsche Bank Trust Company Americas provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below.  The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: Abu Dhabi Islamic Bank (BIC: ABDIAE)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T1 | 20,000,000.00 | 03-May-11 | Askar Amangeldiyev | unknown |

2779855.1

ii) Remitting Bank: Bank of Cyprus (BIC: BCYCPY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T18 | 5,000,000.00 | 09-Apr-10 | Lumette Corporation | CY5200200155000000407364806 |
| T19 | 5,000,000.00 | 27-Apr-10 | Lumette Corporation | CY5200200155000000407364806 |
| T20 | 2,002,506.96 | 18-Feb-11 | Bryllant Group Limited | CY2200200385000000403104606 |

iii) Remitting Bank: Eurobank EFG (BIC: EFGBCY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T25 | 4,350,533.97 | 22-Sep-08 | Georgios Papachristoforou | CY2201800030000201300002308 |
| T26 | 1,000,989.84 | 23-Dec-10 | Credo Ventures Ltd | 2011-00057523 |

iv) Remitting Bank: FBME Tanzania Ltd (BIC: FBMETZ)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T27 | 27,400,000.00 | 09-Jun-11 | Amber Limited | unknown |

v) Remitting Bank: Hellenic Bank (BIC: HEBACY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T28 | 1,990,966.41 | 18-Apr-11 | Sheldon Limited | 240-07-551637-01 |
| T29 | 1,992,000.00 | 20-Apr-11 | Sheldon Limited | 240-07-551637-01 |

vi) Remitting Bank: JSC The State Export-Import Bank of Ukraine (BIC: EXBSUA)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T36 | 1,211,270.00 | 13-Jun-08 | LLC Zemelny Capital | 2601 5010 0396 09 |
| T37 | 3,000,270.00 | 25-Jul-08 | LLC Zemelny Capital | 2600 5010 0396 09 |

vii) Remitting Bank: Marfin Laiki Bank (BIC: LIKICY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T38 | 4,000,000.00 | 21-Aug-08 | Amdover Limited | 178-32-143752 |
| T39 | 4,000,000.00 | 22-Aug-08 | Amdover Limited | 178-32-143752 |
| T40 | 4,000,000.00 | 26-Aug-08 | Amdover Limited | 178-32-143752 |
| T41 | 4,000,000.00 | 28-Aug-08 | Amdover Limited | 178-32-143752 |
| T42 | 4,000,000.00 | 01-Sep-08 | Amdover Limited | 178-32-143752 |
| T43 | 1,700,000.00 | 03-Sep-08 | Amdover Limited | 178-32-143752 |
| T44 | 1,082,919.30 | 09-Mar-10 | Tristana Holdings Limited | 178-32-192771 |

viii) Remitting Bank: OJSC Promsvyazbank, Cyprus Branch (BIC: PRMSCY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T45 | 1,450,000.00 | 28-Apr-05 | Grey Culver Ltd | 40807840900000016101 |
| T46 | 1,012,500.00 | 06-Sep-05 | Agravein Services Ltd | 40807840800000077101 |
| T47 | 3,200,000.00 | 19-Sep-05 | Agravein Services Ltd | 40807840800000077101 |
| T48 | 2,993,000.00 | 25-Oct-05 | Agravein Services Ltd | 40807840800000077101 |
| T49 | 2,731,000.00 | 25-Oct-05 | Agravein Services Ltd | 40807840800000077101 |
| T50 | 1,776,000.00 | 25-Oct-05 | Agravein Services Ltd | 40807840800000077101 |
| T51 | 5,500,000.00 | 02-Nov-05 | Agravein Services Ltd | 40807840800000077101 |
| T52 | 3,000,000.00 | 13-Dec-05 | Alliance Invest Limited | 40807840500000095001 |

27798S5.1

ix) Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T55 | 8,489,008.00 | 08-Sep-05 | BARBARAN LLC | LV13RTMB0000155806293 |
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB0000060806489 |

x) Remitting Bank: Trasta Komercbanka (BIC: KBRBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T61 | 7,000,000.00 | 15-Mar-05 | Bramex Management Inc | LV55KBRB111210649001 |

2779855.1

**Request to Habib American Bank**

a) *Bank Account Request:* There is no Bank Account Request to Habib American Bank.

b) *Specific Transaction Request:* We request that Habib American Bank provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: Hellenic Bank (BIC: HEBACY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T28 | 1,990,966.41 | 18-Apr-11 | Sheldon Limited | 240-07-551637-01 |
| T29 | 1,992,000.00 | 20-Apr-11 | Sheldon Limited | 240-07-551637-01 |

2779855.1

**Request to HSBC Bank USA, N.A.**

a) *Bank Account Request*: We request that HSBC Bank USA, N.A. provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | N/A | N/A | N/A |
| OJSC JSCB Rosbank | N/A | RSBNRU | N/A | N/A | N/A |
| Uralsib Bank OAO | N/A | AVTBRU | N/A | N/A | N/A |

b) *Specific Transaction Request*: We request that HSBC Bank USA, N.A. provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: Hellenic Bank (BIC: HEBACY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T28 | 1,990,966.41 | 18-Apr-11 | Sheldon Limited | 240-07-551637-01 |
| T29 | 1,992,000.00 | 20-Apr-11 | Sheldon Limited | 240-07-551637-01 |

2779855.1

ii) Remitting Bank: HSBC Bank PLC (BIC: MIDLGB)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T30 | 2,247,000.00 | 16-Nov-09 | Mesano Managent S.A. | GB98MIDL40051569204905 |
| T31 | 2,400,000.00 | 26-Nov-09 | Concord Distributing Services Ltd | GB76MIDL40051569204913 |
| T32 | 1,178,000.00 | 23-Dec-09 | Concord Distributing Services Ltd | GB76MIDL40051569204913 |

iii) Remitting Bank: Marfin Laiki Bank (BIC: LIKICY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T38 | 4,000,000.00 | 21-Aug-08 | Amdover Limited | 178-32-143752 |
| T39 | 4,000,000.00 | 22-Aug-08 | Amdover Limited | 178-32-143752 |
| T40 | 4,000,000.00 | 26-Aug-08 | Amdover Limited | 178-32-143752 |
| T41 | 4,000,000.00 | 28-Aug-08 | Amdover Limited | 178-32-143752 |
| T42 | 4,000,000.00 | 01-Sep-08 | Amdover Limited | 178-32-143752 |
| T43 | 1,700,000.00 | 03-Sep-08 | Amdover Limited | 178-32-143752 |
| T44 | 1,082,919.30 | 09-Mar-10 | Tristana Holdings Limited | 178-32-192771 |

iv) Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T55 | 8,489,008.00 | 08-Sep-05 | BARBARAN LLC | LV13RTMB0001558062593 |
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB0000660680689 |

2779855.1

**Israel Discount Bank of New York**

a) *Bank Account Request*: We request that Israel Discount Bank of New York provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | Israel Discount Bank, Tel Aviv | N/A | IDBLILIT |

b) *Specific Transaction Request*: There is no Specific Transaction Request to Israel Discount Bank of New York.

## Request to J.P. Morgan Chase Bank, N.A.

a) *Bank Account Request:* We request that J.P. Morgan Chase & Co. provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| AMT Bank LLC (BIC: ITASRU) | BTA Moscow LLS and Slavinvestbank LLC | ITASRU | N/A | N/A | N/A |
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | N/A | N/A | N/A |
| JSC Trasta Komercbanka (BIC: KBRBLV) | N/A | RTMBLV | National Bank of Canada, Montreal | N/A | BNDC CA MM |
| LGT (Schweiz) AG | Dresdner (Schweiz) AG | BLFLCH | LGT Bank in Lichtenstein | N/A | BLFLCHBB |
| Uralsib Bank OAO | N/A | AVTBRU | N/A | N/A | N/A |

b) *Specific Transaction Request:* We request that J.P. Morgan Chase & Co. provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: Abu Dhabi Islamic Bank (BIC: ABDIAE)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T1 | 20,000,000.00 | 03-May-11 | Askar Amangeldiyev | unknown |

2779855.1

ii)  Remitting Bank: AMT Bank LLC  (BIC: ITASRU)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. | Name of Remitting Bank At Date of Transaction |
|---|---|---|---|---|---|
| T15 | 6,040,000.00 | 19-Aug-08 | Barenholt Productions Inc | 40807840800000000148 | BTA Bank ILS Moscow |
| T17 | 2,491,000.00 | 22-Jan-10 | CJSC CENTRO-CAR 2000 | 40702840000000200092 | AMT Bank LLC |
| T16 | 13,107,000.00 | 24-Jul-09 | CJSC Stroyproekt | 40702840600000904204 | AMT Bank LLC |
| T2 | 9,999,999.99 | 04-Oct-06 | JSC Eurasia M4 | 40702840000000002494 | LLC Slavinvestbank |
| T3 | 1,500,517.22 | 27-Oct-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T4 | 21,000,485.81 | 01-Nov-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T5 | 25,000,478.13 | 27-Nov-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T6 | 9,100,540.35 | 05-Dec-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T9 | 7,200,525.39 | 16-Jan-07 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T11 | 20,800,492.24 | 07-Feb-07 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T12 | 3,500,000.04 | 20-Apr-07 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T8 | 5,000,000.00 | 27-Dec-06 | LLC Investhildingstroi | 40702840600000000004203 | LLC Slavinvestbank |
| T13 | 1,225,181.00 | 11-Jul-07 | LLC Investhildingstroi | 40702840600000000004203 | LLC Slavinvestbank |
| T7 | 15,450,000.00 | 20-Dec-06 | OOO Stroi Elite Limited | 40702840700000004297 | LLC Slavinvestbank |
| T10 | 8,836,750.00 | 30-Jan-07 | OOO Stroi Elite Limited | 40702840700000004297 | LLC Slavinvestbank |
| T14 | 3,999,970.70 | 04-Oct-07 | Sanesta Investments Ltd | 40808784070000000086 | LLC Slavinvestbank |

iii)  Remitting Bank: Bank of Cyprus (BIC: BCYPCY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T18 | 5,000,000.00 | 09-Apr-10 | Lumette Corporation | CY52002001550000004073648806 |
| T19 | 5,000,000.00 | 27-Apr-10 | Lumette Corporation | CY52002001550000004073648806 |
| T20 | 2,002,506.96 | 18-Feb-11 | Bryllant Group Limited | CY22002003850000004033104606 |

2779855.1

iv) Remitting Bank: BNP Paribas (Suisse) SA (BIC: BPPBCH)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T22 | 1,001,154.51 | 23-Feb-09 | Expedia Enterprises Limited | CH38 0868 6001 0861 5200 1 |

v) Remitting Bank: RBS Coutts Bank (BIC: COUTCH)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T23 | 1,750,000.00 | 10-Aug-09 | MTA Securities and Investments | CH51 0862 0111 1480 2200 1 |

vi) Remitting Bank: Emirates Bank International (BIC: EBILAE)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T24 | 15,000,000.00 | 18-Oct-06 | Atex International (FZC) | unknown |

vii) Remitting Bank: FBME Tanzania Ltd (BIC: FBMETZ)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T27 | 27,400,000.00 | 09-Jun-11 | Amber Limited | unknown |

viii) Remitting Bank: Hellenic Bank (BIC: HEBACY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T28 | 1,990,966.41 | 18-Apr-11 | Sheldon Limited | 240-07-551637-01 |
| T29 | 1,992,000.00 | 20-Apr-11 | Sheldon Limited | 240-07-551637-01 |

2779855.1

ix) Remitting Bank: JSC The State Export-Import Bank of Ukraine (BIC: EXBSUA)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T36 | 1,211,270.00 | 13-Jun-08 | LLC Zemelny Capital | 2601 5010 0396 09 |
| T37 | 3,000,270.00 | 25-Jul-08 | LLC Zemelny Capital | 2600 5010 0396 09 |

x) Remitting Bank: Marfin Laiki Bank (BIC: LIKICY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T38 | 4,000,000.00 | 21-Aug-08 | Amdover Limited | 178-32-143752 |
| T39 | 4,000,000.00 | 22-Aug-08 | Amdover Limited | 178-32-143752 |
| T40 | 4,000,000.00 | 26-Aug-08 | Amdover Limited | 178-32-143752 |
| T41 | 4,000,000.00 | 28-Aug-08 | Amdover Limited | 178-32-143752 |
| T42 | 4,000,000.00 | 01-Sep-08 | Amdover Limited | 178-32-143752 |
| T43 | 1,700,000.00 | 03-Sep-08 | Amdover Limited | 178-32-143752 |
| T44 | 1,082,919.30 | 09-Mar-10 | Tristana Holdings Limited | 178-32-192771 |

xi) Remitting Bank: OJSC Promsvyazbank, Cyprus Branch (BIC: PRMSCY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T45 | 1,450,000.00 | 28-Apr-05 | Grey Culver Ltd | 40807840900000016101 |
| T46 | 1,012,500.00 | 06-Sep-05 | Agravein Services Ltd | 40807840800000077101 |
| T47 | 3,200,000.00 | 19-Sep-05 | Agravein Services Ltd | 40807840800000077101 |
| T48 | 2,993,000.00 | 25-Oct-05 | Agravein Services Ltd | 40807840800000077101 |
| T49 | 2,731,000.00 | 25-Oct-05 | Agravein Services Ltd | 40807840800000077101 |
| T50 | 1,776,000.00 | 25-Oct-05 | Agravein Services Ltd | 40807840800000077101 |
| T51 | 5,500,000.00 | 02-Nov-05 | Agravein Services Ltd | 40807840800000077101 |
| T52 | 3,000,000.00 | 13-Dec-05 | Alliance Invest Limited | 40807840500000095001 |

xii) Remitting Bank: Public Bank (Hong Kong) Limited  (BIC: CBHKHK)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T54 | 3,006,174.42 | 20-Oct-06 | Maxray Logistics Limited | 717231146026 |

xiii)  Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T55 | 8,489,008.00 | 08-Sep-05 | BARBARAN LLC | LV13RTMB0000155806293 |
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB0000606806489 |

xiv)  Remitting Bank: Trasta Komercbanka (BIC: KBRBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T66 | 3,000,000.00 | 02-Apr-09 | Nyanga Ltd | LV20KBRB11125238001 |
| T67 | 1,000,000.00 | 19-Aug-09 | Perrycat Limited | LV05KBRB11121368001 |
| T68 | 1,000,000.00 | 24-Sep-09 | Perrycat Limited | LV05KBRB11121368001 |
| T69 | 1,000,000.00 | 17-Dec-09 | Perrycat Limited | LV05KBRB11121368001 |
| T70 | 1,000,000.00 | 01-Feb-10 | Perrycat Limited | LV05KBRB11121368001 |
| T71 | 1,000,000.00 | 18-Jun-10 | Perrycat Limited | LV05KBRB11121368001 |

**Request to Societe Generale**

a) *Bank Account Request:* There is no Bank Account Request to Societe Generale.

b) *Specific Transaction Request:* We request that Societe Generale provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: SG Private Banking (Suisse) S.A. (BIC: RUEGCH)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|-----|-------------|------|------------------|----------------------|
| T57 | 2,000,004.11 | 09-Jul-07 | Tylex CO. LTD | 154520 |
| T58 | 1,700,004.22 | 06-Aug-07 | Tylex CO. LTD | 154520 |
| T59 | 1,000,004.27 | 27-Sep-07 | Tylex CO. LTD | 154520 |

2779855.1

## Request to Standard Chartered Bank (previously known as American Express Bank)

a) *Bank Account Request:* We request that Standard Chartered Bank provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | N/A | N/A | N/A |
| Uralsib Bank OAO | N/A | AVTBRU | N/A | N/A | N/A |

b) *Specific Transaction Request:* We request that Standard Chartered Bank provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

   i) Remitting Bank: Hellenic Bank (BIC: HEBACY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T28 | 1,990,966.41 | 18-Apr-11 | Sheldon Limited | 240-07-551637-01 |
| T29 | 1,992,000.00 | 20-Apr-11 | Sheldon Limited | 240-07-551637-01 |

2779855.1

ii) Remitting Bank: Marfin Laiki Bank (BIC: LIKICY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T38 | 4,000,000.00 | 21-Aug-08 | Amdover Limited | 178-32-143752 |
| T39 | 4,000,000.00 | 22-Aug-08 | Amdover Limited | 178-32-143752 |
| T40 | 4,000,000.00 | 26-Aug-08 | Amdover Limited | 178-32-143752 |
| T41 | 4,000,000.00 | 28-Aug-08 | Amdover Limited | 178-32-143752 |
| T42 | 4,000,000.00 | 01-Sep-08 | Amdover Limited | 178-32-143752 |
| T43 | 1,700,000.00 | 03-Sep-08 | Amdover Limited | 178-32-143752 |

iii) Remitting Bank: OJSC Promsvyazbank, Cyprus Branch (BIC: PRMSCY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T45 | 1,450,000.00 | 28-Apr-05 | Grey Culver Ltd | 40807840900000016101 |
| T46 | 1,012,500.00 | 06-Sep-05 | Agravein Services Ltd | 40807840800000077101 |
| T47 | 3,200,000.00 | 19-Sep-05 | Agravein Services Ltd | 40807840800000077101 |
| T48 | 2,993,000.00 | 25-Oct-05 | Agravein Services Ltd | 40807840800000077101 |
| T49 | 2,731,000.00 | 25-Oct-05 | Agravein Services Ltd | 40807840800000077101 |
| T50 | 1,776,000.00 | 25-Oct-05 | Agravein Services Ltd | 40807840800000077101 |
| T51 | 5,500,000.00 | 02-Nov-05 | Agravein Services Ltd | 40807840800000077101 |
| T52 | 3,000,000.00 | 13-Dec-05 | Alliance Invest Limited | 40807840500000095001 |

iv) Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB0000606806489 |

2779855.1

v) Remitting Bank: Standard Chartered Bank, Abu Dhabi (BIC: SCBLAE)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T60 | 15,000,000.00 | 18-Oct-06 | R&B Gulf & International Investment (FZE) | unknown |

2779855.1

**Request to The Bank of New York Mellon**

a) *Bank Account Request*: We request that The Bank of New York Mellon provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name: | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| AMT Bank LLC (BIC: ITASRU) | BTA Moscow LLS and Slavinvestbank LLC | ITASRU | N/A | N/A | N/A |
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | National Westminster Bank PLC | N/A | NWBKGB /RBOSGB |
| OJSC JSCB Rosbank | N/A | RSBNRU | N/A | N/A | N/A |
| Uralsib Bank OAO | N/A | AVTBRU | N/A | N/A | N/A |

b) *Specific Transaction Request*: We request that The Bank of New York Mellon provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: Abu Dhabi Islamic Bank (BIC: ABDIAE)

| No. | Value (USD) | Date: | Remitter Details: | Remitter Account No. |
|---|---|---|---|---|
| T1 | 20,000,000.00 | 03-May-11 | Askar Amangeldiyev | unknown |

2779855.1

ii) Remitting Bank: AMT Bank LLC  (BIC: ITASRU)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. | Name of Remitting Bank At Date of Transaction |
|---|---|---|---|---|---|
| T15 | 6,040,000.00 | 19-Aug-08 | Barenholt Productions Inc | 40807840800000000148 | BTA Bank LLS Moscow |
| T17 | 2,491,000.00 | 22-Jan-10 | CJSC CENTRO-CAR 2000 | 40702840000000092 | AMT Bank LLC |
| T16 | 13,107,000.00 | 24-Jul-09 | CJSC Stroyproekt | 40702840600009004204 | AMT Bank LLC |
| T2 | 9,999,999.99 | 04-Oct-06 | JSC Eurasia M4 | 40702840000000002494 | LLC Slavinvestbank |
| T3 | 1,500,517.22 | 27-Oct-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T4 | 21,000,485.81 | 01-Nov-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T5 | 25,000,478.13 | 27-Nov-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T6 | 9,100,540.35 | 05-Dec-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T9 | 7,200,525.39 | 16-Jan-07 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T11 | 20,800,492.24 | 07-Feb-07 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T12 | 3,500,000.04 | 20-Apr-07 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T8 | 5,000,000.00 | 27-Dec-06 | LLC Investhildingstroi | 40702840600000000004203 | LLC Slavinvestbank |
| T13 | 1,225,181.00 | 11-Jul-07 | LLC Investhildingstroi | 40702840600000000004203 | LLC Slavinvestbank |
| T7 | 15,450,000.00 | 20-Dec-06 | OOO Stroi Elite Limited | 40702840700000004297 | LLC Slavinvestbank |
| T10 | 8,836,750.00 | 30-Jan-07 | OOO Stroi Elite Limited | 40702840700000004297 | LLC Slavinvestbank |
| T14 | 3,999,970.70 | 04-Oct-07 | Sanesta Investments Ltd | 40807840700000000086 | LLC Slavinvestbank |

iii) Remitting Bank: Hellenic Bank (BIC: HEBACY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T28 | 1,990,966.41 | 18-Apr-11 | Sheldon Limited | 240-07-551637-01 |
| T29 | 1,992,000.00 | 20-Apr-11 | Sheldon Limited | 240-07-551637-01 |

2779855.1

iv) Remitting Bank: Marfin Laiki Bank (BIC: LIKICY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T38 | 4,000,000.00 | 21-Aug-08 | Amdover Limited | 178-32-143752 |
| T39 | 4,000,000.00 | 22-Aug-08 | Amdover Limited | 178-32-143752 |
| T40 | 4,000,000.00 | 26-Aug-08 | Amdover Limited | 178-32-143752 |
| T41 | 4,000,000.00 | 28-Aug-08 | Amdover Limited | 178-32-143752 |
| T42 | 4,000,000.00 | 01-Sep-08 | Amdover Limited | 178-32-143752 |
| T43 | 1,700,000.00 | 03-Sep-08 | Amdover Limited | 178-32-143752 |
| T44 | 1,082,919.30 | 09-Mar-10 | Tristana Holdings Limited | 178-32-192771 |

v) Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB0000608066489 |

27798S5.1

## Request to The Northern Trust Company

a) *Bank Account Request:* We request that The Northern Trust International Banking Corporation provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|-----------|---------------|--------|-----------------------------------|---------------|-------------------|
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | National Westminster Bank PLC | N/A | NWBKGB/ RBOSGB |

b) *Specific Transaction Request:* There is no Specific Transaction request to The Northern Trust International Banking Corporation.

2779855.1

**Request to UBS AG**

a) *Bank Account Request:* We request that UBS AG, Stamford provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Page Reference | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|---|
| AMT Bank LLC (BIC: ITASRU) | BTA Moscow LLS and Slavinvestbank LLC | ITASRU | 11 | UBS AG, Zurich | N/A | UBSWCH /UBSACH |
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | 464 | N/A | N/A | N/A |
| LGT (Schweiz) AG | Dresdner (Schweiz) AG | BLFLCH | 302 | N/A | N/A | N/A |

b) *Specific Transaction Request:* We request that UBS AG, Stamford provide all outgoing SWIFT message types MT103, MT202 and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: AMT Bank LLC (BIC: ITASRU)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. | Name of Remitting Bank At Date of Transaction |
|---|---|---|---|---|---|
| T15 | 6,040,000.00 | 19-Aug-08 | Barenholt Productions Inc | 40807840800000000148 | BTA Bank LLS Moscow |
| T17 | 2,491,000.00 | 22-Jan-10 | CJSC CENTRO-CAR 2000 | 40702840000000200092 | AMT Bank LLC |
| T16 | 13,107,000.00 | 24-Jul-09 | CJSC Stroyproekt | 40702840600000904204 | AMT Bank LLC |
| T2 | 9,999,999.99 | 04-Oct-06 | JSC Eurasia M4 | 40702840000000002494 | LLC Slavinvestbank |
| T3 | 1,500,517.22 | 27-Oct-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. | Remitting Bank |
|---|---|---|---|---|---|
| T4 | 21,000,485.81 | 01-Nov-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T5 | 25,000,478.13 | 27-Nov-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T6 | 9,100,540.35 | 05-Dec-06 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T9 | 7,200,525.39 | 16-Jan-07 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T11 | 20,800,492.24 | 07-Feb-07 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T12 | 3,500,000.04 | 20-Apr-07 | JSC Eurasia M4 | 40702840300000003041 | LLC Slavinvestbank |
| T8 | 5,000,000.00 | 27-Dec-06 | LLC Investhildingstroi | 40702840600000000004203 | LLC Slavinvestbank |
| T13 | 1,225,181.00 | 11-Jul-07 | LLC Investhildingstroi | 40702840600000000004203 | LLC Slavinvestbank |
| T7 | 15,450,000.00 | 20-Dec-06 | OOO Stroi Elite Limited | 40702840700000004297 | LLC Slavinvestbank |
| T10 | 8,836,750.00 | 30-Jan-07 | OOO Stroi Elite Limited | 40702840700000004297 | LLC Slavinvestbank |
| T14 | 3,999,970.70 | 04-Oct-07 | Sanesta Investments Ltd | 40807840700000000086 | LLC Slavinvestbank |

ii) Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T55 | 8,489,008.00 | 08-Sep-05 | BARBARAN LLC | LV13RTMB0000155806293 |
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB0000060806489 |

iii) Remitting Bank: UBS AG

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T72 | 1,000,000.00 | 11-Mar-05 | Teronk Finance LLP | 0240747716 |

2779855.1

**Request to Union Bank, N.A. (previously known as Union Bank of California)**

a) *Bank Account Request*: We request that Union Bank, N.A. provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| AMT Bank LLC (BIC: ITASRU) | BTA Moscow LLS and Slavinvestbank LLC | ITASRU | N/A | N/A | N/A |
| OJSC JSCB Rosbank | N/A | RSBNRU | N/A | N/A | N/A |

b) *Specific Transaction Request*: There is no request Specific Transaction Request to Union Bank, N.A.

**Request to Wells Fargo Bank, N.A. (previously known as Wachovia Bank, N.A.)**

a) *Bank Account Request:* We request that Wells Fargo & Co. provide all incoming and outgoing SWIFT message types MT103, MT202 and MT202COV for all transactions that occurred between January 1, 2005 and December 31, 2012, where the remitter or beneficiary is any of the companies listed in Annex A. The remitting bank and beneficiary bank should be limited by the names of the banks listed below.

| Bank Name | Previous Name | BIC | Intermediary Name | Previous Name | BIC |
|---|---|---|---|---|---|
| AMT Bank LLC (BIC: ITASRU) | BTA Moscow LLS and Slavinvestbank LLC | ITASRU | N/A | N/A | N/A |
| JSC Rietumu Banka (BIC: RTMBLV) | N/A | RTMBLV | N/A | N/A | N/A |
| Uralsib Bank OAO | N/A | AVTBRU | N/A | N/A | N/A |

b) *Specific Transaction Request:* We request that Wells Fargo & Co. provide all outgoing SWIFT message types MT103, MT202, and MT202COV received up to and including two months from the date of each transaction listed below. The searches should be limited by the name of the remitter and the remitting bank listed for each of the corresponding transactions.

i) Remitting Bank: AMT Bank LLC (BIC: ITASRU)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. | Name of Remitting Bank At Date of Transaction |
|---|---|---|---|---|---|
| T15 | 6,040,000.00 | 19-Aug-08 | Barenholt Productions Inc | 40807840800000000148 | BTA Bank LLS Moscow |
| T17 | 2,491,000.00 | 22-Jan-10 | CJSC CENTRO-CAR 2000 | 40702840000000200092 | AMT Bank LLC |
| T16 | 13,107,000.00 | 24-Jul-09 | CJSC Stroyproekt | 40702840600009004204 | AMT Bank LLC |

2779855.1

ii) Remitting Bank: Hellenic Bank (BIC: HEBACY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T28 | 1,990,966.41 | 18-Apr-11 | Sheldon Limited | 240-07-551637-01 |
| T29 | 1,992,000.00 | 20-Apr-11 | Sheldon Limited | 240-07-551637-01 |

iii) Remitting Bank: Marfin Laiki Bank (BIC: LIKICY)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T44 | 1,082,919.30 | 09-Mar-10 | Tristana Holdings Limited | 178-32-192771 |

iv) Remitting Bank: Rietumu Banka (BIC: RTMBLV)

| No. | Value (USD) | Date | Remitter Details | Remitter Account No. |
|---|---|---|---|---|
| T55 | 8,489,008.00 | 08-Sep-05 | BARBARAN LLC | LV13RTMB0000155806293 |
| T56 | 6,544,201.00 | 06-Jun-08 | Larsen Markets LLP | LV10RTMB0000060806489 |

2779855.1